**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

04 11600 RGS

| | |
|---|---|
| JAMES GILLIAM, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>FIDELITY MANAGEMENT AND RESEARCH COMPANY, FMR CO., INC., FMR CORP., FIDELITY DISTRIBUTORS CORPORATION, EDWARD C. JOHNSON III, ABIGAIL P. JOHNSON, EDWARD C. JOHNSON IV, ELIZABETH L. JOHNSON, PETER S. LYNCH, LAURA B. CRONIN, ROBERT L. REYNOLDS, ROBERT C. POZEN, J. GARY BURKHEAD, J. MICHAEL COOK, RALPH F. COX, ROBERT M. GATES, DONALD J. KIRK, MARIE L. KNOWLES, NED C. LAUTENBACH, MARVIN L. MANN, WILLIAM O. MCCOY, WILLIAM S. STAVROPOULOS, GEORGE H. HEILMEIER, GERALD C. MCDONOUGH, THOMAS R. WILLIAMS, and JOHN DOES 1-100,<br><br>Defendants,<br><br>FIDELITY ADVISOR AGGRESSIVE GROWTH FUND, FIDELITY ADVISOR ASSET ALLOCATION FUND, FIDELITY ADVISOR BALANCED FUND, FIDELITY ADVISOR BIOTECHNOLOGY FUND, FIDELITY ADVISOR CALIFORNIA MUNICIPAL INCOME FUND, FIDELITY ADVISOR CONSUMER INDUSTRIES FUND, FIDELITY ADVISOR CYCLICAL INDUSTRIES FUND, FIDELITY ADVISOR DEVELOPING COMMUNICATIONS FUND, FIDELITY ADVISOR DIVERSIFIED INTERNATIONAL FUND, FIDELITY ADVISOR DIVIDEND GROWTH FUND, FIDELITY ADVISOR | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT FOR EXCESSIVE FEES IN VIOLATION OF SECTIONS 34(b), 36(b) AND 48(a) OF THE INVESTMENT COMPANY ACT AND SECTIONS 206 AND 215 OF THE INVESTMENT ADVISERS ACT, AND FOR BREACHES OF FIDUCIARY DUTY**<br><br>MAGISTRATE JUDGE Bowler<br><br>**JURY TRIAL DEMANDED**<br><br>RECEIPT # 57382<br>AMOUNT $____<br>SUMMONS ISSUED Yes<br>LOCAL RULE 4.1_____<br>WAIVER FORM_____<br>MCF ISSUED_____<br>BY DPTY CLK_____<br>DATE 1/19/04 |

**[Caption Continues On Next Page]**

DYNAMIC CAPITAL APPRECIATION FUND,  :
FIDELITY ADVISOR ELECTRONICS FUND,  :
FIDELITY ADVISOR EMERGING ASIA FUND,  :
FIDELITY ADVISOR EMERGING MARKETS  :
FUND, FIDELITY ADVISOR EMERGING  :
MARKETS INCOME FUND, FIDELITY  :
ADVISOR EQUITY GROWTH FUND,  :
FIDELITY ADVISOR EQUITY INCOME  :
FUND, FIDELITY ADVISOR EQUITY VALUE  :
FUND, FIDELITY ADVISOR EUROPE  :
CAPITAL APPRECIATION FUND, FIDELITY  :
ADVISOR FIFTY FUND, FIDELITY ADVISOR  :
FINANCIAL SERVICES FUND, FIDELITY  :
ADVISOR FLOATING RATE HIGH INCOME  :
FUND, FIDELITY ADVISOR FREEDOM 2000  :
FUND, FIDELITY ADVISOR FREEDOM 2005  :
FUND, FIDELITY ADVISOR FREEDOM 2010  :
FUND, FIDELITY ADVISOR FREEDOM 2015  :
FUND, FIDELITY ADVISOR FREEDOM 2020  :
FUND, FIDELITY ADVISOR FREEDOM 2025  :
FUND, FIDELITY ADVISOR FREEDOM 2030  :
FUND, FIDELITY ADVISOR FREEDOM 2035  :
FUND, FIDELITY ADVISOR FREEDOM 2040  :
FUND, FIDELITY ADVISOR FREEDOM  :
INCOME FUND, FIDELITY ADVISOR  :
GLOBAL EQUITY FUND, FIDELITY  :
ADVISOR GOVERNMENT INVESTMENT  :
FUND, FIDELITY ADVISOR GROWTH &  :
INCOME FUND, FIDELITY ADVISOR  :
GROWTH & INCOME FUND II, FIDELITY  :
ADVISOR GROWTH OPPORTUNITIES FUND,  :
FIDELITY ADVISOR HEALTH CARE FUND,  :
FIDELITY ADVISOR HIGH INCOME  :
ADVANTAGE FUND, FIDELITY ADVISOR  :
HIGH INCOME FUND, FIDELITY ADVISOR  :
INFLATION-PROTECTED BOND FUND,  :
FIDELITY ADVISOR INTERMEDIATE BOND  :
FUND, FIDELITY ADVISOR  :
INTERNATIONAL CAPITAL APPRECIATION  :
FUND, FIDELITY ADVISOR  :
INTERNATIONAL SMALL CAP FUND,  :
FIDELITY ADVISOR INVESTMENT GRADE  :
BOND FUND, FIDELITY ADVISOR JAPAN  :

