LEXSEE 2000 DEL. CH. LEXIS 91

IN RE DELTA AND PINE LAND COMPANY SHAREHOLDERS LITIGATION

Consolidated Civil Action No. 17707

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2000 Del. Ch. LEXIS 91*

**June 1, 2000, Submitted**
**June 21, 2000, Decided**

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court July 3, 2000.

**COUNSEL:** Norman M. Monhait, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: MILBERG WEISS BERSHAD HYNES & LERACH LLP, New York, New York; STULL STULL & BRODY, New York, New York; SAVETT FRUTKIN PODELL & RYAN, P.C., Philadelphia, Pennsylvania; JAROSLAWICZ & JAROS, New York, New York; BEATIE and OSBORN, New York, New York; LEVIN FISHBEIN SEDRAN & BERMAN, Philadelphia, Pennsylvania; WEISS & YOURMAN, New York, New York; and SMITH, MACKINNON, GREELEY, BOWDOIN & EDWARDS, P.A., Orlando, Florida, Attorneys for Plaintiffs.

Jon E. Abramczyk, and Jessica Zeldin, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Allen Kezsbom and Jennifer L. Colyer, of FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York; David Boies, and Philip C. Korologos, of BOIES, SCHILLER & FLEXNER, LLP, Armonk, New York, Attorneys for Defendants Rudi E. Scheidt, Jon E.M. Jacoby, Nam-Hai Chua, Joseph A. Murphy, Stanley P. Roth, Roger D. Malkin and Nominal Defendant Delta and Pine Land Company.

Donald J. Wolfe, Jr., and Richard L. Horwitz, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: [*2] KIRKLAND & ELLIS, Chicago, Illinois, Attorneys for Defendant/Cross-Claim Plaintiff Monsanto Company.

**JUDGES:** CHANDLER, Chancellor.

**OPINIONBY:** CHANDLER

**OPINION:**

MEMORANDUM OPINION

CHANDLER, Chancellor

This dispute arises out of the failed merger between Delta & Pine Land Company ("Delta") and Monsanto Company ("Monsanto"). After allegedly attempting to secure antitrust regulatory approval for the merger for over a year, Monsanto terminated the merger agreement for the purported reason that it could not obtain antitrust clearance. On the same day, Monsanto announced an agreement and plan of merger with Pharmacia & Upjohn, Inc. ("Pharmacia"). Following negotiations between the Monsanto and Delta boards regarding payment of a termination fee and Delta's potential damages resulting from the termination, Delta's board filed a breach of contract lawsuit against Monsanto in Mississippi state court for injuries arising out of the collapsed merger.

Despite Delta's efforts to negotiate damages against its would-be merger partner and its ultimate filing of a lawsuit in Mississippi (actions clearly signaling a well-functioning Delta board), the shareholder plaintiffs nevertheless commenced this lawsuit, [*3] insisting that the Delta board cannot disinterestedly and independently pursue the Mississippi action. Accordingly, the shareholder plaintiffs seek to wrest control of the breach of contract action from Delta's board, and have filed both a derivative claim and a class claim against Delta's directors and Monsanto. I also note that the shareholder plaintiffs surprisingly supported Monsanto's motion to stay the Mississippi action, which the Mississippi Court granted, despite the availability of a jury trial and the potential to seek punitive damages in Mississippi. Delta has filed a motion to dismiss the shareholder plaintiffs' complaint, which I consider below.

I. FACTUAL BACKGROUND

A. The Parties

Defendant Delta is a Delaware corporation with its principal offices located in Mississippi. It is the largest commercial breeder, producer, and marketer of cotton planting seed in the United States. Rudi E. Scheidt, Jon E.M. Jacoby, Nam-Hai Chua, Joseph M. Murphy, Stanley P. Roth and Roger D. Malkin (collectively the "director defendants"), who form Delta's board of directors, are the individual defendants.

Defendant Monsanto is a Delaware corporation with its principal offices located [*4] in Missouri. Monsanto, among other things, is one of the largest developers of genetically modified seeds in the world. It licenses its technology to sellers, commercial growers and individual farmers.

B. The Failed Delta-Monsanto Merger

On May 8, 1998, Delta and Monsanto entered into a merger agreement (the "Agreement") by which Delta would merge into Monsanto in a stock-for-stock combination. Each share of Delta stock would be exchanged for 0.8625 shares of Monsanto common stock. Based on the closing price of Monsanto common on May 8, 1998 (pre-announcement), the merger valued each Delta share at $ 46.14. The exchange ratio was subject to adjustment if Monsanto's average stock price rose or fell by more than 25 percent during a 90-day period before the shareholders' meeting to approve the transaction.

