LEXSEE 2005 DEL CH. LEXIS 51

**IN RE J.P. MORGAN CHASE & CO. SHAREHOLDER LITIGATION**

**Consolidated C.A. No. 531-N**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2005 Del. Ch. LEXIS 51*

**January 27, 2005, Submitted**
**April 29, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Motion to dismiss granted.

**COUNSEL:**

Seth D. Rigrodsky, Esquire, Ralph N. Sianni, Esquire, MILBERG WEISS BERSHAD & SCHULMAN LLP, Wilmington, Delaware; Steven G. Schulman, Esquire, Richard Weiss, Esquire, MILBERG WEISS BERSHAD & SCHULMAN LLP, New York, New York; Peter D. Bull, Esquire, BULL & LIFSHITZ, LLP, New York, New York, Attorneys for the Plaintiffs.

Jesse A. Finkelstein, Esquire, Lisa M. Zwally, Esquire, Michael R. Robinson, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael A. Cooper, Esquire, Sharon L. Nelles, Esquire, SULLIVAN & CROMWELL LLP, New York, New York; Nancy E. Schwartzkopf, Esquire, JP MORGAN CHASE LEGAL DEPT., New York, New York, Attorneys for the Defendants.

**JUDGES:** LAMB, Vice Chancellor.

**OPINIONBY:** LAMB

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

LAMB, Vice Chancellor.

**I.**

In 2004, two banks agreed to a business combination that was expected to create the second largest financial institution in the country. One bank paid a premium over the market share price for the other bank, effectively making one bank the acquirer and the [*2] other bank the target.

After the merger was completed, the stockholders of the acquirer sued its directors, alleging breaches of fiduciary duty with regard to the acquisition. Their claims stem from the allegation that the directors paid too much for the acquired bank. Specifically, the plaintiffs claim that the CEO of the target proposed a no-premium merger if he were immediately promoted to CEO of the resulting entity. The CEO of the acquirer allegedly refused that offer, choosing instead to pay the premium for the target's stock and retain his title.

The plaintiffs bring this class action in an effort to recover damages for what they contend are direct claims. The defendants move to dismiss the complaint on the basis that the claims are derivative, not direct, and that demand was not excused. For the reasons below, that motion is granted.

**II.** n1

---

n1 All facts herein are taken from the well-pleaded allegations of the complaint unless otherwise noted.

---

A. The Parties

The plaintiffs are Ronda Robins, [*3] George Ziegler, and Bruce T. Taylor, who are stockholders of J.P. Morgan Chase & Co. ("JPMC") during the relevant times. n2 The plaintiffs bring this action on their own behalf and as a class action pursuant to Court of Chancery Rule 23. The class is alleged to consist of all persons who owned JPMC common stock on the date the merger was announced, January 14, 2004, and continued to own such stock through the date the merger closed, July 1, 2004.

n2 Bruce T. Taylor is acting as custodian for Julia Ann Taylor.

The defendants are JPMC and the members of its board of directors who approved the merger with Bank One Corporation ("Bank One").

B. Background

On January 14, 2004, JPMC and Bank One published a joint press release announcing their agreed-upon merger, which had been unanimously approved by their respective boards of directors. Pursuant to the agreement, JPMC would issue shares of its common stock to Bank One stockholders at a premium of 14% over the closing price of Bank One common stock on the date [*4] of the announcement of the merger. n3

n3 Joint Proxy Statement at 36.

The merger agreement also laid out the succession plan for JPMC. After the merger, the CEO of JPMC, William B. Harrison, Jr., would continue as CEO for two years, after which time the CEO of Bank One, James Dimon, would succeed. During the interim two years, Dimon would serve as President and COO. Harrison, who was Chairman of JPMC before the merger, would continue in that role indefinitely beyond the two years.

The Joint Proxy Statement filed with the Securities and Exchange Commission on February 20, 2004 listed various reasons for the merger, including "a number of significant strategic opportunities and benefits," "more balanced business mix," "greater geographic diversification," and "expected financial synergies." n4 The merger, when announced, was expected to create the second largest financial institution in the country, measured by total assets. On May 25, 2004, the stockholders of JPMC overwhelmingly approved the merger, with 99.18% [*5] of the votes cast in its favor. n5 The merger closed July 1, 2004.

n4 *Id.* at 34-35.

n5 Form 8-K, May 25, 2004.

C. The Dispute

On June 26, 2004, just days before the merger closed, *The New York Times* printed an article that described preliminary negotiations between Harrison and Dimon. According to the article, Dimon offered to sell Bank One to JPMC at no premium if he were appointed CEO of the new entity immediately. Because much of the complaint hinges on one sentence in the article, the court finds it important to include it verbatim, as follows: "Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become the chief executive immediately, according to two people close to the deal." n6

n6 Landon Thomas, Jr., *The Yin, the Yang, and the Deal,* N.Y. TIMES, June 27, 2004, § 3 (Sunday Business) at 1.

[*6]

The plaintiffs allege that this one sentence proves that JPMC could have purchased Bank One for no premium if JPMC agreed to appoint Dimon CEO. The plaintiffs argue that JPMC instead agreed to pay a premium simply to satisfy Harrison's desire to retain the CEO title for two more years. In addition, the plaintiffs contend that Harrison remains CEO in title only and that Dimon is effectively exercising the powers of a CEO. Therefore, they claim, the only difference between Dimon's preliminary offer and the merger as consummated was that JPMC agreed to pay the 14% premium.

