# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES GILLIAM, Individually And On Behalf Of All Others Similarly Situated, ) ) | Civil Action No. 04cv11600 (MBB) |
| Plaintiff, ) ) | **Consolidated Case Nos.:** |
| vs. ) ) | 04cv11642 |
| ) | 04cv11709 |
| FIDELITY MANAGEMENT AND RESEARCH COMPANY, et al., ) ) | 04cv11735 04cv11812 |
| Defendants. ) ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**MOULTON & GANS, P.C.**
Nancy Freeman Gans (BBO #184540)
33 Broad Street, Suite 1100
Boston, MA 02109-4216
(617) 369-7979

*Liaison Counsel for Plaintiffs*

**MILBERG WEISS BERSHAD & SCHULMAN LLP**
Jerome M. Congress
Janine L. Pollack
Kim E. Miller
Michael R. Reese
One Pennsylvania Plaza
New York, NY 10119-0165
(212) 594-5300

**STULL, STULL & BRODY**
Jules Brody
Mark Levine
6 East 45th Street
New York, NY 10017
(212) 687-7230

**SCOTT + SCOTT, LLC**
Arthur L. Shingler, III
Wells Fargo Building
401 B Street, Suite 307
San Diego, CA 92101
(619) 233-4565

*Tri-Lead Counsel for Plaintiffs*

## Table of Contents

**Page**

PRELIMINARY STATEMENT ...................................................................1

ARGUMENT ...........................................................................................8

I.     THE PLEADING STANDARD ...........................................................8

II.    PLAINTIFFS HAVE PROPERLY ALLEGED A VIOLATION OF
       INVESTMENT COMPANY ACT § 36(b) ...........................................9

       A.    Plaintiffs Have Stated a § 36(b) Claim with Regard to All Fidelity
             Funds...............................................................................9

             1.    *Gartenberg* Is a Post-Trial Decision That Does Not Alter
                   the Rule 8 Pleading Standard on a Motion to Dismiss .................11

             2.    The Language of § 36(b) Does Not Require that Plaintiffs
                   Plead Detailed Facts Regarding All Funds Within the
                   Complex..................................................................12

             3.    The Legislative History of § 36(b) Supports Plaintiffs'
                   Ability to Bring Suit Based Upon Allegations Directed at
                   the Fund Complex.......................................................13

             4.    Plaintiffs Have Stated a Section 36(b) Claim With Respect
                   to All Fidelity Funds by Combining Complex-Wide and
                   Fund-Specific Allegations ............................................14

             5.    The Trustees' Lack of Independence Further Supports the
                   Validity of Plaintiffs' § 36(b) Claims ............................22

       B.    Plaintiffs May Assert Direct Claims under § 36(b) on Behalf of
             Plaintiffs and the Class as Investors in the Fidelity Funds ......................23

             1.    Supreme Court Rulings and Legislative History Confirm
                   that § 36(b) Claims Are Direct Rather than Derivative ................23

             2.    Recent Decisions, Including Within this District, Have
                   Found Section 36(b) Claims to be Direct ....................................26

             3.    The Language of § 36(b) Confirms that the Fund Investors
                   Have a Primary and Direct Right of Action Under § 36(b)..........27

III.  PLAINTIFFS HAVE STANDING TO ASSERT CLAIMS REGARDING
      ALL FIDELITY FUNDS .................................................................................29

      A.    Plaintiffs Have Standing to Assert Direct Claims on Behalf of All
            Fidelity Funds Shareholders ....................................................................29

            1.    Courts Have Held That a Plaintiff Need Not Have Invested
                  in Each Fund to Satisfy the Standing Requirement ......................29

            2.    Plaintiffs Also Have Standing to Pursue Their Direct
                  Claims on Behalf of Shareholders in All of the Fidelity
                  Funds Pursuant to the Juridical Link Doctrine ............................36

            3.    Plaintiffs Have Standing Due to their Ongoing Financial
                  Interest in the Outcome of the Litigation Regarding All
                  Funds .............................................................................................39

      B.    Plaintiffs Have Standing to Pursue Claims "On Behalf Of" All of
            the Fidelity Funds as Members of an Unincorporated Association
            Pursuant to Fed. R. Civ. P. 23.2 ..............................................................40

IV.   PLAINTIFFS HAVE PROPERLY PLEADED DIRECT (NOT
      DERIVATIVE) CLAIMS UNDER STATE LAW AND INVESTMENT
      COMPANY ACT §§ 34(b), 36(a), 36(b), AND 48(a)..........................................43

      A.    The Trustees' Transfer of Fund Assets to the Investment Adviser
            and Distributor Defendants Who Took for No Consideration, or on
            Notice of a Breach of Trust, Gave Rise to a Direct Cause of Action
            by Fundholders, and Demand on the Trustees Was Not Required
            Prior to Instituting Suit...........................................................................44

      B.    Under Massachusetts and Delaware Corporate Law, the Harm to
            Fund Investors Was Direct and Not Derivative .........................................51

V.    A PRIVATE RIGHT OF ACTION EXISTS UNDER INVESTMENT
      COMPANY ACT §§ 34(b), 36(a) AND 48(a) ....................................................57

      A.    Congress Intended that a Private Right of Action Exist under
            §§ 34(b) and 36(a)....................................................................................57

      B.    *Jackson*, the Most Recent Supreme Court Decision on this Issue,
            Supports a Private Right of Action under §§ 34(b), 36(a) and 48(a).........63

VI.   PLAINTIFFS HAVE ADEQUATELY ALLEGED A VIOLATION OF
      INVESTMENT COMPANY ACT § 48(a)..........................................................67

VII.    THE STATE CLAIMS ARE NOT PREEMPTED BY SLUSA ...........................70

    A.    The State Law Claims Are Brought on Behalf of a Subclass of
Holders, Whose Claims Do Not Arise in Connection with the
Purchase or Sale of a Covered Security......................................................70

    B.    The Complaint Adequately Distinguishes the State Claims on
Behalf of Holders from any Allegations Pertaining to the Purchase
or Sale of Securities .................................................................................72

    C.    The Subclass Holder Claims Are Based on Fees That Are Paid
Regardless of Purchases or Sales of Fidelity Funds ..................................76

VIII.    DISMISSAL WITH PREJUDICE WOULD BE INAPPROPRIATE
HERE .................................................................................................................79

CONCLUSION...........................................................................................................80

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975).................................................................................64

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)......................................................................59, 65, 67

*Alves v. Harvard Pilgrim Health Care, Inc.*,
    204 F. Supp. 2d 198 (D. Mass. 2002), *aff'd*, 316 F.3d 290 (1st Cir. 2003) ...........39, 40

*In re America Cont'l Corp./Lincoln Sav. & Loan Sec. Litigation*,
    794 F. Supp. 1424 (D. Ariz. 1992) ...........................................................36

*Associated Students of U.C. Riverside v. Kleindienst*,
    60 F.R.D. 65 (C.D. Cal. 1973) ..................................................................44

*Atencio v. Smith Barney*,
    2005 U.S. Dist. LEXIS 1526 (S.D.N.Y. Feb. 2, 2005)................................................77

*Bachman v. AG Edwards*,
    2005 U.S. Dist. LEXIS 35684 (E.D. Mo. Sept. 26, 2005)..........................3, 77, 83, 84

*Bancroft Convertible Fund, Inc. v. Zico Investment Holdings, Inc.*,
    825 F.2d 731 (3d Cir. 1987)...................................................................65

*Batra v. Investors Research Corp.*,
    1991 U.S. Dist. LEXIS 14773 (W.D. Mo. Oct. 4, 1991)......................................42, 43

*Bingham v. Zolt*,
    66 F.3d 553 (2d Cir. 1995)......................................................................56

*Blasberg v. Oxbow Power Corp.*,
    934 F. Supp. 21 (D. Mass. 1996) .........................................................53, 55,

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975)...............................................................................74

*Booth v. Greer Investment Co.*,
    52 F.2d 857 (N.D. Okla. 1931), *aff'd sub nom.*, 62 F.2d 321 (10th Cir. 1932) ..........49

*Brown v. Bullock*,
    294 F.2d 415 (2d Cir. 1961).....................................................................65

*Burks v. Lasker*,
 441 U.S. 471 (1979)..................................................................................30

*Cape Ann Investors LLC v. Lepone*,
 296 F. Supp. 2d 4 (D. Mass. 2003) ...........................................................76

*Ceribelli v. Elghanayan*,
 990 F.2d 62 (2d Cir. 1993)........................................................................56

*Chinn v. Belfer*,
 2002 U.S. Dist. LEXIS 20343 (D. Or. June 19, 2002) ..............................75

*Clairdale Enterprises, Inc. v. C.I. Realty Investors*,
 423 F. Supp. 257 (S.D.N.Y. 1976)............................................................51

*Cohen v. Beneficial Loan Corp.*,
 337 U.S. 541 (1949)..................................................................................25

*In re Columbia Entities Litigation*,
 2005 U.S. Dist. LEXIS 33439 (D. Mass. 2005) ................................ *passim*

*Cross v. Oneida Paper Products Co.*,
 117 F. Supp. 919 (D.N.J. 1954) ................................................................44

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 395 F.3d 25 (2d Cir. 2005)...................................................................77, 82

*Daily Income Fund, Inc. v. Fox*,
 464 U.S. 523 (1984)........................................................................... *passim*

*In re Davis Selected Mutual Funds Litigation*,
 2005 U.S. Dist. LEXIS 23203 (S.D.N.Y. Oct. 11, 2005) ..........................69

*Davis v. Kozlowski*,
 2005 U.S. Dist. LEXIS 4481 (D.N.H. Mar. 17, 2005) .........................76, 77

*Delaware & Hudson Co. v. Albany & Susquehanna R. Co.*,
 213 U.S. 435 (1909)..................................................................................26

*Donatelli v. National Hockey League*,
 893 F.2d 459 (1st Cir. 1990).....................................................................44

*Dowling v. Narragansett Capital Corp.*,
 735 F. Supp. 1105 (D.R.I. 1990)...............................................................72

*In re Dreyfus Aggressive Growth Mutual Fund Litigation*,
 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000)...................................34, 35

*In re Dreyfus Mutual Funds Fee Litigation*,
 2005 U.S. Dist. LEXIS 29152 (E.D. Pa. Sept. 30, 2005) ................................... *passim*

*Dull v. Arch*,
 2005 U.S. Dist. LEXIS 14988 (N.D. Ill. July 27, 2005)............................................67

*In re Eaton Vance Mutual Funds Fee Litigation*,
 380 F. Supp. 2d 222 (S.D.N.Y. 2005)................................................................ *passim*

*In re Eaton Vance Corp. Securities Litigation*,
 219 F.R.D. 38 (D. Mass. 2003)....................................................................34, 37, 38

*In re Eaton Vance Corp. Securities Litigation*,
 220 F.R.D. 162 (D. Mass. 2004)................................................................................39

*In re Eaton Vance Mutual Funds Fee Litigation*,
 2005 U.S. Dist. LEXIS 32094 (S.D.N.Y. Dec. 6, 2005) ...........................................68

*Esplin v. Hirschi*,
 402 F.2d 94 (10th Cir. 1968) ....................................................................................65

*Estates of Ungar v. Palestinian Authority*,
 304 F. Supp. 2d 232 (D.R.I. 2004)............................................................................44

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
 125 S. Ct. 2611 (2005)...............................................................................................67

*Falkowski v. Imation Corp.*,
 309 F.3d 1123 (9th Cir. 2002) .......................................................................77, 79, 80

*Fallick v. Nationwide Mutual Insurance Co.*,
 162 F.3d 410 (6th Cir. 1998) ..............................................................................35, 36

*Feitelberg v. Credit Suisse First Boston LLC*,
 2003 U.S. Dist. LEXIS 19116 (N.D. Cal. Oct. 24, 2003)....................................77, 78

*Fox v. Reich & Tang, Inc.*,
 692 F.2d 250 (2d Cir. 1982)......................................................................................27

*In re Franklin Mutual Funds Fee Litigation*,
 388 F. Supp. 2d 451 (D.N.J. 2005) .................................................................. *passim*

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
 694 F.2d 923 (2d Cir. 1982)..................................................................... *passim*

*Gollust v. Mendell*,
 501 U.S. 115 (1991)....................................................................................42

*Gonzaga University v. Doe*,
 536 U.S. 273 (2002)....................................................................................59

*Goodman v. Lukens Steel Co.*,
 777 F.2d 113 (3d Cir. 1985), *aff'd on other grounds*, 482 U.S. 656 (1987) ...............32

*Gordon v. Buntrock*,
 2000 U.S. Dist. LEXIS 5977 (N.D. Ill. May 3, 2000) .................................78

*Grabow v. PriceWaterhouseCoopers LLP*,
 313 F. Supp. 2d 1152 (N.D. Okla. 2004) ....................................................77

*Gratz v. Bollinger*,
 539 U.S. 244 (2003)....................................................................................31

*Green v. Nuveen Advisory Corp.*,
 186 F.R.D. 486 (N.D. Ill. 1999).................................................................53

*Green v. Ameritrade, Inc.*,
 279 F.3d 590 (8th Cir. 2002) .............................................................. *passim*

*Green v. Fund Asset Management, L.P.*,
 19 F. Supp. 2d 227 (D.N.J. 1998) .............................................................13

*Gutierrez v. Deloitte & Touche, L.L.P.*,
 147 F. Supp. 2d 584 (W.D. Tex. 2001)....................................77, 78, 80, 81

*Haas v. Pittsburgh Nat'l Bank*,
 526 F.2d 1083 (3d Cir. 1975).............................................................32, 33

*Hawes v. Oakland*,
 104 U.S. 450 (1882)....................................................................................25

*Heffler v. U.S. Fidelity & Guaranty Insurance Co.*,
 1992 U.S. Dist. LEXIS 3090 (E.D. Pa. Mar. 10, 1992)...............................39

*ING Principal Prot. Funds Deriv. Litigation*,
 369 F. Supp. 2d 163 (D. Mass. 2005) ....................................12, 24, 51, 52

*J.I. Case Co. v. Borak*,
  377 U.S. 426 (1964) ............................................................................63

*Jackson v. Birmingham Board of Education*,
  125 S. Ct. 1497 (2005) .................................................................... *passim*

*Jacobs v. Bremner*,
  2005 U.S. Dist. LEXIS 14762 (N.D. Ill. July 20, 2005) ...........................67

*Jones v. Harris Associates, L.P.*,
  2005 WL. 831301 (N.D. Ill. Apr. 7, 2005) .....................................6, 12, 17

*Kamen v. Kemper Financial Services, Inc.*,
  500 U.S. 90 (1991) .........................................................................26, 46

*Kauffman v. Dreyfus Fund, Inc.*,
  434 F.2d 727 (3d Cir. 1970) ....................................................................54

*Kircher v. Putnam Funds Trust*,
  403 F.3d 478 (7th Cir. 2005) ...................................................................85

*Kitchens v. U.S. Shelter Corp.*,
  1983 U.S. Dist. LEXIS 12812 (D.S.C. Oct. 13, 1983) .............................36

*Koster v. Lumbermens Mutual Casualty Co.*,
  330 U.S. 518 (1947).................................................................................26

*Krantz v. Fidelity Management & Research, Co.*,
  98 F. Supp. 2d 150 (D. Mass. 2000) .................................................. *passim*

*Krinsk v. Fund Asset Management*,
  875 F.2d 404 (2d Cir. 1989).....................................................................21

*Krome v. Merrill Lynch & Co.*,
  637 F. Supp. 910 (S.D.N.Y. 1986)............................................................65

*Lalondriz v. USA Networks, Inc.*,
  68 F. Supp. 2d 285 (S.D.N.Y. 1999).........................................................77

*La Mar v. H&B Novelty & Loan Co.*,
  489 F.2d 461 (9th Cir. 1973) ..................................................................39

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163, 168 (1993)...........................................................................9

*Lessler v. Little*,
    857 F.2d 866 (1st Cir. 1998) ..........................................................................65

*Levitt v. Johnson*,
    334 F.2d 815 (1st Cir. 1964) ..........................................................................65

*In re Lord Abbett Mutual Funds Fee Litigation*,
    385 F. Supp. 2d 471 (D.N.J. 2005) ........................................................3, 21, 85

*In re Lord Abbett Mutual Funds Fee Litigation*,
    2005 U.S. Dist. LEXIS 37492 (as amended) ......................................... *passim*

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................42

*Luyando v. Bowen*,
    124 F.R.D. 52 (S.D.N.Y. 1989) ................................................................38, 39

*In re ML-Lee Acquisition Fund II L.P.*,
    848 F. Supp. 527 (D. Del. 1994) ...........................................................35, 65, 69

*Malmros v. Jones*,
    2004 U.S. Dist. LEXIS 4371 (E.D. Pa. Feb. 27, 2004) ...............................56

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) .....................................................................35

*McLachlan v. Simon*,
    31 F. Supp. 2d 731 (N.D. Cal. 1998) .............................................................66

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) .......................................................................................64

*Meyer v. Oppenheimer Management Corp.*,
    895 F.2d 861 (2d Cir. 1990) .............................................................................9

*Meyer v. Putnam International Voyager Fund*,
    220 F.R.D. 127 (D. Mass. 2004) ..........................................................76, 78, 79

*Management Television System, Inc. v. National Football League*,
    52 F.R.D. 162 (E.D. Pa. 1971) ......................................................................44

*Millenco L.P. v. meVC Advisors, Inc.*,
    2002 U.S. Dist. LEXIS 19512 (D. Del. Aug. 12, 2002) ...............................12

*In re MobileMedia Securities Litigation*,
  28 F. Supp. 2d 901 (D.N.J. 1998) .............................................................36

*Moore v. Comfed Sav. Bank*,
  908 F.2d 834 (11th Cir. 1990) ..................................................................41

*Motta v. Samuel Weiser, Inc.*,
  768 F.2d 481 (1st Cir. 1985).....................................................................44

*In re Mutual Funds Investment Litigation (In re Janus Subtrack)*,
  384 F. Supp. 2d 845 (D. Md. 2005) ............................................11, 12, 34

*Mutchka v. Harris*,
  373 F. Supp. 2d 1021 (C.D. Cal. 2005) ....................................................28

*Newby v. Enron Corp.*,
  2004 U.S. Dist. LEXIS 8158 (S.D. Tex. Feb. 24, 2004) ...........................39

*In re Nuveen Fund Litigation*,
  1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996) .............................61

*Olmsted v. Pruco Life Insurance Co. of N.J.*,
  283 F.3d 429 (2d Cir. 2002)............................................................. *passim*

*Payton v. County of Kane*,
  308 F.3d 673 (7th Cir. 2002) ...................................................................39

*Pfeiffer v. Bjurman, Barry & Associates*,
  2004 U.S. Dist. LEXIS 16924 (S.D.N.Y. Aug. 26, 2004)..............13, 22, 23

*Price v. Gurney*,
  324 U.S. 100 (1945)..................................................................................26

*Prostic v. Xerox Corp.*,
  1991 U.S. Dist. LEXIS 15950 (D. Conn. July 19, 1991)............................30

*In re Prudential Sec. Inc. Ltd. P'ships Litigation*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ..............................................................35

*Resolution Trust Corp. v. DeLoitte & Touche*,
  822 F. Supp. 1512 (D. Colo. 1993)...........................................................45

*Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  292 F.3d 1334 (11th Cir. 2002) ...........................................................77, 78

*Ripon Society v. National Republican Party*,
   525 F.2d 567 (D.C. Cir. 1975) ..................................................................................45

*Risinger v. Concannon*,
   201 F.R.D. 16 (D. Me. 2001) ....................................................................................30

*Rodi v. S. New Eng. Sch. of Law*,
   389 F.3d 5 (1st Cir. 2004) .........................................................................................86

*Ross v. Bernhard*,
   396 U.S. 531 (1970) ..................................................................................................25

*Rowinski v. Salomon Smith Barney, Inc.*,
   398 F.3d 294 (3d Cir. 2005) ......................................................................................85

*SEC v. Happ*,
   392 F.3d 12 (1st Cir. 2004) .......................................................................................60

*Securities Investor Protection Corp. v. Barbour*,
   421 U.S. 412 (1975) ..................................................................................................62

*Shaev v. Claflin*,
   2001 U.S. Dist. LEXIS 6677 (N.D. Cal. May 17, 2001) ..........................................77

*Sosna v. Iowa*,
   419 U.S. 393 (1975) ..................................................................................................32

*Stegall v. Ladner*,
   394 F. Supp. 2d 358 (D. Mass. 2005) ............................................................. *passim*

*Strigliabotti v. Franklin Resources, Inc.*,
   2005 U.S. Dist. LEXIS 28410 (N.D. Cal. Nov. 9, 2005) .................................. *passim*

*Strigliabotti v. Franklin Resources, Inc.*,
   2005 U.S. Dist. LEXIS 9625 (N.D. Cal. Mar. 7, 2005) .................................... *passim*

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*,
   964 F. Supp. 783 (S.D.N.Y. 1997) ................................................................8, 61, 65

*Strougo v. Bassini*,
   282 F.3d 162 (2d Cir. 2002) ............................................................................ *passim*

*Sutton v. Medical Serv. Association*,
   1993 U.S. Dist. LEXIS 9763 (E.D. Pa. July 20, 1993) ............................................31

*Tannenbaum v. Zeller*,
    552 F.2d 402 (2d Cir. 1977)...............................................................................30, 63

*Taussig v. Wellington Fund, Inc.*,
    313 F.2d 472 (3d Cir. 1963)........................................................................................65

*Tedesco v. Mishkin*,
    689 F. Supp. 1327 (S.D.N.Y. 1988)............................................................................36

*United States v. Cartwright*,
    411 U.S. 546 (1973).....................................................................................................53

*Wicks v. Putnam Investment Management*,
    2005 U.S. Dist. LEXIS 4892 (Mar. 28, 2005) ...........................................6, 12, 21, 22

*Woodard v. Online Information Services*,
    191 F.R.D. 502 (E.D.N.C. 2000) ...........................................................................30, 31

*Yameen v. Eaton Vance Distributors, Inc.*,
    394 F. Supp. 2d 350 (D. Mass. 2005) .............................................................. *passim*

*Young v. Nationwide Life Insurance Co.*,
    2 F. Supp. 2d 914 (S.D. Tex. 1998) ...........................................................................63

## STATE CASES

*Jones v. Swift*, 15 N.E.2d 274 (Mass. 1938) ....................................................................50

*Larson v. Sylvester*, 282 Mass. 352 (Mass. 1933) ...........................................................47

*Mann v. Kemper Finance Co.*, 618 N.E.2d 317 (App. Ct. Ill. 1992)..................................56

*Moore v. Mansfield*, 142 N.E. 792 (Mass. 1924)..............................................................50

*Parker v. Lloyd*, 71 N.E.2d 889 (Mass. 1947) ..................................................................50

*Sargent v. Wood*, 81 N.E. 901 (Mass. 1907).....................................................................50

*Simon v. Solomon*, 431 N.E.2d 556 (Mass. 1982) ............................................................24

*Stevens v. Nagel*, 64 Mass. App. Ct. 136 (2005) ..............................................................50

*Swartz v. Sher*, 184 N.E.2d 51 (Mass. 1962)....................................................................52

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)................53, 58

**DOCKETED CASES**

*In re Merrill Lynch Investment Management Funds Securities Litigation,*
   No. 04-3759 (S.D.N.Y.) ................................................................................................3

**FEDERAL STATUTES AND OTHER MATERIALS**

5 U.S.C. §§ 80a-2(a)(3)(C) ...........................................................................................24

15 U.S.C. § 47(a) ..........................................................................................................69

15 U.S.C. § 77r(b)(2) .....................................................................................................74

15 U.S.C. § 80a-1 .....................................................................................................61, 62

15 U.S.C. § 80a-2(a)(9) ...........................................................................................69,70

15 U.S.C. § 80a-21 ........................................................................................................70

15 U.S.C. § 80a-30(a) ....................................................................................................60

15 U.S.C. § 80a-33(b) ....................................................................................................62

15 U.S.C. § 80a-35(a) ....................................................................................................63

15 U.S.C. § 80a-35(b) ..............................................................................9, 13, 25, 29, 43

15 U.S.C. § 80a-47(a) ....................................................................................................61

15 U.S.C. § 80a-8(a) ......................................................................................................62

Fed. R. Civ. P. 8 ..............................................................................................................9

Fed. R. Civ. P. 15(a) ......................................................................................................86

Fed. R. Civ. P. 23.1 ..................................................................................................25, 43

Fed. R. Civ. P. 23.2 ..................................................................................................43, 45

H.R. Rep. No. 1341, 96th Cong. 2d Sess. 28-29 (1980) ................................................66

Investment Company Amendments Act of 1969,
   S. Rep. No. 91-184 (May 21, 1969) .......................................................................14, 65

Securities Litigation Uniform Standard Act of 1988, 15 U.S.C. § 78bb(f) ..................2, 76

# STATE STATUTES

Cal. Bus. & Prof. Code § 17200 ........................................................................55

Cal. Bus. & Prof. Code § 17500 ........................................................................55

12 Del. C. § 3809 ..............................................................................................50

12 Del. C. § 3581 ..............................................................................................51

12 Del. Code § 3801 ..........................................................................................24

Mass. Gen. Laws ch. 156A, § 2(b) ...................................................................54

Mass. Gen. Laws ch. 156D, § 7.42 ...................................................................53

Mass. Gen. Laws ch. 182, § 2B ........................................................................24

Mass. Gen. Laws ch. 182, § 5A ........................................................................54

# MISCELLANEOUS

John H. Langbein, *The Secret Life of the Trust: The Trust as an Instrument of Commerce,* 107 Yale L.J. 165 (Oct. 1997) ...............................................47

Robert H. Sitkoff, *Symposium: Uncorporation: A New Age?: Trust as "Uncorporation": A Research Agenda,* 2005 U. Ill. L. Rev. 31 .................51

Plaintiffs submit this memorandum of law in opposition to the motions of the "Fidelity Defendants," the "Independent Trustee Defendants," and the Nominal Defendant Fidelity Funds (collectively "Fidelity" or "Defendants") to dismiss the Consolidated Amended Class Action Complaint ("Complaint").[1]  The Complaint meets all applicable pleading standards and should be sustained.