**[Caption Continues On Next Page]**

                                                           x

FUND, FIDELITY ADVISOR KOREA FUND,    :
FIDELITY ADVISOR LARGE CAP FUND,    :
FIDELITY ADVISOR LATIN AMERICA FUND,  :
FIDELITY ADVISOR LEVERAGED    :
COMPANY STOCK FUND, FIDELITY    :
ADVISOR MID CAP FUND, FIDELITY    :
ADVISOR MORTGAGE SECURITIES FUND,    :
FIDELITY ADVISOR MUNICIPAL INCOME    :
FUND, FIDELITY ADVISOR NATURAL    :
RESOURCES FUND, FIDELITY ADVISOR    :
NEW INSIGHTS FUND, FIDELITY ADVISOR    :
NEW YORK MUNICIPAL INCOME FUND,    :
FIDELITY ADVISOR OVERSEAS FUND,    :
FIDELITY ADVISOR REAL ESTATE FUND,    :
FIDELITY ADVISOR SHORT FIXED-INCOME    :
FUND, FIDELITY ADVISOR SHORT-    :
INTERMEDIATE MUNICIPAL INCOME    :
FUND, FIDELITY ADVISOR SMALL CAP    :
FUND, FIDELITY ADVISOR STRATEGIC    :
DIVIDEND & INCOME FUND, FIDELITY    :
ADVISOR STRATEGIC GROWTH FUND,    :
FIDELITY ADVISOR STRATEGIC INCOME    :
FUND, FIDELITY ADVISOR TAX MANAGED    :
STOCK FUND, FIDELITY ADVISOR    :
TECHNOLOGY FUND, FIDELITY ADVISOR    :
TELECOMMUNICATIONS & UTILITIES    :
GROWTH FUND, FIDELITY ADVISOR    :
VALUE FUND, FIDELITY ADVISOR VALUE    :
LEADERS FUND, FIDELITY ADVISOR    :
VALUE STRATEGIES FUND, FIDELITY    :
AGGRESSIVE INTERNATIONAL FUND,    :
FIDELITY AIR TRANSPORTATION    :
PORTFOLIO, FIDELITY ARIZONA    :
MUNICIPAL MONEY MARKET FUND,    :
FIDELITY ASSET MANAGER, FIDELITY    :
ASSET MANAGER: AGGRESSIVE, FIDELITY  :
ASSET MANAGER: GROWTH, FIDELITY    :
ASSET MANAGER: INCOME, FIDELITY    :
AUTOMOTIVE PORTFOLIO, FIDELITY    :
BANKING PORTFOLIO, FIDELITY BLUE    :
CHIP GROWTH FUND, FIDELITY BLUE CHIP  :
VALUE FUND, FIDELITY    :
BROKERAGE/INVESTMENT MANAGEMENT    :

                                                           x

**[Caption Continues On Next Page]**

```
                                                    x
_____
MARKET FUND, FIDELITY CANADA FUND,      :
FIDELITY CAPITAL & INCOME FUND,         :
FIDELITY CAPITAL APPRECIATION FUND,     :
FIDELITY CASH RESERVES, FIDELITY        :
CHEMICALS PORTFOLIO, FIDELITY CHINA     :
REGION FUND, FIDELITY COMPUTERS         :
PORTFOLIO, FIDELITY CONNECTICUT         :
MUNICIPAL MONEY MARKET FUND,            :
FIDELITY CONSTRUCTION & HOUSING         :
PORTFOLIO, FIDELITY CONTRAFUND,         :
FIDELITY CONVERTIBLE SECURITIES         :
FUND, FIDELITY DEFENSE & AEROSPACE      :
PORTFOLIO, FIDELITY DISCIPLINED         :
EQUITY FUND, FIDELITY DISCOVERY         :
FUND, FIDELITY ENERGY PORTFOLIO,        :
FIDELITY ENERGY SERVICE PORTFOLIO,      :
FIDELITY ENVIRONMENTAL PORTFOLIO,       :
FIDELITY EQUITY-INCOME FUND,            :
FIDELITY EQUITY-INCOME FUND II,         :
FIDELITY EUROPE FUND, FIDELITY          :
EXPORT AND MULTINATIONAL FUND,          :
FIDELITY FLORIDA MUNICIPAL MONEY        :
MARKET FUND, FIDELITY FOCUSED STOCK     :
FUND, FIDELITY FOOD & AGRICULTURE       :
PORTFOLIO, FIDELITY FOUR-IN-ONE         :
INDEX FUND, FIDELITY FUND, FIDELITY     :
GINNIE MAE FUND, FIDELITY GLOBAL        :
BALANCED FUND, FIDELITY GOLD            :
PORTFOLIO, FIDELITY GOVERNMENT          :
INCOME FUND, FIDELITY GROWTH            :
COMPANY FUND, FIDELITY HOME             :
FINANCE PORTFOLIO, FIDELITY             :
INDEPENDENCE FUND, FIDELITY             :
INDUSTRIAL EQUIPMENT PORTFOLIO,         :
FIDELITY INDUSTRIAL MATERIALS           :
PORTFOLIO, FIDELITY INSURANCE           :
PORTFOLIO, FIDELITY INTERMEDIATE        :
GOVERNMENT INCOME FUND, FIDELITY        :
INTERNATIONAL GROWTH & INCOME           :
FUND, FIDELITY JAPAN SMALLER            :
COMPANIES FUND, FIDELITY LARGE CAP      :
STOCK FUND, FIDELITY LEISURE            :
PORTFOLIO, FIDELITY LOW-PRICED STOCK    :
_____
                                                    x
```