Aware that the merger would require government antitrust clearance, the parties included provisions in the Agreement regarding efforts to procure the necessary regulatory approval. Monsanto agreed to:

> . use its "best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations" [*5] to complete the merger. n1
>
> . use its "reasonable best efforts" to respond fully and promptly to inquiries from antitrust regulatory authorities. n2
>
> . use its "commercially reasonable efforts" to resolve any objections to the merger asserted by antitrust regulatory authorities and to obtain antitrust clearance in order to effectuate the merger. n3
>
> . pay Delta a termination fee of $ 80 million if the merger could not close because antitrust clearance was not obtained, without regard to whether there was a breach. n4

   n1 Merger Agreement § 7.01; Delta's Mississippi Complaint ("Delta Compl.") P18-20; *see also* Am. Compl. P24. Shareholder plaintiffs refer in their amended complaint to both the Agreement and Delta's Mississippi complaint; therefore, both documents are incorporated by reference. *See Precision Air, Inc. v. Standard Chlorine of Del., Inc., Del. Supr., 654 A.2d 403, 406 (1995); Solomon v. Armstrong, Del. Ch., 747 A.2d 1098, 1121 n.72 (1999)* aff'd *746 A.2d 277 (2000).*

   n2 Merger Agreement § 7.12(a); Delta's Mississippi Complaint ("Delta Compl.") P18-20; *see also* Am. Compl. P24.

[*6]

   n3 Merger Agreement § 7.12(b); Delta's Mississippi Complaint ("Delta Compl.") P18-20; *see also* Am. Compl. P24.

   n4 Merger Agreement § 9.04(c); *see also* Am. Compl. P23.

The two corporations announced the merger on May 11, 1998. Immediately following this announcement, plaintiffs' counsel filed a number of lawsuits, which the Court consolidated, seeking to enjoin the merger or, alternatively, seeking rescission and damages if Delta and Monsanto consummated the merger. The shareholder plaintiffs also moved for expedited discovery, which the Court granted.

After Delta distributed a proxy statement to its shareholders, plaintiffs' counsel filed an amended complaint, which clearly indicated that plaintiffs' counsel considered the Delta and Monsanto merger a financial disaster for Delta's shareholders. In relevant part the amended complaint provides:

> Based on the closing price of Monsanto on May 8, 1998, the Merger valued each share of Delta stock at $ 46.14, a discount of approximately 13% from Delta's stock price as of the date of the announcement of the proposed transaction. [*7]
>
> ***

> The Proxy Statement ... fails to disclose ... that the transaction price as it currently stands reflects an even more severe discount of 45% to the pre-announcement level.
>
> \*\*\*
>
> The Individual Defendants violated their duties of loyalty and care by ... agreeing to an exchange ratio detrimental to the interests of Delta's shareholders, an exchange ratio which is woefully inadequate in light of comparable acquisitions by Monsanto itself...
>
> \*\*\*
>
> Plaintiffs ... will not receive their fair proportion of the value of Delta's assets and business, will be largely denied their right to share fairly and proportionately in Delta's future growth and business, and will be prevented from obtaining fair and adequate consideration for their Delta investment. n5

n5 *In re Delta & Pine Land Co. Shareholders Litigation*, Del. Ch., C.A. No. 16383, Am. Compl. P18, p. 8; P26, p. 15; P42(h), p.21; P43, p. 22.

The amended complaint crystallizes the shareholder plaintiffs' contempt for the proposed merger. [*8] In addition to the grossly inadequate price, shareholder plaintiffs' counsel, in the amended complaint, highlighted Delta's directors' failure to disclose material information in the company's proxy statement.

Despite plaintiffs' counsel's blistering account of Delta's actions and their belief that the Delta directors had breached their duty of disclosure, care and loyalty, the same plaintiffs' counsel curiously compromised these claims in a settlement with Delta for relatively modest corrective disclosures. Delta disclosed the following information in an amendment to its proxy statement: (1) the number and value of options Delta's directors and executive officers held; (2) the reasons for Merrill Lynch restating its fairness opinion; and (3) that Merrill Lynch performed services, which constituted an immaterial portion of its revenues, for Monsanto before Delta's engagement of Merrill Lynch for purposes of rendering a fairness opinion on the merger.