The defendants respond by pointing out that the plaintiffs' argument presupposes that the boards of directors of both companies would have approved Dimon's offer. The defendants argue that there was no possibility for JPMC stockholders to approve a merger based on Dimon's alleged offer because neither board of directors ever agreed to that deal. The deal that was agreed to by the boards included a 14% premium for Bank One and a succession plan that had Harrison remaining as CEO for two years, followed by Dimon. They argue that all other possible transaction formats that may have been proposed to and rejected by the [*7] JPMC board are irrelevant and immaterial, as the JPMC directors' consideration and rejection of all such proposals are protected by the business judgment rule.

D. The Complaint

The plaintiffs pursue all defendants for breaches of fiduciary duties surrounding the refusal of Dimon's alleged no-premium offer. They argue that by allowing Harrison to keep the title of CEO, the board of JPMC overpaid for Bank One by the 14% premium. Relying on the proxy materials stating that Harrison kept the board informed of his negotiations with Dimon, the plaintiffs claim that the board knew of Dimon's no-premium offer. Moreover, the plaintiffs claim that a majority of the board was beholden to Harrison and, thus, not able to act independently of him. The plaintiffs allege that the

board's lack of independence caused it to approve the 14% premium in order to let Harrison retain the title of CEO instead of insisting on the no-premium offer.

Alternatively, the plaintiffs claim that Harrison secretly refused Dimon's no-premium offer. Without presenting the offer to the JPMC board, they claim, Harrison refused to concede the title of CEO, but continued negotiating with Dimon. Under this set of facts, [*8] the plaintiffs contend that Harrison's self-interested refusal caused Dimon to demand a premium over Bank One's share price, which Harrison eventually agreed to and presented to the board.

The plaintiffs seek damages in the amount of the merger exchange ratio premium, approximately $ 7 billion. They allege that the JPMC board of directors, by approving the unfavorable merger exchange ratio and the unnecessary premium, harmed them directly by diluting their interests in JPMC. If the JPMC board had approved a no-premium merger exchange ratio, the argument goes, the plaintiffs would have a greater stake in the resulting company. Instead, the stockholders of the pre-merger JPMC now have less of a stake in the post-merger JPMC.

The JPMC board consisted of twelve directors--eleven, outsiders plus Harrison. The plaintiffs allege that eight of the eleven outside directors lacked sufficient independence with regard to the merger. n7 The plaintiffs base their claims on certain relationships between the directors and JPMC and/or Harrison. The defendants counter that the relationships described by the plaintiffs fall into three categories: normal business relationships, inconsequential charitable [*9] relationships, or family relationships that are either disclosed or ended. The defendants contend that none of the relationships affect the ability of the directors to act independently. The defendants also point out that a majority of the board of directors was certified as independent pursuant to NYSE Corporate Governance listing standards.

n7 The plaintiffs concede that three directors are independent: Hans W. Becherer, John H. Biggs, and Lee R. Raymond. The plaintiffs allege that Harrison benefitted from the merger by securing a $ 3.5 million increase in his severance package to $ 22.5 million. They further contend that Harrison knew his job was in jeopardy and he used the Bank One deal to retain the title of CEO for two more years. Harrison's alleged lack of independence is not disputed by the defendants in this motion to dismiss.

Set forth below are the directors in question and the specific allegations found in the complaint about each.

1. Riley Bechtel

Bechtel is the Chairman, CEO, and a director [*10] of the Bechtel Group, Inc. The plaintiffs allege that Bechtel is not independent because the Bechtel Group does business with the Trade Bank of Iraq, which is managed by JPMC. The plaintiffs claim that the Bechtel Group has received $ 2 billion from the Trade Bank in connection with the reconstruction of Iraq. The plaintiffs further allege that Bechtel is not independent because JPMC and the Bechtel Group share other financial interests. As an example, the plaintiffs cite an investment partnership that is jointly owned by partners of the Bechtel Group and a private equity firm affiliated with JPMC.

2. Lawrence Bossidy

The plaintiffs question the independence of Bossidy because his son is employed as a JPMC Vice President. The plaintiffs contend that Bossidy would be unable to vote against Harrison because his vote would potentially endanger his son's career.

3. Ellen Futter

Futter is the President, as well as a trustee, of The American Museum of Natural History. The plaintiffs claim that Futter cannot act independently because JPMC is a significant benefactor to the museum. The plaintiffs also claim that Futter cannot act independently because JPMC employed her brother-in-law [*11] as a managing director. n8

n8 The court takes judicial notice that Futter's brother-in-law was terminated on January 6, 2004 (effective March 8, 2004), one week before the JPMC board approved the merger with Bank One. *See Cohan v. J.P. Morgan Chase & Co.,* No. 03-5981 (S.D.N.Y. 2004), Second Amended Compl.; Joint Proxy Statement at 34. He has since sued JPMC in connection with his termination. *See Cohan,* No. 03-5981, Second Amended Compl.

4. Helene Kaplan

Kaplan is Vice-Chair and a trustee of The American Museum of Natural History. Like Futter, Kaplan is a senior fiduciary of the museum and the plaintiffs challenge her independence on the basis of her charitable ties to JPMC.

5. William Gray n9

n9 In their answering brief, the plaintiffs provide more detailed information about Gray

than is contained in the complaint. For example, they specify the dollar amount of JPMC's contributions to UNCF instead of simply stating that JPMC is a sponsor. The court takes these facts as true since presumably the plaintiffs could amend the complaint to include them.

 [*12]

Gray is the President and CEO of the United Negro College Fund ("UNCF"). In 2003, JPMC matched over $ 1 million in UNCF donations from its employees. Since 1990, JPMC and its employees have contributed over $ 18 million to UNCF. In addition, Harrison has served as treasurer of UNCF. Based on Gray's charitable ties to JPMC and Harrison's reciprocal involvement with UNCF, the plaintiffs claim that Gray cannot vote independently.