## PRELIMINARY STATEMENT

This is a class action on behalf of holders of Fidelity mutual funds ("Fidelity Funds" or the "Funds"), during the period July 19, 1999 through November 17, 2003 (the "Class Period") for claims arising under the Investment Company Act of 1940 (the "Investment Company Act," or "ICA") (the "Class").  The action is also brought on behalf of a subclass (the "Subclass") of all persons or entities who acquired before July 19, 1999 and held during the Class Period one or more Funds,[2] for unjust enrichment, and breaches of Defendants' common law fiduciary duties, arising from the receipt of excessive compensation and fees by Defendants.[3]

---

[1]  The "Fidelity Defendants" define themselves to include Defendants Fidelity Management and Research Company, FMR Co., Inc., FMR Corp., Fidelity Distributors Corporation, Edward C. Johnson 3d, Abigail P. Johnson, Peter S. Lynch, Laura B. Cronin, Robert L. Reynolds and Richard C. Pozen.  Def. Br. at 1.  The "Independent Trustee Defendants" define themselves to include Defendants J. Michael Cook, Ralph F. Cox, Robert M. Gates, George H. Heilmeier, Donald J. Kirk, Marie L. Knowles, Ned C. Lautenbach, Marvin L. Mann, William O. McCoy, Gerald C. McDonough, and William S. Stavropoulos.  Tr. Br. at 1.  Plaintiffs voluntarily dismissed without prejudice their claims against defendants Edward C. Johnson IV, Elizabeth L. Johnson and J. Gary Burkhead pursuant to a notice filed on October 20, 2005.  Plaintiffs also note that Thomas R. Williams, a former independent trustee of the Fidelity Funds, was previously named as a Defendant in this action and is deceased, and that Plaintiffs voluntarily dismissed their claims against Mr. Williams and his estate without prejudice pursuant to a notice filed on November 2, 2005.  Defendants Fidelity Management and Research and FMR Co., Inc. are hereinafter referred to as the "Investment Adviser Defendants," and Fidelity Distributors Corporation is hereinafter referred to as the "Distributor Defendant." "Trustee Defendants" will refer to all remaining individual trustees of the Fidelity Funds named as Defendants in this action.

[2]  Expressly excluded from the Subclass are any and all transactions that constitute a "purchase" within the meaning of the Securities Litigation Uniform Standard Act of 1988, 15 U.S.C. § 78bb(f) ("SLUSA"), including any dividend reinvestments during the Class Period.  *See* ¶ 1.  All references to "¶ __" are to the Complaint, unless otherwise noted.

[3]  Plaintiffs are voluntarily withdrawing their claim against the Trustee Defendants in Count III under ICA § 36(b), and their claim in Count V under Investment Advisers Act §§ 206 and 215.  Defendants have argued

Plaintiffs have alleged that Defendants are liable because the investment adviser fees, administrative fees, 12b-1 fees, and the trustee compensation received by Defendants from the Funds and their investors were disproportionate to the value of services provided, and were not within the bounds of what would have been negotiated at arm's-length. During the relevant time frame, compensation and fees to the Adviser and Distributor Defendants rose even though the services provided by these Defendants remained the same, and no additional benefits were provided to the Funds or their investors in return for the additional fees.

A major reason for the dramatic increase in compensation to the Investment Adviser and Distributor Defendants was the growth in the size of the Funds resulting from Defendants' use of Fund assets to promote the sale of Fund shares. Among other things, those programs included: (a) cash payments to brokers in return for the brokers' agreement to promote sales of Fund shares; (b) the directing of Fund portfolio brokerage to brokerage firms in return for agreements by the brokers to promote the shares of the Funds; and (c) excessive "Soft Dollar" commission arrangements with brokers. The resulting growth of the Funds benefited the Investment Adviser and Distributor Defendants by increasing their management and other asset-based fees. Defendants engaged in those programs even though many such activities were in violation of Securities and Exchange Commission ("SEC") and National Association of Securities Dealers ("NASD") rules and regulations, and despite ample evidence that their increased compensation was not justified by any increase in the quality or nature of the services which they provided to the Funds and their investors.

---

that Count V should be dismissed because Plaintiffs did not allege that the advisory contracts were unlawful and did not properly make a demand on the trustees before instituting suit. Def. Br. at 27-36; Tr. Br. at 8-13; Funds Br. at 4-7. Plaintiffs have chosen voluntarily to dismiss Count V, which is their sole derivative claim, thus obviating any need here to address whether demand on the trustees was required before instituting suit. Plaintiffs, however, do address the issue of demand on the trustees, in the section discussing the direct nature of the claims at issue here, and in the section demonstrating that the trustees' alleged lack of conscientiousness is an indicia that the fees were excessive. *See* sections IV, II.A.5, *infra*.

Despite red flags showing the dramatic increase in the Funds' assets under management and asset-based fees, the Trustee Defendants breached their duties to negotiate with the Investment Adviser and Distributor Defendants to lower their fees, and were otherwise instrumental in the implementation of Defendants' course of conduct by failing to independently or conscientiously scrutinize the fees. Defendants also omitted material facts from investors regarding their excessive fees and commissions charged to investors and the Funds. Plaintiffs allege that, as a result of such conduct, Defendants are liable under §§ 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act; for unjust enrichment; and for breaches of their fiduciary duties to the Class.

In their briefs, Defendants negatively refer to similar actions filed by Plaintiffs' counsel here involving other mutual fund families as "copy-cat" complaints. *See* Def. Br. at 1.[4] Although some courts have dismissed various claims in such actions, this action presents somewhat different and, in some respects, much more detailed allegations, and Plaintiffs are confident that this Court will approach this case on its own merits. In fact, Defendants have conceded that Plaintiffs plead sufficient facts to state a claim under ICA § 36(b) with respect to at least five of the Fidelity Funds. *See* Def. Br. at 14. Accordingly, the § 36(b) claim will proceed, at a minimum, with respect to those Funds.

---

[4] Defendants fail adequately to call to the Court's attention that a number of these so called "copy-cat" actions has been upheld either entirely or in part. In *Bachman v. A.G. Edwards*, 2005 U.S. Dist. LEXIS 35684 (E.D. Mo. Sept. 26, 2005), the court denied the motion to dismiss on federal jurisdiction grounds (*i.e.*, SLUSA), but Defendants only note that the plaintiffs filed a Complaint. *See* Def. Br. Attach. A. In *In re Dreyfus Mutual Funds Fee Litigation*, 2005 U.S. Dist. LEXIS 29152, at *25 (E.D. Pa. Sept. 30, 2005), the court found that the plaintiffs' 36(b) claim was adequately pled. Plaintiffs also note that certain claims in *In re Franklin Mutual Funds Fee Litigation*, 388 F. Supp. 2d 451 (D.N.J. 2005), and *In re Lord Abbett Mutual Funds Fee Litigation*, 2005 U.S. Dist. LEXIS 37492 (D.N.J. 2005), were dismissed without prejudice, and that plaintiffs have filed, or will file shortly, amended complaints in those actions. Defendants also misleadingly state that the action, *In re Merrill Lynch Investment Management Funds Securities Litigation*, No. 04-3759 (S.D.N.Y.), was the subject of a "stipulated dismissal with prejudice." Def. Br. Attach. A. The *Merrill Lynch* stipulation only dismissed certain defendants, and that case is still pending against the bulk of the defendants.

Moreover, the mere fact that Plaintiffs' counsel have filed similar class actions involving similar misconduct by a number of mutual fund families is not a fact that helps Defendants. To the contrary, as numerous recent regulatory actions involving mutual fund investment advisers and distributors demonstrate, the misconduct engaged in by Defendants was widespread throughout the industry, and has been widely condemned. *See* ¶¶ 11-12, 13 (describing the SEC and NASD's actions against Morgan Stanley for accepting undisclosed kickbacks from certain mutual fund companies, including Fidelity, in violation of § 17(a)(2) of the Securities Act of 1933 and NASD Rule 2830(k)).

The undisclosed practice of charging excessive fees in order to increase assets under management to retain the benefits of economies of scale by paying undisclosed kickbacks to brokers as compensation for pushing mutual fund shares of the sort Defendants have engaged in here ("shelf-space programs") has been widespread throughout the mutual fund industry. Over the last year, the SEC has issued cease and desist orders against a number of mutual fund advisers and distributors for conduct virtually identical to the wrongdoing complained of herein.[5]

---

[5]  In parallel proceedings against the mutual fund companies Massachusetts Financial Services ("MFS"), PA Distributors ("PIMCO"), Franklin-Templeton Distributors ("Franklin"), American Funds Distributors ("American Funds"), Lord Abbett Distributor LLC, and OppenheimerFunds, Inc., the SEC, as well as other regulators, have repeatedly made clear that such undisclosed kickback schemes as that engaged in by Fidelity are illegal. *See* ¶¶ 159-65; *see also* March 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions In the Matter of Massachusetts Financial Services Co., available at http://www.sec.gov/litigation/admin/ia-2224.htm; September 15, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions In the Matter of PA Fund Management LLC et al., available at http://www.sec.gov/litigation/admin/34-50384.pdf; December 13, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions In the Matter of Franklin Advisers, Inc. and Franklin/Templeton Distributors, Inc., available at http://www.sec.gov/litigation/admin/34-50841.htm; Pollack Declaration (hereinafter "Pollack Decl.") Ex. A (March 23, 2005 Press Release re: *People v. State of California v. American Funds Distributors et al.*, filed by the California Attorney General's Office March 23, 2005); Pollack Decl. Ex. B (October 10, 2005 NASD Press Release, "NASD Charges Eight Firms [Including Lord Abbett Distributor LLC] With Directed Brokerage Violations, Imposes Fines Totaling More Than $7.75 Million"); September 14, 2005 SEC Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions against OppenheimerFund, Inc., available at http://www.sec.gov/litigation/admin/34-52420.pdf. The SEC, NASD and NYSE have also settled an action against mutual fund distributor Edward D. Jones & Co., L.P. ("Edward

On March 23, 2005, the SEC instituted and simultaneously settled an enforcement action against Citigroup Global Markets, Inc. ("CGMI") for, *inter alia*, failing fully to disclose that CGMI was receiving revenue sharing payments from various mutual fund complexes in exchange for access to "shelf space."[6]  According to its website, Citigroup Investment Services, along with its clearing firm, CGMI, is one of the brokerage firms with which Fidelity had revenue sharing arrangements.  ¶ 153.  The SEC found that CGMI's actions "willfully violated" Securities Act § 17(a)(2) and Exchange Act Rule 10b-10.  ¶ 154.

Fidelity also had shelf space arrangements with, among others, Linsco/Private Ledger Corp. and Piper Jaffray, each of which the NASD recently fined for violation of the NASD's Anti-Reciprocal Rule (Rule 2830(k)), which prohibits firms from favoring the sale of shares of particular mutual funds on the basis of brokerage commissions received by the firm.[7]  In connection with a June 8, 2005 NASD action involving 14 broker-dealer firms, 11 with which Fidelity had had arrangements, NASD Vice Chairman Mary L. Schapiro stated that,

> "When recommending mutual fund investments, firms must act on the basis of the merits of the funds and the investment objectives of the customers and not because of other benefits the brokerage firm will receive…  NASD's prohibition on the receipt of directed brokerage is designed to eliminate these conflicts of interest."

Pollack Decl. Ex. C.

---

Jones") for its receipt of undisclosed kickbacks from mutual funds.  Jones Financial Companies, L.L.L.P., Current Report (Form 8-K) (Dec. 27, 2004) and accompanying exhibits of settlement agreements between Edward D. Jones & Co., L.P. and the SEC, NASD, New York Stock Exchange, Inc., and the United States Attorney's Office for the Eastern District of Missouri, available at http://www.sec.gov/Archives/edgar/data/815917/000106880004000745/0001068800-04-000745-index.htm.

[6]  *See* March 23, 2005 Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions In the Matter of Citigroup Global Markets, Inc.) ,available at http://www.sec.gov/litigation/admin/33-8557.pdf.

[7]  *See* ¶¶ 156-58; Pollack Decl. Ex. C (Press Release, NASD Charges 15 Firms With Directed Brokerage Violations, Imposes Fines Totaling More Than $34 Million (June 8, 2005)); Pollack Decl. Ex. D (Press Release, NASD Fines Quick & Reilly, Piper Jaffray $845,000 For Directed Brokerage Violations (Feb. 22, 2005)).

The Investment Adviser and Distributor Defendants were motivated to engage in this undisclosed misconduct because the fees they collected for managing and advising the Fidelity Funds were calculated as a percentage of assets under management and, therefore, increased as Fidelity Fund assets grew.  By contrast, Plaintiffs and the Class members received no benefit from Defendants' expansion of the Funds' gross assets through their "shelf space" programs because economies of scale from the enlargement of Fund assets were not passed on by Defendants to the Funds and their investors.  Plaintiffs now seek recovery of the millions of dollars of excessive fees and charges used to finance Defendants' kickback scheme.

Plaintiffs thus state a claim under, *inter alia*, ICA § 36(b), as discussed by Judge O'Toole in *Wicks v. Putnam Investment Management,* 2005 U.S. Dist. LEXIS 4892 (Mar. 28, 2005), and numerous recent decisions which have upheld § 36(b) claims based on allegations similar to the allegations in this case.  *See, e.g., Dreyfus*, 2005 U.S. Dist. LEXIS 29152, at *28; *Jones v. Harris Assocs., L.P.*, 2005 WL 831301, at *6-7 (N.D. Ill. Apr. 7, 2005); *Strigliabotti v. Franklin Res., Inc.*, 2005 U.S. Dist. LEXIS 9625, at *12 (N.D. Cal. Mar. 7, 2005).  In all four of these cases, the court upheld allegations that the defendants were growing the funds (*e.g.*, through kickbacks or Soft Dollars, etc.) without reducing their fees from the benefits of economies of scale or providing additional services, making the fees excessive.  *See, e.g., Jones*, 2005 WL 831301, at *3 (a fee that can be characterized as paying "something for nothing" is actionable under § 36(b)).  Here, Plaintiffs similarly allege excessive fees because Plaintiffs paid "something for nothing."

Defendants have moved to dismiss the Complaint on numerous unavailing grounds:

- Defendants argue that Plaintiffs may not bring their § 36(b) claim directly because it is a derivative claim, and that Plaintiffs may not bring their § 36(b) claim on behalf of Funds in which they did not invest.  Def. Br. at 10-20; Funds Br. at 1-4.  However, the Supreme Court has held that a § 36(b) claim is direct.  *Daily Income Fund, Inc. v. Fox*, 464 U.S.

523, 528-29 (1984).[8]  Plaintiffs also properly bring this action regarding all Fidelity Funds by setting forth complex-wide and fund-specific allegations that meet the Rule 8 pleading requirements.  *See* section II.A.4, *infra*.

- Defendants incorrectly argue that Plaintiffs' other ICA and state law claims can only be brought derivatively.  Def. Br. at 21-27; Tr. Br. at 5-8; Funds Br. at 2-4.  However, under well-settled principles of trust law, the trustees' transfer of fund assets to the Investment Adviser and Distributor Defendants who took for no consideration, or on notice of a breach of trust, gave rise to a direct cause of action, and pre-suit demand was not required.  Moreover, the ICA claims allege harms made directly to the shareholders; and the breach of fiduciary duty ICA and state law claims allege breaches of duties arising from excessive fees charged directly to shareholders.  In the context of a mutual fund, which is a pooling of investor assets, such claims are direct.  *See Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *25.  Plaintiffs have also alleged that the Funds were not harmed by Defendants' misconduct, but in fact grew in asset size.  As such, the harm was not experienced by the Funds but, rather, by the investors directly.

- Defendants argue that Plaintiffs do not have standing to bring claims on behalf of Funds or investors in Funds within the Fidelity Fund complex other than those in which Plaintiffs invested.  Def. Br. at 14-19; Tr. Br. at 3 n.2; Funds Br. at 1-2.  However, where, as here, the named plaintiffs do have standing to bring their individual claims, courts have consistently framed this issue as one of compliance with Federal Rule of Civil Procedure 23, not Article III standing.  *See, e.g., Lord Abbett*, 2005 U.S. Dist. LEXIS 37492, at *17 ("Plaintiffs' lack of any ownership interest in certain Funds on whose shareholders' behalf they purport to assert class claims provides no basis for dismissal of any claims at this time."); *Dreyfus*, 2005 U.S. Dist. LEXIS 29152, at *28, n.7 ("To be clear, we do not find that this is an issue of Constitutional standing.").

- Defendants argue that Plaintiffs have no private rights of action under ICA §§ 34(b), 36(a) and 48(a).  Def. Br. at 6-10; Tr. Br. at 3 n.2; Funds Br. at 7.  To the contrary, as the court recognized in *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.* 964 F. Supp. 783 (S.D.N.Y. 1997), the existence of implied rights of action under these sections has a long, established history.[9]  Defendants' position, which is essentially that no federal statutory right of action can exist unless it is expressly referenced in the language

---

[8]  *Accord, e.g., In re Columbia Entities Litig.*, 2005 U.S. Dist. LEXIS 33439, at *18 (D. Mass. 2005) ("*Columbia*") ("In [*Daily Income*], the Court held that, due to the purposes of the statute, Section 36(b) of the ICA provided for a direct action to be brought by a shareholder, rather than for a derivative action to be brought on behalf of the corporation."); *Dreyfus*, 2005 U.S. Dist. LEXIS 29152, at *28, n.7 ("Because a section 36(b) claim is not brought derivatively, we need not address the funds on whose behalf this claim can be brought.").

[9]  Plaintiffs admit that no trial court after *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 432 (2d Cir. 2002), and *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001), has held a private right of action exists under ICA §§ 34(b) or 36(a).  However, Plaintiffs expect that, given recent notices of appeal filed in cases similar to this, one or more appellate courts will rule on this issue in the near future.  As explained herein, such private rights of action should be implied.

of the statute, was also recently rejected by the Supreme Court in *Jackson v. Birmingham Board of Education*, 125 S. Ct. 1497 (2005).

- Finally, Defendants' argument that Plaintiffs' state law claims are preempted under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") (Def. Br. at 40-43; Tr. Br. at 3 n.2), runs counter to the plain language of the statute and the weight of authority, which supports Plaintiffs' ability to bring claims on behalf of a Subclass of Fund holders. *See, e.g., Strigliabotti v. Franklin Res., Inc.*, 2005 U.S. Dist. LEXIS 28410, at *26-27 (N.D. Cal. Nov. 9, 2005). These state law claims properly plead breach of fiduciary duty and unjust enrichment.

Accordingly, Defendants' motions to dismiss should be denied in their entirety.

## ARGUMENT

## I.    THE PLEADING STANDARD

Plaintiffs have met the applicable pleading standard and the Complaint should be upheld in its entirety. "For the purposes of a motion to dismiss, all well-pleaded allegations are accepted as true, and the plaintiff is given the benefit of all reasonable inferences." *Krantz v. Fidelity Mgmt. & Research, Co.*, 98 F. Supp. 2d 150, 153 (D. Mass. 2000). "Dismissal under Fed. R. Civ. P. 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery." *Id.* "The Federal Rules of Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Id.* (quoting *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)). "To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman*, 507 U.S. at 168; *see also* Fed. R. Civ. P. 8. The Complaint far exceeds this standard, and this Court should deny Defendants' Motions to Dismiss.

## II.    PLAINTIFFS HAVE PROPERLY ALLEGED A VIOLATION OF INVESTMENT COMPANY ACT § 36(b)

Plaintiffs have sufficiently alleged facts stating a § 36(b) claim under the ICA.[10]  "In layman's terms, the definitive question [under § 36(b)] is whether the investors got their money's worth out of their investment managers."  *See Dreyfus*, 2005 U.S. Dist. LEXIS 29152, at *27. Plaintiffs have sufficiently alleged that they and the members of the Class did not "get their money's worth" from Defendants.

Defendants raise two flawed arguments regarding Plaintiffs' § 36(b) claim.  First, Defendants incorrectly argue that Plaintiffs have failed to meet applicable pleading standards with respect to 201 of 206 Fidelity Funds.  Def. Br. at 14.  Second, Defendants incorrectly argue that Plaintiffs may only bring a § 36(b) claim derivatively.  Def. Br. at 10; Tr. Br. at 3 n.2; Funds Br. at 4 n.3.  Defendants are wrong on both counts.[11]

### A.    Plaintiffs Have Stated a § 36(b) Claim with Regard to All Fidelity Funds

Defendants argue that, "[w]ith respect to 201 of the 206 Fidelity Funds at issue in this case, Plaintiffs fail to make any factual allegations that would support a cause of action for excessive fees under Section 36(b)."  Def. Br. at 14.  By implication, Defendants thus ***concede*** that Plaintiffs ***have*** made factual allegations supporting a cause of action for excessive fees under § 36(b) with respect

---

[10]  Section 36(b) imposes a fiduciary duty on investment advisers and their affiliates "with respect to the receipt of compensation for services, or of payments of a material nature," and creates an express private right of action "for breach of fiduciary duty in respect of such compensation."  15 U.S.C. § 80a-35(b).  "An advisory fee violates Section 36(b) if it 'is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'"  *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990) (quoting *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982)).

[11]  Defendants additionally argue that the Trustee Defendants are not proper parties under § 36(b) because they were allegedly "not the recipients of the challenged compensation."  Def. Br. at 19.  As briefly mentioned above, without conceding the merit of this argument, Plaintiffs are withdrawing their § 36(b) claim against the Trustee Defendants.  Plaintiffs, however, are not withdrawing their remaining claims against the Trustee Defendants under ICA §§ 34(b), 36(a) and 48(a), and for common law breach of fiduciary duty and unjust enrichment.

to at least five of the Fidelity Funds in which Plaintiffs invested, inasmuch as Defendants make no

substantive attack on such allegations.  As such, the § 36(b) claim will proceed, at a minimum, with

respect to those Funds.  With respect to the remaining 201 Funds, Defendants are incorrect because

Plaintiffs have similarly alleged sufficient facts to sustain their § 36(b) claim.

As discussed below, Plaintiffs have made sufficiently detailed complex-wide and fund-

specific allegations that pertain to ***all Fidelity Funds*** to satisfy the Rule 8 pleading requirements.

Courts have upheld this as an acceptable approach at the pleading stage to address a course of

conduct that is common to an entire mutual fund complex.[12]  In *Dreyfus*, Judge Lancaster of the

Western District of Pennsylvania denied the defendants' motion to dismiss the plaintiffs' § 36(b)

claim against the adviser and distributor defendants based on allegations that the savings realized

from economies of scale were not passed on to investors where growth of the funds was due to

kickbacks for shelf space paid to brokers to push those funds.  *Dreyfus*, 2005 U.S. Dist. LEXIS

29152, at *11-12.  In *Dreyfus*, the plaintiffs had brought their action on behalf of investors in all

funds within the Dreyfus mutual fund complex, and alleged by example that, "despite the fact that

the net assets for the Dreyfus Premier New Leaders Fund increased . . . from $673,351 million to

$728,634 million during the Class Period, the net asset value per share of the fund decreased by

more than 17%, falling from $50.67 per share at year end 1999 to $41.91 at year end 2003.  Yet

during the same period, expenses charged by Defendants increased, with the ratio of expenses to net

assets jumping from 1.13% in 1999 to 1.25% in 2003."  *See Dreyfus*, Consolidated Amended

---

[12]  Contrary to Defendants' assertion, it is not clear that each of the Funds is a "separate and legally distinct
entity" (Def. Br. at 17), but even if this were true, it does not follow that it would require the pleading of
facts specific to each Fund under § 36(b).  For example, as Defendants' public filings make clear, and as
Plaintiffs have alleged, each Fidelity trustee often oversees, *at a minimum*, ***289 Funds***.  *See* ¶¶ 46-63.
Defendants deride Plaintiffs' inclusion of all Fidelity Funds in a single Complaint as attempting to "sweep"
all of them into a single pleading "under the purported guise of judicial expediency."  Def. Br. at 17.  Yet,
sweeping all of the Funds under singular leadership and control is precisely how Defendants have chosen to
conduct their business.  Defendants assert that each Fund has its "own advisory agreement."  Def. Br. at 17.
Yet, each agreement is with the same two investment advisers named as Defendants herein.

Compl. ¶ 66.  Although the two named plaintiffs only held two Dreyfus Funds, Judge Lancaster

found that the complaint survived the motion to dismiss with respect to ***all funds*** within the

complex, finding that the issue was not one of Constitutional standing to be addressed at the

pleading stage.  *See Dreyfus*, 2005 U.S. Dist. LEXIS 29152, at *28 n.7.  As discussed below,

Plaintiffs here have pleaded their § 36 (b) claim with even greater particularity and the Complaint

should similarly be sustained.

     In *In re Mutual Funds Investment Litigation* (*In re Janus Subtrack*), 384 F. Supp. 2d 845 (D.

Md. 2005) (hereinafter "*Janus*"), Judge Motz of the District of Maryland sustained the plaintiffs'

§ 36(b) claim for excessive mutual fund fees and expenses with regard to all funds in the Janus

complex for harm resulting from the defendants' market timing and late trading schemes.  384 F.

Supp. 2d at 867-68.  The Lead Plaintiff in *Janus* had only alleged that during the class period it had

purchased Janus mutual funds, including mutual funds which were subject to market timing,

without alleging that it had purchased every fund in the complex.  *See Janus*, Amended Complaint

at ¶ 14.  The *Janus* complaint alleged that the defendants' misconduct impacted and involved all of

the Janus funds, but also pleaded by example how market timing and late trading occurred in

specific funds.  The court did not apply a heightened pleading standard to the plaintiffs' § 36(b)

claims, nor did it require the plaintiffs to plead detailed allegations specific to each and every fund.