**[Caption Continues On Next Page]**

```
_____ x
FUND, FIDELITY MAGELLAN FUND,           :
FIDELITY MASSACHUSETTS MUNICIPAL        :
MONEY MARKET FUND, FIDELITY             :
MEDICAL DELIVERY PORTFOLIO,             :
FIDELITY MEDICAL EQUIPMENT/SYSTEMS      :
PORTFOLIO, FIDELITY MICHIGAN            :
MUNICIPAL MONEY MARKET FUND,            :
FIDELITY MID-CAP STOCK FUND, FIDELITY   :
MONEY MARKET TRUST: RETIREMENT          :
GOVERNMENT MONEY MARKET                 :
PORTFOLIO, FIDELITY MONEY MARKET        :
TRUST: RETIREMENT MONEY MARKET          :
PORTFOLIO, FIDELITY MULTIMEDIA          :
PORTFOLIO, FIDELITY MUNICIPAL MONEY     :
MARKET FUND, FIDELITY NASDAQ            :
COMPOSITE INDEX FUND, FIDELITY          :
NATURAL GAS PORTFOLIO, FIDELITY         :
NETWORKING & INFRASTRUCTURE             :
PORTFOLIO, FIDELITY NEW JERSEY          :
MUNICIPAL MONEY MARKET FUND,            :
FIDELITY NEW MARKETS INCOME FUND,       :
FIDELITY NEW MILLENNIUM FUND,           :
FIDELITY NEW YORK MUNICIPAL MONEY       :
MARKET FUND, FIDELITY NORDIC FUND,      :
FIDELITY OHIO MUNICIPAL MONEY           :
MARKET FUND, FIDELITY OTC PORTFOLIO,    :
FIDELITY PACIFIC BASIN FUND, FIDELITY   :
PAPER & FOREST PRODUCTS PORTFOLIO,      :
FIDELITY PENNSYLVANIA MUNICIPAL         :
MONEY MARKET FUND, FIDELITY             :
PHARMACEUTICALS PORTFOLIO, FIDELITY     :
PURITAN FUND, FIDELITY REAL ESTATE      :
INCOME FUND, FIDELITY RETAILING         :
PORTFOLIO, FIDELITY SELECT MONEY        :
MARKET PORTFOLIO, FIDELITY SHORT-       :
TERM BOND FUND, FIDELITY SMALL CAP      :
INDEPENDENCE FUND, FIDELITY SMALL       :
CAP RETIREMENT FUND, FIDELITY SMALL     :
CAP STOCK FUND, FIDELITY                :
SOFTWARE/COMPUTER SERVICES              :
PORTFOLIO, FIDELITY SOUTHEAST ASIA      :
FUND, FIDELITY SPARTAN GOVERNMENT       :
INCOME FUND, FIDELITY STOCK             :
_____ x
```

**[Caption Continues On Next Page]**

                                                           **x**

SELECTOR FUND, FIDELITY STRUCTURED    :
LARGE CAP GROWTH FUND, FIDELITY    :
STRUCTURED LARGE CAP VALUE FUND,    :
FIDELITY STRUCTURED MID CAP GROWTH    :
FUND, FIDELITY STRUCTURED MID CAP    :
VALUE FUND, FIDELITY TAX-FREE MONEY    :
MARKET FUND, FIDELITY TOTAL BOND    :
FUND, FIDELITY TRANSPORTATION    :
PORTFOLIO, FIDELITY TREND FUND,    :
FIDELITY U.S. BOND INDEX FUND,    :
FIDELITY U.S. GOVERNMENT RESERVES,    :
FIDELITY ULTRA-SHORT BOND FUND,    :
FIDELITY UTILITIES FUND, FIDELITY    :
UTILITIES GROWTH PORTFOLIO, FIDELITY    :
VALUE DISCOVERY FUND, FIDELITY    :
WIRELESS PORTFOLIO, FIDELITY    :
WORLDWIDE FUND, SPARTAN 500 INDEX    :
FUND, SPARTAN ARIZONA MUNICIPAL    :
INCOME FUND, SPARTAN CA MUNICIPAL    :
MONEY MARKET FUND, SPARTAN    :
CALIFORNIA MUNICIPAL INCOME FUND,    :
SPARTAN CONNECTICUT MUNICIPAL    :
INCOME FUND, SPARTAN EXTENDED    :
MARKET INDEX FUND, SPARTAN FLORIDA    :
MUNICIPAL INCOME FUND, SPARTAN    :
INTERMEDIATE MUNICIPAL INCOME    :
FUND, SPARTAN INTERNATIONAL INDEX    :
FUND, SPARTAN INVESTMENT GRADE    :
BOND FUND, SPARTAN MA MUNICIPAL    :
MONEY MARKET FUND, SPARTAN    :
MARYLAND MUNICIPAL INCOME FUND,    :
SPARTAN MASSACHUSETTS MUNICIPAL    :
INCOME FUND, SPARTAN MICHIGAN    :
MUNICIPAL INCOME FUND, SPARTAN    :
MINNESOTA MUNICIPAL INCOME FUND,    :
SPARTAN MONEY MARKET FUND,    :
SPARTAN MUNICIPAL INCOME FUND,    :
SPARTAN MUNICIPAL MONEY FUND,    :
SPARTAN NEW JERSEY MUNICIPAL    :
INCOME FUND, SPARTAN NEW YORK    :
MUNICIPAL INCOME FUND, SPARTAN NJ    :
MUNICIPAL MONEY MARKET FUND,    :
SPARTAN NY MUNICIPAL MONEY MARKET    :

                                                           **x**

**[Caption Continues On Next Page]**

_____ x
FUND, SPARTAN OHIO MUNICIPAL INCOME :
FUND, SPARTAN PENNSYLVANIA :
MUNICIPAL INCOME FUND, SPARTAN :
SHORT-INTERMEDIATE MUNICIPAL FUND, :
SPARTAN TAX-FREE BOND FUND, :
SPARTAN TOTAL MARKET INDEX FUND, :
SPARTAN U.S. EQUITY INDEX FUND, :
SPARTAN U.S. GOVERNMENT MONEY :
MARKET FUND, SPARTAN U.S. TREASURY :
MONEY MARKET FUND,(collectively known as :
the "FIDELITY FUNDS"), :
:
         Nominal Defendants. :
_____ x

Plaintiff, by and through his counsel, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, media reports, news articles, academic literature, and academic studies. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a class action on behalf of investors in mutual funds belonging to the Fidelity Investments family of mutual funds (*i.e.,* the "Fidelity Funds," as defined in the caption above and on the list annexed hereto as Exhibit A) and derivatively on behalf of the Fidelity Funds, against the Fidelity Funds investment advisers, the Fidelity Funds principal underwriter, the investment advisers' and underwriter's corporate parents and the Fidelity Funds trustees.