Despite the corrective disclosure, the parties never actually settled their claims. As shareholder plaintiffs' counsel explained during oral argument, the parties conditioned the settlement, presumably including shareholder plaintiffs' [*9] attorneys' fees, on the successful close of the Delta-Monsanto merger. Delta and Monsanto, however, never completed their merger. On December 20, 1999, Monsanto withdrew its request for United States Department of Justice ("DOJ") antitrust clearance and informed Delta that it could not "come to an understanding" with the DOJ regarding the government's antitrust concerns. The merger's collapse doomed the tentative settlement. On the same day that Monsanto withdrew its request for antitrust clearance, Monsanto announced that Pharmacia would acquire it instead.

Following Monsanto's announcement, Delta immediately demanded the $ 80 million termination fee the parties had negotiated as part of the Agreement plus additional damages. Delta contends that Monsanto breached the Agreement because it allowed the merger to languish at the DOJ for 19 months and did not use its "best efforts" to consummate the merger. Monsanto rebuffed Delta's efforts to negotiate an arrangement for payment of the termination fee and other damages arising from the termination of the merger. Accordingly, on December 30, 1999, Delta filed a complaint against Monsanto in Mississippi state court seeking $ 1 billion [*10] in actual damages, and $ 1 billion in punitive damages. The Mississippi complaint also demanded a jury trial.

The very next day, Monsanto agreed to pay the termination fee to Delta unconditionally and to engage in negotiations to resolve Delta's other claims. In return, Delta agreed to withdraw the December 30 complaint without prejudice for a two-week negotiating period. The two companies could not reach an agreement during this period and, as a result, Delta refiled the December 30 complaint after the negotiating period expired.

While Delta's board pursued Monsanto, counsel for Delta's shareholders pursued interests of their own. Evidently, after Monsanto terminated the merger with Delta, shareholder plaintiffs' counsel had a drastic change of heart. The same attorneys who had derided the Delta-Monsanto merger as grossly unfair to Delta's shareholders and sued the Delta directors for entering into such a transaction, commenced this action, alleging that the Delta directors breached their fiduciary duties because they did not take appropriate steps to ensure the successful closing of the very transaction the same plaintiff shareholders' counsel had earlier disparaged. One might [*11] have thought that the shareholder plaintiffs would have been ecstatic that the merger collapsed, considering the "woefully inadequate" price of the deal. In any event, the shareholder plaintiffs have brought a derivative and a

class claim against the Delta directors and against Monsanto because the parties did not *complete the merger*. A sample of the amended complaint provides:

> Monsanto refuses to seek [Hart-Scott-Rodino] approval and Delta's directors stand idly by, do not seek specific performance of the merger agreement and allow Delta to deteriorate. n6
>
> ***
>
> The Individual Defendants and Monsanto have ... breached fiduciary duties of loyalty, care and good faith owed to the Company and its stockholders by ... failing to act diligently to consummate the transaction contemplated by the Merger Agreement, failing to seek specific performance of the Merger Agreement, and permitting Monsanto to terminate the deal without actively seeking proper damages from Monsanto... n7
>
> ***
>
> The entire Delta Board of Directors acted with gross negligence and a lack of loyalty in ... failing to act diligently to carry the Merger out... n8

Plaintiffs' counsel originally [*12] insisted that Delta's directors breached their fiduciary duties because they entered into a merger agreement containing a woefully inadequate price. Now, the same attorneys insist that the Delta directors breached their fiduciary duties because they failed to seek specific performance of the same merger agreement containing that woefully inadequate price. Mindful of the failed settlement between Delta and the shareholder plaintiffs, I can only speculate about the motivation behind counsel's change of heart regarding the Delta-Monsanto merger.

> n6 Am. Compl. P25.
>
> n7 Am. Compl. P55(d).
>
> n8 Am. Compl. P67(b).

After shareholder plaintiffs' counsel filed this action alleging a derivative and a class claim, Monsanto filed a cross-claim against Delta for a declaratory judgment that Monsanto was not in breach of the Agreement. Monsanto, furthermore, moved to stay the Mississippi action pending the outcome of the Delaware action. Plaintiffs' counsel actually supported Monsanto's motion to stay the Mississippi [*13] action. The Mississippi Court granted the stay.