6. Frank Bennack

Bennack is the Chairman of the Executive Committee and Vice Chairman of the Board of the Hearst Corporation. He was instrumental in creating Hearst-Argyle Television, Inc., which has a credit facility with a consortium of banks led, in part, by JPMC. The plaintiffs maintain that the financial relationship between JPMC and Hearst-Argyle, when viewed in the context of the relationship between Bennack and Hearst-Argyle, causes Bennack to be unable to act independently as a director.

7. John Stafford

Stafford is a consultant to Wyeth and he was Chairman of the Board of Wyeth from 1986 until 2003. JPMC is the administrative agent and a lending bank under Wyeth's credit facilities. JPMC serves as indenture trustee, paying agent, and conversion [*13] agent for $ 4.5 billion of Wyeth's debt securities. The plaintiffs maintain that the financial relationship between JPMC and Wyeth precludes Stafford's ability to exercise independence as a director.

8. M. Anthony Burns

Burns is the Chairman Emeritus and former CEO of Ryder Systems, Inc. JPMC serves as indenture trustee for Ryder, including its recent August 2003 registration of $ 800 million of securities. The plaintiffs maintain that the financial relationship between JPMC and Ryder impedes Bums's ability to act as an independent director.

E. Procedure

The defendants move to dismiss, arguing that the claims asserted are derivative and that demand is not excused. The defendants further argue that the board of directors has a majority of members who were independent and disinterested, and, therefore, the board's decision to authorize the merger is governed by the business judgment rule.

The plaintiffs oppose the motion, arguing that the claims asserted are direct. Alternatively, they argue that if the claims are found to be derivative, demand is futile and therefore excused because a majority of the board of JPMC was not able to act independently of Harrison in voting [*14] to authorize the merger and, therefore, is not capable of acting on a demand. Even if the claims against the board are dismissed, the plaintiffs assert that they can pursue Harrison individually if he did not relay Dimon's offer to the board for its approval.

The plaintiffs also allege a breach of the directors' disclosure duties in connection with the failure to disclose material information in the proxy statement. n10

> n10 In their answering brief, the plaintiffs assert that PP 81-89 of the complaint state a claim for equitable fraud. They further assert that the defendants did not address the equitable fraud claim in the defendants' opening brief. Therefore, the plaintiffs argue, the equitable fraud claim must be permitted to go forward. The court finds that the complaint does not adequately allege a claim for equitable fraud. Under Court of Chancery Rule 8(a), a complaint "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Nowhere in PP 81-89 of the complaint is the term "equitable fraud" to be found. Furthermore, the allegations in those paragraphs do not contain a plain statement that would put the defendants on notice that the plaintiffs were alleging equitable fraud. Moreover, "[a] class action may not be maintained in a purely common law or equitable fraud case." *Gaffin v. Teledyne, Inc., 611 A.2d 467, 474 (Del. 1992)*. Even if the allegations in PP 81-89 of the complaint could be construed as equitable fraud, it is not enough to maintain a class action.

 [*15]

F. Federal Action

A similar federal class action complaint was filed in the District of Delaware on March 17, 2005. The federal complaint alleges substantially the same claims that are before this court. It does, however, have several important differences. First, the federal complaint characterizes the deal between Harrison and Dimon as a "secret deal." This description implies that the merger negotiations were unknown to the board of JPMC, a fact that appears inconsistent with the state complaint's primary allegation, as well as later allegations in the federal complaint that

the "defendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon." n11

> n11 Federal Compl. P 144(e).

Second, the federal complaint alleges that JPMC violated federal securities laws, specifically *Sections 10(b), 11, 12(a)(2), 14(a), 15,* and *20(a) of the Securities Exchange Act of 1934*. These claims are sufficient to give federal courts jurisdiction over the claims, including the related breaches of fiduciary [*16] duty claims.

Finally, the federal complaint lists important distinguishing facts, some of which are inconsistent with facts in this action. For instance, the federal complaint states that *Harrison* offered the no-premium deal. n12 The complaint before this court makes the opposite claim, i.e. that it was Dimon who made an offer of that nature. This discrepancy is not explained.

> n12 *Id.* P 81 (citing *Fortune,* Jan. 26, 2004, which states "Harrison was offering what he calls a market deal,' meaning that J.P. Morgan would simply buy Bank One at its current stock price - around $ 45 a share.").

The federal complaint alleges additional substantive facts concerning certain directors. For example, the federal complaint ties Futter's fund-raising activities to her board membership, as reported in *New York Magazine* on February 21, 2000. n13 Additionally, the federal complaint alleges that Kaplan is an attorney whose law firm receives substantial fees from JPMC. n14

> n13 *Id.* P 171.

[*17]

> n14 *Id. P 174.*

On April 18, 2005, the federal district court refused to enjoin this action. n15 In his decision, Judge Farnan stated that any possibility of harm to the federal plaintiff is speculative at this stage of the litigation. This court will therefore proceed to decide the motion to dismiss the state complaint.

> n15 *Hyland v. Harrison,* C.A. No. 05-162, mem. order (D. Del. Apr. 18, 2005).

III.