*Janus*, 384 F. Supp. 2d at 867-68.  Instead, the court held that the plaintiffs' § 36(b) claim was

supported by allegations in the complaint that the defendants' misconduct increased the funds'

assets and therefore "excessively" increased "management fees, which were based upon the amount

of funds under management."  *Id*. at 868.  Such allegations are similar to the § 36(b) allegations in

this case, as described further below.  As in *Janus*, these allegations state a claim under § 36(b).

     **1.**       ***Gartenberg* Is a Post-Trial Decision That Does Not Alter the Rule 8
             Pleading Standard on a Motion to Dismiss**

Defendants argue that to state a § 36(b) claim Plaintiffs must plead facts demonstrating excessive fees with respect to each Fidelity Fund under the six factors recognized by the Second Circuit in *Gartenberg*, 694 F.2d at 928. *See* Def. Br. at 15. Defendants are wrong. *Gartenberg* is a post-trial decision, its six factors pertain to what a plaintiff must ***prove at trial*** under § 36(b), and it does not alter the Rule 8 pleading requirements discussed above.[13]

As explained by the Judge O'Toole of this District in *Wicks*:

> *Gartenberg* … does not establish a heightened pleading requirement for § 36(b) excessive fee claims. A plaintiff's failure to plead certain *Gartenberg* factors is not itself grounds for dismissal. The Court's focus in reviewing the defendants' motion to dismiss is on whether the allegations in the complaint set forth "***a short and plain statement of the claim showing that the pleader[s] [are] entitled to relief***."

2005 U.S. Dist. LEXIS 4892, at *13 (emphasis added; citation omitted).

As further explained in *Pfeiffer v. Bjurman, Barry & Associates*:

> To prevail in this [§ 36(b)] action, the plaintiff will have to demonstrate that the fees were in fact excessive … ***Whether the plaintiff can meet this burden will be decided at a later stage of this action. The plaintiff's failure to do so in his pleading is not a ground for dismissal***.

2004 U.S. Dist. LEXIS 16924, at *18 (S.D.N.Y. Aug. 26, 2004) (emphasis added).[14]

## 2. The Language of § 36(b) Does Not Require that Plaintiffs Plead Detailed Facts Regarding All Funds Within the Complex

---

[13] *See ING Principal Prot. Funds Deriv. Litig.*, 369 F. Supp. 2d 163, 168 (D. Mass. 2005); *Janus*, 384 F. Supp. 2d at 867-68; *Jones*, 2005 WL 831301, at *6-7; *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *12; *Millenco L.P. v. meVC Advisors, Inc.*, 2002 U.S. Dist. LEXIS 19512, at *9-10 (D. Del. Aug. 12, 2002). The *ING* court upheld a complaint tying the *Gartenberg* factors to specific allegations in the complaint, but the court stated that, "[a] plaintiff's failure to plead these factors is not itself grounds for dismissal." 369 F. Supp. 2d at 168. Citing *Wicks*, 2005 U.S. Dist. LEXIS 4892, the *ING* court found that a complaint must simply "contain 'a short and plain statement' showing that the fee charged is so large that it bears no reasonable relationship to the relevant services actually provided." *Id.* As explained herein, Plaintiffs have met this Rule 8 pleading standard.

[14] Other courts have condoned an even more liberal standard than *Pfeiffer*. In *Green v. Fund Asset Management, L.P.*, 19 F. Supp. 2d 227, 234 (D.N.J. 1998), the court sustained a § 36(b) claim where plaintiffs did not allege that the advisory fees were "excessive" or "disproportionate." The court found that § 36(b) "**is not expressly limited to situations in which the advisory fees received by an investment adviser were excessive, disproportionate or otherwise unreasonable.**" *Id.* (emphasis added). Thus, "[t]he statute encompasses the receipt of fees by an investment adviser in violation of the adviser's fiduciary duty." *Id.*

Defendants argue that, "[t]he plain language of Section 36(b) mandates that a plaintiff plead and prove fund-specific allegations, and cannot make generic allegations directed to all funds within a complex." Def. Br. at 16.  Defendants misread the statute.  Section 36(b) provides, in part, the following:

> An action may be brought under [§ 36(b)] by . . . a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser . . . for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

15 U.S.C. § 80a-35(b).  Nowhere does the statute state the standard Defendants now advocate.  In fact, to the contrary, as demonstrated above, court after court has held that Rule 8 notice pleading governs a § 36(b) claim.  There is no question that Defendants have notice of the claims against them with respect to all of the Fidelity Funds.  Indeed, Defendants concede that Plaintiffs have satisfied the § 36(b) standing and pleading requirements with respect to at least five Fidelity Funds.[15]  Given the common Defendants who manage and underwrite/market all of the Funds in the Fidelity complex, and the common course of conduct alleged, these allegations are applicable across all of the Funds and plainly give Defendants sufficient notice of the claims against them.

**3.     The Legislative History of § 36(b) Supports Plaintiffs' Ability to Bring Suit Based Upon Allegations Directed at the Fund Complex**

Defendants argue that, "Congress never intended . . . a plaintiff to bring suit challenging the fees of hundreds of different mutual funds based upon . . . allegations directed at the fund complex . . ." Def. Br. at 16.  The legislative history of § 36(b) states otherwise.  A 1969 Senate Report summarizing the amendments to the Investment Company Act that added § 36(b) to the statute stated that a court examining a § 36(b) claim should consider "all the facts," including allegations relating to the entire fund complex:

---

[15] Plaintiffs held shares in 32 Fidelity Funds during the Class Period, including the five for which Defendants concede Plaintiffs have stated a § 36(b) claim. *See* ¶¶ 19-36.

In the event that court action is brought to enforce this fiduciary duty of the investment adviser [under § 36(b)] as to compensation or payments received by him, it is intended that the court look at all the facts in connection with the determination and receipt of such compensation, including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as a fiduciary in relation to such compensation. ***In the case of fund complexes, this could, under certain circumstances, include consideration of services rendered by such investment advisers to other funds in such complex and compensation or payments made by such other funds for such services***.

Investment Company Amendments Act of 1969, S. Rep. No. 91-184, at 15 (May 21, 1969) (emphasis added). Congress thus found that Plaintiffs may state a claim under § 36(b) by pleading facts pertaining to funds they hold, as well as facts pertaining to other funds and/or the complex as a whole. The interrelatedness of mutual funds within a complex, such as the Fidelity Funds, requires a court to examine an adviser's activity vis-à-vis the entire complex. *See* section III.A.2, *infra* (discussing the juridical links between and among the Funds).[16]

### 4.    Plaintiffs Have Stated a Section 36(b) Claim With Respect to All Fidelity Funds by Combining Complex-Wide and Fund-Specific Allegations

Defendants argue that, "[t]o state a claim under Section 36(b), a plaintiff must plead facts demonstrating that the challenged fee for *each fund* is 'so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'" Def. Br. at 15 (emphasis in original) (quoting *Gartenberg*, 694 F.2d at 928). Plaintiffs, do, however, set forth detailed complex-wide allegations – and allegations regarding

---

[16] In *Krantz*, for example, Judge Saris of this District upheld the plaintiff's § 36(b) allegations regarding the two funds the plaintiff held, based on allegations involving economies of scale and total revenues regarding ***the entire Fidelity Fund complex***. *See Krantz*, 98 F. Supp. 2d at 152, 159. The plaintiff alleged that, "the defendants did not pass along savings to investors that Fidelity realized from economies of scale and better computer technology." *Id*. at 153. Specifically, "[t]o demonstrate the new scale of the funds, the plaintiff states that, in 1985, the ***entire fund complex*** had $ 35.8 billion in assets under management, and defendants received 1.085% of those funds, or $ 388.6 million, whereas in 1995, the ***fund complex***'s assets increased to $ 373.3 billion, and the management fee also increased to 1.146% of those assets, or $ 4.3 billion." *Id*. Thus, the plaintiff alleged generally that, "between 1985 and 1995 the ***total revenues*** of defendants [Fidelity Management & Research, Co., Fidelity Distributors Corp., and FMR Corp. (Defendants herein)] increased as a percentage of the mutual fund assets under management." *Id*. at 159 (emphasis added). This court should similarly uphold Plaintiffs' claims here.

specific Funds within the Fidelity complex – sufficient to satisfy Rule 8 notice pleading.  *See*, *e.g.*, *Krantz*, 98 F. Supp. 2d at 153 ("The Federal Rules of Procedure do not require a claimant to set out in detail the facts upon which he bases his claim.").[17]

In satisfaction of the Rule 8 pleading requirements for a short and plain statement of the claim, this action alleges that Defendants received increased fees and compensation due to the growth in assets of the Funds through their asset-based fees, ***without any corresponding benefit or increase in services to the Funds or their investors***, leading to a disparity between the fees paid and the services rendered.  Defendants grew the Fidelity Funds through shelf space agreement with brokers, including:  (a) cash payments to brokers in return for the brokers' agreement to promote sales of Fund shares; (b) the directing of Fund portfolio brokerage to brokerage firms in return for agreements by the brokers to promote the shares of the Funds; and (c) excessive Soft Dollar commission arrangements with brokers designed to compensate them for promoting shares of the Funds, all of which benefited Defendants rather than the Fund owners.  *See*, *e.g.*, ¶¶ 72, 75-81, 98-100, 107-108, 123-26, 127-35, 137-45.

Although an increase in mutual fund assets can benefit investors through economies of scale that decrease the expenses of operating such funds on a per share basis, Defendants failed to reduce their fees to pass on the economies of scale to the Funds.  Instead, they retained the economies of

---

[17]  Defendants' reliance on *Yameen v. Eaton Vance Distributors, Inc.*, 394 F. Supp. 2d 350 (D. Mass. 2005) (Woodlock, J.), to demonstrate how a plaintiff must allege facts for each fund showing a relationship between the mutual fund fees charged and services rendered (Def. Br. at 15), is misplaced.  In *Yameen*, the plaintiff alleged that distribution (12b-1) fees for marketing the funds were *per se* excessive under § 36(b) because the funds were closed to new investors.  *Id.* at 357.  The court dismissed the § 36(b) claim because the plaintiff relied on "the categorical contention, rejected by the regulatory bodies charged with supervising this activity, that such fees are per se disproportionately large and hence unreasonable when paid out while the fund is closed."  *Id.* at 358.  These facts bear no resemblance whatsoever to the facts in this case.  Plaintiffs here make no such "per se" allegations but instead allege the ways in which Defendants charged and received excessive fees.  In addition, the regulators have repeatedly condemned the very behavior at issue here.  *See* ¶¶ 11-14, 146-65.  As described above, Plaintiffs here have plainly alleged a relationship between the fees charged and the services rendered.  *Cf.* 394 F. Supp. 2d at 358.  Thus, *Yameen* has no relevance here.

scale for their own benefit.  *See* ¶¶ 5, 6, 81-97, 99-106 (economies of scale); *see also* ¶¶ 2, 8, 72, 75, 78, 81-97, 123, 193, 244 (alleging that inflated fees were charged to funds without any corresponding benefit to investors).  For instance, as the Funds' assets grew, the advisory fee percentages remained fixed (meaning that the dollar amounts increased substantially), when they should have been decreasing as a result of the economies of scale arising from the increase in the Funds' asset base.[18]  *See, e.g.*, ¶¶ 82-97.

Defendants failed to reduce their management fees to reflect the benefits obtained by Defendants from such payments, and in fact benefited from increased fees, ¶¶ 82-85, and charged management and other fees that were wrongfully inflated to cover other revenue sharing payments that were ostensibly made from the assets of the Investment Adviser and Distributor Defendants.  ¶¶ 72, 75 (12b-1 fees), ¶ 123 (advisory fees).  These circumstances evidence that the fees received by Defendants were disproportionate to the services rendered (*i.e.*, none) and were not what investors would willingly have paid through arm's length bargaining.  In essence, Plaintiffs were paying "something for nothing," which is a classic § 36(b) claim.  *See Jones*, 2005 WL 831301, at *3.

Apart from their erroneous argument that Plaintiffs' § 36(b) claims may only be brought *derivatively* on behalf of the Funds (addressed below), Defendants do not challenge that Plaintiffs have alleged facts sufficient to state a claim under § 36(b) with respect to certain Fidelity Funds.  *See* Def. Br. at 14 (conceding by implication that Plaintiffs have made factual allegations that would support a cause of action for excessive fees under § 36(b) for at least five of the 206 Fidelity Funds).  Those Funds include Fidelity Blue Chip Growth Fund (¶ 95), Fidelity China Region Fund

---

[18]  The SEC and Supreme Court have recognized that, in the mutual funds context, this growth in fees paid to the investment adviser and its affiliates simply due to the increase in the assets – without any additional services bring provided to investors – creates an impermissible windfall to the advisers that they can not properly retain.  *See Daily Income*, 464 U.S. at 537 ("The [SEC] determined that, as a fund's assets grew, this form of payment could produce unreasonable fees in light of the economies of scale realized in managing a larger portfolio").  Plaintiffs have alleged that Defendants took advantage of, and have retained, the very windfall referred to in *Daily Income*.

(¶¶ 89, 193), Fidelity Contrafund (¶¶ 83, 106, 175, 180, 184), Fidelity Low-Priced Stock Fund (¶ 96), and Fidelity Magellan Fund (¶¶ 83, 87, 93, 106, 126, 169, 171).  *See* Def. Br. at 14, n.11.

Plaintiffs invested in all of these Funds.  However, Plaintiffs have also pleaded specific facts, which Defendants ignore, regarding the Fidelity Diversified International Fund (¶¶ 88, 167, 173),[19] the Fidelity Small Cap Independence Fund (¶ 90),[20] the Fidelity Value Fund (¶ 91), the Fidelity Growth & Income Fund (¶ 94),[21] and the Pacific Basin Fund (¶ 193).  Many such allegations are substantially similar to the facts for those Funds which Defendants concede are sufficient to state a claim under § 36(b).  With respect to each of these Funds, Plaintiffs have demonstrated how Defendants' complex-wide practice of using excessive management and distribution fees to grow the Funds had no corresponding benefit to investors.

For example, Defendants concede that Plaintiffs have stated a substantive § 36(b) claim regarding the Fidelity Blue Chip Growth Fund, for which Plaintiffs allege the following:

---

[19]  Plaintiffs invested in the Diversified International Fund.  Defendants assert that, "Subclass Plaintiff James Gilliam purports to have owned shares in 'Fidelity Diversified International Fund' (CAC ¶ 37)," but that this fund is not at issue in this case because it does not appear on Exhibit A to the Amended Complaint.  Def. Br. at 3 n.2.  Plaintiffs have named as a Nominal Defendant the "Fidelity Advisor Diversified International Fund."  Plaintiffs seek leave, at an appropriate time, to add the Fidelity Diversified International Fund as a Nominal Defendant, as well as other Fidelity Funds, which were originally only named as Nominal Defendants preceded by the words "Fidelity Advisor," such as the "Fidelity Advisor Growth & Income Fund" and the "Fidelity Advisor Value Fund."  This was an inadvertent error and Plaintiffs intended to include as Nominal Defendants both the "Fidelity Advisor" and non-"Fidelity Advisor" Funds.  Defendants also argue that, "Plaintiff William S. Groeschel purports to own shares in 'Fidelity Select Biotechnology Portfolio' (CAC ¶ 35)," but that this Fund was not named as a Nominal Defendant.  Plaintiffs seek leave at an appropriate time to add as Nominal Defendants the Fidelity Select Biotechnology Portfolio and all other "Fidelity Select" funds, which were previously inadvertently omitted as Nominal Defendants.

[20]  Plaintiffs invested in the Small Cap Independence Fund.  Defendants assert that, "Plaintiff Stanley H. Krupa purports to own shares in 'Fidelity Small Cap Selector Fund' (CAC ¶ 24)" but that this fund is not at issue in this case because it does not appear on Exhibit A to the Amended Complaint.  Def. Br. at 3 n.2.  According to Fidelity's own documents, the Fidelity Small Cap Selector Fund changed its name to the Fidelity Small Cap Independence Fund on July 13, 2001.  Pollack Decl. Ex. E (Historical Information Sheet for the Fidelity Small Cap Independence Fund, available at http://content.members.fidelity.com /mfl/fundhist/ 0,,315912303,00.html).  For the sake of completeness, Plaintiffs have alleged that Mr. Krupa owned both Funds – *i.e.*, "Selector" and "Independence."  ¶ 24.  Defendants' argument therefore can easily be rejected.

[21]  Plaintiffs do not allege that they invested in the Fidelity Value Fund or the Fidelity Growth & Income Fund.

> As of July 31, 1994, the Fidelity Blue Chip Growth Fund had over $2.2 billion in assets under management while Defendants received approximately $8.5 million in management fees during the previous fiscal year. According to recent regulatory filings, by July 2003, this fund's assets had jumped to almost $20 billion while fees soared to over $100 million per year, again for this single portfolio.

¶ 95. The Fund assets thus increased more than nine times during this period and management fees grew at a comparable or greater rate, demonstrating that any economies of scale did not inure to the benefit of the Blue Chip Growth Fund investors. Plaintiffs likewise allege a comparable three-fold increase in assets and fees for the Fidelity Growth & Income Fund:

> As of July 31, 1994, the Fidelity Growth & Income Fund had over $8.7 billion in assets under management, and Defendants received approximately $41 million in total management fees. According to recent regulatory filings, by July of 2003, this fund's assets had jumped to over $28 billion while fees paid to the Defendants soared to nearly $130 million in a single year.

¶ 94; *see also* ¶¶ 88-93, 95-97 (other examples). These specific examples of Defendants failing to pass on economies of scale to investors, including those for which Defendants concede Plaintiffs state a substantive § 36(b) claim, apply across the board to all Fidelity Funds in the complex, because the Funds are all managed and controlled by a common board of trustees and the same investment advisers and distributor.[22]

Plaintiffs include additional complex-wide allegations that support their § 36(b) claim. For example, as alleged in the Complaint:

> According to a former employee who worked in the investments institutional services department at Fidelity for 6 years, "I was told, now [that] Fidelity has over two hundred funds, the Magellan Fund alone paid for all [of the] operating expenses [of] the company, which included rent, which included employee benefits, which included salaries, bonuses, etc. – all from one fund. That's what I was told. I was told all they needed was Magellan to run the company."

¶ 87. The fact that Fidelity earned sufficient fees from only the Magellan Fund in order to cover all of its expenses for the remaining (over 200) Funds demonstrates that Plaintiffs have alleged that the

---

[22] Additional allegations demonstrating that Fidelity's conduct was common across all Funds is their issuance of substantially similar public filings for all Funds. *See* section III.A.1, *infra*.

fees charged the Magellan Fund, and all other such funds, were not reasonably related to the services rendered, *i.e.*, were excessive under § 36(b). *See Dreyfus*, 2005 U.S. Dist. LEXIS 29152, at *28, n.7 (upholding § 36(b) claim regarding the entire fund complex). It also demonstrates that all of the Fidelity Funds are inter-related, which further supports Plaintiffs' complex-wide allegations regarding Defendants' common course of conduct across all Funds.

As Plaintiffs have alleged, analysts in the mutual fund industry have recognized, and Plaintiffs' investigation has confirmed, that Defendants have a common course of conduct of charging excessive fees across all Fidelity Funds:

- Defendants' unique implementation of technological advances has increased the economies of scale for all Fidelity Funds, which are among the largest in the world (¶¶ 43, 104), and reduced the costs of providing investment advisory services to the vast number of shareholder accounts the Defendants are charged with overseeing, yet Defendants failed to reduce their fees during the Class Period. *See* ¶¶ 102-08.

- Inconsistent with their virtually unmatched and award-winning in-house research apparatus, Defendants paid excessive Soft Dollars and excessive commissions to broker-dealers, which, insofar as they were given under the guise of research services, were a sham and utterly unjustifiable. Fidelity's end to paying Soft Dollars complex-wide on July 1, 2004, in response to regulatory and investor scrutiny of such practices is an admission that Defendants had been previously overcharging all Fidelity Funds and investors for Soft Dollars, which they estimated cost all of their stock mutual funds $160 million in a single year. *See* ¶¶ 127-35.

- Defendants paid more for shelf space than other funds to appear on brokers' preferred lists because Fidelity was disliked by brokerage firms, such as Merrill Lynch. According to a former employee who worked with Fidelity Investments Institutional Services, many of the brokerage firms disliked Fidelity because it was the first company to sell directly to investors and cut out brokers. ¶ 113.[23]

- Defendants also had a practice of charging lower management fees to institutional clients than to ordinary retail mutual fund investors. ¶ 136.

---

[23] Allegations such as Fidelity's use of technology, its end to the use of Soft Dollars, and need to pay top dollar for shelf space distinguish this action from recent actions relied upon by Defendants, where the plaintiffs did not include such allegations. *Contra Franklin*, 388 F. Supp. 2d 451; *Lord Abbett*, 2005 U.S. Dist. LEXIS 37492; *Eaton Vance*, 380 F. Supp. 2d 222.

These types of allegations demonstrating a common course of conduct by the same group of Defendants across all of the Fidelity Funds complex-wide are sufficient to state a § 36(b) claim under Rule 8 notice pleading standards.

As Judge O'Toole recently held in *Wicks*, the very type of conduct alleged here is subject to challenge under § 36(b).[24]  In *Wicks*, the plaintiff sued the investment manager for certain Putnam Funds based upon the allegation that "***[t]he defendants . . . direct the payment of excessive commissions to securities broker-dealers to execute trades for the Funds in exchange for 'soft dollars' (said to be a form of kickback) that benefit the defendants and not the Funds.***"  2005 U.S. Dist. LEXIS 4892, at *3 (emphasis added).  The *Wicks* defendants (and not the investors) benefited because, as the plaintiffs alleged, "[a]lthough assets held by the Funds [] increased significantly over time, the nature and quality of the services rendered by the defendants to the Funds has not substantially changed[, creating] benefits from *economies of scale* which the defendants [] failed to share with the Funds."  *Id.* (emphasis added).  As the plaintiffs alleged, the "defendants continue[d] to receive *larger fees* from the Funds, capturing all benefits from the *economies of scale* for themselves."  *Id*. (emphasis added).  In denying the defendants' motion to dismiss, the court held that such allegations were sufficient to survive a motion to dismiss for failure to state a claim upon which relief can be granted.  *Id*. at *13; *see also Krantz*, 98 F. Supp. 2d at 159 (sustaining a § 36(b) claim where the plaintiffs alleged, *inter alia*, that "defendants did not pass savings on to the funds' investors that Fidelity realized from economies of scale").  As in *Wicks*, Plaintiffs here have alleged the fees were excessive because they and other Fund investors were

---

[24]  Plaintiffs' allegations in this regard support a finding of excessive advisory and other fees under § 36(b); but, at a minimum, the economies of scale from which Defendants benefited as a result of the growth of the Fidelity Funds are a "fallout benefit" under the fifth prong of the *Gartenberg* analysis that supports a claim under § 36(b).  *See Krinsk v. Fund Asset Mgmt.*, 875 F.2d 404, 409 (2d Cir. 1989) (citing *Gartenberg*, 694 F.2d at 929-30).

paying increasing amounts of asset-based fees as the Funds grew with no increase in services or other corresponding benefit to the Funds or their investors.

Numerous courts in addition to *Wicks* have upheld similar § 36(b) claims as those presented here. *See, e.g.*, *Jones*, 2005 WL 831301, at *6-7 (§ 36(b) claim upheld where the plaintiffs alleged investment advisers retained unearned fees); *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *12 (§ 36(b) claim upheld alleging that the defendants charged the plaintiffs much higher fees than other clients for equivalent advisory services and retained excess profits resulting from economies of scale); *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924, at *14 (§ 36(b) claim upheld where plaintiffs alleged that defendants violated their fiduciary duty by receiving excessive promotion, distribution and servicing fees).[25]

Additionally, Fidelity's post-Class Period reduction of management fees for a number of Funds as a result of intense regulatory scrutiny of fees demonstrates that fees charged on those Funds during the Class Period were excessive. Plaintiffs thus alleged in the Complaint that:

> Subsequent to the Class Period, Fidelity has been part of the group of funds that has reduced its fees. Fidelity recently cut 31% from the fees of 12 retail investment bond funds; cut 10% from fees of its eight Advisor Funds; and trimmed fees on its Freedom Funds and five of its index funds. *See* Frank Byrt, *Mutual-Fund Giant*

---

[25] The recently-decided *Columbia* opinion, in which Judge Keeton dismissed the plaintiffs' § 36(b) claim, will offer Defendants no support, should they choose to rely on it on reply. 2005 U.S. Dist. LEXIS 33439. Judge Keeton's **sole basis** for dismissing the § 36(b) claim was his misunderstanding that the plaintiffs had alleged that the defendants paid kickbacks to brokers but did not allege that the defendants had received excessive fees. *Id*. at *32. In so ruling, however, the court in *Columbia* overlooked the numerous allegations in the plaintiffs' complaint that stated that the defendants were the recipients of the disputed fees and that such fees were, in and of themselves, excessive even though the "kickbacks" were paid to brokers as a way to grow the funds. Here, the Complaint similarly alleges that the fees were excessive because Defendants caused the Funds to grow (through kickbacks and other means), which increased the Defendants' fees while the Defendants provided no corresponding increase in services. In other words, the Defendants received "something for nothing." The *Columbia* court did not rule on such central "something for nothing" allegations. In fact, the holding in *Columbia* directly conflicts with Judge O'Toole's holding in *Wicks*, which upheld allegations substantially similar to those in this case. *See Wicks*, 2005 U.S. Dist. LEXIS 4892, at *3. As such, courts, including within this District, have explicitly rejected Judge Keeton's (erroneous) conclusion that the payment of kickbacks to brokers negates the allegation that the advisers and distributors received excessive compensation under § 36(b). Accordingly, this Court should not now follow this erroneous ruling. The plaintiffs in the *Columbia* action have filed a notice of appeal.

> *Fidelity Trims Fees on 12 Bond Funds*, The Associated Press State & Local Wire,
> June 1, 2005.

¶ 92.  The Fidelity Funds named herein include Fidelity's bond funds, Advisor Funds, Freedom

Funds and index funds.