2.      This complaint alleges that FMR Corp. (d/b/a Fidelity Investments) and its affiliated investment advisers and distributor, Fidelity Distributors Corporation ("FDC") (collectively referred to herein as "Fidelity"), drew upon the assets of the Fidelity Funds to pay brokers to aggressively push Fidelity Funds over other funds, and that Fidelity concealed such payments from investors by disguising them as brokerage commissions. Such brokerage commissions, though payable from fund assets, were not disclosed to investors in the Fidelity Funds public filings or elsewhere.

3.      Thus Fidelity Funds investors were induced to purchase Fidelity Funds by brokers who received undisclosed payments from Fidelity to push Fidelity Funds over other mutual funds and who therefore had an undisclosed conflict of interest. Then, once invested in one or

more of the Fidelity Funds, Fidelity Funds investors were charged and paid undisclosed fees that were improperly used, in part, to pay brokers to aggressively push Fidelity Funds to still other brokerage clients.

4.      Fidelity was motivated to make these secret payments to finance the improper marketing of Fidelity Funds because its fees were calculated as a percentage of the funds' average daily net asset value and, therefore, tended to increase as the number of Fidelity Funds investors grew.  Fidelity attempted to justify this conduct on the ground that by increasing the Fidelity Funds assets, they were creating economies of scale that inured to the benefit of investors.  Once an adviser's assets under management reach a critical mass, however, each additional dollar of revenue is virtually pure profit, since the larger a portfolio, the greater the benefits from economies of scale and the less it costs per dollar invested to provide investment advisory services.  In truth and in fact, Fidelity Funds investors received none of the benefits of these purported economies of scale.

5.      Yet, during the Class Period (as defined herein), Fidelity continued to skim millions from the Fidelity Funds to finance its ongoing marketing campaign.  The Fidelity Funds trustees, who purported to be Fidelity Funds investor watchdogs, knowingly or recklessly permitted this conduct to occur.

6.      By engaging in this conduct, Fidelity and the defendant entities that control it breached their statutorily-defined fiduciary duties under Sections 36(a) and (b) of the Investment Company Act of 1940 (the "Investment Company Act") and Section 206 of the Investment Advisers Act of 1940 (the "Investment Advisers Act"), breached their common law fiduciary duties, and knowingly aided and abetted the brokers in the breach of fiduciary duties to their clients.  Fidelity also violated Section 34(b) of the Investment Company Act because, to further

2

its improper course of conduct, it made untrue statements of material fact in fund registration

statements and omitted to disclose material facts concerning the procedure for determining the

amount of fees payable to Fidelity and concerning the improper uses to which the fees were put.

Additionally, the Fidelity Funds trustees breached their statutory and common law fiduciary

duties to the Fidelity Funds investors by knowingly and/or recklessly allowing the improper

conduct alleged herein to occur and harm Fidelity Funds investors.

7.     On January 28, 2004, *The Los Angeles Times* published an article about a Senate

committee hearing on mutual fund abuses which stated, in pertinent part, as follows:

> "The mutual fund industry is indeed the world's largest skimming
> operation," said Sen. Peter Fitzgerald (R-Ill.), chairman of the
> panel, comparing the scandal-plagued industry to "a $7-trillion
> trough" exploited by fund managers, brokers and other insiders.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 34(b), 36(b) and

48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and 80a-47(a),

Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§80b-6 and 80b-15, and

common law.

9.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 44 of the Investment Company Act, 15 U.S.C. §80a-43; Section 214 of the Investment

Advisers Act, 15 U.S.C. §80b-14; and 28 U.S.C. § 1391(b).

10.     Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District.

Defendants conducted other substantial business within this District and many Class members

reside within this District. Defendants Fidelity Management and Research Company ("FMR"),

3

FMR Co., Inc. ("FMRC"), FMR Corp. and FDC were active participants in the wrongful conduct alleged herein and are headquartered within this District, as described below.

11.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.    Plaintiff James Gilliam purchased during the Class Period and continues to own shares or units of the Fidelity Diversified International Fund (Sym: FDIVX), the Fidelity Pacific Basin Fund (Sym: FPBFX) and the Fidelity China Region Fund (Sym: FHKCX) and has been damaged by the conduct alleged herein.

13.    Defendant FMR is registered as an investment adviser under the Investment Advisers Act and managed and advised the Fidelity Funds during the Class Period. FMR had overall responsibility for directing each fund's investments and handling its business affairs. Investment management fees payable to FMR are calculated as a percentage of the funds' average net assets. As of March 28, 2002, FMR had approximately $13.6 billion in discretionary assets under management. The primary business address of FMR is One Federal Street, Boston, Massachusetts 02110.

14.    Defendant FMRC is registered as an investment adviser under the Investment Advisers Act and served as the sub-adviser for the Fidelity Funds during the Class Period and had day-to-day responsibility for choosing investments for the funds. FMR pays FMRC for its providing sub-advisory services. FMRC is an affiliate of FMR and as of March 28, 2002, had approximately $543.8 billion in assets under management. The primary business address of FMRC is One Federal Street, Boston, Massachusetts 02110.