### C. The Shareholder Plaintiffs' Complaint

The amended complaint alleges a derivative claim and a class claim. The plaintiffs assert the derivative claim against the Delta directors individually and against Monsanto on behalf of Delta. The derivative claim alleges that the Delta directors breached their duty of loyalty and due care to the company essentially for failing to consummate the transaction with Monsanto, and that Monsanto aided and abetted those breaches. By bringing this derivative claim, shareholder plaintiffs' counsel seek to wrest control of the breach of contract litigation against Monsanto over the failed merger from Delta's directors. Shareholder plaintiffs' counsel insist that Monsanto controls the Delta board; therefore, the Delta board cannot act disinterestedly and independently in its efforts to seek redress from Monsanto for the failed merger. According to shareholder plaintiffs' counsel, Monsanto controls Delta because (1) Monsanto owns about 4.5 percent of Delta's outstanding stock; (2) Monsanto forced Delta to hire Stephen Hawkins, who does *not* sit on the Delta board, as its director of marketing; and (3) [*14] Delta and Monsanto have entered into a host of licensing agreements and joint ventures.

Essentially, by bringing this derivative claim, plaintiffs' counsel ask the Court to believe that they are in the best position to assert Delta's rights under an agreement to which they once vigorously objected (but now curiously endorse), rather than Delta's directors who have always supported the Agreement with Monsanto and have already acted to assert Delta's rights under that agreement in the Mississippi action.

The shareholder plaintiffs assert the class claim against the Delta directors individually. The class claim alleges that the Delta directors' pursuit of the Monsanto merger initiated an active process to sell the company and, therefore, obligated the directors to take all appropriate steps necessary to maximize shareholder value under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* n9 The directors failure to do so, plaintiffs argue, caused them to breach their duty of loyalty and due care to the Delta shareholders.

> n9 *Del. Supr., 506 A.2d 173 (1986).*

[*15]

## II. LEGAL ANALYSIS

### A. Derivative Claim

Court of Chancery Rule 23.1 provides that a derivative action "complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors..." The purpose of this demand requirement is to provide the corporation the opportunity to address the alleged wrong without litigation, or to control litigation brought for the corporation's benefit. n10

> n10 *Haber v. Bell*, Del. Ch., 465 A.2d 353 (1983); *Lewis v. Aronson*, Del. Ch., 466 A.2d 375 (1983), *rev'd on other grounds*, Del. Supr., 473 A.2d 805 (1984).

Delta was already appropriately addressing Monsanto's alleged wrongdoing before the shareholder plaintiffs' filed their complaint. Indeed, Delta demanded payment of the $ 80 million termination fee and other damages the same day that Monsanto issued its press release announcing that it withdrew its request for antitrust approval. Delta then met with Monsanto [*16] on December 21, 1999, the day after Monsanto had withdrawn its request for DOJ antitrust clearance. The same day, Delta issued a press release announcing that it had demanded payment of the termination fee. On December 23, 1999, Delta sent a formal demand letter to Monsanto demanding immediate payment of the termination fee. Delta also refused to grant Monsanto a general release as a precondition for payment of the $ 80 million termination fee and, instead, sued Monsanto in Mississippi (as it turns out, on the same day that shareholder plaintiffs brought this action).

Monsanto paid Delta the termination fee on January 3, 2000. Delta then negotiated an agreement with Monsanto to withdraw temporarily the Mississippi lawsuit without prejudice in order to discuss (and attempt to settle) the damage claims Delta alleged against Monsanto for breach of the Agreement. Delta re-filed its Mississippi action after negotiations with Monsanto stalled. One can only speculate as to why plaintiffs' counsel would continue to pursue a derivative claim--the general purpose of which is to assert claims against Monsanto for breach of the Agreement--if the Delta board has already engaged in that very action. [*17]

Notwithstanding the demand requirement of Rule 23.1, shareholder plaintiffs' concede that they have not made such a demand on the Delta board. Absent demand, the plaintiffs must demonstrate "with particularity ... the reasons for ... not making [a demand]." n11 The shareholder plaintiffs, however, cannot possibly meet the burden of Rule 23.1. They allege that demand on the board would have been "futile and useless" because the Delta board "cannot be relied upon to reach a truly independent decision as to whether to commence the instant action ..." n12 The Delta board's actions, however, formidably contradict shareholder plaintiffs' allegations--Delta's board did file the precise lawsuit the plaintiffs claim the Delta board would have refused to file had they demanded it. Moreover, the Delta board filed its Mississippi action only 10 days after Monsanto retracted its request for DOJ antitrust clearance. It also obtained the $ 80 million termination fee through negotiation and repeatedly refused to provide Monsanto with a general release in return for payment of the termination fee. n13 As this Court has previously found, the existence of a board-initiated action "conclusively defeats [*18] any claim that demand would have been futile. Indeed, there is something to be said for the idea that this Court should inquire no further if it finds that the corporate directors are litigating the same claims advanced in the derivative action." n14