In order to dismiss a complaint under Court of Chancery Rule 12(b)(6), a court "must determine whether it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief" n16 When making its decision, a court must accept as true all well-pleaded factual allegations in the complaint and all reasonable inferences to be drawn from those facts. n17 But a court need not "blindly accept as true all allegations, nor must [*18] it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." n18

> n16 *VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 610-11 (Del. 2003)* (quotations omitted).
>
> n17 *Grobow v. Perot, 539 A.2d 180, 187 n.6 (Del. 1988).*
>
> n18 *Id. at 187.*

A. Direct Or Derivative Analysis

The court begins by analyzing whether the stated claims are direct or derivative. The Delaware Supreme Court recently revised the standard for determining whether a claim is direct or derivative to "turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" n19 "Under *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." n20 "Instead the court must look to all the facts [*19] of the complaint and determine for itself whether a direct claim exists." n21

> n19 *Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004).*
>
> n20 *In re Syncor Int'l Corp. S'holders Litig., 857 A.2d 994, 997 (Del. Ch. 2004).*
>
> n21 *Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004).*

The plaintiffs' main complaint is that the defendant directors breached their fiduciary duty by approving a merger exchange ratio that paid an unnecessary or exces-

sive premium to Bank One stockholders. This premium, the plaintiffs argue, prevented them from receiving their fair share of the resulting business combination, causing them to be harmed directly through dilution of their collective ownership percentage.

1. Who Suffered The Alleged Harm?

In order to show a direct injury under *Tooley,* a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation. [*20] " n22

n22 *845 A.2d at 1039.*

By describing the harm as a dilution of their stockholder interests, the plaintiffs attempt to allege a harm to them that does not affect the corporation. But their argument fails to acknowledge the context in which they were allegedly harmed. "[A] complaint that directly challenges the fairness of the process and the price' of a merger suggests ... that the corporation suffered harm ... and that the harm suffered by stockholders is only a natural and foreseeable consequence of the harm to the corporation." n23 At the heart of their complaint, the plaintiffs claim that JPMC overpaid for Bank One. If JPMC had paid cash for Bank One, the plaintiffs' claim would clearly be derivative. JPMC would have suffered the alleged harm by paying too much money for Bank One. Any such cash overpayment would not have harmed the stockholders of JPMC directly. The only harm to the stockholders would have been the natural and foreseeable consequence of the harm to JPMC.

n23 *Agostino v. Hicks,* 845 A.2d 1110, 1119 (Del. Ch. 2004) (quoting, in part, *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1245 (Del. 1999)).

[*21]

The fact that this transaction was effectuated by issuing stock and not by paying cash does not change the result. The harm, if any, was still suffered by JPMC. Although "dilution claims emphasizing the diminishment of voting power have been categorized as direct claims," n24 "[they] are individual in nature [only] where a significant stockholder's interest is increased at the sole expense of the minority." n25 "To the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares ... results from the issuance of new equity to a third party ..., plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed." n26

n24 *Gentile v. Singlepoint Fin.,* 2003 Del. Ch. LEXIS 21, 2003 WL 1240504, at *5 n.36 (Del. Ch. Mar. 5, 2003).

n25 *In re Paxson Communication Corp. S'holders Litig.,* 2001 Del. Ch. LEXIS 95, 2001 WL 812028, at *5 (Del. Ch. July 10, 2001).

n26 *Id.*

Here, the plaintiffs rely on the claim of "dilution" in an attempt [*22] to frame the harm as direct. But, they do not allege any stockholder dilution in relation to pre-merger voting rights. Instead, their claim of dilution is related to the issuance of stock to consummate the merger. This dilution claim is based on the merger exchange ratio, which was a necessary result of the purchase price for Bank One. Any alleged dilution was a harm suffered by all pre-merger JPMC stockholders and, consequently, JPMC itself. Thus, the harm alleged in the complaint cannot give rise to a direct claim.

In response to the court's request for support "for the proposition that a claim which would undoubtedly be a derivative claim is somehow converted into a direct claim because of the form of consideration," n27 the plaintiffs were not able to cite any persuasive authority. Indeed, in their post-hearing submissions, the plaintiffs were unable to point to any authority under Delaware law that the direct/derivative analysis is affected by the form of consideration used in a transaction. In fact, Delaware case law states that "if a board of directors authorizes the issuance of stock for no or grossly inadequate consideration, the corporation is directly injured and shareholders [*23] are injured derivatively." n28 Furthermore, as Chancellor Chandler has recently noted, "mere claims of dilution, without more, cannot convert a claim traditionally understood as derivative, into a direct one." n29 Thus, the plaintiffs' argument that they were harmed directly because the merger consideration was stock instead of cash must fail as a matter of law.

n27 Tr. at 44.

n28 *Avacus Partners, L.P. v. Brian,* 1990 Del. Ch. LEXIS 178, 1990 WL 161909, at *6 (Del. Ch. Oct. 24, 1990).

n29 *Gatz v. Ponsoldt,* 2004 Del. Ch. LEXIS 203, 2004 WL 3029868, at *7 (Del. Ch. Nov. 5, 2004).

Putting the 14% premium payment in the proper context, the court finds that any alleged harm was suf-

fered by JPMC, regardless of whether the payment was in cash or in stock. The plaintiffs, if they were harmed at all, were harmed indirectly and only because of their ownership in JPMC. Therefore, under the first prong of *Tooley,* the court concludes that the plaintiffs' claim is derivative.

2. Who Would Receive The Benefit Of Any Recovery [*24] Or Other Remedy?

Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. n30 Here, the plaintiffs seek a return of the "proper interest" n31 of JPMC to stockholders who owned pre-merger JPMC stock, but they offer no explanation of what such a proper interest might be. Additionally, the plaintiffs are unable to demonstrate why they, and not JPMC, should receive the benefit of any remedy.

n30 *845 A.2d at 1033*.

n31 Pls.' Answering Br. at 43.