### 5.    The Trustees' Lack of Independence Further Supports the Validity of Plaintiffs' § 36(b) Claims

Allegations of a lack of independence or conscientiousness of fund trustees weighs in favor

of a finding of the sufficiency of a claim alleging the fees charged fund investors were excessive.[26]

In *Dreyfus*, the court found that such allegations supported a § 36(b) claim.  2005 U.S. Dist. LEXIS

29152, at *28.  As stated in *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924, at *14, whether the trustees

were independent or conscientious was "of particular importance" because:

> The expertise of the trustees, whether they are fully informed, and the extent of care
> and conscientiousness with which they perform their duties are ***among the most
> important factors*** to be examined in evaluating the reasonableness of compensation
> under section 36(b).

*Id.* (quoting *Krinsk*, 875 F.2d at 212) (emphasis added).

Here, Plaintiffs' complaint contains allegations similar to those relied upon in *Dreyfus* and

*Pfeiffer* regarding the trustees' lack of independence, conscientiousness and due care that led those

courts to uphold the plaintiffs' § 36(b) claims.[27]  Moreover, most of the Trustee Defendants here

served as trustees of between 289 and 291 Funds (*see* ¶¶ 46-63), which supports an inference of

---

[26]  *See Gartenberg*, 694 F.2d at 930.

[27]  *See* ¶¶ 186-190 (trustees have a duty to be the independent "watchdogs" of the Funds, which includes managing and supervising the Funds and their advisers); ¶¶ 191-93, 194 ("as a result of the Trustee Defendants' dependence on the investment management company, and their failure to properly manage the investment advisers, millions and millions of dollars in Fidelity Funds assets were transferred through fees payable from Fidelity Funds assets to the Investment Adviser Defendants and their affiliates that were of no benefit to Fund investors"); ¶¶ 106-108 (trustees failed in their duties of conscientiousness and due care by disregarding the "red flags"); *see also* ¶¶ 168(f), 170(h), 174(i), 177(i), 181(h), 185(h) (alleging trustees abdicated duties of due care and conscientiousness); ¶¶ 191-93 (alleging trustees are controlled and beholden to the advisers resulting in wrongful approval of fees charged to investors); ¶¶ 210-218; ¶¶ 268-71 (alleging trustees' breach of fiduciary duties violated state law).

their lack of conscientiousness with respect to all of the Fidelity Funds.  *See Krantz*, 98 F. Supp. 2d

at 158 (finding that, "membership on multiple boards . . . may support an inference of a lack of

conscientiousness (*Gartenberg* factor 6) by the directors in reviewing the fees paid by each of the

funds").[28]

### B.    Plaintiffs May Assert Direct Claims under § 36(b) on Behalf of Plaintiffs and the Class as Investors in the Fidelity Funds

#### 1.    Supreme Court Rulings and Legislative History Confirm that § 36(b) Claims Are Direct Rather than Derivative

Defendants argue that Plaintiffs' § 36(b) claim should be dismissed because it was

improperly brought directly as a class action rather than derivatively.  Def. Br. at 10; *see also* Tr.

Br. at 3 n.2; Funds Br. at 4 n.3.  In arguing that a § 36(b) claim is derivative, Defendants have

misinterpreted the statutory text and the Supreme Court's opinion in *Daily Income*, 464 U.S. 523,

upon which they rely.  Def. Br. at 11-12.  Although § 36(b) claims are brought "on behalf of" the

mutual fund (15 U.S.C. § 80a-35(b)), not all claims on behalf of a business entity are derivative.  By

---

[28]  Should this Court find that any of Plaintiffs' state law or non-§36(b) claims is derivative rather than direct, the same allegations discussed in this section regarding the trustees' abdication of their duties would support Plaintiffs' allegation that under Massachusetts and Delaware law, demand on the trustees prior to instituting suit would have been futile.  *See* ¶ 211 (alleging trustees were appointed by, and serve at the pleasure of, and were beholden to, the Investment Adviser Defendants); ¶ 212-14 (alleging trustees participated in, and approved excessive fees and misleading public filings at issue here, thereby breaching their fiduciary trust duties); ¶ 215 (alleging trustees were self-interested in Fund growth) ¶¶ 46-63, 216 (alleging total excessive trustee compensation topping, for example, $1,714,250 for one trustee during the Class Period, and service on **hundreds** of Fund boards); ¶¶ 217-18 (alleging trustees were interested in the transactions at issue here and would otherwise be required to sue themselves, and breach close personal relationships with other trustees); *see also Columbia*, 2005 U.S. Dist. LEXIS 33439, at *23 (finding under Oregon law that, given allegations similar to those made in the present action, "plaintiffs' pleadings disclose[d] a situation where, if plaintiffs' allegations of wrongdoing are true, demand would likely be nugatory").  In Massachusetts, the law of demand futility survives the Massachusetts universal demand statute where it does not apply, because the legislature is presumed to legislate against the common law background.  *Simon v. Solomon*, 431 N.E.2d 556, 565 (Mass. 1982) (holding that statutes using common law wording incorporate common law).  Massachusetts and Delaware both look to the ICA to determine whether an investment company trustee should be deemed independent or interested when making any determination or taking any action as a trustee.  Mass. Gen. Laws ch. 182, § 2B (2005); 12 Del. Code § 3801(h); *see also ING*, 369 F. Supp. 2d at 171.  The ICA's definition of "interested person" includes "any person directly or indirectly controlling, controlled by, or under common control with, such other person," 5 U.S.C. §§ 80a-2(a)(3)(C), (19)(A)(i).  Plaintiffs have alleged that the trustees were under the common control of the Investment Adviser Defendants and their affiliates (¶¶ 74, 191); demand would therefore be excused.

statute, a § 36(b) claim may only be brought by a security holder or the SEC, not the fund itself. Although courts have found that a § 36(b) recovery is paid to the fund, the Fed. R. Civ. P. 23.1 requirement is not applicable, *Daily Income*, 464 U.S. at 528-29, which Defendants freely admit. Rather, as the Supreme Court has held, § 36(b) claims are direct because the fund itself has no right of action. *Id.*

In *Daily Income*, the Supreme Court reviewed its prior decisions and concluded that it had always used the term "derivative action" to refer to a situation in which the corporation was entitled to assert the claim in court on its own behalf:

> In *Hawes v. Oakland*, 104 U.S. 450, 460 (1882), … the Court explained that a derivative suit is one "founded on a right of action existing ***in the corporation itself, and in which the corporation itself is the appropriate plaintiff***." Similarly, *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949), stated that a derivative action allows a stockholder "to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own"; and the Court added that such a stockholder "brings suit on a cause of action derived from the corporation." *Id.* at 549. Finally, *Ross v. Bernhard*, 396 U.S. 531, 534 (1970), described a derivative action as "a suit to enforce a ***corporate*** cause of action against officers, directors, and third parties" (emphasis in original) and viewed the question there presented – whether the Seventh Amendment confers a right to a jury in such an action – as the same as whether the corporation, had it brought the suit itself, would be entitled to a jury. *Id.* at 538-539. ***In sum, the term "derivative action," which defines the scope of Rule 23.1, has long been understood to apply only to those actions in which the right claimed by the shareholder is one the corporation could itself have enforced in court***. *See also, Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 522 (1947); *Price v. Gurney*, 324 U.S. 100, 105 (1945); *Delaware & Hudson Co. v. Albany & Susquehanna R. Co.*, 213 U.S. 435, 447 (1909) n4.

*Id.* at 528-29 (emphasis added).

The Supreme Court held in *Daily Income* that, "Congress intended the unique right created by § 36(b) to be enforced solely by the [SEC] and security holders of the investment company." *Id.* at 536. Therefore, the primary or direct right to bring such claim is held by the security holder, not the mutual fund. This conclusion was subsequently confirmed by the Supreme Court in *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 108 (1991), in which the Supreme Court stated that

"a shareholder action 'on behalf of' the company under § 36(b) is direct rather than derivative…"
*See also Dreyfus*, 2005 U.S. Dist. LEXIS 29152, at *28, n.7 (holding that a § 36(b) claim is not derivative); *Columbia*, 2005 U.S. Dist. LEXIS 33439, at *18 (same).

Defendants rely on the "on behalf of" language in § 36(b) to support their argument that Plaintiffs' § 36(b) claim should have been brought derivatively. Def. Br. at 11-13. But as explained by the Supreme Court in *Daily Income*:

> The fact that derivative suits are brought on behalf of a corporation does not mean, however, that all suits brought on behalf of a corporation are derivative.

464 U.S. at 535.[29]

Furthermore, the overwhelming thrust of the Supreme Court's discussion in *Daily Income* is that in deciding whether the proper party plaintiff to a lawsuit is the shareholder or the corporation, the determining factor is whether the corporation itself is entitled to assert that claim in court. In *Daily Income*, the Supreme Court specifically stated, "a shareholder action that the corporation cannot control raises no proper party concerns." *Id.* at 533 n.9.

The legislative history shows that Congress specifically considered and rejected proposed language stating that a security holder action under § 36(b) would be brought in a "derivative" capacity. As described by the Supreme Court in *Daily Income*:

> [T]he Senate bill required a security holder to make demand on the SEC before bringing suit and provided that, if the Commission refused or failed to bring an action within six months, ***the security holder could maintain a suit against the adviser in a "derivative" or representative capacity***. *Ibid.* Like the original SEC proposal, however, the Senate bill provided that the SEC could intervene in any action brought by the company or by a security holder on its behalf. *Id.*, § 22.

---

[29] In the Second Circuit decision that *Daily Income* affirmed, the court stated, "[t]he words 'on behalf of' do not create by implication a statutory right of the company itself to sue, from which the stockholders' right may be said to be 'derivative.' These words . . . signify only that either party so entitled to bring an action under § 36(b) must do so to seek return of excessive management fees to the company treasury and not to individual or governmental coffers." *Fox v. Reich & Tang, Inc.*, 692 F.2d 250, 255 (2d Cir. 1982).

After the bill was reintroduced in the 91st Congress, further hearings and consultations with the industry led to the present version of § 36(b). . . .  The new bill further provided that "either the SEC or a shareholder may sue in court on a complaint that a mutual fund's management fees involve a breach of fiduciary duty." *Id.*, at 7.  **The reference in the previous bill to the derivative or representative nature of the security holder action was eliminated**, as was the earlier provision for intervention by the SEC in actions brought by the investment company itself.  *See* S. 2224, supra, § 22.

*Id.* at 538-39 (emphasis added).  Section 36(b) claims are thus direct and a class action may be

brought on behalf of all investors in all Fidelity Funds, who are the proper parties to bring suit.

> **2.    Recent Decisions, Including Within this District, Have Found Section 36(b) Claims to be Direct**

Judge Woodlock of this District, in *Stegall v. Ladner*, 394 F. Supp. 2d 358 (D. Mass. 2005),

recently confirmed that "courts have found a direct cause of action under § 36(b)." *Id.* at 373, n.16

(citing *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *25; *Krantz*, 98 F. Supp. 2d at 157-58).  In

*Stegall*, Judge Woodlock explained that, "[a]s the Supreme Court determined in *Daily Income* […],

a shareholder's § 36(b) 'suit on the fund's behalf was not a derivative one in the sense that the

shareholder was seeking to enforce a cause of action that the fund had but refused to enforce on its

own.'"  *Id.* (quoting *Wicks*, 2005 U.S. Dist. LEXIS 4892).

In *Columbia*, an action involving similar allegations as the present case against the

Columbia mutual fund family, although Judge Keeton improperly dismissed all of the plaintiffs'

claims, he accurately found that, based on *Daily Income*, a claim under § 36(b) is direct in nature:

> In [*Daily Income*], the Court held that, due to the purposes of the statute, **Section 36(b) of the ICA provided for a direct action to be brought by a shareholder, rather than for a derivative action to be brought on behalf of the corporation**.  [464 U.S. at 540-41.]  **The Court elaborated that, regardless of state law, Section 36(b) did not provide for a derivative action** because the right of action was not one that could be asserted by the corporation itself.  *Id.* at 528-29.

2005 U.S. Dist. LEXIS 33439, at *18-19 (emphasis added).  As Judge Keeton recognized, the

Supreme Court in *Daily Income* did not look to state law to determine the nature of a § 36(b) claim.

Rather, as the Supreme Court recognized, a § 36(b) claim is direct by its very terms.  This finding

contradicts Defendants' argument here, relying upon *Mutchka v. Harris*, 373 F. Supp. 2d 1021,

1025 (C.D. Cal. 2005), that the nature of a § 36(b) claim is governed "by the law of the state in

which the fund is organized."  Def. Br. at 13.  Defendants' reliance upon *Mutchka* is further

misplaced to the extent *Mutchka* stands for the proposition that an action brought "on behalf of" a

mutual fund is necessarily derivative in nature (Def. Br. at 11), because, as discussed above, the

Supreme Court has expressly held to the contrary.  *See Daily Income*, 464 U.S. at 535.

Additional recent cases demonstrate that § 36(b) is properly brought as a direct claim.[30]  In

*Dreyfus*, an action similarly alleging the charging of excessive mutual fund fees, the Western

District of Pennsylvania upheld the plaintiffs' § 36(b) claim and stated, "a section 36(b) claim is not

brought derivatively."  2005 U.S. Dist. LEXIS 29152, at *28 n.7.[31]

### 3.    The Language of § 36(b) Confirms that the Fund Investors Have a Primary and Direct Right of Action Under § 36(b)

Section 36(b) states that the "investment adviser of a registered investment company shall be

deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of

payments of a material nature, paid by such registered investment company, *or by the security*

*holders thereof*."  15 U.S.C. § 80a-35(b) (emphasis added).  As stated by the Supreme Court in

---

[30]  In *Eaton Vance*, upon which Defendants heavily rely, the defendants conceded that claims under § 36(b) are direct rather than derivative, and Judge Koeltl stated during oral argument on the motion to dismiss that this was not in dispute.  Pollack Decl. Ex. F at 85-86 (Excerpt of *Eaton Vance* Transcript of Motion to Dismiss Hearing).

[31]  Defendants rely on the *Lord Abbett* and *Franklin* decisions (both decided by Judge Martini of the District of New Jersey) in support of their argument that § 36(b) is a derivative claim.  Def. Br. at 10-11.  Plaintiffs strongly disagree with these holdings, which are contrary to the Supreme Court precedent discussed above and recent decisions recognizing that a § 36(b) claim may only be brought directly by a fundholder rather than derivatively.  Nonetheless, although Judge Martini incorrectly held that the plaintiffs' § 36(b) claims were derivative rather than direct, he dismissed the § 36(b) claim without prejudice, permitting the plaintiffs to replead the claim derivatively.  *See Lord Abbett*, 2005 U.S. Dist. LEXIS 37492, at *43-44; *Franklin*, 388 F. Supp. 2d at 474.  Should this court find that Plaintiffs' § 36(b) claim is derivative and that it would be necessary for Plaintiffs to amend their Complaint, Plaintiffs hereby request leave to replead.

*Daily Income*, "[t]he fiduciary duty imposed on advisers by § 36(b) is owed to the company itself ***as well as its shareholders*** …."  464 U.S. at 535, n.11 (emphasis added).

Although § 36(b) provides that an action may be brought by a security holder "in respect of such compensation or payments paid by such registered investment company or by the security holders thereof," the statute requires that any recovery go to the mutual fund regardless of whether the excessive payments were made by the mutual fund itself or by the security holders.  Thus, the language and structure of § 36(b) manifest a recognition that, in substance, mutual funds are pools of assets owned by the shareholders, so that a suit for the benefit of the fund will automatically be a suit for the shareholders' own benefit even if the payments giving rise to the cause of action are made by the shareholders themselves.

This same concept of the relationship between mutual funds and their shareholders has been recognized repeatedly by the courts.  In *Burks v. Lasker*, 441 U.S. 471 (1979), the Supreme Court stated, "[a] mutual fund is a pool of assets, consisting primarily of portfolio securities, belonging to the individual investors holding shares in the fund."  Similarly, in *Tannenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir. 1977), the court stated,

> The mutual fund industry is in many ways unique…  A mutual fund is a "mere shell," a pool of assets consisting mostly of portfolio securities that belongs to the individual investors holding shares in the fund.

The fact that any recovery on a § 36(b) claim goes to the fund rather than to the individual shareholder does not render the suit "derivative" rather than direct.  This situation is analogous to when a fiduciary such as an executor or a guardian sues for the benefit of his or her beneficiary, which does not make that suit derivative merely because the plaintiff is not the beneficiary of any recovery in the lawsuit.  Indeed, many such fiduciaries have been certified to represent a class, despite the fact that the plaintiff's individual claim is asserted on behalf of the plaintiff's

28

beneficiary.[32]  Accordingly, Plaintiffs here may bring a § 36(b) claim directly on their own behalf

for the benefit of Fidelity Funds they own, as well as a class action on behalf of similarly-situated

investors in the Fidelity Funds.

### III.    PLAINTIFFS HAVE STANDING TO ASSERT CLAIMS REGARDING ALL FIDELITY FUNDS

#### A.    Plaintiffs Have Standing to Assert Direct Claims on Behalf of All Fidelity Funds Shareholders

##### 1.    Courts Have Held That a Plaintiff Need Not Have Invested in Each Fund to Satisfy the Standing Requirement

Defendants incorrectly argue that, "Plaintiffs lack standing to sue on behalf of funds in

which they are not shareholders and their claims with respect to these funds should be dismissed."

Def. Br. at 36; *see also* Funds Br. at 1-2.  It is axiomatic that standing is a prerequisite in any action,

including a class action, and a potential class representative must possess standing to assert an

individual claim.  *See Gratz v. Bollinger*, 539 U.S. 244, 285 (2003).  However, once the plaintiff's

standing to assert his or her individual claim has been established, the plaintiff's ability to represent

the class depends solely on whether the requirements of Rule 23 are met.[33]  As stated by the

Supreme Court in *Sosna v. Iowa*:

---

[32]  *See, e.g., Risinger v. Concannon*, 201 F.R.D. 16 (D. Me. 2001) (parents on behalf of their disabled children); *Woodard v. Online Info. Servs.*, 191 F.R.D. 502 (E.D.N.C. 2000) (guardian of legally incompetent plaintiff); *Prostic v. Xerox Corp.*, 1991 U.S. Dist. LEXIS 15950 (D. Conn. July 19, 1991) (securities fraud class action brought by representative of the estate of deceased investor).  "[T]here is nothing inherent in this status that would preclude fiduciaries or trustees from serving as class representatives on behalf of their own beneficiaries as well as others similarly situated, and many courts have so held."  *Woodard*, 191 F.R.D. at 506 (quoting Newberg on Class Actions, § 3.34 (3d ed. 1992)).

[33]  Even where courts have addressed this issue in terms of standing, the outcome has been the same, permitting a plaintiff to represent other securities, ERISA plans and mutual funds in addition to his or her own.  *See Sutton v. Med. Serv. Ass'n*, 1993 U.S. Dist. LEXIS 9763, at *13 (E.D. Pa. July 20, 1993); *see also In re Lord Abbett Mut. Funds Fee Litig.*, 2005 U.S. Dist. LEXIS 37492, at *22 (D.N.J. Dec. 28, 2005) ("Given the named Plaintiffs' undisputed standing to bring some claim against each Defendant, . . . their lack of standing to assert the other (obviously closely related) claims on behalf of shareholders of specific Lord Abbett Funds in which the named Plaintiffs lack an ownership interest does not warrant dismissal of any claims at this time.").

> A named plaintiff in a class action must show that the threat of injury in a case such as this is "real and immediate," not "conjectural" or "hypothetical." . . . This conclusion does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, ***but it does shift the focus of examination from the elements of justiciability to the ability of the named representative to "fairly and adequately protect the interests of the class***."

419 U.S. 393, 402-03 (1975) (emphasis added); *see also Goodman v. Lukens Steel Co.*, 777 F.2d 113, 122 (3d Cir. 1985) ("[C]ontrary to the defendants' contentions, the issue here is one of compliance with the provisions of Rule 23, not one of Article III standing. Each of the named plaintiffs has presented claims of injury to himself and has alleged facts which present a case or controversy under the Constitution"), *aff'd on other grounds*, 482 U.S. 656 (1987).

In the class action context, a plaintiff may assert a claim on behalf of shareholders of all the funds in a mutual fund complex even though that plaintiff would lack individual standing to assert those claims, as long as the claims are closely related, and the plaintiff and class members all have individual claims against the same defendants. In *Lord Abbett*, a recent action alleging excessive mutual fund fees, the plaintiffs only held seven of the 50 Lord Abbett mutual funds at issue in that case. 2005 U.S. Dist. LEXIS 37492, at *22. The defendants argued that "all claims in the Complaint asserted on behalf of shareholders of specific Lord Abbett Funds in which the named Plaintiffs lack an ownership interest must be dismissed because the named Plaintiffs lack standing to assert these claims." *Id*. at *17. Judge Martini of the District of New Jersey held that, "Plaintiffs' lack of any ownership interest in certain Funds on whose shareholders' behalf they purport to assert class claims does not warrant dismissal of any claims at this time." *Id*. In so holding, the *Lord Abbett* court relied upon the Third Circuit decision in *Haas v. Pittsburgh National Bank*, where a defendant argued for summary judgment in its favor on standing grounds against two nominal plaintiffs because they lacked standing to assert some but not all of their putative class claims against the defendant. *Haas*, 526 F.2d 1083, 1088-89 (3d Cir. 1975). The Third Circuit in

*Haas* rejected the defendant's argument because the plaintiffs had standing to bring some (even if not all) of their claims against the defendant and because the claims over which they lacked individual standing were closely related. *Id.*

In *Franklin*, an excessive mutual fund fee case similar to *Lord Abbett* and the present action, Judge Martini also adopted the *Haas* rationale. Although the named plaintiffs only held certain Franklin funds, Judge Martini found that, "plaintiffs may assert claims on behalf of investors in the *one hundred other funds*, but only to the extent that the named plaintiffs properly pleaded direct claims against those defendants." 388 F. Supp. 2d at 461.[34]

Here, Defendants do not challenge that the named Plaintiffs have standing to pursue claims against Defendants regarding the Fidelity Funds held by the named Plaintiffs. And Plaintiffs have linked each of the § 36(b) Defendants to all of the Funds in the complex. *See* ¶¶ 40-41 (alleging both Investment Adviser Defendants advised all Fidelity Funds); ¶ 45 (alleging the Distributor Defendant distributed and marketed all Fidelity Funds). Plaintiffs have indisputably alleged a common course of conduct by all Defendants across all Funds and, thus, closely-related claims. *See* ¶¶ 1-14 (describing Defendants' common course of conduct across all Fidelity Funds); ¶¶ 65-68 (describing juridical links between and among all § 36(b) Defendants and the Funds). As such, should the Court hold that it must decide the standing issue now, it can easily find (and Defendants do not dispute) that Plaintiffs have standing to bring their individual claims and that as a pleading matter they can also bring the closely-related claims against the very same Defendants for investors who purchased shares in other Funds. At the class certification stage, the Court will decide if the

---

[34] Although the *Franklin* plaintiffs did not demonstrate their individual standing against the numerous defendants because they did not link each defendant to the specific funds they held, the court stated that the plaintiffs would be able to "amend their Complaint with relative ease to satisfy the standing requirement." *See id.* at 462.

criteria of Rule 23 are satisfied.  If so, Plaintiffs can be certified as class representatives to represent investors in all of the Fidelity Funds.

Additional recent decisions in the mutual fund context confirm that because Plaintiffs have individual standing, they may pursue claims regarding all Funds in the Fidelity complex.  In *Dreyfus*, plaintiffs who only held two Dreyfus funds were permitted to pursue claims regarding the entire complex.  As Judge Lancaster explained:

> We do not decide at this stage of the case [*i.e.*, the motion to dismiss stage] how the fact that the named plaintiffs are only "security holders" (as required by statute) in two of the Dreyfus Funds might affect this case.  To be clear, ***we do not find that this is an issue of Constitutional standing***.

*Dreyfus*, 2005 U.S. Dist. LEXIS 29152, at *28, n.7 (emphasis added).

In *Janus*, the "[d]efendants contend[ed] that plaintiffs who own shares in a particular fund lack Article III standing to assert claims in connection with other funds in the same family."  *Janus*, 2005 U.S. Dist. LEXIS 18083, at *7 n.4.  However, the District of Maryland deferred ruling on the standing issue instead of addressing it at the motion to dismiss stage, and upheld the plaintiffs' § 36(b) claim.  *See id.*[35]

In *In re Dreyfus Aggressive Growth Mutual Fund Litigation*, 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000), in granting the plaintiffs' motion for class certification, the court certified plaintiffs who invested in one mutual fund to represent purchasers in another fund:

> Courts have repeatedly held that on allegations such as these, class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security.  Courts have not addressed this concern vis a vis the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.

---

[35]  The court in *In re Eaton Vance Corp. Securities Litigation,* 219 F.R.D. 38, 41 (D. Mass. 2003), on which Defendants rely, also did not address the defendants' standing argument at the motion to dismiss stage, but at the class certification stage.

*Id*. at *8.  In *Dreyfus Aggressive Growth*, certification was supported by the same factors that exist

in this case.  As summarized by the court:

> Here, the claims of the named plaintiffs and prospective class members derive from
> the same course of events.  The plaintiffs have alleged that both Funds made similar
> misrepresentations and omissions in the Registration Statements, Prospectuses,
> Statements of Additional Information and annual and semi-annual reports used to
> sell the Funds. . . .  And indeed the claims of the named plaintiffs and prospective
> class members are based on the same legal theories.

*Id*. at *14.  Here, Plaintiffs' omission claim arises from public filings that are all substantially

identical to one another across the entire Fund complex.  *See*, *e.g.*, ¶¶ 166, 167, 169, 173, 175, 178,

180, 182, 184.