4

15.    Defendant FMR Corp., a corporation organized in 1972, is the ultimate parent company of FMR and FMRC.  During the Class Period, FMR Corp. and its subsidiaries' primary business activities included the provision of investment advisory, management and certain fiduciary services for individual and institutional investors, and the provision of securities brokerage services.  Members of defendant Edward C. Johnson III's ("Ned Johnson") family, including defendants Ned Johnson and Abigail Johnson, as well as Abigail Johnson's brother, Edward C. Johnson IV and her sister Elizabeth L. Johnson (the "Johnson Family Group"), are the predominant owners of Class B shares of common stock of FMR Corp., a private corporation, representing approximately 49% of the voting power of FMR Corp.  The Johnson Family Group and all other Class B shareholders have entered into a shareholders' voting agreement under which all Class B shares will be voted in accordance with the majority vote of Class B shares. Accordingly, through their ownership of voting common stock and the execution of the shareholders' voting agreement, the Johnson Family Group may be deemed, under the Investment Company Act, to form a controlling group with respect to FMR Corp.  The remaining 51% of the firm's Class B shares are owned by other Fidelity employees.  The principal business address of FMR Corp. is 82 Devonshire Street, Boston, MA 02109.

16.    Defendant Edward C. Johnson IV owns a reported 5.6 percent of the voting power of FMR Corp., and, as discussed above, is a member of the controlling group of FMR Corp.

17.    Defendant Elizabeth L. Johnson owns a reported 5.6 percent of the voting power of FMR Corp., and, as discussed above, is a member of the controlling group of FMR Corp.

18.    Defendant FDC, a Massachusetts corporation and broker-dealer registered under the Securities Exchange Act of 1934, acts as general distributor for the Fidelity Funds.  In this

5

capacity, FDC underwrites, sponsors and provides retailing services for the Fidelity Funds.

FDC's principal business address is 82 Devonshire Street, Boston, Massachusetts 02109.

19.    Defendant Ned Johnson has amassed a sizeable fortune at the helm of FMR

Corp., which Diana B. Henriques described in her book, Fidelity's World, in early 1995, as:

> one of the largest investors in the securities of bankrupt companies,
> so powerful that it virtually dictated the terms under which both
> R.H. Macy & Company and Federated Department Stores were
> reorganized after respective bankruptcies—and then almost single-
> handedly brought about the merger of those two chains to create
> the biggest retailing empire in the country. Fidelity had become
> one of the largest stock-trading operations in the world, through a
> discount brokerage service that was second in size only to that of
> Charles A. Schwab. Through its private venture capital operation,
> it held a stake in countless small businesses, including a chain of
> art galleries and an executive recruiting firm. It owned a collection
> of small newspapers that ringed Boston, and a glossy magazine
> that covered the investment world. It was the largest property
> owner in downtown Boston—and the biggest mutual company in
> the world. And it remained private, entirely in the control of one
> intensely secretive man, Ned Johnson.
>
> Not since the days of the robber barons, and perhaps not even then,
> had so much money—other people's money—been controlled by a
> single individual. It was an arrangement that, inevitably, would
> change the financial face of America.

20.    Ned Johnson owns approximately 12 percent of FMR Corp.'s voting stock. After

taking over from his father, Edward C. Johnson, II, as president of Fidelity in 1972 and chairman

in 1976, Ned Johnson pioneered such mutual fund practices as selling directly to investors rather

than through brokers, offering discount brokerage services, forming a unit to handle big

institutional accounts, and creating dozens of funds that specialize in specific industries or

geographic regions.

21.    During the Class Period, Ned Johnson was the Chairman of the Board of Trustees

and an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class

Period, Ned Johnson also acted as Chief Executive Officer, Chairman and Director of FMRC;

Director and Chairman of the Board and of the Executive Committee of FMR; and Chairman and a Director of FMR Co., Inc. Ned Johnson's business address is 82 Devonshire Street, Boston, Massachusetts 02109.

22.     During the Class Period, defendant Abigail P. Johnson ("Abigail Johnson") was an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Abigail Johnson also acted as: a Senior Vice President of various Fidelity Funds, including the Fidelity Diversified International Fund; President and a Director of FMR; President and a Director of FMRC; and as a Director of FMR Corp. Abigail Johnson holds 24.5 percent of FMR Corp.'s voting stock -- a stake valued at about $10 billion. Abigail Johnson's business address is 82 Devonshire Street, Boston, Massachusetts 02109.

23.     During the Class Period, defendant Peter S. Lynch ("Lynch") was an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Lynch also acted as: Vice Chairman and a Director of FMR; and Vice Chairman and a Director of FMRC. Lynch's business address is 82 Devonshire Street, Boston, Massachusetts 02109.

24.     During the Class Period, defendant Laura B. Cronin ("Cronin") was an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Cronin also acted as: Executive Vice President and Chief Financial Officer of FMR Corp.; and Chief Financial Officer of FMR, Fidelity Personal Investments and Fidelity Brokerage Company. Cronin's business address is 82 Devonshire Street, Boston, Massachusetts 02109.

25.     During the Class Period, defendant Robert L. Reynolds ("Reynolds") was an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Reynolds also acted as Chief Operating Officer of FMR Corp. Reynolds' business address is 82 Devonshire Street, Boston, Massachusetts 02109.

26.    During the Class Period, defendant Robert C. Pozen ("Pozen") was an interested Trustee in charge of overseeing numerous funds advised by FMR or an affiliate. During the Class Period, Pozen also acted as President and Director of FMR and FMR Co., Inc.

27.    During the Class Period, defendant J. Gary Burkhead ("Burkhead") was a Trustee in charge of overseeing funds advised by FMR or an affiliate. During the Class Period, Burkhead also acted as Vice Chairman and Member of the Board of Directors of FMR Corp.

28.    During the Class Period, defendant J. Michael Cook ("Cook") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Cook received compensation totaling $246,000.