> n11 Ct. Ch. R. 23.1.
>
> n12 Am. Compl. P61(c).
>
> n13 The shareholder plaintiffs say that "the proper time to measure demand futility is at the filing of the complaint" and that the shareholder plaintiffs filed this Delaware action before Delta filed the Mississippi action. *Harris v. Carter, Del. Ch., 582 A.2d 222, 228 (1990).* Accordingly, plaintiffs implore the Court not to consider the Mississippi action when considering demand futility. I have three reactions to this argument. One, shareholder plaintiffs' counsel admits that the shareholder plaintiffs and the Delta board filed their respective actions on the same day a matter of hours apart; therefore, to not consider the filing of the Mississippi action because the plaintiffs' counsel happened to reach the Delaware courthouse a few hours before Delta's counsel reached the Mississippi courthouse would be an unnecessarily rigid interpretation of this Court's precedents. *See Friedman v. Alcatel, 752 A.2d 544, 552 n.24,* Steele, V.C. (December 10, 1999); *In re Chambers Dev. Co. Shareholders Litig., 1993 Del. Ch. LEXIS 79, *20,* Del. Ch., C.A. No. 12508, Chandler, V.C. (May 20, 1993)(treating actions filed within the same general time period as simultaneously-filed). Two, if the purpose of the demand requirement is to give the corporation the opportunity to take over a suit that was brought on its behalf in the first place and allow the directors the chance to occupy their normal status as captains of the corporation's affairs, then the board's very filing of a lawsuit, whether hours before or hours after the filing of the shareholder suit, provides a significant indica-

tion that that board maintains the ability to reach a business judgment regarding whether to bring an action. Three, even if the shareholders technically filed their lawsuit first, the Delta board had already been actively pursuing Monsanto before the filing of the shareholders' action. For example, days before either the Delta board or its shareholders filed their respective lawsuits, the Delta board had already demanded the $ 80 million termination fee from Monsanto after Monsanto withdrew its request for antitrust clearance. Therefore, even at the time the shareholders filed their derivative suit, Delta had been attempting to assert its rights against Monsanto under the Agreement.

[*19]

n14 *Silverzweig v. Unocal Corp.,* 1989 Del. Ch. LEXIS 4, *11-12, Del. Ch., C.A. No. 9078, Berger, V.C. (Jan. 19, 1989), *aff'd*, 561 A.2d 993 (1989).

Although the Delta board filed a lawsuit in Mississippi, the shareholder plaintiffs still insist that demand was futile. In order to plead demand futility, a complaint must contain particularized facts which create a reasonable doubt that (a) the directors are disinterested and independent, or (b) the challenged transaction was otherwise the product of a valid exercise of business judgment. n15 The plaintiffs contend that they satisfy the first prong of the *Aronson* test.

n15 *Aronson v. Lewis,* Del. Supr., 473 A.2d 805 (1984).

A director is interested for purposes of demand futility when a complaint alleges divided loyalties. That is, will the director at issue receive a personal financial benefit different from that of other shareholders? The Court will [*20] determine that a director lacks independence for purposes of determining demand futility when the complaint alleges outside influences which affect that director's performance of his duties, particularly with respect to the challenged transaction. In other words, is the director beholden to another individual or entity? Under *Aronson's* first prong, whether addressing disinterestedness or independence, the Court considers whether the directors can exercise their business judgment regarding the appropriate course of action for the company free from either outside influence or conflicts of interest. n16

n16 *Rales v. Blasband,* Del. Supr., 634 A.2d 927, 932-937 (1993).

The shareholder plaintiffs fail to demonstrate demand futility under *Aronson's* first prong. They ask the Court to excuse demand because the Delta board lacks independence. The amended complaint, however, does not contain a single particularized allegation that any director, let alone a majority of directors, lacks independence [*21] due to Monsanto's alleged control. According to shareholder plaintiffs' amended complaint, Delta's directors lack independence because they are beholden to Monsanto for three reasons: (1) Monsanto holds 4.6 percent of Delta's stock; (2) Monsanto forced Delta to hire Stephen Hawkins as Delta's director of marketing; and (3) Delta and Monsanto are parties to a number of licensing agreements and joint ventures. These facts, however, do not show that Delta's directors are even slightly beholden to Monsanto, particularly in light of the fact that Delta's board has filed a lawsuit against Monsanto in Mississippi seeking over $ 1 billion in damages.