As discussed above, if there was harm suffered by payment of a merger. premium, JPMC suffered it. Thus, if the defendants are found liable, the remedy will accrue to JPMC. Although the plaintiffs go to great lengths to define the class in a way that would allow them to argue for a direct class benefit, their effort to make the claim direct fails. The plaintiffs' argument that the previous Bank One stockholders, who ostensibly have already benefitted from any misconduct, should [*25] be excluded from the remedy is not persuasive. Any remedy from the alleged harm would necessarily accrue to JPMC and not to a subset of stockholders. Therefore, the plaintiffs' claims are derivative under the second question of *Tooley.*

B. Section 220 Demand

Before turning to the issue of whether demand should be excused, the court notes that the plaintiffs did not make a books and records demand of JPMC before filing suit. *Section 220 of the Delaware General Corporation Law* provides that stockholders have the right to inspect a corporation's books and records for "any proper purpose." n32 Both the Delaware Supreme Court and the Court of Chancery "have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a *Section 220* books and records inspection to uncover such facts." n33

n32 *8 Del. C. § 220*.

n33 *Beam v. Stewart, 845 A.2d 1040, 1056 (Del. 2004)*.

In this case, the court is once again confronted [*26] with a situation in which the plaintiffs attempt to plead demand futility, but have not sought access to the books and records of the corporation under *section 220*. Like the plaintiff in *Beam,* the plaintiffs here did not seek information from the defendant corporation that may have provided them additional facts, from which they could have fashioned a more particularized complaint. For example, if the plaintiffs had successfully sought information from JPMC, they most likely would have learned whether Harrison presented a no-premium offer to the board. Instead, the plaintiffs rely on general wording from public filings that Harrison kept the board informed.

Furthermore, the plaintiffs could have used *section 220* to learn more about the relationships between Harrison and the defendant directors. As the Delaware Supreme Court noted in *Beam,* plaintiffs who seek information under *section 220* may be able to review the minutes of board meetings and determine how the directors handled the CEO's proposals or conduct in various contexts. n34 Armed with this information, the plaintiffs may have been able to link the alleged relationships to directors' conduct through particularized [*27] facts.

n34 *Id.*

Despite the frequent admonitions of the Delaware Supreme Court and the Court of Chancery, the plaintiffs did not pursue this remedy. Although their failure to use "a books and records inspection does not change the standard to be applied to review of the complaint," n35 the court notes at the outset that the plaintiffs had the time and opportunity to file such an action. The plaintiffs did not learn of the alleged no-premium offer from the newspaper article until days before the merger closed. During the short time available before the merger, they did not seek injunctive relief that may have delayed the closing. Once the merger closed, however, the plaintiffs had ample time and opportunity to investigate the facts behind the anonymous allegations in the newspaper article through the filing of a *section 220* action. The plaintiffs did not file the amended complaint until two months after the merger closed.

n35 *Id at 1057 n.52*.

[*28]

C. Demand Futility

The plaintiffs argue that if their claims are derivative, demand is excused because it would be futile. Under Court of Chancery Rule 23.1, "a plaintiff shareholder [must] make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf." n36 If a plaintiff argues demand futility, the two-prong test under *Aronson* and its progeny must be met. n37 The first prong of the *Aronson* test is whether "a shareholder [has pled] *with particularity* facts that establish that demand would be futile because the directors are not independent or disinterested." n38 The second prong of the test is whether "a reasonable doubt is created that ... the challenged transaction was otherwise the product of a valid exercise of business judgment." n39 The two prongs of the *Aronson* test are disjunctive, meaning that if either part is satisfied, demand is excused." n40

   n36 *Jacobs v. Yang, 2004 Del. Ch. LEXIS 117, 2004 WL 1728521, at *2 (Del. Ch. Aug. 2, 2004), aff'd, 867 A.2d 902 (Del. 2005) 2005 Del. LEXIS 38*.

[*29]

   n37 *Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000)*; *Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984)*.

   n38 *Jacobs, 2004 Del. Ch. LEXIS 117, 2004 WL 1728521, at *2* (emphasis in original).

   n39 *Aronson, 473 A.2d at 814*.

   n40 *Brehm, 746 A.2d at 256*.

1. First Prong Of *Aronson*

The plaintiffs argue that demand is excused under the first prong of the *Aronson* test because at least eight of the twelve directors on the board fail the test of being disinterested and independent. n41 Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." n42 "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." n43

   n41 The plaintiffs do not challenge the independence of directors Becherer, Biggs, and Raymond. Harrison is the twelfth director and his lack of independence is not disputed in this motion to dismiss.

[*30]

   n42 *Aronson, 473 A.2d at 812*.

   n43 *Id. at 816*.

Here, none of the outside directors stood on both sides of the transaction nor are they alleged to have received any personal financial benefit from it other than one that devolved on all JPMC stockholders alike. Thus, there is no issue regarding these directors' interest in the deal. Rather, the thrust of the plaintiffs' allegations is that the directors were so positioned, as a result of various business, charitable, or family relationships, that they were disabled from exercising independent judgment. The complaint alleges that, through these various relationships, the outside directors were beholden to Harrison and unable to act independently of Harrison's influence.

JPMC's board consists of twelve directors. Thus, the plaintiffs need to show that 5 directors, plus Harrison, were not independent. n44 The court's review of the complaint's well-pleaded allegations shows that, in addition to the three concededly independent directors, the plaintiffs fail to meet their burden with respect to any of the other [*31] outside directors.

   n44 *See Beam, 845 A.2d at 1046* ("Demand is excused where a board is evenly divided between interested and disinterested directors.").

Before analyzing each director individually, the court pauses to note the overall structure of the JPMC board. The board is dominated by outsiders. Eleven of the twelve directors are not employees of JPMC. Harrison cannot fire any of them. Additionally, Harrison is not a controlling stockholder of JPMC and therefore has no power to oust them as directors through a stockholder vote. On the contrary, it is the eleven outside directors who collectively have the power to dismiss Harrison and the rest of his management team. The plaintiffs allege that the defendant directors are beholden to Harrison, but they fail to demonstrate why that is so. Even in cases in which the CEO had a supermajority of voting power, courts have upheld outside directors' independence in the face of additional relationships. n45 Here, Harrison reports to a board of directors [*32] that he cannot fire or

remove, a fact that appears lost in the allegations that each director, no matter how indirectly, has some external relationship to JPMC.