Similarly, in *In re ML-Lee Acquisition Fund II L.P.*, 848 F. Supp. 527 (D. Del. 1994), the

defendants argued in opposition to the plaintiffs' motion for class certification that the proposed

class representatives could not represent investors in a mutual fund that they did not own.  The court

rejected this contention due to the similarity of the related mutual funds and of the wrongdoing that

impacted both funds at issue.  *Id*. at 561 (certifying class upon finding that the fund securities were

"substantially identical" and "marketed pursuant to the same Prospectus which [was] the subject of

many of Plaintiffs' allegations of wrongdoing").

In addition to such case law in the mutual funds context, other relevant decisions support

Plaintiffs' ability to represent investors in the other Funds, in light of the similarity of the claims of

all Class members against all Defendants and the close interrelationship between the Defendants.[36]

---

[36]  *See, e.g., In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995) (finding that
"plaintiffs [were] in the same position as absent Class Members, regardless of the specific [limited]
partnership in which they invested, because of the uniform course of improper conduct and standardized
sales approach applied by defendants"); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57
(S.D.N.Y. 1993) (plaintiffs who invested in three limited partnerships could represent persons who had
invested in two other limited partnerships, where, as here, the complaint alleged that investors in all five
limited partnerships were victims of a single pattern of fraud by defendants); *Tedesco v. Mishkin*, 689 F.
Supp. 1327, 1335-36 (S.D.N.Y. 1988) (investors in various companies and partnerships controlled by
defendants could represent a class including investors in other companies and partnerships); *Kitchens v. U.S.
Shelter Corp.*, 1983 U.S. Dist. LEXIS 12812 (D.S.C. Oct. 13, 1983) (permitting named plaintiffs to represent

In *Fallick v. Nationwide Mutual Insurance Co.*, 162 F.3d 410 (6th Cir. 1998), the plaintiff alleged that Nationwide breached its fiduciary duties with respect to his ERISA plan, as well as other ERISA plans of which he was not a member.  The district court dismissed the claims as to all ERISA plans other than the plaintiff's plan on standing grounds.  *Id*. at 411-12.  The Sixth Circuit reversed, finding the district court's reasoning "fundamentally flawed" for confusing the issue of the plaintiff's Article III standing with his ability to bring a class action under Rule 23.  *Id*. at 422. The court concluded that, "once a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong."  *Id*. at 424.[37]

Similarly, many courts have held that a plaintiff who purchased one type of a corporation's securities may represent persons who purchased other types of the corporation's securities, when purchasers of both types of securities were subjected to a common course of wrongful conduct. *See, e.g., In re MobileMedia Secs. Litig.*, 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998) (stock purchasers could represent note purchasers); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1461 (D. Ariz. 1992) (explaining how "plaintiffs need not name a representative of the class for each subgroup of securities, where common issues predominate as to all securities").

As discussed above, Plaintiffs herein have made sufficient complex-wide allegations regarding a course of conduct common across all Fidelity Funds engaged in by the same Defendants

---

purchasers of interests in 12 separate limited partnerships, even though representatives held interests in only three of the partnerships).

[37]  The *Fallick* court also cited with approval authority holding that when a single defendant offers a range of ERISA plans, an individual in one plan can represent a class of plaintiffs – including some belonging to other plans – as long as "the gravamen of the plaintiff's challenge is to the general practices [of the defendant] which affect all of the plans."  162 F.3d at 422.

who advise, underwrite/market and govern/supervise all of the Fidelity Funds.  Given these facts,

the cases cited by Defendants are not controlling.  *See* Def. Br. at 36; Funds Br. at 1.  The actions,

*Stegall v. Ladner*, 394 F. Supp. 2d 358, and *In re Eaton Vance Corp. Sec. Litig.,* 219 F.R.D. 38,

were either brought against (or were misunderstood as having been brought against) the mutual

funds at issue in those cases, and are therefore inapplicable to the standing issue here, where

Plaintiffs are not seeking recovery from the Funds.

In *Stegall*, Judge Woodlock held that a holder of one John Hancock Fund would have

standing to challenge the defendants' alleged failure to ensure his fund participated in class action

settlements in which the fund was a class member, but found that the plaintiff could not bring

claims against the remainder of the funds in the complex.  *See* 394 F. Supp. 2d at 363.  To the extent

the *Stegall* court understood the plaintiff's claims as brought ***against*** the mutual funds as

defendants, it is not applicable here, where Plaintiffs are not seeking recovery from the Funds.

Although the *Stegall* plaintiff's claim involved the recovery of money that should have been

recovered for the funds' benefit, the *Stegall* court oddly pointed out that the *Stegall* plaintiff had not

named the fund he owned as a ***defendant***.  *Id.* at 362, n.2.  In holding that the plaintiff had standing

to bring his claim, the *Stegall* court stated that, "plaintiff would have standing to seek recovery for

injuries to the Small Cap Fund.  All other defendants would have to be dismissed from the action."

*Id*. at 363.  This language suggests that the court found it would be necessary for all funds in the

complex to be named as defendants, and that the plaintiff would have lacked standing to sue each

fund-defendant.  To the contrary, the *Stegall* plaintiff brought his claim against the adviser, trustees,

parent company and affiliates of the adviser, against whom he did have standing.

That *Stegall*'s reasoning was incorrect is made clear by its citation to the *Eaton Vance*

decision, where the plaintiffs had named four mutual funds as ***defendants***.  In this regard, the

*Stegall* court quoted the following holding from *Eaton Vance*:

The named plaintiffs in this case are ***seeking to sue four mutual funds, each of which is a separate defendant***.  Yet the named plaintiffs never purchased shares in or conducted any other business with two of the four funds, namely, the Institutional and Advisers funds. ***The named plaintiffs have therefore not been injured by Institutional and Advisers funds***.  Because the plaintiffs cannot "demonstrate the requisite case or controversy between themselves personally and [the Institutional and Advisers funds], none may seek relief on behalf of himself or any other member of the class."

*Id.* at 363 (quoting *Eaton Vance*, 219 F.R.D. at 41) (emphasis added).  Plaintiffs here do not allege that they were injured by the Funds, but by their investment advisers and other affiliates, against whom Plaintiffs do have standing and have properly brought their claims.  Accordingly, *Stegall* and *Eaton Vance* do not apply here.[38]

> 2.    **Plaintiffs Also Have Standing to Pursue Their Direct Claims on Behalf of Shareholders in All of the Fidelity Funds Pursuant to the Juridical Link Doctrine**

Defendants and all the Fidelity Funds are juridically linked with one other, making collective prosecution of this action the most efficient means for resolution of the dispute.  As explained in *Luyando v. Bowen*, 124 F.R.D. 52 (S.D.N.Y. 1989), the "juridical link" doctrine allows a plaintiff to bring a class claim against a defendant as to which he or she lacks standing if there exists a "legal relationship which relates all defendants in a way such that single resolution of the dispute is preferred to a multiplicity of similar actions."  *Id*. at 58; *Heffler v. U.S. Fidelity & Guar. Ins. Co.*, 1992 U.S. Dist. LEXIS 3090, at *11 (E.D. Pa. Mar. 10, 1992) (noting that a "juridical

---

[38]  Defendants' reliance on *Columbia*, 2005 U.S. Dist. LEXIS 33439, at *29 (*see* Def. Br. at 36), is also misplaced to the extent the *Columbia* court understood that action as alleging claims against the funds themselves, and also relied on *Eaton Vance*, 219 F.R.D. at 40-41.  *See Columbia*, 2005 U.S. Dist. LEXIS 33439, at *29 ("Courts in this circuit have held that ownership of shares in a limited number of defendant mutual funds is not sufficient to confer standing ***against*** all funds, regardless of the similarity of the alleged wrongful conduct.") (emphasis added).

link," or legal relationship, would make single resolution of the dispute preferable over multiple actions).[39]

The juridical link doctrine is properly applied where efficiency and expediency allow plaintiffs to join together to address common wrongs by a group of defendants. "The doctrine is a powerful tool that can allow a [plaintiff] to force many defendants (and what might otherwise be numerous class actions) into a single lawsuit at a substantially reduced cost." *Newby v. Enron Corp.*, 2004 U.S. Dist. LEXIS 8158, at *108 (S.D. Tex. Feb. 24, 2004); *see also Payton v. County of Kane*, 308 F.3d 673, 678-79 (7th Cir. 2002) ("if the plaintiffs as a group - named and unnamed - have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise 'juridically related in a manner that suggests a single resolution of the dispute would be expeditious,' the claim could go forward") (quoting *La Mar v. H&B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973)).

In *Alves*, 204 F. Supp. 2d 198 (D. Mass. 2002), *aff'd*, 316 F.3d 290 (1st Cir. 2003), two class representatives brought an ERISA class action against five defendants. Even though neither plaintiff was ever a member of an ERISA plan that the defendants sponsored, Judge Saris employed the juridical link doctrine to conclude that "plaintiffs' claims against [defendants] should not be dismissed for lack of standing. Because these defendants [were] wholly[-]owned affiliates of [the corporate defendant], in which plaintiffs were participants, and the copayment plan provisions [were] substantially the same, a single resolution of the dispute would be expeditious." *Id.* at 205.

---

[39] The First Circuit has demonstrated a receptivity to the juridical link doctrine. In *In re Eaton Vance Corp. Securities Litigation*, 220 F.R.D. 162, 164 (D. Mass. 2004), following an appeal of the district court's denial of class certification, where certification would have permitted holders of two mutual funds to bring claims regarding a total of four funds, the First Circuit stayed the case and remanded it to the district court "'for the limited purpose of obtaining … a discussion' of … the 'juridical link' doctrine." *Id.* Although on remand Judge Harrington found the doctrine inapplicable to the facts of that case, he did acknowledge its applicability in situations involving common conduct by defendants, such as a conspiracy. *See id.* at 171; *see also Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d 198 (D. Mass. 2002), *aff'd*, 316 F.3d 290 (1st Cir. 2003)

Here, Plaintiffs have alleged in the Complaint that each of the prospectuses issued during the Class Period pursuant to which the Fidelity Funds were offered "contained substantially the same materially false and misleading omissions regarding shelf space arrangements and revenue sharing/directed brokerage, 12b-1 fees, commissions and Soft Dollars." ¶ 166. Moreover, all the Fidelity Funds are intertwined as the Defendants pool together the fees and expenses collected from the Fidelity Fund shareholders (the same fees and expenses that are challenged as excessive in the Complaint), such that the Fidelity Funds share expenses with one another. ¶ 68. The Funds, essentially pools of investor assets, are managed and administered by a common body of officers and employees of the Defendants. ¶ 67. The Fidelity Funds share the same investment advisers. *Id*. Hence, the Fidelity Funds have no independent will and are totally dominated by the Investment Adviser Defendants, their affiliates and the common body of Trustees established by them. *Id*. The Fidelity Funds thus function as components of one unitary organization. *Id*. Accordingly, Plaintiffs in the instant action have demonstrated sufficient juridical links.

Indeed, the wrongdoing alleged here was only possible because of such juridical links. The Investment Adviser and Distributor Defendants' access to and use of the entire fund complex's assets were what made their kickback programs possible and significant in their impact. Notably, on March 23, 2005, the SEC fined and censured Citigroup for kickbacks its subsidiary Smith Barney had received from Fidelity (*i.e.*, the Defendants herein) and other mutual fund companies. In the Cease-and-Desist Order, the SEC noted that the prospectuses "did not specifically disclose the magnitude of the revenue sharing payments that CGMI received from fund complexes or that certain fund complexes had greater access to, or increased visibility in, CGMI's retail network." *See* March 23, 2005 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions in In the Matter of Citigroup Global Markets, Inc.), available at http://www.sec.gov/litigation/admin/33-8557.pdf. Because of these inadequate

disclosures, the customers "were not provided with sufficient information to appreciate the

***dimension*** of the conflict of interest the revenue sharing program created." *Id.* (emphasis added).

This language illustrates that the conflict of interest not only arises from the inappropriate

relationship between advisers and brokers, but also from the amounts that were involved. This

undisclosed magnitude was only possible due to the Investment Adviser and Distributor

Defendants' access to the entire Fund complex and, as a result, impacted the entire complex.[40]

 Under the juridical link doctrine, the issues involving the Fidelity Funds would be assured of

efficient and consistent treatment in a single action involving all such Funds. *See Moore v. Comfed*

*Sav. Bank*, 908 F.2d 834, 838 (11th Cir. 1990) (While "[o]ther named plaintiffs could be supplied to

match with each named defendant . . . it would be unwieldy to do so . . . . The case is simpler and

more economical with the class of plaintiffs and the named defendants").

  **3.** **Plaintiffs Have Standing Due to their Ongoing Financial Interest in the Outcome of the Litigation Regarding All Funds**

 Plaintiffs have an ongoing financial interest in the resolution of this action regarding all

Funds. The United States Supreme Court has stated that standing consists of the following three

elements:

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally
> protected interest which is (a) concrete and particularized . . . and (b) "actual or
> imminent, not 'conjectural' or 'hypothetical.'" . . . Second, there must be a causal
> connection between the injury and the conduct complained of -- the injury has to be
> "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result
> [of] the independent action of some third party not before the court." . . . Third, it
> must be "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Under *Gollust v. Mendell*, 501 U.S.

115, 126 (1991), standing is grounded in a plaintiff's "distinct and palpable injury to himself," and

---

[40] All of the facts cited in this and the next sub-section also support Plaintiffs' contention that they have
adequately alleged a § 36(b) claim for all of the Fidelity Funds.

his or her ability to "maintain a 'personal stake' in the outcome of the litigation...." *Id.* As pointed out by at least one court in the mutual funds context, *Gollust* contradicts Defendants' argument that a mutual fund shareholder may not assert claims regarding funds in which he did not invest (Def. Br. at 36; Funds Br. at 1-2), as long as the shareholder has some financial interest in the claims involving the other funds. *See Batra v. Investors Research Corp.*, 1991 U.S. Dist. LEXIS 14773, at *10 (W.D. Mo. Oct. 4, 1991).

In *Batra*, Twentieth Century Investors ("TCI") was the registrant of 12 different funds or "series." *Id.* at *1. The court held that by holding shares in one fund, the plaintiff had standing to sue on behalf of other funds because, as a shareholder in the fund, the plaintiff benefited from any recovery of excessive fees from the other mutual funds. The court stated:

> [T]he *Gollust* holding nullifies the defendants' contention that the plaintiff cannot maintain an action on behalf of other funds where he held solely Cash Reserve securities. *Gollust* provides that where a plaintiff satisfies the statutory requirements, he need not continue to hold shares **so long as he holds some financial interest in the outcome of the litigation ... As a shareholder in [series he owned or in] any other series, he benefits from any recovery of excessive fees by TCI**.

*Id.* at *10 (emphasis added). Here, Plaintiffs have a financial interest in the outcome with respect to all the Funds because all the Funds are alleged to be alter egos of each other, and have shared the expenses at issue in the litigation. An accounting with respect to all Funds is thus necessary to award relief to any of the Funds. ¶¶ 67-68. In other words, Plaintiffs here are not attempting to challenge conduct from which they suffered no injury. Plaintiffs were injured by all of Defendants' practices (which impacted *all* of the Fidelity Funds), and they thus have standing to bring claims challenging all such practices.

**B.    Plaintiffs Have Standing to Pursue Claims "On Behalf Of" All of the Fidelity Funds as Members of an Unincorporated Association Pursuant to Fed. R. Civ. P. 23.2**

Defendants argue that § 36(b) claims may only be brought on behalf of those Fidelity Funds which plaintiffs held. Def. Br. at 39. Plaintiffs, however, have standing to bring their claims "on behalf of" all of the Fidelity Funds as members of an unincorporated association pursuant to Fed. R. Civ. P. 23.2.[41]

Rule 23.2, entitled "Actions Relating to Unincorporated Associations," provides, in relevant part, the following:

> An action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will fairly and adequately protect the interests of the association and its members.

Fed. R. Civ. P. 23.2. Under this provision, the members of an unincorporated association may bring a class action on behalf of the association.

The Fidelity Funds constitute an unincorporated association for standing purposes under federal law.[42] *See* ¶¶ 66-68. An unincorporated association is defined as a body of persons acting together pursuant to a common purpose and/or enterprise. *See Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 486 (1st Cir. 1985); *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 258 (D.R.I. 2004).[43] As discussed above, Plaintiffs allege that the individual Funds comprising the Fidelity Fund complex acted with a common purpose and/or as a common enterprise, and function

---

[41] Defendants argue that Plaintiffs lack standing to assert derivative claims on behalf of funds that Plaintiffs did not own, because Fed. R. Civ. P. 23.1 requires a plaintiff to allege that he or she was a shareholder "at the time of the transaction." Def. Br. at 38-39. However, as Plaintiffs have argued herein, absent their IAA § 206 and 215 claim in Count V, which they are voluntarily withdrawing, Plaintiffs do not assert any derivative claims.

[42] Because Plaintiffs' § 36(b) claim involves substantive federal rights, a federal court must apply federal law to determine what constitutes an "unincorporated association" for standing purposes. *See Associated Students of U.C. Riverside v. Kleindienst*, 60 F.R.D. 65, 67 (C.D. Cal. 1973).

[43] Even if the Fidelity Funds are individual, distinct legal entities, that would *not* be dispositive of the principle that the Fidelity Funds, together, constitute an unincorporated association for the constituents of an unincorporated association may be individually incorporated or otherwise organized as business entities. *See Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 461 (1st Cir. 1990); *Mgmt. Television Sys., Inc. v. Nat'l Football League*, 52 F.R.D. 162, 164 (E.D. Pa. 1971).

as components of one unitary organization. The goodwill of the Fidelity Funds has been diminished and impaired by the wrongful acts described in the Complaint. *See Cross v. Oneida Paper Prods Co.*, 117 F. Supp. 919, 921 (D.N.J. 1954) (recognizing, for federal representative party purposes, that "members of a[n] . . . unincorporated association[] clearly have a joint or common right in its trade-mark"). Moreover, the Fidelity Fund family is commonly known by the brand name "Fidelity." Defendants use this to brand the mutual fund family name to the public and entice people to purchase Fidelity Funds. *See* Pollack Decl. Ex. G (*Brand Name Value Among Mutual Funds*, Morningstar). This is another illustration of the Fidelity Defendants' strategy to treat the entire family of Funds as a single, brandable, synergistic unit, in order to maximize the benefits to themselves.[44]

Under the foregoing principles, Plaintiffs have standing as to the § 36(b) claim to bring such claim "on behalf of" all of the Fidelity Funds.[45] In effect, Plaintiffs bring the § 36(b) claim on behalf of the individual fund invested in and on behalf of the unincorporated association of all Fidelity Funds in which Plaintiffs' Funds are members. *See* Fed. R. Civ. P. 23.2. Under Rule 23.2, it is clear that any member of the unincorporated association can bring a claim on behalf of all the members thereof. Accordingly, because the § 36(b) claim is brought "on behalf of" certain members of such an association, this claim can be brought on behalf of all members of that association. The Fidelity Fund family is commonly viewed as a single entity and fairness dictates

---

[44] These "branding" expenses are marketing costs that constitute 12b-1 fees. The fact that these fees are used to market the Funds as a single commodity emphasizes the significance of the pooling of assets by Defendants and the numerous juridical links that provide another basis for Plaintiffs' standing, discussed herein, as well as support for Plaintiffs' contention that they have alleged sufficient facts for their § 36(b) claim for all of the Fidelity Funds. *See* section II.A, *supra*.

[45] *See Resolution Trust Corp. v. DeLoitte & Touche*, 822 F. Supp. 1512, 1515 (D. Colo. 1993) (discussing representative principles of Fed. R. Civ. P. 23.2, and certifying defendant subclasses of individual partners of an accounting firm as an unincorporated association).

that it be treated as an unincorporated association here.  *See Ripon Soc'y v. Nat'l Republican Party*, 525 F.2d 567, 571-72 (D.C. Cir. 1975).

## IV.    PLAINTIFFS HAVE PROPERLY PLEADED DIRECT (NOT DERIVATIVE) CLAIMS UNDER STATE LAW AND INVESTMENT COMPANY ACT §§ 34(b), 36(a), 36(b), AND 48(a)

Defendants claim that, under Massachusetts and Delaware law, Plaintiffs' state law and ICA claims are derivative in nature and, therefore, must be dismissed.  Defendants further argue that, absent a pre-suit demand on the Fund trustees, Plaintiffs may not pursue such allegedly derivative claims.  Def. Br. at 21-36; Tr. Br. at 5-13; Funds Br. at 2-7.  As demonstrated below, Defendants are wrong.

As an initial matter, whether claims under the ICA (other than § 36(b)[46]) are direct or derivative is decided by the fund's state of organization, unless application of those rules would frustrate the specific federal policy objectives underlying the ICA.  *See Kamen*, 500 U.S. at 108 ("[W]here a gap in the federal securities laws must be bridged by a rule that bears on the allocation of governing powers within the corporation, federal courts should incorporate state law into federal common law *unless the particular state law in question is inconsistent with the policies underlying the federal statute*.") (emphasis added).

In describing the "specific federal policy objectives underlying the ICA," § 1 of the ICA states the following, *inter alia*:

> [I]t is hereby declared that the national public interest and *the interest of investors* are adversely affected -- . . .
>
> (2) *when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof, [or] in the interest of underwriters, brokers, or dealers . . . rather than in the interest of all classes of such companies' security holders* . . .

---

[46]  Defendants argue that Plaintiffs' § 36(b) claim is "derivative" (Def. Br. at 21 n.15) but, as discussed herein, the Supreme Court has held otherwise.

15 U.S.C. § 80a-1(b)(2) (emphasis added).  As stated by ICA § 1, the federal policy underlying the

ICA is the protection of mutual fund investors from fund directors, investment advisers,

distributors, brokers and others who organize, operate and manage mutual funds in their own, rather

than the shareholders', best interests.  Under Supreme Court authority, this Court cannot determine

whether Plaintiffs' claims are direct or derivative under state law in a manner that contradicts this

express federal policy.  *Kamen*, 500 U.S. at 108-09; *see also Strougo*, 282 F.3d at 176 (finding that

plaintiff's bringing ICA claims directly, pursuant to Maryland shareholder standing law, comported

with the policies underlying the ICA).

> **A.     The Trustees' Transfer of Fund Assets to the Investment Adviser and
> Distributor Defendants Who Took for No Consideration, or on Notice of a
> Breach of Trust, Gave Rise to a Direct Cause of Action by Fundholders, and
> Demand on the Trustees Was Not Required Prior to Instituting Suit**

Each Fidelity Fund is organized as a series of a Massachusetts business trust or a Delaware

statutory trust, and these states' laws therefore apply to determine whether Plaintiffs' claims are

direct or derivative.  *See* Def. Br. at 28, n.20; Def. Br. at Attach. B.  Under these two states' laws,

and as the leading scholar on trust law has recognized, where trustees, in breach of trust, transfer

trust property to a third party (here, the Investment Adviser and Distributor Defendants) in return

for no consideration, or where the third party has notice of the breach of trust, this presents a direct

harm to the beneficiaries of the trust (here, Plaintiffs and the Subclass Plaintiff and other members

of the Class and Subclass).  *See* Scott, The Law Of Trusts - Fourth Edition, § 294.1 (Aspen 2001)

(hereinafter "Scott on Trusts").  Accordingly, Plaintiffs and the Subclass Plaintiff may maintain a

direct cause of action against the Investment Adviser and Distributor Defendants without having

first made a demand on the Fund trustees.

Although the Fidelity Funds are organized as trusts, Defendants rely primarily on corporate law[47] and ignore that trusts are not separate legal entities.[48]  Defendants also ignore a distinction between two general fact patterns in trust law:  *in the first*, a third party improperly takes trust assets without the authorization of the trustees; and *in the second,* the trustees themselves make the improper transfer of trust property to the third party.  Austin W. Scott, the leading commentator on trust law, has summarized in the following terms the need for a demand on the trustees in the first fact pattern, which does not apply here:

> [I]f a third person commits a tort with respect to the trust property, the trustee and not the beneficiary is ordinarily the proper party to bring an action against him.  ***The beneficiary can maintain a suit in equity against the tortfeasor only if the trustee improperly refuses or neglects to bring an action, or if the trustee cannot be subjected to the jurisdiction of the court, or if there is a vacancy in the office of trustee.***

Scott on Trusts, § 294.1 (emphasis added).

By contrast, where, under the second fact pattern, as here, Plaintiffs have alleged that the trustees have improperly authorized the transfer of trust (and investor) assets to the third party in return for no consideration, the harm to the beneficiaries is direct.  Scott describes the harm under these circumstances in the following terms:

---

[47]  The Fund Defendants, for example, rely exclusively on case law involving the relationship between corporate stockholders and corporations.  *See* Funds Br. at 2-3.

[48]  Defendants ignore that, whereas a corporation is considered a distinct legal entity that "owns" the corporation's property, by contrast, "[i]n conventional trust doctrine, ***the trustees are the juridical persons who own the trust property***, but subject to their trust duties."  John H. Langbein, The Secret Life of the Trust:  The Trust as an Instrument of Commerce, 107 Yale L.J. 165, 180 n.87 (Oct. 1997); *see also Larson v. Sylvester*, 282 Mass. 352, 357-358 (Mass. 1933) ("[A] trust is not a legal personality. . . . [I]t cannot be sued. . . . It differs from a corporation or a partnership.  The former is a legal person.  The latter, in the law of Massachusetts, is an association of individuals united for transaction of business.  The former can be sued as a body corporate in its own name.  The latter must be sued, ordinarily, in the names of the partners.").  A trustee's duty to segregate trust property from non-trust property "separates the trustee's trust property from nontrust property ***without having to lodge ownership of the trust property in a distinct entity endowed with juridical personality, such as a corporation***."  *Id*. at 180 (emphasis added).  This distinction between trusts and corporations survives today, although "[t]his contrast between ***corporation as entity*** and ***trust as personal obligation*** has eroded in common parlance."  *Id*. at 180 n.87 (emphasis added).  Here, the distinction between trusts and corporations provides a rational basis for this Court to find that the injury here was suffered directly by the trust beneficiaries, not the "trusts."