29.    During the Class Period, defendant Ralph F. Cox ("Cox") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Cox received compensation totaling $256,500.

30.    During the Class Period, defendant Robert M. Gates ("Gates") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Gates received compensation totaling $250,500.

31.    During the Class Period, defendant Donald J. Kirk ("Kirk") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Kirk received compensation totaling $256,500.

32.    During the Class Period, defendant Marie L. Knowles ("Knowles") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for her services as a Fidelity Funds trustee, Knowles received compensation totaling $255,000.

8

33.    During the Class Period, defendant Ned C. Lautenbach ("Lautenbach") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Lautenbach received compensation totaling $246,000.

34.    During the Class Period, defendant Marvin L. Mann ("Mann") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Mann received compensation totaling $330,000.

35.    During the Class Period, defendant William O. McCoy ("McCoy") was a non-interested Trustee of at least 271 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, McCoy received compensation totaling $285,000.

36.    During the Class Period, defendant William S. Stavropoulos ("Stavropoulos") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Stavropoulos received compensation totaling $256,500.

37.    During the Class Period, defendant George H. Heilmeier ("Heilmeier") was a non-interested Trustee of at least 269 funds advised by FMR or an affiliate.

38.    During the Class Period, defendant Gerald C. McDonough ("McDonough") was a non-interested Trustee of numerous funds advised by FMR or an affiliate. In 2000, for his services as a Fidelity Funds trustee, McDonough received compensation totaling $269,000.

39.    During the Class Period, defendant Thomas R. Williams ("Williams") was a non-interested Trustee of numerous funds advised by FMR or an affiliate. In 2000, for his services as a Fidelity Funds trustee, Williams received compensation totaling $213,000.

40.    Defendants John Does 1-100 were Trustees or other officers charged with overseeing the Fidelity fund complex during the Class Period, and any other wrongdoers later

9

discovered, whose identities have yet to be ascertained and which will be determined during the course of plaintiff's counsel's ongoing investigation.

41.    Defendants Ned Johnson, Abigail Johnson, Lynch, Cronin, Reynolds, Pozen, Burkhead, Cook, Cox, Gates, Kirk, Knowles, Lautenbach, Mann, McCoy, Stavropoulos, Heilmeier, McDonough, Williams, and John Does 1-100 are referred to collectively herein as the "Trustee Defendants."

42.    Nominal defendants the Fidelity Funds are open-ended management companies consisting of the capital invested by mutual fund shareholders, each having a board of trustees charged with representing the interests of the shareholders in one or a series of the funds. The Fidelity Funds are named as nominal defendants to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.    Plaintiff brings certain of these claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased, redeemed or held shares or like interests in any of the Fidelity Funds between July 19, 1999 and November 17, 2003, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

44.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are many thousands of members in the proposed Class. Record owners and other members of the Class

10

may be identified from records maintained by Fidelity and the Fidelity Funds and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Investment Company Act was violated by defendants' acts as alleged herein;

(b)    whether the Investment Advisers Act was violated by defendants' acts as alleged herein;

(c)    whether Fidelity breached its common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties;

(d)    whether statements made by defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about the business, operations and financial statements of the Fidelity Funds; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

11

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Trustee Defendants Breached Their
### Fiduciary Duties To Fidelity Funds Investors

49.    Fidelity Funds public filings state that the Fidelity Funds have boards of trustees that are responsible for the management and supervision of each fund. In this regard, the Statement of Additional Information dated December 30, 2002 for funds offered by Fidelity Investment Trust, which includes the Fidelity Diversified International Fund and is available to the investor upon request (the "Statement of Additional Information"), is typical of Statements of Additional Information available for other Fidelity Funds. It states that, "**The Board of Trustees governs each fund and is responsible for protecting the interests of shareholders**. The Trustees are experienced executives who meet periodically throughout the year to oversee each fund's activities, review contractual arrangements with companies that provide services to each fund, and review each fund's performance. **Except for William O. McCoy, each of the Trustees oversees 269 funds advised by FMR or an affiliate. Mr. McCoy oversees 271 funds advised by FMR or an affiliate**." [Emphasis added.]

50.    Moreover, the Statement of Additional Information states, with respect to the duties of the trustees vis-à-vis the funds' investment adviser, as follows:

> Under the terms of its management contract with each fund, FMR acts as investment adviser and, **subject to the supervision of the**

12

**Board of Trustees**, has overall responsibility for directing the investments of the fund in accordance with its investment objective, policies and limitations.

\* \* \*

The Committee on Service Fees is composed of Messrs. McCoy (Chairman), Cook, Kirk, and Lautenbach. The committee members confer periodically and meet at least annually. **The committee considers the structure of the Fidelity funds' transfer agency fees, direct fees to investors, and the specific services rendered by FMR and its affiliates in consideration of these fees**. The committee also considers fee structures for other non-investment management services rendered to the Fidelity funds by FMR and its affiliates. During the fiscal year ended October 31, 2002, the committee held two meetings.

[Emphasis added.]

51.    The Statement of Additional Information also sets forth in greater detail the

purported process by which the investment adviser is approved:

In connection with their meetings, the Board of Trustees, including the non-interested Trustees, received materials specifically relating to the existing management contracts, and sub-advisory agreements (the Investment Advisory Contracts). These materials included (i) information on the investment performance of each fund, a peer group of funds and an appropriate index or combination of indices, (ii) sales and redemption data in respect of each fund, and (iii) the economic outlook and the general investment outlook in the markets in which each fund invests. The Board of Trustees, including the non-interested Trustees, also considers periodically other material facts such as (1) the Investment Advisers' results and financial condition, (2) arrangements in respect of the distribution of each fund's shares, (3) the procedures employed to determine the value of each fund's assets, (4) **the allocation of each fund's brokerage, if any, including allocations to brokers affiliated with the Investment Advisers, the use of "soft" commission dollars to pay fund expenses and to pay for research and other similar services, and the allocation of brokerage to firms that sell Fidelity fund shares,** (5) the Investment Advisers' management of the relationships with each fund's custodian and subcustodians, (6) the resources devoted to and the record of compliance with each fund's investment policies and restrictions and with policies on personal securities transactions, and (7) the nature, cost and

13

character of non-investment management services provided by the
Investment Advisers and their affiliates.