Shareholder plaintiffs' first allegation--that Monsanto controls the Delta board because Monsanto owns 4.6 percent of Delta's stock--is pure fantasy. If plaintiffs' counsel had investigated all publicly available facts, they would have realized that Delta's directors alone own more shares than Monsanto, and that Monsanto held less than one third the number of shares that Delta's largest investor held. n17 Even if Monsanto owned a sizable percentage, stock ownership alone does not support Monsanto's alleged domination of the Delta board. n18 Accordingly, [*22] the amended complaint must allege particularized facts, in addition to stock ownership, that create a reasonable doubt as to the directors' independence. The amended complaint here is woefully inadequate for Rule 23.1 purposes.

n17 Delaware Courts have urged plaintiffs to conduct investigations before alleging demand futility. The Supreme Court cautioned in *Rales v. Blasband* that "although derivative plaintiffs may believe it is difficult to meet the particularized requirement of *Aronson* because they are not entitled to discovery to assist their compliance with Rule 23.1, they have many avenues available to obtain information bearing on the subject of their claims." *Del. Supr., 634 A.2d 927, 934 n.10 (1993).* More recently, in *White v. Panic*, this Court remarked that "further investigation might also have lead plaintiff and his counsel to abandon their claim or to acknowledge that demand

was not excused." *2000 Del. Ch. LEXIS 14, 23,* Del. Ch., C.A. No. 16800, Lamb, V.C. (Jan 19, 2000).

n18 *Aronson v. Lewis, Del. Supr., 473 A.2d 805, 815 (1984)*(stock ownership alone is not sufficient proof of domination or control); *In re Western National Shareholders Litig., 2000 Del. Ch. LEXIS 82,* Del. Ch., C.A. No. 15927, Chandler, C. (May 22, 2000) (46 percent shareholder does not control or dominate the board due to stock ownership alone).

[*23]

Shareholder plaintiffs' second allegation--that Monsanto controls Delta's directors because Monsanto forced Delta to hire a particular director of marketing--stretches the bounds of reality. Stephen Hawkins, Delta's new director of marketing, does not even sit on the Delta board. Thus, shareholder plaintiffs' counsel would have me believe that Delta's director of marketing somehow controlled Delta's board and sterilized the board's ability to form a business judgment regarding demand even though he does not sit on the board. The amended complaint does not allege any connection between Hawkins and a member of the board whatsoever. As this Court once tersely stated: "I need not find that plaintiffs' argument is illogical to conclude that it is imaginary." n19

n19 *Behrens v. United Investors Management Company, 1993 Del. Ch. LEXIS 217,* Del. Ch., C.A. No. 12876, mem. op., Allen, C. (Oct. 1, 1993).

Plaintiff shareholders' final argument--that the existence of licensing agreements and joint ventures between Delta and Monsanto somehow [*24] robs Delta's board of its independence--is fanciful. Licensing agreements and joint ventures are matters of contract. To assert that contractual relationships necessarily cause one contracting party to control the other is an unsupported exaggeration. n20 If this were so, customers and suppliers would control every existing company.

n20 Certain types of contractual arrangements, such as stockholder voting agreements, can of course influence control issues.

Moreover, the existence of contractual relationships between the parties does not prevent the Delta board from freely deliberating and forming a business judgment about whether to bring an action against Monsanto for breaching the Agreement. The existence of a contractual relationship with Monsanto makes the Delta board's decision more difficult, but it does not sterilize the board's ability to decide. The plaintiffs cannot impute a personal disqualifying interest to Delta's directors merely because the decision to litigate may strain Delta's existing contractual [*25] relationship. In forming their business judgment about whether to sue, Delta's board should consider all adverse consequences that might result from bringing a suit, such as the cost of litigation, the potential to temporarily paralyze the company and, as in this case, the possibility that such a suit will strain existing contractual relations. Potential negative side-effects from bringing a lawsuit, however, do not constitute a personally disqualifying interest that might prevent the directors from freely assessing the benefits and detriments of bringing the suit in the first place. n21

n21 Plaintiffs allege in the amended complaint that the Delta directors have not pursued Monsanto quickly and vigorously enough. To my mind, the Delta board's decision to negotiate first, as opposed to immediately litigate, evidences a well-functioning board recognizing that litigation with Monsanto might jeopardize future contractual relations. Based on the amended complaint, plaintiff shareholders' counsel, however, would have Delta act in a more hostile and litigious manner, a posture that would no doubt threaten Delta's relationship with Monsanto more than already necessary. Such a suggestion is certainly not in the best interests of Delta or its shareholders and may even call into question counsel's ability to adequately represent Delta's shareholders.