> n45 *Id. at 1051* ("Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence.").

The court begins its analysis by looking to defendant directors Bennack, Stafford, and Bums, whose independence is questioned by the plaintiffs due to certain financial ties to JPMC. These three directors are, or were, intimately involved with several of America's largest corporations. All three directors have substantial personal wealth invested in their related companies, each of which conducts business with JPMC.

JPMC is a national commercial and investment bank. That it provided financing [*33] to large American companies should come as no shock to anyone. Yet this is all that the plaintiffs allege. What the plaintiffs fail to allege are facts showing a connection between the financing and these three defendant directors. Instead, the plaintiffs attempt to rely on a mere inference that because a former executive of a major corporation owns a small percentage of the corporation's outstanding shares n46 and that corporation does business with a national bank, somehow that former executive could not act independently of the bank's CEO as a director of the bank. The allegations raised against all three of these directors are simply not enough, without more, to raise a substantial question about their independence.

> n46 Facts about the stock ownership of Bennack, Stafford, and Burns are contained in the plaintiffs' answering brief. *See supra* note 9.

The plaintiffs also challenge the independence of Bechtel based on his business relationships. The complaint alleges facts that indicate Bechtel's business [*34] ties to JPMC are more direct and more substantial than those of Bennack, Stafford, and Burns, but the complaint again fails to show how such facts impinge on Bechtel's ability to act independently of Harrison. Although Bechtel's company has received over $ 2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country, the plaintiffs do not allege that the money was somehow connected to Bechtel's relationship with JPMC or that future reconstruction work would be jeopardized if Bechtel voted against Harrison. Therefore, the complaint fails to adequately challenge Bechtel's independence.

The court next turns to Futter, whose independence is challenged because she is President and trustee of The American Museum of Natural History. n47 The plaintiffs make much of the fact that JPMC contributes to the museum. But the plaintiffs make no mention of any potential influence that JPMC's contributions may have on Futter. Indeed, the plaintiffs do not even go so far as to indicate what percentage of the museum's overall contributions are made by JPMC. The plaintiffs state that JPMC is a significant benefactor, but they never state how JPMC's contributions could, or [*35] did, affect the decision-making process of the president of one of the largest museums in the nation. Therefore, as alleged, the complaint does not demonstrate that Futter is not independent.

> n47 Futter is also challenged due her brother-in-law's employment with JPMC. This employment, however, was terminated before the JPMC board voted on the merger, so the court will not consider this allegation. *See Grobow, 539 A.2d at 187* ("A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.").

The plaintiffs make the same conclusory argument about Kaplan as they do about Futter. The only allegation against Kaplan is her relationship to The American Museum of Natural History. Again, the plaintiffs fail to connect JPMC's contributions to the potential lack of independence of a JPMC director. n48 They simply aver that Kaplan was a trustee of an institution that received contributions from JPMC. Therefore, [*36] as pled, the complaint does not raise a substantial question about Kaplan's independence.

> n48 Delaware courts have previously recognized that philanthropic relationships with institutions may give rise to questions about a director's independence. *See, e.g., In re Oracle Corp. Derivative Litig., 824 A.2d 917 (Del. Ch. 2003)*; *In re The Limited, Inc. S'holders Litig., 2002 Del. Ch. LEXIS 28, 2002 WL 537692 (Del. Ch. Mar. 27, 2002)*; *Lewis v. Fuqua, 502 A.2d 962 (Del. Ch. 1985)*. But in those cases, the complaints had many more particularized facts about the materiality of the relationship in question that would

create a reasonable doubt about the independence of the directors. In *Oracle,* two special litigation committee members, both professors at Stanford, were asked to investigate other Oracle board members who had the following substantial ties to Stanford: (i) one of the other directors was a professor at Stanford who had taught one of the special litigation committee members; (ii) another director was "a Stanford alumnus who [had] directed millions of dollars of contributions to Stanford during recent years;" and (iii) "Oracle's CEO, who has made millions of dollars in donations to Stanford through a personal foundation and large donations indirectly through Oracle, . . . was considering making donations of his $ 100 million house and $ 170 million for a scholarship program." *Oracle, 824 A.2d at 920-21*. In *The Limited,* the court concluded that a director, the university president of the alma mater of the corporation's largest stockholder, and the corporation's founder, President, Chairman, and CEO, was not independent in part because of a successful solicitation of $ 25 million donation to the university. *The Limited, Inc. S'holders Litig., 2002 Del. Ch.LEXIS 28, 2002 WL 537692 at *6-7*. In *Fuqua,* the court found that the sole member of the special litigation committee was not independent because he was President of Duke University, which had recently received a $ 10 million pledge from the company, and the CEO was a trustee of Duke. *Fuqua, 502 A.2d at 966-67*. Indeed, the CEO was J.B. Fuqua of the eponymous Fuqua School of Business at Duke University. Moreover, *Oracle* and *Fuqua* were cases in which the court made searching inquiries into the nature of a special litigation committee member's independence. *Beam, 845 A.2d at 1055* (discussing the special litigation committee's burden of establishing its own independence). Finally, as noted above, the plaintiffs here did not make a *section 220* books and records demand. If they had, they would have been able to investigate the decision-making process behind the qualification of the directors as independent under the NYSE Corporate Governance rules. Instead, they rely on conclusory allegations that do not create a reasonable doubt about Futter's or Kaplan's independence based on the charitable ties to The American Museum of Natural History.