The situation is different where the trustee in breach of trust transfers property to a third person. In this situation the third person is not acting adversely to the trustee, and would have done no wrong and incurred no liability if the trustee had held the property free of trust. The wrong that he commits is a wrong to the beneficiaries in taking or retaining the property after he has notice of the breach of trust, and he thereby incurs a liability to them unless, indeed, he is a bona fide purchaser. In this situation, therefore, the beneficiaries can maintain a suit in equity against the transferee, if he took *with notice of the breach of trust or paid no value*. . . . *Primarily the liability of the transferee is to the beneficiaries rather than to the trustee, and the right of the beneficiaries against the transferee is a direct right and not one that is derivative through the trustee*.

Scott on Trusts, § 294.1 (emphasis added; footnotes omitted). Thus, where a third party has "paid no value" in return for the receipt of trust property from trustees who have breached their duties to the trust in making such transfer, or with knowledge of such breach, an action by the beneficiaries to regain such property is direct in nature, and a demand on the trustees is not required before instituting suit. *See* Restatement 2d of Trusts, § 289 ("If the trustee in breach of trust transfers trust property *and no value is given for the transfer*, *the transferee does not hold the property free of the trust*, although he had no notice of the trust.") (emphasis added); *see also* Restatement 2d of Trusts, § 288 ("If the trustee in breach of trust transfers trust property to a person who takes with notice of the breach of trust, the transferee does not hold the property free of the trust, although he paid value for the transfer.").

In his analysis, Scott cites to *Booth v. Greer Investment Co.*, 52 F.2d 857 (N.D. Okla. 1931), *aff'd sub nom.*, 62 F.2d 321 (10th Cir. 1932), where the trustees of a *business trust* in breach of trust transferred all the assets of the trust estate to a corporation, and the beneficiaries brought suit against the corporation and the trustees to have the trust property restored to the trust and for an accounting by the trustees for mismanagement. *Id.* at 859. The defendants in *Booth* argued that the plaintiff shareholders of the trust estate could not maintain the action without alleging and proving that they had made demand on the trustees to bring an action against the third party corporation. *Id.* at 860. Holding that such demand was unnecessary, the court stated the following:

46

[T]his action is against the corporation and the trustees to have the trust property restored to the trust, and for an accounting against the trustees for alleged mismanagement of the trust estate. ***The contention that the complainants should have made demand upon the trustees to bring the action against the corporation is without merit***.

*Id*. (emphasis added).

The Supreme Judicial Court of Massachusetts has long recognized the well-settled rule that such suits are direct and that demand is not required. *See Parker v. Lloyd*, 71 N.E.2d 889, 893 (Mass. 1947); *see also Moore v. Mansfield*, 142 N.E. 792 (Mass. 1924); *Sargent v. Wood*, 81 N.E. 901 (Mass. 1907) ("[P]roperty held under a trust may be followed by those interested as beneficiaries, so long as it can be identified, and may be appropriated by the court to the uses for which it was intended."). The Appeals Court of Massachusetts recently found that,

"it is elementary that, if a trustee, in breach of trust, transfers property to one who takes with notice of the breach of trust or who gives no value for the transfer, ***the transferee does not hold the property free of the trust***. And a person who has been unjustly enriched at the expense of another may be required to make restitution to the other."

*Stevens v. Nagel*, 64 Mass. App. Ct. 136, 139 (2005) (quoting *Jones v. Swift*, 15 N.E.2d 274 (Mass. 1938)). In *Stevens*, the two plaintiffs' father had died and their aunt acted as executrix for the father's estate. In that role, and in breach of trust, the aunt diverted to herself the proceeds of the father's insurance policy that should have properly been paid to the two plaintiffs as beneficiaries. The *Stevens* court held that the plaintiffs could reclaim directly from the aunt's husband's estate the proceeds of the policy which the aunt had improperly transferred to the husband. *Id.* at 141.

General Delaware trust law has been expressly incorporated into the law governing Delaware statutory trusts such as the Fidelity Funds organized as Delaware statutory trusts. *See* 12 Del. C. § 3809 ("the laws of this State pertaining to trusts are hereby made applicable to statutory

trusts"). In other words, in interpreting the duties the trustee of a statutory trust owes to the trust's beneficiaries, the courts should look to trust, rather than corporate, law.[49]

Delaware has recognized the ability of a beneficiary to seek the return of trust property from third parties to whom such property was transferred in breach of trust. In this regard, the Delaware code provides that, "[a] violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." 12 Del. C. § 3581(a). Statutory remedies for breaches of trust include "[c]ompelling the trustee to redress a breach of trust by paying money, restoring property, or other means" or "voiding an act of the trustee, imposing a lien or a constructive trust on trust property or tracing trust property wrongfully disposed of and recover the property or its proceeds." 12 Del. C. § 3581(b). Plaintiffs here seek the restoration of trust (and investor) property to the trusts.

Here, the Trustee Defendants have authorized payments to the Investment Adviser and Distributor Defendants in breach of trust,[50] and the Investment Adviser and Distributor Defendants have given no value in return. *See, e.g.*, ¶ 193;[51] *see also* ¶¶ 72, 75, 81-97, 123 (alleging that inflated fees were charged to funds without any corresponding benefit to investors). Such recipients therefore hold the assets for the benefit of the trust beneficiaries – *i.e.*, Plaintiffs and the Subclass

---

[49] As noted by one scholar on business trusts, "The general point is that, by providing for trust law to fill the gaps, the modern [statutory business trust] statutes appear to incorporate the ***stricter fiduciary standards of trust law instead of corporate law's more relaxed approach***." Robert H. Sitkoff, Symposium: Uncorporation: A New Age?: Trust as "Uncorporation": A Research Agenda, 2005 U. Ill. L. Rev. 31, 37 (emphasis added).

[50] *See, e.g.*, ¶ 106 (escalating fees were a red flag to the trustees); ¶ 107 (trustees failed to terminate plans for excessive 12b-1 fees); ¶ 168(f) (describing trustees' abdication of duties), ¶¶ 188-89 (describing the trustees' approval of advisory compensation and distribution fees); ¶¶ 191, 270 (alleging trustees' breach of fiduciary duties).

[51] Here, the Trustee Defendants were responsible for approving the advisory compensation and distribution fees, and "as a result of the Trustee Defendants' dependence on the investment management company, and their failure to properly manage the investment advisers, ***millions and millions of dollars in Fidelity Funds assets were transferred*** through fees payable from Fidelity Funds assets ***to the Investment Adviser Defendants and their affiliates*** that were ***of no benefit to Fund investors***." ¶ 193 (emphasis added).

Plaintiff and the other members of the Class and Subclass – and must return them. *See* Restatement 2d of Trusts, § 292(1) ("If the trustee in breach of trust transfers trust property and no value is paid for the transfer, the transferee can be compelled to restore the property to the trust if he has not disposed of it and has not so changed his position that it would be inequitable to compel him to restore it.").

Despite Defendants' arguments to the contrary, under these circumstances, demand on the trustees prior to instituting suit is not required. Scott writes that a court would be incorrect to hold that a beneficiary must first make a demand on the trustees before instituting a direct suit to vindicate the type of harm presented by this action:

> *[I]n a suit brought by the beneficiaries against the transferee to compel him to restore the property to the trust, it is unnecessary to allege or prove that the trustee has improperly neglected or refused to sue the transferee.* There are, indeed, a few cases in which the court speaks as though the beneficiaries could not maintain the suit without such allegations and proof. *In these cases the court failed to notice the distinction between suits brought against a person acting adversely to the trustee, and suits brought against persons to whom the trustee in breach of trust had transferred trust property. In the latter case, because the trustee has already committed a breach of trust in making the transfer, it is unnecessary for the beneficiaries to call on him to undo what he has done.*

Scott on Trusts, § 294.1 (emphasis added; footnotes omitted).

Defendants have argued that all of Plaintiffs' claims are derivative and that demand should have been made on the trustees prior to instituting suit. *See* Def. Br. at 21 n.14. Defendants argue that, with respect to the Funds organized as Massachusetts business trusts, demand is mandatory because the Massachusetts "universal demand" statute applies equally to corporations and trusts. Def. Br. at 29. First, as Plaintiffs have explained, their claims are direct and not derivative, and the universal demand statute therefore does not apply. Second, by its very terms, the universal demand

statute only applies to "corporations," and not business trusts.[52]  *See* Mass. Gen. Laws ch. 156D, §

7.42 ("No shareholder may commence a ***derivative proceeding*** until: . . . a written demand has been

made upon the ***corporation*** to take suitable action…") (emphasis added).  Here, this Court should

not apply the universal demand statute given the distinction between the two fact patterns in trust

law discussed above.

    In the cases upon which Defendants rely that apply the "universal demand" statute to mutual

funds, the claims were expressly brought derivatively on behalf of the trusts, and/or the courts were

not presented with the present argument or any other compelling reason to distinguish between

corporations and trusts for the purposes of the universal demand statute.  *See Yameen*, 394 F. Supp.

2d at 352 n.1 (action expressly brought derivatively); *Stegall*, 394 F. Supp. 2d at 367 (seeing "no

reason . . . to find that the universal demand requirement does not apply to mutual funds"); *ING*,

369 F. Supp. 2d at 171 (action expressly brought derivatively).[53]  These cases are federal decisions

interpreting state law without guidance from the Massachusetts courts.  Most such cases cite *ING*,

which merely stated in *dicta* that the court believed that Massachusetts would hold there is no

difference between business trusts and corporations for the purposes of the universal demand

statute.  *See ING*, 369 F. Supp. 2d at 171.  The chief Massachusetts decision cited by the *ING* court,

*Swartz v. Sher*, 184 N.E.2d 51, 53 (Mass. 1962), in fact stated the following:  "To be sure [trusts

with transferable shares] are not corporations, nor are they entities apart from the trustees."

Defendants' decisions therefore do not apply here.[54]

---

[52]  Businesses take various forms under Massachusetts law (*e.g.*, corporations, business trusts, partnerships, LPs, LLCs, etc.), and it is reasonable to presume that when the Massachusetts Legislature wrote "corporation" into the demand statute, it intended to limit the statute's application to corporations.

[53]  Defendants' citations to *Green v. Nuveen Advisory Fund, Inc.*, 186 F.R.D. 486, 489 n.2 (N.D. Ill. 1999), and *Clairdale Enterprises, Inc. v. C.I. Realty Investors*, 423 F. Supp. 257, 261 (S.D.N.Y. 1976), are unavailing, because this action is in no way "against" the business trust.  Def. Br. at 30 n.21.

[54]  Moreover, Massachusetts law provides that those involved with rendering professional services to a trust have direct liability to those receiving such services.

### B.    Under Massachusetts and Delaware Corporate Law, the Harm to Fund Investors Was Direct and Not Derivative

Should the Court choose instead to rely upon traditional corporate law by analogy, Massachusetts and Delaware follow a similar approach in determining whether, under corporate law, a claim is properly direct or derivative.  Under Massachusetts corporate law, "[w]hat differentiates a direct from a derivative suit is … the source of the claim of right itself. . . . If the right flows from the breach of a duty owed directly to the plaintiff independent of the plaintiff's status as a shareholder, investor, or creditor of the corporation, the suit is direct."  *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996).  Under Delaware corporate law, "The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she

---

> If a trust is formed under this chapter for the purpose of rendering one or more professional services as defined in chapter one hundred and fifty-six A, the relationship between the trust or a trustee or employee thereof rendering professional service and the person receiving such service shall be the same as if such trust or trustee or employee rendered such service to said person as an individual practitioner, including any liability arising out of the rendering of such service.

Mass. Gen. Laws ch. 182, § 5A (emphasis added).  Under Massachusetts Code chapter 156A, "professional service" includes:

> any [  ] type of service which may be rendered only pursuant to a license pursuant to the laws of the commonwealth, if the applicable regulating boards permit the licensed person to incorporate his profession under this chapter, or if such licensed person elects to incorporate his profession under this chapter and such incorporation is not prohibited by law or by regulations….

Mass. Gen. Laws ch. 156A, § 2(b) (emphasis added).  Here, under Mass. Gen. Laws ch. 182, § 5A, the Trustee Defendants are "trustees," and the Investment Adviser and Distributor Defendants are "employees" of the trust (hired by the Trustee Defendants and paid out of the trust Funds).  They all provide "professional services" because they provide the "type of service which may be rendered only pursuant to a license" under Mass. Gen. Laws ch. 156A, § 2(b), because the "type of service" involved is investment advisory-type services.  Under Mass. Gen. Laws ch. 110A, § 201, "[i]t is unlawful for any person to transact business in this commonwealth as an investment adviser or as an investment adviser representative unless he is so registered under this chapter."  Therefore, under Mass. Gen. Laws ch. 182, § 5A, the relationship between the Fidelity Fund shareholders receiving these services and the trustees and employees of the Funds providing the professional services – *i.e.*, the Trustee and Investment Adviser and Distributor Defendants – is one, "as if such trust or trustee or employee rendered such service to said person as an individual practitioner, including any liability arising out of the rendering of such service."  Plaintiffs therefore may bring direct claims against the Defendants.

can prevail without showing an injury to the corporation." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004).

In *Strigliabotti*, which is directly on point, the court found that numerous state law claims (including those asserted by Plaintiffs here) alleging excessive mutual fund fees and overcharges were direct.  2005 U.S. Dist. LEXIS 9625, at *25.[55]  The *Strigliabotti* court discussed the fact that the unique nature and structure of mutual funds demonstrates that "financial harm from overcharges is harm to the individual investors, who own the Funds' assets and bear its expenses directly on a pro rata basis."  *Id.*  Citing *United States v. Cartwright*, 411 U.S. 546 (1973), the *Strigliabotti* court noted that a mutual fund issues redeemable securities, and the value of mutual fund shares is computed daily "by taking the market value at the time of all portfolio securities, adding the value of other assets and [subtracting] liabilities, and dividing the result by the number of shares outstanding."  *Id.* at *24; *see* ¶ 204 (describing how the Fidelity Funds issue "redeemable securities").  The court thus found that "[f]ees . . . are paid by individual investors."  *Id.*  As a result, the court held that "plaintiffs do not allege injury to the Funds themselves, but rather individual injury.  Indeed, the financial harm from overcharges is harm to the individual investors, who own the Funds' assets and bear its expenses directly on a pro rata basis."[56]  *Id.* at *25.  The same reasoning applies in the present case.[57]  *See* ¶¶ 202-06.[58]

---

[55]  In *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *5-6, the state law claims upheld as direct were breach of fiduciary duty under California law; civil conspiracy to breach fiduciary duty under California law; common law aiding and abetting breaches of fiduciary duty; "acting in concert" under § 876(b) of the Restatement (Second) of Torts; breach of Cal. Bus. & Prof. Code § 17200; breach of Cal. Bus. & Prof. Code § 17500; and common law unjust enrichment.  Plaintiffs here likewise allege state law breaches of fiduciary duty and unjust enrichment.  *See* ¶¶ 263-273.

[56]  In support of their argument that the claims herein are derivative, Defendants rely on *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 733 (3d Cir. 1970), which stated that the redeemable nature of mutual fund securities did not "destroy" the "separate identities" of shareholder and corporation.  The *Kauffman* court addressed a mutual fund organized as a corporation and not as a trust.  Moreover, Plaintiffs believe the *Strigliabotti* decision represents the more well-reasoned approach.

[57]  Although the *Strigliabotti* court analyzed the issue of whether the plaintiffs' claims were direct or

Plaintiffs' claims arising from alleged omissions are direct in nature. In *Eaton Vance*, 380 F. Supp. 2d at 235 n.5, upon which Defendants rely, although the court dismissed the plaintiffs' ICA § 34(b) claim for lack of a private right of action, the court recognized that claims for material omissions allege a direct, rather than a derivative harm:

> The Independent Trustee Defendants' argument that Count One [(the § 34(b) claim)] must be brought as a derivative suit is unavailing. Count One alleges that the defendants made material misrepresentations or omissions regarding their management of the Eaton Vance Funds. Count One alleges an injury directly to the investors who, based on the alleged misrepresentations and omissions, continued to invest in the Eaton Vance Funds and were thereby injured. Count One alleges an injury to the investors separate and distinct from any injury to the Eaton Vance Funds and it is properly brought as a direct claim rather than a derivative claim.

Such a claim is therefore direct.[59] *See Blasberg*, 934 F. Supp. at 26 ("[I]f a plaintiff alleges that she, as an individual investor, was misled or defrauded in the purchase of her investment, this kind of claim is a 'direct' one."). In this case, Plaintiffs' Complaint contains nearly identical allegations as those that the *Eaton Vance* court upheld as direct. *See, e.g.*, ¶¶ 166-85 (detailing how the Fidelity Fund Prospectuses, Annual Reports, and Semi-Annual Reports were misleading); ¶¶ 226-233 (Count I under ICA § 34(b)). The *Eaton Vance* decision thus supports Plaintiffs' pleading of their § 34(b) claim in this case as a direct claim.

---

derivative under California law, it stated that the result would be the same under Massachusetts, Delaware, and Maryland law, where certain of the Franklin funds at issue in that case were also incorporated. *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *25. Here, as noted above, Massachusetts and Delaware law apply.

[58] Defendants challenge the *Strigliabotti* decision on the ground that other courts have rejected it. Despite such holdings, however, Judge Illston of the Northern District of California recently upheld the reasoning of her prior *Strigliabotti* decision after the defendants in that action filed a motion for judgment on the pleadings. *See Strigliabotti v. Franklin Res., Inc.*, 2005 U.S. Dist. LEXIS 28410, at *11 (N.D. Cal. Nov. 8, 2005). Judge Illston's holding regarding the direct nature of the harm was correct and reflects the reality of investing in a mutual fund.

[59] Defendants incorrectly assert that the *Eaton Vance* court dismissed the § 34(b) claim on the ground that it should have been brought derivatively. Def. Br. at 26. The *Eaton Vance* court did not so hold. *See* 380 F. Supp. 2d at 234 (finding, where the § 34(b) claim was Count **One**, that "Counts Two, Four, Seven, Eight, Nine, and Ten" should have been brought derivatively).

Similarly, as the Second Circuit has found under Maryland law, the growth of a mutual fund that is accompanied by harm to shareholders states a direct, not derivative, claim. *Strougo v. Bassini*, 282 F.3d at 169.  In *Strougo*, the Second Circuit upheld direct claims brought pursuant to § 36(a) (for breach of fiduciary duty) and § 48 of the ICA where there had been a "reduction in the net equity value of the shares," as is alleged here.  *Id*. at 174.  *Strougo* also makes clear that shareholders may bring a direct action even when all shareholders were injured in the same manner:

> There may be acts that injure shareholders equally but do not injure the corporation at all; ***indeed they might be seen as benefitting [sic] the corporation in the sense that they might increase its assets***.  The shareholders, despite their undifferentiated harm, could not bring a derivative suit -- nor could the corporation recover for them -- because no such suit could succeed without a showing of injury to the corporation. In such circumstances, only a direct suit by shareholders can redress the harm to them, even though the harm was suffered by the shareholders equally.

282 F.3d at 172.  Here, the Defendants' activities benefited the Fidelity Funds as the Funds grew in size, such as the $66 billion Magellan Fund which doubled in size over ten years (*see* ¶ 93), but harmed individual shareholders through excessive fees, the effect of which was to reduce the redemption value of their shares.

In *Strougo*, the Second Circuit stated that a direct claim exists where, as here, shareholders suffered injury, although the conduct complained of might have actually increased the assets of the mutual funds:

> Indeed, with reference to the shareholders that purchased new shares in order to avoid dilution, ***the acts that allegedly harmed the shareholders increased the Fund's assets.***  And as for the non-participating shareholders, the reduced value of their equity did not derive from a reduction in the value of the Fund's assets, but rather from a reallocation of equity value to those shareholders who did participate.
>
> Thus, in the case of both the participating and non-participating shareholders, it would appear that the alleged injuries were to the shareholders alone and not to the Fund.  These harms therefore constitute "distinct" injuries supporting direct shareholder claims under Maryland law.  The corporation cannot bring the action seeking compensation for these injuries because they were suffered by its shareholders, not itself.

*Id.* at 175 (emphasis added); *see also Mann v. Kemper Fin. Co.*, 618 N.E.2d 317, 325. (Ill. Ct. App. 1992) ("A plaintiff shareholder's injury may not be unique to that particular shareholder, but a plaintiff's cause of action could still be individual instead of derivative.").[60]

Here, even if this Court were to find that the Funds are initially "harmed" from the exacting of excessive fees against their assets, the benefit to the Funds from their growth far outweighs such harm. Investors, however, do not benefit from increased fund size. In the aggregate, therefore, investors have suffered a harm independent and distinct from that suffered by the Fidelity Funds. For example, assume a Fund has 100 shares and assets of $11,000. Each share is thus valued at $110. Then, $1000 is paid out of Fund (and investor) assets to improperly market the Funds to new investors. The overall value of the Fund decreases from $11,000 to $10,000 and the value of each share falls to $100. The marketing campaign results in new investors who enter the Fund by buying 100 shares (at $100 apiece) and adding $10,000 to the assets of the Fund. The end result is that the Fund grows from $11,000 to $20,000 – an overall benefit for the Fund, and for the investment advisers and distributors who collect their fees based on a percentage of Fund assets. The investment advisers and distributors (and their parent companies) experience a windfall – their fees double without providing any additional services to investors. However, for the 100 initial investors in the Fund, the value of each of their shares remains decreased by $10. The addition of

---

[60]  It is well-settled that a plaintiff's allegations of a breach of fiduciary duty to the shareholders allows that plaintiff to bring a direct cause of action. *Malmros v. Jones*, 2004 U.S. Dist. LEXIS 4371, at *12 (E.D. Pa. Feb. 27, 2004). As the United States Court of Appeals for the Second Circuit has explained:

> We have . . . permitted a shareholder to sue directly when the defendant owes a direct legal duty to the shareholder. *See Ceribelli v. Elghanayan*, 990 F.2d 62, 64 (2d Cir. 1993). Zolt and Steinberg, Bob Marley's accountant and lawyer, owed fiduciary duties directly to him and his estate. Their actions in diverting estate assets and income breached that duty. Consequently, even in the schemes where the estate was injured only as a shareholder, defendants' breaches of their fiduciary duty as well as equitable considerations confer standing on plaintiff in this action.

*Bingham v. Zolt*, 66 F.3d 553, 562 (2d Cir. 1995).

new investors has not increased the value of their shares (*i.e.*, $20,000 / 20 total investors = $100/share).

Thus, where improper (and illegal) marketing schemes result in the growth of a mutual fund, unless the investment advisers reduce their advisory or distribution fees to take the economies of scale into account, which Fidelity did not do during the Class Period, current investors in the Funds directly bear the expenses of growth of the Funds, and ***in the aggregate***, the Funds suffer ***no harm***, but in fact benefit from the scheme. Such was the case here, as Plaintiffs have alleged. *See* ¶¶ 3-4, 78, 81-97.

The Fund Defendants argue that, "Massachusetts law requires a derivative rather than direct action when, in the context of mutual funds, the 'plaintiffs are damaged indirectly because the assets of the Funds are reduced." Funds Br. at 3 (quoting *Eaton Vance*, 380 F. Supp. 2d at 234; citing *Stegall*, 394 F. Supp. 2d 358). Defendants' overly simplistic analysis ignores that Plaintiffs here were harmed from excessive fees because their redemption value was decreased, while the Funds themselves benefited from increased assets ***overall***.[61]

Furthermore, a direct action is necessary because a derivative action would not fully redress the harms Defendants caused. Although in certain instances the fees may have in some manner increased fund assets, at the same time they injured the individual shareholders, who bore the cost of the fees but received no benefit in return. For this reason, only a direct action will fully vindicate the shareholders' rights. *See Strougo*, 282 F.3d at 175. Furthermore, as the Class Period ended on November 17, 2003, numerous members of the proposed Class who paid the excessive fees and

---

[61] Moreover, as alleged in the Complaint, Defendants' own prospectuses, SAIs, and annual and semi-annual reports acknowledge that the cost of investing in a Fund is not limited to the initial price of purchasing shares. That cost also includes additional fees and expenses subsequently imposed on the investors in connection with the service aspect of mutual fund investing. According to the May 21, 2002 Magellan Fund Prospectus, "If payments made by FMR to FDC or to intermediaries under the Distribution and Service Plan were considered to be paid out of the fund's assets on an ongoing basis, they might increase the cost of your investment and might cost you more than paying other types of sales charges." ¶ 205.

expenses no longer hold their shares of the Funds and would not be protected if the Court required

this case to proceed as a derivative action.[62]  Only a direct action would cover these Class members.

Under the foregoing authorities, Plaintiffs' state and ICA breach of fiduciary duty claims for

excessive fees, and § 34(b) omission claims, are properly alleged as direct claims.

## V.    A PRIVATE RIGHT OF ACTION EXISTS UNDER INVESTMENT COMPANY ACT §§ 34(b), 36(a) AND 48(a)

Defendants argue that there is no private right of action under §§ 34(b), 36(a) or 48(a) of the

ICA.  Def. Br. at 6-10; Funds Br. at 7; Tr. Br. at 3 n.2.  As demonstrated below, this is erroneous

because under recent Supreme Court and lower court jurisprudence, it is appropriate to find an

implied private right of action under those sections of the ICA.[63]

### A.    Congress Intended that a Private Right of Action Exist under §§ 34(b) and 36(a)

As Defendants recognize (Def. Br. at 7), courts must "***look to the intent of Congress*** in

determining whether a federal private right of action exists for violations of a federal statute."

*Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 432 (2d Cir. 2002) (emphasis added).  In

making this determination, an important factor is whether the statute discusses "the individuals [to

be] protected."  *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).  If it does not, there exists "no

implication of an intent to confer rights on a particular class of persons" and, consequently, no

---

[62]  If, as Defendants argue, these claims are properly derivative claims, then the recovery from such claims would go solely to the Funds, which would create a windfall for whomever happens to own Fund shares at the time of recovery and would deprive those who were Fund shareholders during the wrongdoing – *i.e.*, those who were actually harmed – of any remedy for the harm they suffered.  *See, e.g., Tooley*, 845 A.2d at 1033 (stating that to decide whether action is properly direct or derivative, the court should consider who will receive the benefit of remedy, the corporation or the individual stockholders).