\* \* \*

Based on its evaluation of all material factors and assisted by the
advice of independent counsel, the Board of Trustees, including
the non-interested Trustees, concluded that the existing advisory
fee structures are fair, reasonable, and that the existing Investment
Advisory Contracts should be continued.

[Emphasis added.] The Trustee Defendants, through their purportedly independent Committee

on Service Fees, are thus responsible for the review and approval of the advisory and fee

agreements between Fidelity and the Fidelity Funds.

52.    With regard to the board of trustees' review and approval of the manner in which

Fidelity places portfolio transactions, the Statement of Additional Information states as follows:

"The Trustees of each fund periodically review FMR's performance of its responsibilities in

connection with the placement of portfolio transactions on behalf of the fund and review the

commissions paid by the fund over representative periods of time to determine if they are

reasonable in relation to the benefits to the fund."

53.    The Investment Company Institute ("ICI"), of which Fidelity Investments is a

member, recently described the duties of mutual fund boards as follows:

More than 77 million Americans have chosen mutual funds to gain
convenient access to a professionally managed and diversified
portfolio of investments.

Investors receive many other benefits by investing in mutual funds,
including strong legal protections and full disclosure. In addition,
shareholders gain an extra layer of protection because each mutual
fund has a board of directors looking out for shareholders'
interests.

**Unlike the directors of other corporations, mutual fund
directors are responsible for protecting consumers, in this case,
the funds' investors. The unique "watchdog" role, which does
not exist in any other type of company in America, provides**

14

> **investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.**
>
> **In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.**

[Emphasis added.]¹

54.     In truth and in fact, the Fidelity Funds boards of trustees, *i.e.,* the Trustee Defendants, were captive to and controlled by Fidelity, who induced the Trustee Defendants to breach their statutory and fiduciary duties to manage and supervise the Fidelity Funds, approve all significant agreements and otherwise take reasonable steps to prevent Fidelity from depleting Fidelity Funds assets. In many cases, key Fidelity Funds trustees were employees or former employees of Fidelity, and the defendant Johnsons, and were beholden for their positions, not to Fidelity Funds investors, but, rather, to Fidelity, whom they were supposed to oversee. The Trustee Defendants served for indefinite terms at the pleasure of Fidelity and formed supposedly independent committees, charged with responsibility for billions of dollars of fund assets (much of which were comprised of investors' college and retirement savings).

55.     To ensure that the Trustee Defendants were compliant, Fidelity often selected key fund trustees from its own ranks. For example, during the Class Period, defendant Ned Johnson was the Chairman of the Board of Trustees and an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Ned Johnson also acted as Chief Executive Officer, Chairman and Director of FMR Corp.; Director and Chairman of the Board

---

¹       The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts. Its mutual fund members have 86.6 million individual shareholders and manage approximately $7.2 trillion in investor assets. The quotation above is excerpted from a

(continued on next page)

and of the Executive Committee of FMR; and Chairman and a Director of FMRC. Additionally, during the Class Period, defendant Abigail Johnson was an interested Trustee of at least 269 funds advised by FMR or an affiliate, and also acted as: a Senior Vice President of various Fidelity Funds, including the Fidelity Diversified International Fund; President and a Director of FMR; President and a Director of FMRC; and a Director of FMR Corp. Moreover, during the Class Period, defendant Lynch was an interested Trustee of at least 269 funds advised by FMR or an affiliate, and also acted as: Vice Chairman and a Director of FMR; and Vice Chairman and a Director of FMRC.

56.     In exchange for creating and managing the Fidelity Funds, including the Fidelity Diversified International Fund, the Fidelity Pacific Basin Fund and the Fidelity China Region Fund, Fidelity charged the Fidelity Funds a variety of fees, each of which was calculated as a percentage of the funds' average net assets. Hence, the more money invested in the funds, the greater the fees paid to Fidelity. In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board. However, as a result of the Trustee Defendants' dependence on the investment management company, and their failure to properly manage the investment adviser, millions of dollars in Fidelity Funds assets were transferred through fees payable from Fidelity Funds assets to Fidelity that were of no benefit to fund investors.

57.     As a result of these practices, the mutual funds business was enormously profitable for Fidelity. In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

---

paper entitled *Understanding the Role of Mutual Fund Directors,* available on the ICI's website at

(continued on next page)

16

The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall . . . . [f]or the most part, customers do not enjoy the benefits of the economies of scale created by having larger funds. **Indeed, once a fund reaches a certain critical mass, the directors know that there is no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true - once a fund becomes too large it loses the ability to trade in and out of positions without hurting its investors.**

\* \* \*

**The [mutual fund] business grew 71-fold (20 fold in real terms) in the two decades through 1999, yet costs as a percentage of assets somehow managed to go up 29%. . . .** Fund vendors have a way of stacking their boards with rubber stamps. As famed investor Warren Buffett opines in Berkshire Hathaway's 2002 annual report: 'Tens of thousands of "independent" directors, over more than six decades, have failed miserably.' A genuinely independent board would occasionally fire an incompetent or overcharging fund advisor. That happens just about never."

[Emphasis added.]