[*26]

Further exacerbating the difficulties with the shareholder plaintiffs' argument, their counsel cite inapposite authority for the position they have adopted. Shareholder plaintiffs' counsel cite a number of demand futility cases to support their position, yet the consistent theme running through these cases--that the complaint at issue alleges particularized facts showing influence or control over the employment, the livelihood, or the financial interests of the directors on an individual and personal basis--is glaringly absent in this amended complaint. For example, shareholder plaintiffs' counsel cite *Rales v. Blasband* n22 as authority supporting their position. It clearly does not. In *Rales*, the Delaware Supreme Court found that two directors lacked independence because the Rales brothers provided substantial income for the two directors and could remove the two directors from their management positions at other companies the Rales

brothers controlled. The Court recognized that the two directors at issue would suffer "significant [personal] financial consequences" if they voted to pursue an action after shareholders made a demand. The amended complaint currently before [*27] me lacks allegations of this type of financial influence or control. n23

n22 *Del. Supr., 634 A.2d 927 (1993).*

n23 Plaintiffs' counsel cite a host of other cases to support their position. The cases, however, demonstrate why the Court should *not* excuse demand. The complaints at issue in the cases the plaintiffs' counsel cite all contain the type of particularized facts nowhere to be found in the amended complaint before the Court today. *See, e.g., In re NVF Co. Litigation, 1989 Del. Ch. LEXIS 167,* Del. Ch., C.A. No. 9050, Chandler, V.C. (Nov. 21, 1989)(demand futility found where some directors being paid by majority shareholder and others related to him); *Kahn v. Tremont Corp., 1994 Del. Ch. LEXIS 41,* Del. Ch., C.A. No. 12339, Allen, C. (Apr. 22, 1994) (demand futility found where complaint specifically alleged that controlling shareholder employed a majority of the directors at various of his entities either Tremont itself or at the shareholder's other companies); *In re MAXXAM, Inc./Federated Dev. Shareholder Litigation, Del. Supr., 659 A.2d 760 (1995)* (lack of independence found on five-member special committee, single shareholder compensated one director through annual consulting contract; another director received annual income as chairman of a different company, plus multi-million dollar bonus; third director received lucrative consulting fees); *Steiner v. Meyerson, 1995 Del. Ch. LEXIS 95,* Del. Ch., C.A. No. 13139, Allen. C. (July 18, 1995) (one director could control second director's job security and income, and could deprive third director of over $ 1 million in receipts to law firm).

[*28]

Nothing in the shareholder plaintiffs' amended complaint causes the Court to doubt the Delta board's ability to function properly in considering a shareholder demand. Plaintiffs' counsel have not alleged any director financial interest in the transaction. Nor have they alleged facts demonstrating a reasonable doubt that the Delta board is beholden to Monsanto. Moreover, it is difficult to claim that making a demand on Delta's board to sue Monsanto would have been futile if that very board has already brought an action against Monsanto. As the amended complaint is devoid of facts, let alone particularized facts, that would support a derivative claim, I grant Delta's motion to dismiss.

B. Class Claim

Shareholder plaintiffs' contention that Delta's board is under a duty to shop the company similarly fails. Nothing in the amended complaint alleges facts demonstrating that the failure of Delta and Monsanto to close their stock-for-stock strategic merger places Delta in a *Revlon* situation. When a potential transaction exists in a *Revlon* context, the target board, consistent with its fiduciary duties, must maximize immediate value for the shareholders. n24 Directors find themselves [*29] in a *Revlon* environment when transactions include breaking up the company, cashing out the shareholders, or selling control of the company to a majority shareholder. n25 The Agreement, however, did not contemplate any of these transactions. As a result, the Delta board is under no on-going obligation to auction the company.

n24 *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., Del. Supr., 506 A.2d 173 (1986).*

n25 *See Arnold v. Society for Sav. Bancorp., Inc., Del. Supr., 650 A.2d 1270, 1290 (1994).*

The Delaware Supreme Court has already made abundantly clear that every corporate combination does not trigger a duty to maximize immediate shareholder value. n26 The Delta-Monsanto merger did not involve a cash sale of the company, an event that would have placed the transaction in a *Revlon* factual context. The merger also did not involve a change of control, another event triggering *Revlon*. The merger was a stock-for-stock transaction between two widely-held public [*30] companies. Notably, the Delaware Supreme Court has affirmed the dismissal of a complaint because it failed to allege the corporate ownership structure of the would-be acquirer. The Supreme Court said this:

> Conspicuously absent from the complaint is a description of the stock ownership structure of Burlington. Absent this factual averment, plaintiffs have failed to allege that control of Burlington and Santa Fe after the merger would not remain 'in a large, fluid, changeable and changing market.' n27

The amended complaint in this case also fails to allege the stock ownership structure of Delta. The absence of

this fact provides another reason why I must dismiss the class claim.