[*37]

Next in the analysis is Bossidy, whose independence is challenged because his son is employed by JPMC. Family employment ties can give rise to concerns about the ability of directors to act independently of a company's management. For example, the NYSE rules governing director independence focus on this subject, holding that employment of a child as an executive officer of the corporation may disqualify an outside director from serving as a disinterested member of the board. n49 Delaware courts also recognize that familial ties to management can disqualify one from functioning disinterestedly. n50 In this case, however, Bossidy's son is not an executive officer of JPMC, and the complaint does not allege that Bossidy and his son live in the same household. Under NYSE Corporate Governance rules, Bossidy was found to meet the criteria for certification as an outside, independent director. Moreover, the fact that Bossidy's son is employed by JPMC is duly disclosed in JPMC's proxy materials. For these reasons, the plaintiffs' attack on Bossidy's independence must fail.

n49 NYSE Corporate Governance Rule 303A.02(b)(i) ("In addition, a director is not independent if ... the director is, or has been within the last three years, an employee of the listed company, or an immediate family member is, or has been within the last three years, an executive officer, of the listed company.").

[*38]

n50 *Grimes v. Donald, 673 A.2d 1207, 1216 (Del. 1996)* (finding that familial interest is a basis for demand excusal).

Finally, the court turns to Gray, who is challenged due to his charitable ties with Harrison. At first glance, the reciprocal relationship between JPMC and UNCF, as evidenced by the positions held by Gray and Harrison, could call into question the independence of Gray. However, upon closer examination, the court finds that the complaint is devoid of particularized facts that would lead to the conclusion that Harrison had any influence over Gray. Nowhere in the complaint do the plaintiffs aver that Harrison was treasurer of UNCF during the merger negotiations or the board vote. Indeed, this uncertainty about Ham son's involvement with UNCF at the relevant time is noted by the plaintiffs in their answering brief, which states that Ham son's relationship to UNCF is not disclosed in the joint proxy statement. Furthermore, just as they fail to indicate the importance of JPMC's contributions to The American Museum of Natural History, the plaintiffs fail to indicate [*39] how JPMC's contributions would affect UNCF and therefore influence Gray. The plaintiffs provide only the dollar value, not the representative percentage, of JPMC's con-

tributions to UNCF. Thus, the plaintiffs' allegations do not successfully challenge Gray's independence.

In addition to the three concededly independent directors, the court finds that the other eight outside directors are also independent. Therefore, the plaintiffs will be unable to prove that a majority of the board of JPMC was either interested or not independent under the first prong of *Aronson.*

2. Second Prong Of Aronson

The plaintiffs argue that demand is also excused under the second prong of the *Aronson* test. In order to succeed in their argument, the "plaintiffs must allege particularized facts that raise doubt about whether the challenged transaction is entitled to the protection of the business judgment rule." n51 Specifically, the "plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." n52

n51 *In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003)* (citing *Aronson, 473 A.2d at 814-15*).

[*40]

n52 *Walt Disney, 825 A.2d at 286.*

Nothing in the complaint indicates that the JPMC board was not adequately informed about the negotiations with Bank One. Indeed, the plaintiffs note that the proxy materials stated Harrison kept the board informed of the negotiations. Yet this fact presents a paradox for the plaintiffs. They need to allege that Harrison informed the board in order to list the other directors as defendants, but they would rather label those same directors as "uninformed" in order to succeed on the second prong of *Aronson.* The complaint fails, however, to allege facts that would indicate that the board was presented with the decision, but was not provided with information from which it could make a proper decision.

With regard to the honesty and good faith of the board, the plaintiffs do not allege any facts that directly call into question the acts of the directors. The plaintiffs' allegations concern only the directors' relationships to Harrison. Nowhere in the complaint do the plaintiffs allege that any individual defendant director personally acted without [*41] honesty and good faith. The only allegation in the complaint is that somehow, due to their financial, charitable, or personal relationship to Harrison, the individual director defendants were beholden to Harrison, allegations that have already been found to be insufficient.

Due to the absence of particularized factual allegations calling into question the directors' good faith, honesty, or lack of adequate information, the court finds that the complaint does not give rise to a reason to doubt whether the decision of the board of directors of JPMC to approve the Merger Agreement is entitled to the protection of the business judgment rule.

The plaintiffs are unable to meet either prong of the *Aronson* test. They have failed to show that a majority of the board is either interested or not independent. They have also not shown why the board's decision is not protected by the business judgment rule. Thus, the plaintiffs' derivative claim must be dismissed because demand is not excused.

C. Proxy Disclosure

Finally, the court turns to the plaintiffs' claim that the defendants breached their fiduciary duty by publishing materially inaccurate or incomplete disclosures regarding [*42] the proxy statement. The plaintiffs claim that the purported class was harmed because the proxy did not include information about the alleged offer from Dimon to Harrison. Notably, however, the complaint does not claim that the merger itself harmed either JPMC or the class. The harm alleged is the lost opportunity to vote for and approve a better deal, *i.e.* the Dimon offer that was rejected during negotiations and never approved by either board of directors. For this alleged harm, the complaint seeks money damages.

The issue the court sees is whether this purported class-based disclosure claim can exist as a claim for money damages apart from the underlying derivative claim. This issue is particularly framed by the fact that the damages allegedly flowing from the disclosure violation are exactly the same as those allegedly suffered by JPMC in the underlying claim.