[63]  Defendants argue that there is no implied private right of action under ICA § 48(a).  Def. Br. at 6-10; Funds Br. at 7; Tr. Br. at 3 n.2.  Defendants are wrong.  ICA § 48(a) makes it unlawful for "any person, directly or indirectly, to cause to be done ***any act or thing*** through or by means of any other person ***which it would be unlawful for such person to do under the provisions of [the ICA]***."  15 U.S.C. § 80a-47(a) (emphasis added).  A private right of action therefore exists under § 48(a) to the same extent it exists under other sections of the ICA, including § 36(b), which has an express private right of action.  *See Dreyfus*, 2005 U.S. Dist. LEXIS 29152 (upholding plaintiffs' § 36(b) claim and therefore, Plaintiffs' § 48(a) claim as well).  Should this Court find that §§ 34(b) and 36(a) provide for a private right of action, a private right likewise exists under § 48(a) for violations of those statutory provisions as well.

implied right of action.  *Id*.  However, a discussion of the group of "individuals [to be] protected," is

an indication of an implied right of action.  *Id*.; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284

(2002) (noting that an implied right of action exists if the text of the statute is "phrased in terms of

the persons benefited").  As discussed below, the language of the statutory schemes of §§ 34(b) and

36(a) state that Congress intended for §§ 34(b) and 36(a) to be ***for the protection of investors*** --

language that is supportive of a private right of action under §§ 34(b) and 36(a).[64]

Section 34(b) makes it "unlawful for any person to make any untrue statement of a material

fact in any registration statement…or other document filed or transmitted pursuant to this title or the

keeping of which is required pursuant to section 31(a)."  15 U.S.C. § 80a-33(b).  Section 31(a) of

the ICA states that its requirements are intended "***for the protection of investors***."  15 U.S.C. § 80a-

30(a) (emphasis added).  Likewise, § 8 of the ICA, which sets out the reporting requirements for the

registration statement discussed in § 34(b), SEC Form N-1A, states that the purpose of such a

registration statement is "***for the protection of investors***."  15 U.S.C. § 80a-8(a) (emphasis added).

Specifically, as stated in Form N-1A, the purpose of its reporting requirements is to "provide

essential information about the Fund in a way that will help ***investors*** to make informed decisions

about whether to purchase the Fund's shares described" therein.  SEC Form N-1A at C.2.(a),

*available at* http://www.sec.gov/about/forms/formn-1a.pdf (emphasis added).

That § 34(b) is aimed at protecting investors is also evident from the fact that it proscribes

the omission of facts "necessary in order to prevent the statements made therein, in the light of the

circumstances under which they were made, from being ***materially misleading***."  15 U.S.C. § 80a-

---

[64]  In contrast, following the logic of the Supreme Court in *Sandoval*, the court in *Olmsted* refused to
recognize a private right of action for §§ 26(f) and 27(i) of the ICA because, "[t]he language of these sections
only describes actions by insurance companies that are prohibited; ***it does not mention*** [an intent to protect]
investors such as the plaintiffs."  *Olmsted*, 283 F.3d at 433 (emphasis added).  Here, §§ 34(b) and 36(a) do,
in fact, ***expressly*** state that investors are the group to be protected by the conduct proscribed in §§ 34(b) and
36(a).

33(b) (emphasis added).  The phrase "materially misleading" only makes sense in the context of protecting investors, as the test for materiality focuses on providing accurate information to the investor.  *See*, *e.g.*, *SEC v. Happ*, 392 F.3d 12, 21 (1st Cir. 2004) (noting that a fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable ***investor*** as having significantly altered the 'total mix' of information made available") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (emphasis added)).

Courts have specifically found private rights of action under § 34(b).  In *In re Nuveen Fund Litigation,* 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996), as here, the plaintiffs alleged that the defendants violated § 34(b) by not acting in the best interests of mutual fund shareholders in trying to increase the funds' assets and therefore increased advisory fees with no corresponding benefit to the shareholder through any economies of scale.  The court in *Nuveen* held that shareholders had a private right of action under § 34(b) because "***the language and structure of the statute***" demonstrated that a private right of action existed.  *Id*. at *12 (emphasis added).  The court concluded that "[i]n light of the ICA's remedial purposes, the substantial line of precedent recognizing implied private rights under the ICA . . . the legislative intent attendant to two subsequent amendments to the ICA," and the plain "language and structure of the statute," a private cause of action existed under § 34(b).  *Id*. at *11.

Section 36(a) states that if a breach of fiduciary duty thereunder is established, the court may enter reasonable relief against the wrongdoers, "having due regard to the protection of investors and to the effectuation of the policies declared in section 1(b) of this title [15 U.S.C. § 80a-1(b)]."  15 U.S.C. § 80a-35(a).  A private right of action for § 36(a) "is supported by the text of [§] 36." *Strougo v. Bassini*, 964 F. Supp. 783, 796 (S.D.N.Y. 1997).  Specifically, § 36(a) states that, like § 34(b), it is for "***the protection of investors***."  15 U.S.C. § 80a-35(a) (emphasis added).  Moreover,

§ 36(a) incorporates § 1(b) of the ICA which states that the purpose of sections such as 36(a) is to protect the "*interests of investors*."  15 U.S.C. § 80a-1 (emphasis added).

An implied right of action under § 36(a) was reaffirmed in *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002), a case decided almost simultaneously with the decision in *Olmsted*.[65]  In *Strougo*, the Second Circuit held that mutual fund shareholders had standing to bring direct actions asserting private rights of action under §§ 36(a) and 48 of the ICA.  In doing so, the Second Circuit emphasized that "the general policy statement of the ICA" regarding mutual funds includes the objectives of "protecting all classes of investment company security holders from the special interests of directors, officers … and preventing investment companies from failing to protect 'the preferences and privileges of the holders of their outstanding securities.'"  *Id*. at 176 (citing ICA § 1(b)).

The SEC's express right to enforce § 36(a) in no way forecloses the possibility of an implied private right of action thereunder.  *Contra* Def. Br. at 10.  In *Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412 (1975), the Supreme Court stated in language that is fully consistent with current Supreme Court authority, "[i]t goes without saying ... that the inference of [] a private cause of action not otherwise authorized by the statute must be consistent with the evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act."  *Id.* at 418.  While "express statutory provision for one form of proceeding ordinarily implies that no other means of enforcement was intended by the Legislature," "*[t]hat implication would yield, however, to 'clear contrary evidence of legislative intent.'*" *Id.* at 419 (emphasis added).  Here, the intent of Congress as manifest in the language and structure of the statute is, at a minimum, ambiguous.  Therefore, the Court should yield to strong legislative intent supporting a private right of action.

---

[65] *Strougo* was amended on March 11, 2002, *after* the March 7, 2002 *Olmsted* decision, confirming that courts have recognized implied rights of action under the ICA in light of *Olmsted*.

From the late 1940's to the mid-1970's, courts were open to implying a private right of action under federal statutory law whenever doing so would appear to further the legislative purpose, which was easily justified under the securities laws.  The Supreme Court's decision in *J.I. Case Co. v. Borak,* 377 U.S. 426 (1964), implying a private right of action for violations of § 14(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), stood for this proposition, and the reasoning was consistently extended throughout the ICA.[66]  As of 1970 -- the year that Congress amended the ICA to subdivide § 36 into subsections (a) and (b) -- the case law strongly supported the implication of private rights of action under many different provisions of the ICA.  Also, the committee reports indicated that the change to subsection (b) to create an express litigation right "should not be read by implication to affect subsection (a)."  S. Rep. No. 91-184, at 166 (1969).[67] Given the judicial posture at the time, especially in light of the clear language in the committee reports, it was virtually certain that a private right of action would be implied.

The legislative history was the principal justification courts gave after 1970 for affording investors a right to sue under § 36(a).  *See, e.g., Tannenbaum v. Zeller*, 552 F.2d 402 (2d Cir. 1977). The legislative history clearly and unambiguously supported the implication of a private right of action.  In 1980, when Congress discussed the amendment of § 36 in 1970 that gave the SEC the

---

[66]  In *Borak*, the Supreme Court concluded that § 27 of the Exchange Act, 15 U.S.C. § 78aa, authorized a federal cause of action for rescission or damages to respondent, a corporate shareholder, with respect to a consummated merger that was authorized pursuant to the use of a proxy statement alleged to contain false and misleading statements violative of § 14(a) of the Exchange Act.  Under the circumstances, the Supreme Court held that it was the duty of the judiciary to be alert to provide such remedies as were necessary to make effective congressional purpose, namely, to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation and, accordingly, implied a private right of action under § 27 to bring suit for violation of § 14(a) of the Act.

[67]  *See also Young v. Nationwide Life Ins. Co.*, 2 F. Supp. 2d 914, 925 (S.D. Tex. 1998) ("[W]hen § 36 was amended ... and an express private remedy was added to subsection (b), the legislative history indicates that 'the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a).'").

ability to enforce § 36(a), Congress emphatically stated that this addition to the SEC's powers did

not in any way preclude the ability of private investors from also bringing a claim under § 36(a):

> ***The Committee wishes to make plain that it expects the courts to imply private
> rights of action under this legislation,*** where the plaintiff falls within the class of
> persons protected by the statutory provision in question.  Such a right would be
> consistent with and further Congress' intent in enacting that provision, and where
> such actions would not improperly occupy an area traditionally the concern of state
> law.  In appropriate instances, for example, breaches of fiduciary duty involving
> personal misconduct should be remedied under Section 36(a) of the Investment
> Company Act.  With respect to business development companies, the Committee
> contemplates suits by shareholders as well as by the Commission, since these are the
> persons the provision is designed to protect, and such private rights of action will
> assist in carrying out the remedial purposes of Section 36.

H.R. REP. NO. 1341, 96th Cong. 2d Sess. 28-29 (1980) (emphasis added).

Finally, Congress is presumed to be aware of an administrative or judicial interpretation of a

statute and to adopt that interpretation when it re-enacts a statute without change. *See Albemarle*

*Paper Co. v. Moody,* 422 U.S. 405, 414, n. 8 (1975); *see also Jackson,* 125 S. Ct. at 1506 (noting

that "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar

with [the relevant case law] and that it expected its enactment [of the statute] to be interpreted in

conformity with [it].")  Congress has made numerous amendments to the ICA over the years, and it

is proper to presume that Congress was aware of private rights of action recognized by courts under

the ICA.  Even though Congress has revisited the sections of the ICA involving mutual funds three

times since courts began to imply such causes of action, it has never indicated any concern

regarding the practice of recognizing implied rights of action that protected mutual fund investors.

*See, e.g.*, *Merrill Lynch*, *Pierce*, *Fenner & Smith*, *Inc. v. Curran*, 456 U.S. 353 (1982) (affirming the

lower courts' allowance of actions under the Commodity Exchange Act (CEA) after an examination

of the CEA's legislative history).  Moreover, when Congress amended the ICA in 1980 to expand

protection for mutual fund investors, the House Committee report made clear that it intended that

private causes of action be recognized.  *See* H.R. REP. NO. 1341, 96th Cong. 2d Sess. 28-29 (1980),

*reprinted in* 1980 U.S.C.C.A.N. 4800, 4810-11, *supra*; *see also Strougo*, 964 F. Supp. at 798.

Congress' awareness of the courts' decisions and its failure to amend the relevant statutory text to

narrow protection ratifies the private rights of action that plainly exist under the ICA.

> **B.** **_Jackson_, the Most Recent Supreme Court Decision on this Issue, Supports a Private Right of Action under §§ 34(b), 36(a) and 48(a)**

The recent Supreme Court decision of *Jackson v. Birmingham Board of Education*, 125 S.

Ct. 1497 (2005), makes clear that a private right of action should be implied under §§ 34(b), 36(a)

and 48(a) of the ICA. *Jackson* shows that the long precedent of private rights of action under the

ICA as recognized both within the First Circuit and other courts for more than 30 years still stands,

despite Defendants' representations to the contrary. *See Lessler v. Little*, 857 F.2d 866, 871 (1st

Cir. 1998) (affirming a private right of action under the ICA and criticizing defendants for ignoring

First Circuit precedent that clearly states implied rights of action exist under the ICA); *Levitt v.

Johnson*, 334 F.2d 815 (1st Cir. 1964) (affirming a private right of action under the ICA); *see also

Strougo*, 964 F. Supp. at 796 ("[c]ourts have long held that a private litigant may commence an

action under Section 36(a) of the ICA"); *Brown v. Bullock*, 294 F.2d 415 (2d Cir. 1961) (affirming

finding of a private right of action under § 36); *Taussig v. Wellington Fund, Inc.*, 313 F.2d 472, 476

(3d Cir. 1963) (finding a private right of action under the ICA); *Esplin v. Hirschi*, 402 F.2d 94, 102

(10th Cir. 1968) (private right of action under § 36).[68]

In *Jackson*, the Supreme Court recognized that an implied right of action existed under Title

IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a).[69]  In so holding, the Supreme

---

[68] The substantial line of precedent recognizing implied rights of action under the ICA also includes, but is not limited to, the following:  *Meyer*, 764 F.2d at 88 (2d Cir. 1985); *In re ML-Lee*, 848 F. Supp. at 539-45 (D. Del. 1994); *Krome v. Merrill Lynch & Co.*, 637 F. Supp. 910, 917-20 (S.D.N.Y. 1986); *Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.*, 825 F.2d 731, 735 (3d Cir. 1987); *McLachlan v. Simon*, 31 F. Supp. 2d 731, 737 (N.D. Cal. 1998).

[69] In *Jackson*, the petitioner sued under Title IX, alleging that the school board had retaliated against him for complaining about sex discrimination against others.  The statute states in relevant part: "[n]o person . . .

Court clarified the limited nature of the holding in *Sandoval*, the very case relied upon by

Defendants to argue that no implied rights of action exist under the ICA,[70] stating that *Sandoval*

stood for the simple proposition that a private right to enforce a ***statute*** does not necessarily include

a private right to enforce ***regulations*** promulgated thereunder, especially when the enabling statute

explicitly forbids one type of activity (*e.g.*, the intentional misconduct alleged in *Sandoval*) and the

private right claimed under the regulations is based upon a different theory absent from the text of

the statute (*e.g.*, the "disparate-impact" theory in *Sandoval*). *Jackson*, 125 S. Ct. at 1506.  The

*Jackson* Court noted that the school board "misses the point" in arguing that Jackson, like the

petitioners in *Sandoval,* sought an "impermissible extension of the statute," stating, "[w]e do not

rely on regulations extending Title IX's protection beyond its statutory limits:  indeed, we do not

rely on the Department of Education's regulation at all, because the statute ***itself*** contains the

necessary prohibition [*i.e.*, discrimination "on the basis of sex"]." *Id.* at 1506-07 (emphasis in

original).

      Consistent with *Sandoval* and *Jackson*, Plaintiffs in this case allege ICA ***statutory*** violations,

not violations under ICA rules or regulations.  In fact, the alleged conduct falls squarely within the

conduct proscribed by the ICA, and the ICA counts in Plaintiffs' Complaint do not rely upon novel

---

shall, on the basis of sex, be . . . subjected to discrimination under any education program . . . receiving Federal financial assistance." 125 S. Ct. at 1510.  The Supreme Court found an implied private right of action under Title IX for a claim of retaliation, even though such a private cause of action was not expressly stated in the text of the statute, because it was encompassed within the concept of sex discrimination.

[70]  In *Sandoval*, plaintiffs sued to enjoin an English-only policy of the Alabama Department of Public Safety on the ground that it impacted non-English speakers in violation of regulations promulgated by the Department of Justice under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*  The statute provides, in relevant part, that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI.  *Sandoval,* 532 U.S. at 303 (citing 42 U.S.C. § 2000d).  Title VI authorizes federal agencies to effectuate the provisions in the statute by enacting regulations.  *Id.*  A regulation was promulgated forbidding funding recipients from adopting policies that had "the effect of subjecting individuals to discrimination because of their race, color, or national origin."  *Sandoval,* 532 U.S. at 278 (citing 28 C.F.R. § 42-l04(b)(2) (l999)).  Thus, the plaintiff in *Sandoval* had sued under the regulations of the statute, not the statute itself.

theories of liability outside the scope of the plain statutory language of the ICA. Accordingly, the Court should find private rights of action under ICA §§ 34(b) and 36(a).[71]

Defendants cite, *inter alia*, *Eaton Vance*, 2005 U.S. Dist. LEXIS 15731, and *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429 (2d Cir. 2002), for their argument that courts are unwilling to imply a cause of action based on the *Sandoval* decision. Def. Br. at 6.[72] In *Eaton Vance*, although the plaintiffs' counsel raised the newly-decided and controlling Supreme Court precedent of *Jackson*, 125 S. Ct. 1497, in a letter to the Court, and also addressed the case at oral argument, the court only expressly considered the Supreme Court's decision upon granting the plaintiffs' Motion for Reconsideration. Upon issuing its opinion on the motion to dismiss, instead of looking to *Jackson*, the *Eaton Vance* court erroneously relied upon the reasoning of the Supreme Court in *Sandoval*, 532 U.S. 275, as articulated in *Olmsted*, 283 F.3d 429. As discussed above, *Sandoval* is inapplicable for the reasons stated by the Supreme Court in *Jackson*. On

---

[71]  The recently-decided cases of *Jacobs v. Bremner*, 2005 U.S. Dist LEXIS 14762 (N.D. Ill. July 20, 2005), and *Dull v. Arch*, 2005 U.S. Dist LEXIS 14988 (N.D. Ill. July 27, 2005), which hold that there is no private right of action under § 36(a), ignore the implication of *Jackson* which strongly supports Plaintiffs' position that a private right of action be implied under § 36(a). Moreover, those cases improperly rely upon *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 125 S. Ct. 2611 (2005), which, as Defendants admit (Def. Br. at 8), does not address the ICA or the issue of private rights of action, but rather discusses the relevance of legislative history when the text of a statute is clear on its face. Here, as discussed above, the text of the ICA sections at issue, at minimum, leave room for the possibility of an implied private right of action. Thus, a review of the legislative history is warranted, and such review leaves no doubt that a private right of action was intended to be implied. In addition, in *Exxon*, even though the Court held that the statute in question was clear on its face, the Court nevertheless reviewed the legislative history and noted that because it was confusing and contradictory it could not provide guidance. *Exxon*, 125 S. Ct. at 2626-28. By contrast, here, the legislative history is clear and instructive.

[72]  Defendants also cite numerous district court decisions that have refused to find an implied private right of action under any section of the ICA. *See* Def. Br. at 6 n.5. Plaintiffs point out that these are district court rulings, and that the implication of private rights of action under the ICA is now an appellate issue. Notably, the plaintiffs in *In re Davis Selected Mutual Funds Litigation*, 2005 U.S. Dist. LEXIS 23203 (S.D.N.Y. Oct. 11, 2005), *In re Eaton Vance Mutual Funds Fee Litigation*, 380 F. Supp. 2d 222 (S.D.N.Y. 2005), and *Columbia*, 2005 U.S. Dist. LEXIS 33439, have filed notices to appeal these unfavorable rulings.

reconsideration, the *Eaton Vance* court again erroneously found *Jackson* to be "inapplicable."  *In re*

*Eaton Vance Mut. Funds Fee Litig.*, 2005 U.S. Dist. LEXIS 32094, at *7 (S.D.N.Y. Dec. 6, 2005).[73]

　　　*Olmsted* is questionable authority after *Jackson* and, in the alternative, is not instructive

because it dealt with different sections of the ICA which had different language, goals, and

legislative history.  In *Olmsted*, the Second Circuit refused to recognize a private right of action for

excessive fee claims under ICA §§ 26(f) and 27(i), which deal with variable insurance contracts,

because these sections stood in stark contrast to other sections of the ICA that had rights-creating

language and had been widely construed to create implied rights of action for decades.  Here,

however, Plaintiffs' § 34(b) and § 36(a) claims involve more than excessive fees – *i.e.*,

misrepresentations, omissions, and broad breaches of fiduciary duty – and *Olmsted* accordingly

does not apply.  *See* ¶ 229 (describing untrue statements of material fact in registration statements

and reports filed pursuant to the ICA); ¶ 237 (describing Defendants' breaches of fiduciary duties).

　　　As explained by the district court in *Olmsted*, upon which the Second Circuit relied, in

looking at the legislative history, §§ 26(f) and 27(i) addressed exceptions to the statute rather than

provisions that embodied the basic purposes of the ICA.  *Olmsted*, 134 F. Supp. 2d at 516-17.

*Olmsted* does not even mention §§ 34(b) or 36(a) in its analysis of whether a private right of action

can be implied under the ICA, and, by contrast, §§ 34(b), 36(a), and 48(a) are for the *protection of*

*investors* and do contain *rights-creating language*.  *See, e.g.*, § 36(a) (for the "protection of

investors"); § 34(b) (expressly incorporating § 31(a) which states that its purpose is for the

protection of investors).

---

[73]  Plaintiffs disagree with the holding on the motion for reconsideration in the *Eaton Vance* decision, and the plaintiffs in that action have filed a notice of appeal.

## VI.   PLAINTIFFS HAVE ADEQUATELY ALLEGED A VIOLATION OF INVESTMENT COMPANY ACT § 48(a)

Defendants argue that Plaintiffs have failed to allege a primary violation of the ICA that would support liability under ICA § 48(a).  Def. Br. at 20.  As discussed above, Plaintiffs have stated primary violations under ICA §§ 34(b), 36(a) and 36(b), which would support liability under § 48(a).[74]

Defendants further argue that Plaintiffs do not plead facts supporting an allegation of "control" under § 48(a) of the ICA by FMR Corp. and the Trustee Defendants over the Investment Adviser and Distributor Defendants.  Def. Br. at 20; Tr. Br. at 15-16.  The Independent Trustee Defendants improperly argue that "control" is a defined term in the ICA, 15 U.S.C. § 80a-2(a)(9), which requires a 25% ownership of voting securities or "the power to exercise a controlling influence over the management or policies of a company."  Tr. Br. at 15.  Defendants are incorrect on both arguments.

The word "control" is not used in the text of § 48(a) and, therefore, the definition of "control" on which Defendants rely is not relevant to § 48(a).  *See In re ML-Lee Acquisition Fund II*, 848 F. Supp. at 545-46 (recognizing a difference between the definition of "control" in 15 U.S.C. § 80a-2(a)(9) and imposing liability under a § 48(a) claim).  Although § 48(a) is informally referred to as a "control person" claim, the type of control contemplated by § 48(a), which does not use the word "control," is different from the definition of "control" in 15 U.S.C. § 80a-2(a)(9).  This is evidenced by the fact that the word "control" does appear in the text of other sections of the ICA.  For example, 15 U.S.C. § 80a-21 provides that "[i]t shall be unlawful for any registered management company to lend money or property to any person, directly or indirectly, if…such

---

[74]  Section 48(a) provides:  "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this title or any rule, regulation, or order thereunder."  15 U.S.C. § 47(a).

person controls or is under common control with such registered company." Obviously, the definition of "control" makes much more sense in this context and is applicable because the word "control" actually appears in the text. Courts have held that this definition is not applicable to a § 48(a) claim. *See In re ML-Lee*, 848 F. Supp. at 545 (allegations "that the transactions at issue in the Complaint were undertaken illegally between 'affiliated' entities and that the alleged controlling Defendants caused those actions to be taken" were sufficient to establish a § 48(a) claim); *Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105, 1110, 1123 (D.R.I. 1990) (finding that § 48(a) broadly "makes it unlawful to do indirectly that which one could not do directly"). Accordingly, neither the 25% rule nor an overly strict reading of "control" applies, as Defendants wrongly contend.

In alleging that FMR Corp. and the Trustee Defendants "caused" the Investment Adviser and Distributor Defendants to violate the ICA under the terms of § 48(a), the Complaint states that FMR Corp. is the ultimate parent of both Investment Adviser Defendants, and that during the Class Period, "FMR Corp. and its subsidiaries' primary business activities included the provision of investment advisory, management and certain fiduciary services for individual and institutional investors, and the provision of securities brokerage services." ¶ 38; *see also* ¶ 252. Plaintiffs have thus adequately alleged that FMR Corp. exerted control over the Investment Adviser Defendants and the Distributor Defendant, such that FMR Corp. "caused" these Defendants to violate the ICA.

Defendants' own public filings reflect how the Trustee Defendants exercise control over the Investment Adviser Defendants. For example, as Plaintiffs alleged in the Complaint, the December 30, 2002 SAI for the Fidelity Diversified International Fund (which is similar to the other Fidelity Funds) states the following:

> Under the terms of its management contract with each fund, FMR acts as investment adviser and, ***subject to the supervision of the Board of Trustees***, has overall

68

responsibility for directing the investments of the fund in accordance with its investment objective, policies and limitations.

¶ 187 (emphasis added).  As Plaintiffs have alleged, the Trustee Defendants are in charge of approving the Investment Adviser Defendants' performance of their advisory contracts with the Funds.  *See* ¶ 213.  Absent such approval, the Investment Adviser Defendants would not be able to provide investment advisory services to the Fidelity Funds.  In this regard, as Plaintiffs quote from the SAI, "The Trustees of each fund periodically review FMR's performance of its responsibilities in connection with the placement of portfolio transactions on behalf of the fund and review the commissions paid by the fund over representative periods of time to determine if they are reasonable in relation to the benefits to the fund."  ¶ 189.  The Trustees' oversight over, and ability to approve or disapprove, the Investment Adviser Defendants' activities necessarily involves the exercise of control.

Moreover, speaking from his own experience as a Fidelity Funds trustee, Defendant Ned Johnson has publicly advocated the exercise of control by fund trustees over investment advisers and their affiliates.  As Plaintiffs have alleged, Mr. Johnson criticized the SEC's January 15, 2004 proposal to require mutual funds to retain board chairmen that are independent from the investment managers.  In a February 17, 2004 *Wall Street Journal* editorial entitled, "Interested, and Proud of It," Mr. Johnson wrote that he was "[p]roud to disclose" his "vested interest" in the investment adviser which he is supposed to monitor.  ¶ 197.  Mr. Johnson added that, if the SEC's proposed rule were adopted, "the immediate result will be to reduce the expertise and ***hands-on 'feel' of mutual-fund board chairs*** across the industry, whose long experience equips them to detect subtle nuances in fund operations."  ¶ 198 (emphasis added).