58.    On January 15, 2004, however, the SEC requested public comment on proposed amendments to rules promulgated under the Investment Company Act, which would significantly change fund governance practices. The amendments, which were adopted by the SEC on June 22, 2004 and will go into effect 18 months thereafter, require that independent directors comprise at least seventy-five percent of mutual fund boards and that the boards retain a chairman who is "independent" of the management company. In the latter respect, the relevant SEC Release stated the following:

We propose to require that the chairman of the fund board be an independent director. The Investment Company Act and state law are silent on who will fill this important role on fund boards. Today, a director who is also an officer of the fund's investment adviser serves as chairman of most, but not all, fund boards. In

---

http://www.ici.org/issues/dir/bro_mf_directors.pdf.

many cases, he (or she) also is the chief executive officer of the adviser. This practice may contribute to the adviser's ability to dominate the actions of the board of directors.

The chairman of a fund board can largely control the board's agenda, which may include matters not welcomed by the adviser. The board is required to consider some matters annually in connection with the renewal of the advisory contract, but other matters the board considers at its discretion, such as termination of service providers, including the adviser. Perhaps more important, the chairman of the board can have a substantial influence on the fund boardroom's culture. The boardroom culture can foster (or suppress) the type of meaningful dialogue between fund management and independent directors that is critical for healthy fund governance. It can support (or diminish) the role of the independent directors in the continuous, active engagement of fund management necessary for them to fulfill their duties.

**A boardroom culture conducive to decisions favoring the long-term interest of fund shareholders may be more likely to prevail when the board chairman does not have the conflicts of interest inherent in his role as an executive of the fund adviser. Moreover, a fund board may be more effective when negotiating with the fund adviser over matters such as the advisory fee if it were not at the same time led by an executive of the adviser with whom it is negotiating. If such negotiation leads to lower advisory and other fees, shareholders would stand to benefit substantially.**

[Emphasis added.]

59.    The amendments had the support of all living former SEC Chairmen, including

Harvey Pitt and Arthur Levitt, who wrote in a June 15, 2004 letter to SEC Secretary Jonathan

Katz, signed by David S. Ruder on behalf of all seven former Chairmen, that:

An independent mutual fund board chairman would provide necessary support and direction for independent fund directors in fulfilling their duties by setting the board's agenda, controlling the conduct of meetings, and enhancing meaningful dialogue with the adviser. **We believe an independent board chairman would be better able to create conditions favoring the long-term interests of fund shareholders than would a chairman who is an executive of the adviser.**

[Emphasis added.]

60.     In a February 17, 2004 *Wall Street Journal* editorial entitled "Interested, and Proud of It," Ned Johnson criticized the SEC's proposal. "Proud to disclose" his "vested interest" in the funds he manages, Johnson asserted that fund chairmen with ownership stakes in a fund's management company, most notably himself, should retain their dominance over fund policy because, among other reasons, "There will always be risk of malfeasance in any industry."

61.     Johnson criticized the SEC's proposal for encroaching upon "shareholder democracy," or investors' ability to influence fund governance policy by withdrawing assets from underperforming fund families. Johnson argued that such "shareholder democracy" had adequately protected mutual fund investors in the past. Dismissing the normative benefits securities legislation has on executives' wrongful conduct, Johnson further wrote, "It is the moral fiber and effectiveness of the men and women in charge and in the trenches – **not laws or a chairperson's so-called independence** – that provide shareholders with the greatest degree of protection." [Emphasis added.] Johnson continued,

> Regulators want to substitute a law in place of shareholders'
> judgment, by mandating that mutual fund chairpersons be
> "independent." If this rule is adopted, the immediate result will be
> to reduce the expertise and hands-on "feel" of mutual-fund board
> chairs across the industry, whose long experience equips them to
> detect subtle nuances in fund operations.

62.     Moreover, while conceding that "having an independent chairperson is [not] always a bad choice," and "fund chairpersons should be accountable and subject to serious independent oversight," Johnson stated that,

> Mandating an independent chairperson is akin to requiring that
> every ship have two captains. I don't know about you, but if a ship
> I was sailing on were headed for an iceberg, I'd want one – and
> only one – captain giving orders. I'd like to know that he'd spent
> some time at sea and knew what he was doing – and if he owned
> the ship, so much the better.

19

63.     For the three fiscal years ended March 31, 2003, Fidelity mutual fund investors

paid management fees totaling $1.6 billion, despite a loss of 24% in 2001, a loss in value in 2002

and a loss in value of 25% in 2003.  Over the last decade, investors in the Fidelity Magellan

Fund have paid $4 billion in management fees yet the defendants' advice has led to a significant

under-performance compared to the S&P 500 Index.  In the words of Vanguard Group Inc.

founder John C. Bogle, "When there are two clearly distinct corporate ships -- the management

company and the fund, each with its own set of owners -- there ought to be two captains."

64.     Due in large part to the conflicted boardroom culture created by Fidelity's

interested directors, specifically including its chairman Ned Johnson, plaintiff and other

members of the Class never knew, nor could they have known, from reading the fund

prospectuses or otherwise, of the extent to which Fidelity was using, *inter alia*, so-called 12b-1

fees, Soft Dollars (as defined below) and directed brokerage commissions to improperly siphon

assets from the funds to assist in peddling its wares to unwitting investors.

### Fidelity Used Rule 12b-1 Marketing
### Fees For Improper Purposes

65.     Rule 12b-1, promulgated by the SEC under Section 12(b) of the Investment

Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their

own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.  The Rule

12b-1 conditions, among others, are that payments for marketing must be made pursuant to a

written plan "describing all material aspects of the proposed financing of distribution;" all

agreements with any person relating to implementation of the plan must be in writing; the plan

must be approved by a vote of the majority of the board of directors; and the board of directors

must review, at least quarterly, "a written report of the amounts so expended and the purposes for

which such expenditures were made."  Additionally, the directors "have a duty to request and