> n26 *See, e.g., Paramount Communications, Inc. v. Time, Inc.*, Del. Supr., 571 A.2d 1140, 1151 (1989); *Mills Acquisition Co. v. Macmillan*, Del. Supr., 559 A.2d 1261, 1285 n.35 (1989).
>
> n27 *In re Santa Fe Pacific Corp. Shareholder Litig.*, Del. Supr., 669 A.2d 59, 71 (1995).

[*31]

The shareholder plaintiffs' point to two allegations for their theory that the Delta board has an obligation to auction the company: (1) two companies--AgrEvo GmbH and The Dow Chemical Company--expressed interest in Delta; and (2) following Monsanto's termination of the merger, Delta announced that "the board continues to explore all strategic alternatives in order to maximize value for its shareholders" and that it was no longer restricted under the Agreement.

Simply because Delta was allegedly "in play" or that "there are still likely suitors for Delta" does not automatically trigger *Revlon* as a matter of law. n28 Furthermore, the plaintiffs' desire to immediately auction the company seems counter-intuitive. In the amended complaint, plaintiffs allege that the failed merger has cost the shareholders "hundreds of millions of dollars in damages" n29 and that "market reaction to the news of the failed deal was swift and punishing as Delta's shares closed at $ 15.50, less then one third of the $ 47.92 per share value contemplated by the merger." n30 If the failed merger has caused so much damage to Delta's share price, why would shareholders want to force an auction of the company [*32] when its stock price, according to the amended complaint, is depressed? One has to wonder about the purpose of advancing such a class claim.

> n28 *See, e.g., Paramount Communications, Inc. v. Time, Inc.*, Del. Supr., 571 A.2d 1140, 1151 (1989); *Mills Acquisition Co. v. Macmillan*, Del. Supr., 559 A.2d 1261, 1285 n.35 (1989).
>
> n29 Am. Compl. P43, p. 17.
>
> n30 Am. Compl. P41, p. 16.

Delta's public announcements following Monsanto's termination of the merger are clearly intended to inform Delta shareholders that Monsanto terminated the merger and to reassure them that the company is still actively pursuing the shareholders' best interest. The announcements, which cannot be found within the four corners of the amended complaint, are not intended to signal the Delta board's decision to auction the company, and do not by themselves support the allegation that the board had a responsibility to sell the company immediately to maximize shareholder value. For these reasons, I also dismiss [*33] the class claim.

### III. CONCLUSION

I am puzzled by this lawsuit. First, in an earlier lawsuit, the shareholder plaintiffs abhor the Delta-Monsanto merger, and sue Delta's directors for entering into it. Then, the shareholder plaintiffs adore the Delta-Monsanto merger, and sue Delta's directors and Monsanto for failing to consummate the merger. Plaintiffs' counsel, who denigrated the merger up until the time that their settlement collapsed, attempts to convince me that they are better equipped to pursue this lawsuit than the Delta directors who have always supported the merger. In addition, plaintiffs' counsel suggest that the Delta directors should have assumed a more hostile and litigious position toward Monsanto--Delta should have burned more bridges, so to speak--despite the fact that such a stance might have threatened future contractual relationships with Monsanto. Finally, shareholder plaintiffs' counsel try to convince me that the Delta directors should sell the company immediately, regardless of the plaintiffs' admission that Delta's share price is depressed. Not one of these assertions is persuasive. Not one is supported legally or factually.

At least two possibilities exist: [*34] either plaintiffs' counsel filed this lawsuit because they have wrongly assessed the existence of a claim or they filed it for a more calculated reason. n31 One thing is certain, however. Delta is entitled to an Order dismissing all of the shareholder plaintiffs' claims against it. I have entered an Order consistent with this Opinion.

> n31 *See, e.g.*, Carol B. Swanson, *Juggling Shareholder Rights and Strike Suits in Derivative Litigation*, 77 Minn. L. Rev. 1339 (1993); William M. Lafferty and W. Leighton Lord III, *Towards a Relaxed Summary Judgment Standard For the Delaware Court of Chancery: A New Weapon Against "Strike" Suits*, 15 Del. J. Corp. L. 921 (1990).

### ORDER

For the reasons set forth in this Court's Memorandum Opinion, entered in this case on this date, it is

ORDERED that all of the derivative and class action claims contained in the shareholder plaintiffs' second

amended complaint are dismissed, in accordance with Court of Chancery Rules 12(b)(6) and 23.1.

DATED: June 21, 2000

William [*35] B. Chandler III, Chancellor