The disclosure claim alleged by the plaintiffs, like the disclosure claims in *In re Triarc Cos. Class & Derivative Litig.,* if proven, could have supported a claim for equitable relief. n53 In this case, the plaintiffs did not seek an injunction to stop the merger before it closed. The time period between the publication [*43] of the article in *The New York Times* and the consummation of the merger was quite short. Nevertheless, the plaintiffs had time to seek a temporary restraining order to preserve the *status quo,* and, had they done so, could have secured the ability to obtain further equitable remedies, such as an order requiring that JPMC amend its proxy statement and resolicit the stockholders for another vote. The plaintiffs also did not act promptly to preserve any other claimed equitable remedies, such as rescission.

Now, of course, the "eggs" have been irretrievably "scrambled" and there is no possibility of effective equitable relief.

> n53 *791 A.2d 872, 876 (Del. Ch. 2001)*. As this court stated in *Triarc*, "*Loudon* recognized a much broader category of cases in which a violation of the duty of disclosure will ordinarily support only a claim for equitable or injunctive relief." *Id.*

Because equitable relief is no longer practicable, the plaintiffs present their disclosure claim as one seeking money [*44] damages. There are several problems with this approach. In order for the plaintiffs' request for compensatory damages arising from a violation of the duty of disclosure to survive a motion to dismiss, the court must find that the plaintiffs have set forth in a well-pleaded complaint allegations to support those damages. n54 But, for the reasons already discussed, the court concludes that the injury alleged in the complaint is properly regarded as injury to the corporation, not to the class, and the damages, if any, flowing from that alleged breach of fiduciary duty belong to the corporation, not to the class. How then could the same directors ever be liable to pay actual compensatory damages to both the corporation and the class for the same injury? The answer, as *Loudon* implicitly recognizes, is that they could not. n55 While the disclosure claim might have given rise to an entitlement to equitable relief that could have been pursued by the stockholders individually or as a class action, the disclosure claim simply does not give rise to a claim for substantial, compensatory damages in this situation. Instead, the claim for actual damages, if there is one, belongs to the corporation [*45] and can only be pursued by the corporation, directly or derivatively.

> n54 *O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 919 (Del. Ch. 1999)*.
>
> n55 *See Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135 (Del. 1997)*.

As in *Loudon,* the plaintiffs try to rely on *Tri-Star* n56 for the rule that there is a "per se rule of damages for breach of the fiduciary duty of disclosure." n57 This is no longer an accurate statement of Delaware law. *Loudon* limited *Tri-Star* to its facts, holding that *"Tri-Star* stands only for the narrow proposition that where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages." n58 For reasons already discussed, the complaint in this case does not properly allege any impairment to the economic or voting interests of the class of JPMC stockholders. The only economic injury the [*46] plaintiffs claim to have suffered is the loss of the opportunity for JPMC to have acquired Bank One on more favorable terms. That injury, if there is one, is to the corporation. Moreover, JPMC stockholders' voting rights were unaffected by the merger. Although there are now more JPMC shares outstanding and a greater number of stockholders, control of the corporation remains unchanged. Thus, the sort of "injury to voting interests" described in *Tri-Star* is absent. n59

> n56 *In re Tri-Star Pictures, Inc., Litig., 634 A.2d 319 (Del. 1993)*.
>
> n57 *Loudon, 700 A.2d at 141*.
>
> n58 *Id. at 142* (describing *Tri-Star's* per se discussion as dictum). *See also Triarc, 791 A.2d at 877* ("*Tri-Star* was narrowly limited to its facts in *Loudon v. Archer-Daniels-Midland Co."*). However, at least one subsequent case states that *Malone* "constitute[s] a retreat to *Tri-Star's* per se rule of damages for all violations of the fiduciary duty of disclosure." *O'Reilly, 745 A.2d at 918* (discussing *Malone v. Brincat, 722 A.2d 5 (Del. 1998))*. This court does not agree. The *Malone* court was presented with the issue of disclosure in the context of public documents filed as a matter of course with the SEC, not proxy statements soliciting stockholder votes. *Malone, 722 A.2d at 8*. Thus, *Malone's* discussion of the duty of disclosure as it relates to solicitation of stockholder votes is dictum and not controlling.

[*47]

> n59 *634 A.2d at 332* ("The power of *Tri-Star's* minority shareholders to oppose the [later] merger was diluted to the point of virtual oblivion.").

For these reasons, the court concludes that the complaint does not state a cognizable disclosure claim. The issues about the adequacy of the proxy statement disclosure would be of continuing relevance to the underlying derivative claim. For example, the quality of those disclosures is relevant to any potential defense based on a theory of stockholder ratification. n60 Nevertheless, there is no possibility of recovery of either nominal or substantial damages by the class on this complaint. n61

n60 See *Yiannatsis v. Stephanis, 653 A.2d 275, 280 (Del. 1995)* ("Ratification can occur only if the stockholders are fully informed of the consequences of their vote.").

n61 The court also notes with interest a recent decision of the United States Supreme Court holding that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharm., Inc. v. Broudo, 161 L. Ed. 2d 577, 125 S. Ct. 1627, 1629 (2005)*. Thus, the Court affirmed the dismissal, on a Rule 12(b)(6) motion, of a claim that failed to allege facts showing that the misleading disclosures had actually caused loss to the plaintiff beyond the simple assertion that the plaintiff's purchase price was inflated by the defendants' misconduct. In its unanimous opinion, the Court recognized that judicially implied rights of action under the federal securities laws are based on the common law of deceit or misrepresentation, which recognizes that a "plaintiff must have suffered substantial damage,' not simply nominal damages, before the cause of action can arise.'" *Id. at 1632* (quoting, in part, W. KEETON ET AL., PROSSER AND KEETON ON LAW OF TORTS § 110, at 765 (5th ed. 1984)).

[*48]

**IV.**

For the foregoing reasons, the motion to dismiss is GRANTED. IT IS SO ORDERED.