Plaintiffs further allege that, "[b]y virtue of their positions of ***operational control and/or authority*** over FMR, FMRC and FDC, . . . FMR Corp. and the Trustee Defendants directly and

indirectly, ***had the power and authority, and exercised the same***, to cause FMR, FMRC and FDC to engage in the wrongful conduct complained of herein." ¶ 252 (emphasis added). Thus, despite Defendants' argument to the contrary, Plaintiffs have alleged more than "some indicia of the exercise of control" by FMR Corp. and the Trustee Defendants over the Investment Adviser and Distributor Defendants.[75]  Def. Br. at 21.

## VII.    THE STATE CLAIMS ARE NOT PREEMPTED BY SLUSA

The complaint alleges state law claims against Defendants for common law breach of fiduciary duty (Counts VI and VII) and unjust enrichment (Count VIII).  Defendants incorrectly argue that these claims are preempted by SLUSA.  *See* Def. Br. at 40-43; Tr. Br. at 3 n.2. Defendants are incorrect because SLUSA does not apply to state law claims brought on behalf of a class of ***holders*** of funds, specifically where, as here, the holders have expressly excluded claims involving purchases or sales of securities.

### A.    The State Law Claims Are Brought on Behalf of a Subclass of Holders, Whose Claims Do Not Arise in Connection with the Purchase or Sale of a Covered Security

Defendants argue that the state claims meet the "in connection with" requirement, because, according to Defendants, "the alleged fraudulent scheme necessarily involves purchases of securities" because the Complaint alleges that Defendants charged excessive fees to induce brokers to steer other investors into the Fidelity Funds.  Def. Br. at 42.  However, the mutual fund purchases that Defendants point to in the Complaint were made by persons expressly excluded from the Subclass on whose behalf the state law claims are brought – *i.e.*, purchasers of Fidelity Funds.  *See* ¶ 1.  Accordingly, SLUSA does not apply.

---

[75]  Plaintiffs have alleged that the Trustees caused the Investment Adviser Defendants to violate the ICA and were also "captive to and controlled by the Investment Adviser Defendants."  *Contra* Tr. Br. at 15 (quoting ¶¶ 74, 191).  This does not present a conflict, because a trustee can be beholden to a third party, but, as a legal matter still have a duty to supervise that third party.

To close a perceived loophole in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress enacted SLUSA to make federal courts the exclusive venue "for most class actions involving the purchase and sale of securities." *Green v. Ameritrade, Inc.*, 279 F.3d 590, 595 (8th Cir. 2002). SLUSA's preemption provision specifically states that:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging-
>
> (1) a misrepresenation or omission of a material fact ***in connection with the purchase or sale of a covered security***; or
>
> (2) that the defendant used or employed any manipulative or deceptive device or contrivance ***in connection with the purchase or sale of a covered security***.

15 U.S.C. § 78bb(f)(i) (emphasis added). Thus, in order for a claim to be preempted by SLUSA, a plaintiff must allege misconduct "in connection with the purchase or sale of a covered security."[76]

SLUSA will preempt only those state class actions which could be brought as federal actions under the Securities Act of 1933 or the Securities and Exchange Act of 1934, which are subject to the heightened requirements of the PSLRA. As the Supreme Court held in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 748 (1975) in the context of Exchange Act § 10(b) and Rule 10b-5, plaintiffs may only bring such federal securities actions if their allegations pertain to actual purchases or sales of securities.

Thus, district courts in the First Circuit have properly recognized that claims brought exclusively on behalf of "holders" of securities – *i.e.*, on behalf of non-purchasers and non-sellers – do not fall within the ambit of SLUSA. *See Davis v. Kozlowski*, 2005 U.S. Dist. LEXIS 4481, at *5 (D.N.H. Mar. 17, 2005); *Meyer v. Putnam Int'l Voyager Fund*, 220 F.R.D. 127, 128-29 (D. Mass. 2004); *Cape Ann Investors LLC v. Lepone*, 296 F. Supp. 2d 4, 11 (D. Mass. 2003). Although the

---

[76] SLUSA defines "covered security" to include mutual funds. 15 U.S.C. § 77r(b)(2).

First Circuit has not addressed the issue, these district court decisions are in accord with the great weight of authority outside of this Circuit.[77]

**B.      The Complaint Adequately Distinguishes the State Claims on Behalf of Holders from any Allegations Pertaining to the Purchase or Sale of Securities**

The state law claims have not been brought by purchasers or sellers, but on behalf of holders of the Fidelity Funds – *i.e.*, on behalf of a Subclass of "all persons or entities who acquired before July 19, 1999 and held during the Class Period one or more Funds." ¶¶ 1, 219. This forecloses the applicability of SLUSA because the Complaint excludes from the claims of the Subclass "any and all transactions that constitute a 'purchase' within the meaning of the Securities Litigation Uniform Standards Act of 1998 ('SLUSA'), 15 U.S.C. § 78bb(f), including any dividend reinvestments during the Class Period." *Id.* SLUSA thus cannot preempt the state law claims as such claims do not involve misrepresentations or omissions in connection with the purchase or sale of a security, and do not fall within the parameters of *Blue Chip Stamps*.[78]

---

[77]  As the *Davis v. Koslowski* court stated, "[a]ll of the circuit courts that have ruled on this issue, including panels of the Second, Eighth, Ninth and Eleventh Circuit Courts of Appeals, have concluded that misconduct is committed 'in connection with the purchase or sale of a security,' only if a defendant's malfeasance has induced a class of plaintiffs to actually purchase or sell securities" – *i.e.*, "[c]laims by 'holders' of securities . . . do not qualify." 2005 U.S. Dist. LEXIS 4481, at *5-6 (citing *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 43 (2d Cir. 2005) (noting that its holding "aligns [it] with every circuit court that has considered the question thus far"); *Green v. Ameritrade,* 279 F.3d at 597-99; *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1131 (9th Cir. 2002); *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1342-43 (11th Cir. 2002); *Atencio v. Smith Barney*, 2005 U.S. Dist. LEXIS 1526 (S.D.N.Y. Feb. 2, 2005); *Grabow v. PriceWaterhouseCoopers LLP*, 313 F. Supp. 2d 1152, 1156 (N.D. Okla. 2004); *Feitelberg v. Credit Suisse First Boston LLC*, 2003 U.S. Dist. LEXIS 19116, at *15016 (N.D. Cal. Oct. 24, 2003); *Gutierrez v. Deloitte & Touche, L.L.P.*, 147 F. Supp. 2d 584, 595 (W.D. Tex 2001); *Chinn v. Belfer*, 2002 U.S. Dist. LEXIS 20343 (D. Or. June 19, 2002); *see also Bachman,* 2005 U.S. Dist. LEXIS 35684, at *14 ("The alleged scheme is not dependent upon the purchase or sale of a security."); *Lalondriz v. USA Networks, Inc.*, 68 F. Supp. 2d 285, 286 (S.D.N.Y. 1999) ("Since plaintiffs' claim does not allege that misrepresentations were made 'in connection with the purchase or sale of a security,' 15 U.S.C. § 78bb(f)(1), it does not fall within the prohibition of the federal statute [SLUSA]."); *Shaev v. Claflin*, 2001 U.S. Dist. LEXIS 6677, at *17 (N.D. Cal. May 17, 2001) (finding claim not preempted by SLUSA and stating "[t]his purported injury arose from the mere holding of 3Com stock, and not from any trading of 3Com securities.").

[78]  Defendants argue incorrectly that it is "counterintuitive" to apply the Supreme Court's decision in *Blue Chip Stamps* to the interpretation of SLUSA's "in connection with" requirement. Def. Br. at 42, n. 27. To the contrary, it is now well-established that the *Blue Chip Stamps* rationale applies here, because Congress adopted SLUSA's "in connection with" language against a backdrop of securities law, including *Blue Chip*

A plaintiff may properly bring "holder" claims by explicitly carving out these claims from a complaint that also tangentially alleges conduct involving the purchase or sale of securities. *See Feitelberg*, 2003 U.S. Dist. LEXIS 19116, at *15-16 ("Plaintiff expressly limits the class to individuals who held shares during the class period, and therefore we cannot find that this claim arises 'in connection with' the purchase or sale of a covered security."); *Gutierrez*, 147 F. Supp. 2d at 593 (finding claim not precluded by SLUSA and endorsing plaintiffs' argument that "they have 'expressly carved out and excluded [purchasers] when they elected to allege only claims for holding covered securities, not the purchase or sale of covered securities'").

For example, in *Meyer*, the plaintiff alleged "on behalf of herself and 'all holders of [the Funds at issue] between January 3, 2000 and September 16, 2003,' that the Defendants breached their fiduciary duty to the proposed class by permitting certain investors and employees to engage in short-term trading (referred to as 'timing') of shares in the Funds." 220 F.R.D. at 128. The short-term trading of mutual funds necessarily involves the purchase and sale of mutual funds by persons other than the named plaintiffs – *i.e.*, so-called "market timers." The defendants argued that SLUSA's requirement that the claims arise in connection with the purchase or sale of securities was "'plainly -- and easily' satisfied by 'transactions between the funds and market timers.'" *Id*. at 129. Judge Young of this District, however, found that, by bringing her claims on behalf of "holders of the Funds," the plaintiff had successfully excluded any claims arising in connection with the purchase or sale of mutual funds and thereby avoided SLUSA preemption. *Id*. The same is true

---

*Stamps*, that had interpreted the meaning of this phrase. *See Riley*, 292 F.3d at 1342-43 ("In using the phrase 'in connection with the purchase or sale of a covered security,' Congress was not creating language from a vacuum; instead, it was using language that, at the time of SLUSA's enactment, had acquired settled, and widely-acknowledged, meaning in the field of securities law, through years of judicial construction in the context of § 10b-5 lawsuits."); *Gordon v. Buntrock*, 2000 U.S. Dist. LEXIS 5977, at *13 (N.D. Ill. May 3, 2000) ("In enacting [SLUSA], Congress was aware of the interpretation of § 10b of the 1934 Act, which acknowledged that causes of actions for the 'nonpurchase' or 'nonsale' of securities were not covered by the 1934 Act, and that state law would fill those gaps.").

here, where any third party's conduct alleged in the complaint that involves purchases or sales of mutual funds is expressly excluded from coverage by the holders Subclass.

In *Strigliabotti*, 2005 U.S. Dist. LEXIS 28410, the plaintiffs alleged, similarly to the present action, that fundholders had not benefited from economies of scale generated from growth of the mutual funds and were charged advisory and distribution fees that were disproportionately large in relation to the services provided. *Id*. at *5. The defendants argued that such claims were preempted by SLUSA. *Id*. at *19-20. Judge Illston held that, "plaintiffs' allegations that defendants charge excessive fees in relation to the advisory services performed does not turn on the purchase or sale of a security." *Id*. at *20. As summarized by Judge Illston:

> plaintiffs allege that defendants have engaged in transactions that should have reduced defendants' costs in providing advisory services to the Funds, but that ***defendants did not pass these savings along to plaintiffs and the Funds and instead defendants kept the savings as additional compensation for themselves***. Here, to the extent plaintiffs allege defendants misrepresented or omitted facts, such allegations do not have more [than] a "tangential relation to the securities transaction."

*Id*. at *26-27 (emphasis added) (quoting *Falkowski*, 309 F.3d at 1130-31).

Notably, Judge Illston did not find that the plaintiffs' allegations regarding payments being made from fund assets to brokers for the ***sale*** of funds necessarily made the plaintiffs' claims for excessive mutual fund fees subject to SLUSA. Specifically, the *Strigliabotti* plaintiffs alleged that Defendants participated in "pay-to-play" schemes such as directed brokerage; engaged in "Soft Dollar" schemes with brokers that increased costs to investors; and made payments to brokers for the distribution of the funds that grew the funds but did not pass on the benefits of economies of scale to plaintiffs. *Id*. at *24-26. The Complaint makes substantially similar allegations here, and also appropriately bases the state law claims solely on the payment of excessive fees by fundholders, which has no more than a "tangential relation" to the securities transactions. *See* ¶¶ 149-58 (specific "pay-to-play" schemes); ¶¶ 137-45 (directed brokerage); ¶¶ 3-4, 127-35 (Soft

74

Dollars); ¶¶ 5, 6, 81-97, 99-106 (economies of scale); ¶¶ 270, 273 (alleging breaches based upon excessive fees).

The *Strigliabotti* plaintiffs did not allege "that they were induced into purchasing or selling any securities, or that defendants' actions led them to hold on to their securities longer than they would have otherwise." *Id*. at *24. Here, members of the Subclass, on whose behalf the state law claims are brought, likewise do not make any allegations related to their own purchase or sale of the Fidelity Funds. ¶¶ 263, 268, 272 (disclaiming fraud allegations). Rather, as in *Strigliabotti*, "[t]he transactions at issue . . . are between defendants and third parties, and do not involve any purchase or sale of securities" by Subclass members themselves. *Id*. at *26. Accordingly, the state law claims are not preempted by SLUSA.

In *Gutierrez*, 147 F. Supp. 2d at 593-594, the plaintiffs had included in their complaint "thirty-nine pages of background facts and a statement of the nature of the case which include[d] references to investors being 'duped into investing their savings'" in the relevant securities. *Id*. at 593. The plaintiffs, however, emphasized in the complaint that it alleged on behalf of a subclass "class claims for misrepresentation 'based exclusively upon the purchase of non-covered securities, or the 'holding' of securities,' neither of which invoke the SLUSA." *Id*. at 593-94. Accordingly, the court held that the plaintiffs did not "expressly state a cause of action for misrepresentation made to purchasers of covered securities" and declined to conclude that the plaintiffs' complaint stated a cause of action for misrepresentations made in connection with purchases of covered securities under SLUSA. *Id*. at 594.

The Subclass Plaintiff here has similarly brought the state law claims solely on behalf of a Subclass of holders and excluded from such Subclass purchasers or sellers of securities. Accordingly, SLUSA does not apply. The recent district court decisions relied upon by Defendants that have held that SLUSA did preempt state law claims similar to those asserted here are

distinguishable.  Unlike the instant action, ***none*** of those complaints alleged a distinct subclass of

holders or expressly disclaimed claims arising from the purchase or sale of securities.[79]  Defendants

fail to bring this distinction to the Court's attention.  *See* Def. Br. at 40-43, n.25, 28.

### C.    The Subclass Holder Claims Are Based on Fees That Are Paid Regardless of Purchases or Sales of Fidelity Funds

The Subclass' state law claims are based solely on fees paid because of their holder status—

no purchases or sales are alleged, and are in fact expressly disclaimed.  For example, the Subclass

Plaintiff's claim for unjust enrichment against all Defendants alleges the following:

> Defendants have benefited from their unlawful acts through ***the excessive and improper fees they charged and received from the Subclass Plaintiff and the other members of the Subclass***.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by the Subclass Plaintiff and the other members of the Subclass and retained by Defendants.

¶ 273 (emphasis added).  Members of the Subclass seek no damages as a result of a purchase or

sale, but instead base their damages on fees resulting from their retention of fund shares.

In *Dabit*, 395 F.3d at 34-44, the Second Circuit interpreted SLUSA's requirement that the

allegations be "in connection with the purchase or sale of a covered security" to mean that claims

made by "holders" of covered securities that do not allege purchases or sales are not preempted by

SLUSA.[80]  *See also* 395 F.3d at 28; *accord* Def. Br. at 42 n. 27.  In the portion of the *Dabit* opinion

particularly relevant to the claims in the case at bar, the Second Circuit held that SLUSA did not

apply.  There, plaintiff IJG had defined as its putative class "all persons or entities who maintained

retail brokerage accounts with Merrill Lynch, and who paid a commission or fees to Merrill Lynch."

*Id.* at 30.  IJG alleged that "Merrill Lynch issued false and misleading reports concerning publicly

---

[79]  *Contra Lord Abbett*, 2005 U.S. Dist. LEXIS 37492, at *33; *Franklin*, 388 F. Supp. 2d at 473 *Eaton Vance*, 380 F. Supp. 2d at 241.

[80]  The Supreme Court heard argument in the *Dabit* action on Wednesday, January 18, 2006.  *See* http://www.supremecourtus.gov/oral_arguments/argument_calendars/monthlyargumentcal january2006.pdf.

traded securities in order to garner investment banking business." *Id*. Despite the alleged
understanding that IJG paid fees and commissions in exchange for objective research, the complaint
asserted that Merrill Lynch "'routinely used biased advice as a way to curry favor with various
companies in order to sell investment banking services to those companies' and in return 'earned
lucrative investment banking fees.'" *Id.* at 30.

The Second Circuit held that, although IJG's recovery of commissions paid in connection
with the purchase or sale of securities was preempted by SLUSA, its claims for flat annual fees
were *not* preempted by SLUSA. *Id.* at 47-48. In the words of the Second Circuit, "[a]n annual fee
for services is paid whether or not the customer transacts on the account, and the misrepresentations
inherent in the alleged nonperformance and statutory violations therefore do not necessarily
'coincide[] with' a securities transaction[.]" *Id.* at 49. The recurrent payments complained of here
are precisely the type of payments the Second Circuit held not to be preempted in *Dabit* – payments
based on holding the Funds that are made regardless of the purchase or sale of Fund shares.

In *Green v. Ameritrade*, the Eighth Circuit found no SLUSA preemption where the claims
were based on a flat monthly fee and therefore could not "reasonably be read as alleging" fraud in
connection with the purchase or sale of securities. 279 F.3d at 598. Furthermore, in *Green v.
Ameritrade*, the Eighth Circuit expressly rejected the defendants' argument that a plaintiff who
could have alleged deception in connection with the purchase or sale of a security is covered by
SLUSA even if he opts not to make such an allegation. It held that the plaintiff's amended
complaint successfully took his case out of SLUSA by deleting existing references to class member
purchases in reliance on deceptive information from the defendants. *Id*. at 598-99. The Eighth
Circuit also referenced, in further support of its view that SLUSA did not apply, the statement by
plaintiffs' counsel during oral argument "that Green does not seek damages for any sale or purchase
made in reliance on the allegedly erroneous price information." *Id*. at 598 n.7. Here, the Subclass

Plaintiff has made substantially similar statements in the Complaint. *See* ¶ 1; ¶¶ 263, 268, 272 (disclaiming allegations that could be construed as alleging fraud).

The *Bachman* action, although brought against a brokerage house rather than a mutual fund family, arises from the same type of conduct alleged here. The *Bachman* case, currently pending in the Eastern District of Missouri, arose from "Defendants' secretly collecting millions and millions of dollars in undisclosed and improper kickbacks paid to the Defendants by certain preferred mutual fund families." 2005 U.S. Dist. LEXIS 35684, at *2. The plaintiffs alleged that such kickbacks "created unmanageable and continuing conflicts of interest and breaches of fiduciary duties by Defendants and allowed Defendants to profit secretly from the assets they [held] in trust for their clients." *Id*. The complaint also alleged that, "certain 'material facts' were 'concealed throughout the Class Period,' including that Defendants participated in certain programs, whereby 'in exchange for Defendants' clients maintaining preferred fund shares in their A.G. Edwards accounts, the preferred mutual funds agreed to pay and did pay substantial kickbacks to Defendants." *Id*. at *2-3.

Like the Defendants here, the *Bachman* defendants argued that the defendants' alleged scheme to steer clients to "preferred" funds to earn fees "could not possibly have worked without a purchase of securities." *Id*. at *11. The *Bachman* plaintiffs' requested relief, however, was limited solely to the profits that were taken from the assets of investors while they held their mutual funds with defendant A.G. Edwards. *See id*. at *14. The court found that "[t]he alleged scheme [was] not dependent upon the purchase or sale of a security," and the state law claims were therefore not preempted by SLUSA. *Id*. at *14.

Here, the state law claims do not involve a purchase in reliance on misrepresentations or omissions, but are instead based on the payment of fees during the period in which Subclass members held their Fidelity Funds. As stated in the Complaint, the allegations of breach of fiduciary duty and unjust enrichment are limited to the wrongful payment of excessive fess, without

regard to "any allegation that could be construed as alleging fraud."  ¶¶ 263, 268, 270, 272-73.

Members of the Subclass allege that they were holders of securities whose fees were being used to

pay improper kickbacks to brokerages – allegations that fall outside the ambit of SLUSA.  *See*

*Green*, 279 F.3d at 595-598; *Bachman*, 2005 U.S. Dist. LEXIS 35684, at *14.

The wrong alleged by the Subclass Plaintiff and members of the Subclass does not coincide

with the purchase of shares of Fidelity Funds.  Since no claims "in connection with the purchase or

sale" of a covered security have been raised in the Complaint, SLUSA does not preempt any of the

Plaintiffs' state law claims.  The Subclass is expressly and unmistakably limited to holders, beyond

the reach of SLUSA.[81]

## VIII.   DISMISSAL WITH PREJUDICE WOULD BE INAPPROPRIATE HERE

Defendants argue that the instant Complaint should be dismissed with prejudice because

"Plaintiffs' counsel were on notice of the defects with their claims when they filed the Amended

Complaint."  Def. Br. at 43.  In support of this contention, Defendants argue that four similar

actions involving mutual funds filed by the same counsel as in the instant action were "dismissed"

prior to the filing of the Amended Complaint here – *Dreyfus*, 2005 U.S. Dist. LEXIS 29152;

*Franklin*, 388 F. Supp. 2d 451; *Lord Abbett*, 2005 U.S. Dist. LEXIS 37492; and *Eaton Vance*, 380

F. Supp. 2d 222.  *Id*.  Defendants' overbroad assertions should be disregarded.

---

[81]  Defendants' cases are distinguishable.  In *Kircher v. Putnam Funds Trust*, 403 F. 3d 478 (7th Cir. 2005), the plaintiffs contended that the mutual funds failed to block arbitrageurs from reaping profits from **plaintiffs' purchases**.  Moreover, as distinguished by the *Strigliabotti* court, *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294 (3d Cir. 2005), likewise dealt with allegations of securities sold and/or purchased. *See Strigliabotti*, 2005 U.S. Dist. LEXIS 28410, at *21-24.  Such is not the case here, where the class definition does not include purchasers.  In *Rowinski*, the Third Circuit stated that, "[t]he plaintiff's theory of damages . . . bears on the SLUSA 'in connection' inquiry," because "the relief sought by plaintiffs – such as the recovery of investment losses or trading fees – may be relevant in 'connecting' the allegations to the purchase or sale of securities."  398 F.3d at 301.  Here, members of the Subclass are **not** seeking the recovery of investment losses or trading fees.  Rather, members of the Subclass are seeking excessive advisory fees paid to Defendants while Subclass members held their Fidelity Funds.

First, of these four actions, only *Eaton Vance* was dismissed in its entirety.  The other three actions are still pending with viable or potentially viable claims, and despite Defendants' assertions to the contrary, the holdings in these four actions are not uniform.  Second, the opinions, including *Eaton Vance* itself, each contain language supporting various aspects of the instant Complaint, as Plaintiffs' counsel have noted herein where appropriate.  Third, all four decisions are from district courts outside this jurisdiction, and two opinions, *Franklin* and *Lord Abbett*, were authored by the same Judge.  In these two opinions, Judge Martini granted the Plaintiffs leave to replead.  Fourth, Plaintiffs' counsel were aware of these decisions when drafting the instant Complaint, and the Complaint contains allegations that are different, and in certain key respects more detailed, than the complaints in those actions.  Here, Defendants have also made different, and in many respects weaker, arguments, than those made in prior cases.  In fact, Defendants have conceded that Plaintiffs have stated a § 36(b) claim with respect to, at a minimum, five Fidelity Funds.  At any rate, it is important for this Court to consider each case on its own merits.[82]

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Dated:  January 19, 2006

Respectfully submitted,
**MOULTON & GANS, P.C.**

By:   __/s/ Nancy Freeman Gans_____
        Nancy Freeman Gans (BBO #184540)
33 Broad Street, Suite 1100
Boston, MA  02109-4216
(617) 369-7975

***Liaison Counsel for Plaintiffs***

---

[82]  To the extent that this Court finds that any of Plaintiffs' allegations are insufficient to state any of the claims in the Complaint, Plaintiffs respectfully request that they be granted leave to amend.  *See* Fed. R. Civ. P. 15(a) (leave to amend shall be "freely given when justice so requires"); *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 20 (1st Cir. 2004) ("The view that the pleading of cases is a game in which every miscue should be fatal is antithetic to the spirit of the federal rules.").

**MILBERG WEISS BERSHAD**
  **& SCHULMAN LLP**
Jerome M. Congress
Janine L. Pollack
Kim E. Miller
Michael R. Reese
One Pennsylvania Plaza
New York, NY  10119-0165
(212) 594-5300

**STULL, STULL & BRODY**
Jules Brody
Mark Levine
6 East 45th Street
New York, NY  10017
(212) 687-7230

**SCOTT + SCOTT, LLC**
Arthur L. Shingler, III
Wells Fargo Building
401 B Street, Suite 307
San Diego, CA  92101
(619) 233-4565

*Tri-Lead Counsel for Plaintiffs*

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, MD  21202
(410) 332-0030

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
280 King of Prussia Rd
Radnor, PA  19087
(610) 667-7706

**WEISS & LURIE**
Joseph H. Weiss
Richard A. Acocelli
551 Fifth Avenue, Suite 1600

New York, NY  10176
(212) 682-3025

**GILMAN AND PASTOR, LLP**
David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
(781) 231-7850

*Additional Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Adam H. Wierzbowski, hereby certify that I served a copy of the foregoing document upon counsel for all parties by mailing a copy of the same, postage prepaid, to each attorney of record, this 18th day of January, 2006.

<u>/s/ Adam H. Wierzbowski</u>
Adam H. Wierzbowski