# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES GILLIAM, Individually And On Behalf Of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>vs.<br><br>FIDELITY MANAGEMENT AND RESEARCH COMPANY, et al.,<br><br>             Defendants. | Civil Action No. 04cv11600 (MBB)<br><br>**Consolidated Case Nos.:**<br><br>04cv11642<br>04cv11709<br>04cv11735<br>04cv11812 |

## DECLARATION OF JANINE L. POLLACK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Janine L. Pollack, hereby declares:

1.     I am a member of the law firm of Milberg Weiss Bershad & Schulman LLP, tri-lead counsel for plaintiffs.  I submit this declaration to place before the Court certain information that is relevant to Plaintiffs' Opposition to Defendants' Motions to Dismiss filed in the above-captioned case.

2.     Attached hereto as Exhibit A is a true and correct copy of the March 23, 2005 California Attorney General press release entitled *"Attorney General Lockyer Sues American Funds For Not Telling Investors Truth About Broker Payments Alleges American, Capital Paid Brokers $426 Million to Push Their Mutual Funds."*

3.     Attached hereto as Exhibit B is a true and correct copy of a October 10, 2005 NASD press release entitled *"NASD Charges Eight Firms with Directed Brokerage Violations, Imposes Fines Totaling More than $7.75 Million."*

4.     Attached hereto as Exhibit C is a true and correct copy of a June 8, 2005 NASD press release entitled *"NASD Charges Fifteen Firms with Directed Brokerage Violations, Imposes Fines Totaling More than $34 Million."*

5.     Attached hereto as Exhibit D is a true and correct copy of a February 22, 2005 NASD press release entitled *"NASD Fines Quick & Reilly, Piper Jaffray $845,000 For Directed Brokerage Violations."*

6.     Attached hereto as Exhibit E is a true and correct copy of the Fidelity Small Cap Independence Fund, Historical Information, *available at* http://content.members.fidelity.com/ mfl/fundhist/0,,315912303,00.html.

7.     Attached hereto as Exhibit F is a true and correct copy of relevant portions of the July 8, 2005 transcript on the Motion to Dismiss hearing in *In re: Eaton Vance Mutual Funds Litigation*, No. 04 Civ. 1144 (S.D.N.Y.).

8.     Attached hereto as Exhibit G is a true and correct copy of the Morningstar article entitled "Brand Name Value Among Mutual Funds," *available at* http://pages.stern.nyu.edu/ ~adamodar/New_Home_Page/invmgmt/ch1/brand.htm.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 19, 2006 in New York, New York.

                                        /s/ Janine L. Pollack
                          By:          Janine L. Pollack

## CERTIFICATE OF SERVICE

I, Janine L. Pollack, hereby certify that I served a copy of the foregoing document upon

counsel for all parties by mailing a copy of the same, postage prepaid, to each attorney of record,

this 19th day of January, 2006.

_/s/ Janine L. Pollack_____
Janine L. Pollack

# Exhibit A



**Office of the Attorney General**
State of California ◆ Dept. of Justice

News

| OFFICE OF THE AG | PROGRAMS & SERVICES | NEWS & ALERTS | PUBLICATIONS | CONTACT US | SEARCH |

REGISTERING WITH US    CAREER OPPORTUNITIES    LINKS TO STATE SITES

## Attorney General Lockyer Sues American Funds For Not Telling Investors Truth About Broker Payments
### *Alleges American, Capital Paid Brokers $426 Million To Push Their Mutual Funds*

March 23, 2005

05-021
FOR IMMEDIATE RELEASE
(916) 324-5500

(LOS ANGELES) – Attorney General Bill Lockyer today filed a securities fraud lawsuit against American Funds' Los Angeles-based distributor and investment manager, alleging the defendants failed to adequately inform investors about $426 million in "shelf space" payments made to dozens of broker-dealers to sell and recommend American Funds.

"American Funds dressed up these arrangements with fancy names like 'execution revenue,' 'target commissions' or 'Broker Partnership Payments,' " said Lockyer. "But when you look beneath the cloak of legitimacy, the payments are little more than kickbacks to buy preferential treatment. Investors deserve to know that. The law American Funds violated is based on that simple principle."

The defendants in the lawsuit filed in Los Angeles County Superior Court are American Funds Distributors, Inc. (AFD) and Capital Research and Management Company (Capital), the investment manager for American Funds. The complaint seeks disgorgement of all profits the defendants obtained as a result of violating provisions of the state's Corporate Securities Law (CSL) that prohibit fraud in the sale or offering of securities. Additionally, the complaint seeks restitution for investors, civil penalties of up to $25,000 per CSL violation and an injunction prohibiting future violations.

Under the CSL, fraud includes failure to disclose material facts that a consumer would consider important to know in deciding whether to make a particular investment. Shelf space arrangements qualify as such material facts, Lockyer's complaint alleges. Such payments – made in cash or "directed brokerage" commissions on mutual funds' portfolio transactions – create conflicts of interest, increase mutual funds' expenses and decrease consumers' investment choices, the complaint notes. The defendants violated the CSL by failing to adequately inform investors about the significance of the shelf space payments and potential problems, and about the preferential treatment the defendants received in return for the payments.

The American Funds complex includes about 29 mutual funds with 20 million shareholders and more than $600 billion in combined assets. From January 1, 2000 through the present, AFD maintained an annual average of about 100 shelf space arrangements with broker-dealers, the complaint alleges. Until 2004, when the U.S. Securities and Exchange Commission (SEC) banned directed brokerage, the defendants paid the top 47 AFD shelf space partners portfolio transaction commissions, as well as cash. From 2000 through the end of 2004, the defendants' shelf space payments totaled at least $426 million, including $294 million in cash and $132 million in directed brokerage, the complaint alleges.

AFD's shelf space brokers included Edward D. Jones & Co. (Jones), Morgan Stanley Dean Witter and Piper Jaffray. To increase sales of American Funds, all three of these partners used shelf space payments to provide bonuses, cash rewards and/or resort travel assistance to local sales representatives. These incentives were not disclosed to investors.

To show the defendants knew they were not informing investors about how the shelf space arrangements worked in practice, the complaint cites a January 9, 2004 "global" voice mail message from AFD's co-CEO Kevin Clifford to all sales representatives. After offering the argument the payments actually help investors, Clifford states, "I think it's important that you be on message because this is the message that we have been using with regulators ... This will be the story that we use with regulators going forward, and I think you'll see it in time incorporated in our disclosure."

The defendants also misled independent directors on the boards of various American Funds, according to the complaint. Executives of Capital – which occasionally subsidized AFD's cash payments to broker-dealers-- falsely told independent directors AFD did not maintain shelf space arrangements, did not use directed brokerage to purchase shelf space and did not provide portfolio transaction targets to broker-dealers, the complaint alleges.

Jones ranked as AFD's top shelf space partner. From 2000 through 2004, AFD paid Jones more than $106.5 million in cash and directed brokerage. After the defendants ended directed brokerage for Jones in January 2002, they replaced it with cash to maintain its preferential treatment. As a result, the cash payments jumped from $10.7 million in 2001 to $20.7 million in 2002. Meanwhile, from 2000 through 2003, Jones sold more than $45 billion in American Funds shares.

Some of AFD's shelf space partners, such as Jones, did not have the capacity to perform securities trades. In those cases, at least until 2002, Capital would trade directly with the shelf space partner's "clearing broker." The clearing broker would keep a portion of the directed brokerage commission and pass on the remainder to the AFD shelf space partner.

Lockyer's office has been working closely with the SEC on the American Funds case, and Lockyer acknowledged the SEC's substantial assistance and cooperation.

The American Funds lawsuit is the fourth brought by Lockyer under a law he sponsored which took effect January 1, 2004. The statute gave his office authority to file civil enforcement actions under the CSL. Lockyer settled shelf space complaints against the distributor of PIMCO funds, PA Distributors (on September 15, 2004) and Franklin Templeton Distributors, Inc. (on November 17, 2004). Both settlements ensured greater disclosure to investors of the shelf space payments. The Franklin Templeton settlement also disgorged $14 million back to its various mutual funds. Lockyer on December 20, 2004 sued Jones, alleging the broker-dealer failed to adequately disclose about $300 million in shelf space payments it received from seven preferred mutual funds, including American. That case remains pending.

Employees of mutual funds or broker-dealers who have knowledge of securities law violations by their companies should contact the Attorney General's Whistleblower Hotline at 800-952-5225 (for California residents) or 916-322-3360 (for out-of-state residents).

# # # #

**BACK**



OFFICE OF THE AG | PROGRAMS & SERVICES | NEWS & ALERTS | PUBLICATIONS | CONTACT US | SEARCH
REGISTERING WITH US | CAREER OPPORTUNITIES | LINKS TO STATE SITES
Privacy Policy | Terms & Conditions | © 2001 DOJ

# Exhibit B



**FOR RELEASE:**      Monday, October 10, 2005
**CONTACTS:**         Nancy Condon (202) 728-8379
                      Herb Perone (202) 728-8464

## NASD Charges Eight Firms with Directed Brokerage Violations, Imposes Fines Totaling More Than $7.75 Million

**Washington, DC** — NASD announced today that it has fined eight broker-dealers - including seven retail firms and one mutual fund distributor - more than $7.75 million for directed brokerage violations. The sanctions announced today are the latest actions resulting from an NASD enforcement sweep focusing on the receipt or payment of directed brokerage in exchange for preferential treatment for certain mutual fund companies.

All of the cases involve violations of NASD's Anti-Reciprocal Rule, which prohibits firms from favoring the sale of shares of mutual funds on the basis of brokerage commissions received by the firm. Among other things, the rule prohibits a firm from recommending funds or establishing preferred lists of funds in exchange for receipt of directed brokerage.

"We continue to pursue conduct which puts the interests of firms ahead of the interests of customers," said Barry Goldsmith, NASD Executive Vice President and Head of Enforcement. "NASD's prohibition on the receipt of directed brokerage is designed to eliminate these conflicts of interest in the sale of mutual funds, whose costs are paid not by the mutual fund company, but by the funds' shareholders."

NASD found that the seven retail firms operated "preferred partner" or "shelf space" programs that provided benefits to specific mutual fund complexes in return for directed brokerage. The benefits to the mutual fund complexes included, in various cases, higher visibility on firms' internal websites, including inclusion on internal lists identifying the funds as participants in the programs; increased access to firms' sales forces; participation in "top producer" or training meetings; and promotion of the preferred funds on a broader basis than was available for other funds.

The mutual fund complexes that participated in these programs paid extra fees for the preferential treatment they received. The additional fees were usually based on a combination of sales and/or assets under management by the brokerage firm. Certain complexes participating in the preferred partner programs paid part or all of the revenue sharing fees by the use of directed brokerage - that is, by directing commissions from trades in the portfolios they managed to the firms. This included a practice of directing trades to the trading desks of designated third parties, which then remitted a portion of the trading commissions to the retail firms named in these actions - although those retail firms provided no services in connection with the trades. The commissions paid under these arrangements were sufficiently large to pay for the preferred benefits received by the funds as well as the costs of trade execution.

The retail firms generally monitored the amount of directed brokerage received to ensure that the fund complexes were satisfying their revenue sharing obligations. The use of directed brokerage allowed the fund complexes to use assets of the mutual funds instead of their own money to meet their revenue sharing obligations.

NASD also censured and fined one mutual fund distributor, Lord Abbett Distributor LLC. Lord Abbett paid for some of its shelf space obligations by having its affiliated investment adviser direct portfolio transactions to or for the benefit of firms to which the distributor owed revenue sharing fees.

The firms and their respective fines are as follows (firms noted with asterisks are wholly owned subsidiaries of National Planning Holdings, Inc.):

| IFC Holdings, Inc. | $1,520,000 | Tampa, FL |

| d/b/a INVEST Financial Corporation* | | |
|---|---|---|
| Commonwealth Financial Network | $1,400,000 | Waltham, MA |
| National Planning Corporation Inc.* | $1,308,000 | Santa Monica, CA |
| Mutual Service Corporation | $1,300,000 | W. Palm Beach, FL |
| Lincoln Financial Advisors Corporation | $950,000 | Ft. Wayne, IN |
| SII Investments, Inc.* | $658,500 | Appleton, WI |
| Investment Centers of America, Inc.* | $363,500 | Appleton, WI |
| Lord Abbett Distributor, LLC | $255,000 | Jersey City, NJ |

The fine imposed on National Planning Corporation also included charges relating to violations of NASD rules relating to its use of non-cash compensation. During four months in 2002, National Planning Corporation, instead of giving equal weight to the sales of all mutual funds, as required by NASD rules, provided registered representatives with double production credits for sales of mutual funds offered by participants in its preferred partner program towards qualification for attendance at a rewards conference. The fine imposed on Commonwealth Financial Network included charges relating to its failure to retain emails as required by the federal securities laws and NASD rules.

NASD has brought 20 previous actions for similar violations.

Investors can obtain more information about, and the disciplinary record of, any NASD-registered broker or brokerage firm by using NASD's BrokerCheck. NASD makes BrokerCheck available at no charge to the public. In 2004, members of the public used this service to conduct more than 3.8 million searches and request almost 190,000 reports for existing brokers or firms. Investors can link directly to BrokerCheck at www.nasdbrokercheck.com.  Investors can also access this service by calling (800) 289-9999.

NASD is the leading private-sector provider of financial regulatory services, dedicated to investor protection and market integrity through effective and efficient regulation and complementary compliance and technology-based services. NASD touches virtually every aspect of the securities business - from registering and educating all industry participants, to examining securities firms, enforcing both NASD rules and the federal securities laws, and administering the largest dispute resolution forum for investors and member firms. For more information, please visit our Web site at www.nasd.com.

Investor protection. Market integrity.

1735 K Street, NW
Washington, DC
20006-1506

tel 202 728 8000
www.nasd.com

©2006 NASD. All rights reserved. | Legal Notices and Privacy Policy.

# Exhibit C

# News Release

**FOR RELEASE:**     Wednesday, June 8, 2005
**CONTACTS:**       Nancy Condon 202-728-8379
                  Herb Perone 202-728-8464



## NASD Charges 15 Firms with Directed Brokerage Violations, Imposes Fines Totaling More than $34 Million

**Washington, DC** — NASD announced today that it has imposed fines totaling more than $34 million on 15 broker-dealers in connection with the receipt of directed brokerage in exchange for preferential treatment for certain mutual fund companies.

Today's cases, part of NASD's efforts to eliminate conflicts of interest in the sale of mutual funds, focus on brokerage firms involved in selling mutual funds to retail investors, as well as one mutual fund distributor. All of the cases involve violations of NASD's Anti-Reciprocal Rule, which prohibits firms from favoring the sale of shares of particular mutual funds on the basis of brokerage commissions received by the firm. Among other things, a firm may not recommend specific funds to sales personnel or establish preferred lists of funds in exchange for directed brokerage.

NASD found that the 14 retail firms, most of which sold funds offered by hundreds of different mutual fund complexes, operated "preferred partner" or "shelf space" programs that provided certain benefits to a relatively small number of mutual fund complexes in return for directed brokerage. The benefits to mutual fund complexes of these quid pro quo arrangements included, in various cases, higher visibility on the firms' internal websites, increased access to the firms' sales forces, participation in "top producer" or training meetings, and promotion of their funds on a broader basis than was available for other funds.

"When recommending mutual fund investments, firms must act on the basis of the merits of the funds and the investment objectives of the customers and not because of other benefits the brokerage firm will receive," said NASD Vice Chairman Mary L. Schapiro. "NASD's prohibition on the receipt of directed brokerage is designed to eliminate these conflicts of interest."

The mutual fund complexes that participated in these programs paid extra fees for enhanced visibility. The additional fees were typically based on a combination of sales and/or assets under management by the brokerage firm.  Some of the complexes participating in the preferred partner programs paid part or all of the revenue sharing fees by the use of directed brokerage - that is, by directing a portion of the trades in the portfolios they managed to the trading desks of the firms participating in the program.

For firms that did not have the capacity to provide trade execution, trades were sent to designated third parties, which then remitted a portion of the trading commissions to the retail firms - although they provided no services in connection with the trade.  These commissions were sufficiently large to pay for the benefits received by the funds as well as the costs of trade execution.

The retail firms generally monitored the amount of directed brokerage received to ensure that the fund complexes were satisfying their revenue sharing obligations.  The use of directed brokerage allowed the fund complexes to use assets of the mutual funds instead of their own money to meet their revenue sharing obligations.

NASD also censured and fined one mutual fund distributor, AllianceBernstein Investment Research and Management, Inc.  AllianceBernstein paid for some of its shelf space obligations by having its affiliated investment adviser direct portfolio transactions to or for the benefit of firms to which the distributor owed revenue sharing fees.

The fifteen firms and their respective fines are as follows (firms noted with asterisks are wholly owned subsidiaries of AIG Advisor Group, Inc.)

| | | |
|---|---|---|
| Royal Alliance Associates, Inc.* | $6,600,000 | New York, NY |
| H.D. Vest Investment Services | $4,015,000 | Irving, TX |
| AllianceBernstein Investment Research and Management, Inc. | $3,984,087 | New York, NY |
| Linsco/Private Ledger Corp. | $3,602,398 | Boston, MA |
| Wells Fargo Investments, LLC | $2,970,000 | San Francisco, CA |
| SunAmerica Securities, Inc.* | $2,500,000 | Phoenix, AZ |
| FSC Securities Corp.* | $2,400,000 | Atlanta, GA |
| Securities America, Inc. | $2,400,000 | Omaha, NE |
| RBC Dain Rauscher, Inc. | $1,700,000 | Minneapolis, MN |
| McDonald Investments Inc. | $1,500,000 | Cleveland, OH |
| AXA Advisors, LLC | $900,000 | New York, NY |
| Sentra Securities Corporation* and Spelman & Co., Inc.* (joint fine) | $780,000 | Phoenix, AZ |
| Advantage Capital Corp.* | $450,000 | Atlanta, GA |
| Advest, Inc. | $286,415 | Hartford, CT |

The fines imposed on eight of the firms - Royal Alliance Associates, SunAmerica Securities, FSC Securities Corp., Advantage Capital Corp., Sentra Securities Corp., Spelman & Co., RBC Dain Rauscher, and McDonald Investments - included charges relating to their failure to retain emails as required by the federal securities laws and NASD rules.

The fine imposed on H.D. Vest Investment Services included charges related to violations of NASD rules relating to non-cash compensation. H.D. Vest reimbursed brokers' expenses incurred in connection with certain firm training and educational conferences based, in part, on the brokers' sales of funds that participated in its preferred partner program - instead of giving equal weight to the sales of all mutual funds, as required by NASD rules.

H.D. Vest Investment Services, RBC Dain Rauscher, and McDonald Investments were also charged with violations of NASD's supervisory systems and procedures rule.

In settling these matters, the firms involved neither admitted nor denied the charges, but consented to the entry of NASD's findings.

NASD has brought five previous actions for similar violations, including a complaint that is still pending against American Fund Distributors and settlements with Quick & Reilly, Inc., Piper Jaffray & Co., Edward D. Jones & Co. L.P. and Morgan Stanley DW Inc.

Investors can obtain more information about, and the disciplinary record of, any NASD-registered broker or brokerage firm by using NASD's BrokerCheck. NASD makes BrokerCheck available at no charge to the public. In 2004, members of the public used this service to conduct more than 3.8 million searches and request almost 190,000 reports for existing brokers or firms. Investors can link directly to BrokerCheck at www.nasdbrokercheck.com. Investors can also access this service by calling 1-800-289-9999.

NASD is the leading private-sector provider of financial regulatory services, dedicated to investor protection and market integrity through effective and efficient regulation and complementary compliance and technology-based services. NASD touches virtually every aspect of the securities business - from registering and educating all industry participants, to examining securities firms, enforcing both NASD rules and the federal securities laws, and administering the largest dispute resolution forum for investors and member firms. For more information, please visit our Web site at www.nasd.com.

**Investor protection. Market integrity.**    1735 K Street, NW    tel 202 728 8000
Washington, DC    www.nasd.com
20006-1506

©2006 NASD. All rights reserved. | Legal Notices and Privacy Policy.

# Exhibit D

# News Release

**FOR RELEASE:** Wednesday, February 22, 2005
**CONTACTS:** Nancy Condon (202) 728-8379
Herb Perone (202) 728-8464



## NASD Fines Quick & Reilly, Piper Jaffray $845,000
## For Directed Brokerage Violations

**Washington, DC**—NASD today announced that it has fined Quick & Reilly, Inc. (now part of Banc of America Investment Services, Inc.) $570,000 and Piper Jaffray & Co. $275,000 for directed brokerage violations. In imposing sanctions against Piper Jaffray, NASD took into account the fact that the firm self-reported its violative conduct after conducting its own internal review. The two cases are the latest enforcement actions in NASD's ongoing effort to crack down on directed brokerage abuses.

NASD found that both firms operated "preferred partner" or "shelf space" programs, giving favorable treatment to funds offered by certain mutual fund companies in return for brokerage commissions and other payments. That special treatment included higher visibility on the firms' internal websites, increased access to the firms' sales forces, participation in "top producer" or training meetings, and promotion of their funds on a broader basis than was available for other funds. That conduct violated NASD's "Anti-Reciprocal Rule" which prohibits firms from favoring the sale of shares of particular mutual funds on the basis of brokerage commissions.

"The purpose of the rule is to help eliminate conflicts of interest in the sale of mutual funds," said Mary L. Schapiro, NASD Vice Chairman.  "These sorts of arrangements encourage the inappropriate use of mutual fund commission dollars and have the potential to improperly influence a firm's judgment when making recommendations to their clients."

Both firms offered a preferred partner program to a relatively small number of mutual fund families. Piper Jaffray, which operated its preferred partner program from 1998 to 2003, included only 12 to 15 fund complexes in the program, but sold funds offered by more than 100 fund complexes. Quick & Reilly maintained its program from 2001 to 2003 and included only 16 to 20 fund complexes, while it sold funds offered by about 300 fund complexes.

The participating mutual fund companies paid the firms extra fees in addition to regular sales fees. Piper Jaffray negotiated those extra payments with mutual fund companies each year, asking for minimum payments of $100,000 to $125,000. Some fund complexes paid a flat fee; others paid amounts based on a percentage of gross fund sales and the average daily assets under management for the fund complex. Quick & Reilly charged participating fund complexes 10 basis points on the gross amount of sales and five basis points on the average daily assets under management, subject to a minimum annual payment of $75,000.

Several of the funds participating in the preferred partner programs paid part or all of the extra fees by directing the funds' brokerage business to the firms.  The commissions were generated by the funds through portfolio transactions which the funds executed either through the firm, in the case of Piper Jaffray, or through an affiliate or third party, in the case of Quick and Reilly.

Piper Jaffray, on its own initiative, conducted an internal review of the general subject matter involved in the case and self-reported its findings to NASD staff.  "This type of self-examination and self-reporting by a registered firm benefits NASD's enforcement program and investors by allowing for cost-effective enforcement and timely remedial action, and was taken into account in assessing sanctions against Piper Jaffray," Schapiro said.

In settling these matters, the two firms neither admitted nor denied the charges, but consented to the entry of NASD's findings.

NASD has brought three previous actions for similar violations.  Earlier this month, NASD charged

American Funds Distributors with violating NASD's Anti-Reciprocal Rule by directing approximately $100 million in brokerage commissions over a three-year period to about 50 brokerage firms that were the top sellers of American Funds. (See NASD News Release 2/16/05.)  In November 2003, NASD sanctioned Morgan Stanley DW Inc. for giving preferential treatment to certain mutual fund companies in return for approximately $15 million in brokerage commissions.  That case was brought in conjunction with an action filed by the Securities and Exchange Commission in which Morgan Stanley agreed to pay $50 million in civil penalties and surrendered profits. (See NASD News Release 11/17/03.)  In December 2004, Edward D. Jones & Co., L.P., agreed to pay $75 million in resolution of charges that it failed to adequately disclose revenue sharing payments that it received from a select group of mutual fund families that it recommended to its customers, that it received directed brokerage payments in violation of the Anti-Reciprocal rule, and for other violations in settlements with NASD, the Securities and Exchange Commission, and the New York Stock Exchange. (See NASD News Release 12/24/04.)

Investors can obtain more information about, and the disciplinary record of, any NASD-registered broker or brokerage firm by using NASD's BrokerCheck.  NASD makes BrokerCheck available at no charge to the public.  In 2004, members of the public used this service to conduct more than 3.8 million searches for existing brokers or firms and requested more than 190,000 reports in cases where disclosable information existed on a broker or firm.  Investors can link directly to BrokerCheck at www.nasdbrokercheck.com. Investors can also access this service by calling (800) 289-9999.

NASD is the leading private-sector provider of financial regulatory services, dedicated to investor protection and market integrity through effective and efficient regulation and complementary compliance and technology-based services.  NASD touches virtually every aspect of the securities business - from registering and educating all industry participants, to examining securities firms, enforcing both NASD rules and the federal securities laws, and administering the largest dispute resolution forum for investors and member firms.  For more information, please visit our Web site at www.nasd.com.

©2006 NASD. All rights reserved. | Legal Notices and Privacy Policy.

# Exhibit E

# Fidelity Small Cap Independence Fund

### Historical Information

<u>Historical Fund Information</u>

- 12/04/1995 -  : Redemption Fee:.75% on shares held less than 90 days
- 11/15/1997 -  : Redemption Fee:1.50% on shares held less than 90 days
- 01/02/1998 -  : Name Change:formerly Fidelity Small Cap Stock Fund
- 07/13/2001 -  : Name Change:formerly Fidelity Small Cap Selector Fund

<u>Load History</u>

- 06/28/1993 - 09/29/1998:          Sales Change:3%
- 09/30/1998 - :                    Sales Change:no sales charge

---



© Copyright 1998-2006 FMR Corp.
All rights reserved.
Terms of Use   Privacy   Security   Site Map

# Exhibit F

5785EVM1                        argument                                    1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    In Re:  Eaton Vance Mutual
     Funds Litigation,
4
                                        04 Civ. 1144 (JGK)
5                                       04 Civ. 1617 (JGK)
                                        04 Civ. 1690 (JGK)
6                                       04 Civ. 1759 (JGK)

7

                     ------------------------------x
8
                                        July 8, 2005
9                                       3:40 p.m.

10   Before:

11                  HON. JOHN G. KOELTL,

12                                       District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

2

5785EVM1                    argument

1                              APPEARANCES

2    MILBERG, WEISS, BERSHAD & SCHULMAN
            Attorneys for Plaintiff Bellikoff
3    BY:   MICHAEL REESE
          JEROME CONGRESS
4
     KIRKPATRICK & LOCKHART
5           Attorneys for Defendant Eaton Vance Corporation
     BY:   CHARLES L. EISEN
6          JEFFREY B. MALETTA
           RICHARD TERRIS
7          DONALD DORON

8    YUVKO & SALVESEN
            Attorneys for Defendant Eaton Vance Funds
9    BY:   SANFORD F. REMZ

10   SHEARMAN & STERLING
            Attorneys for Defendant Orbi-Med Advisors
11   BY:   ADAM HAKKI
           PIRET LOONE
12
     GOODWIN PROCTER, L.L.P.
13          Attorneys for Defendant Non-interested Trustee Defendants
     BY:   JAMES S. DITTMAR
14         STUART M. GLASS

15   NIXON PEABODY
            Attorneys for Defendant Bibliowicz
16   BY:   GEORGE J. SKELLY
           ADAM B. GILBERT

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

578revm2

1    Congress to address 36(b).

2                    THE COURT:  Thank you.

3                    MR. REESE:  Thank you.

4                    MR. CONGRESS:  Thank you, your Honor.  I am Jerome

5    Congress.  I would like to speak to 36(b) and, to the extent

6    there is time, talk briefly about some of the other issues, the

7    derivative direct issue as to which kind of claims we have, the

8    SLUSA issue, a little bit on standing.

9                    On 36(b), and I would like to go initially --

10                   THE COURT:  Let me stop you for one moment.  Thank

11   you.

12                   MR. CONGRESS:  Jumping out of order a little bit in my

13   presentation, I would like to go back to something that you

14   asked Mr. Reese about, because I have maybe a slightly

15   different take from him.  It is on the question of whether the

16   36(b) claims apply not just to payments that are made to the

17   adviser, to the distributor, but also could cover and do cover

18   commissions that go to the brokers and the revenue sharing

19   payments that were made to the brokers.  I believe that they

20   are covered by 36(b) and that there is case law to that effect.

21                   The way in which they are covered is that under the

22   Gartenberg case, when an analysis is done of whether an

23   advisory fee is excessive, one of the things that you look at

24   is what the Second Circuit has called the fallout benefits from

25   payments that are made.

578revm2

1          In this situation, the allegation on commissions is

2     that excessive commissions were improperly paid, direct to

3     brokerage was paid to the brokers, that the purpose was to

4     enlarge the funds, not to benefit the shareholders and not to

5     benefit the funds, but to enlarge the advisory fee, the fee of

6     the adviser.  That is alleged in the complaint.  We believe

7     that would be a fallout benefit to the adviser that is

8     encompassed within the analysis under Gartenberg, and therefore

9     is properly alleged as part of the injury in the 36(b) claim.

10          Similarly, the revenue sharing payments were made to

11     the brokers.  We allege that the advisory fees were

12     artificially inflated so that those payments could be made to

13     the brokers, that the purpose was, again, to enlarge the funds

14     and therefore enlarge the advisory fees.  So again you would

15     have the fallout benefits there.

16          With respect to the payment of the commissions, the

17     recent Wicks case held that those allegations of wrongdoing

18     through those types of commission payments properly fell within

19     the 36(b) claim.

20          To go back and go through 36(b) in a little more

21     organized way, your Honor, first of all, there is no issue as

22     to whether the claim is direct or derivative.  Under the daily

23     income case and the Cayman case in the Supreme Court, it has

24     been held very clearly it is direct, there is a direct claim,

25     only the shareholder and the SEC can bring it, but the benefit

578revm2

1    goes to the fund.

2             THE COURT: I don't think that is disputed.

3             MR. CONGRESS: Pardon?

4             THE COURT: I didn't think that was disputed.

5             MR. CONGRESS: It is not. Your Honor, we believe that

6    the payments that we allege were improperly made were well

7    within the scope of 36(b). To some extent I have already

8    described it, described our responses to the arguments of the

9    defendants.

10            One of the things they argue is that 12(b)(1) fees are

11   not covered by 36(b) because they are not advisory fee

12   payments. We believe that that has been very clearly rejected

13   by the Second Circuit. I refer you specifically to the Meyer

14   v. Oppenheimer case, it is usually referred to as Meyer II, 895

15   F.2d at 861.

16            Because this is a very important issue, I would like

17   to read one paragraph, which we think is definitive for us on

18   this issue from Meyer II. Actually, I think this might be

19   Meyer III, which is the one we are relying on here. In that

20   case the Second Circuit says, "In Meyer II we stated that

21   payments made under Rule 12(b)(1) are excessive when combined

22   with advisory fees where both payments are made to affiliated

23   persons. An investment adviser is cognizable under Section

24   36(b).

25            "This statement stands only for the proposition of the

578revm2

1    cost of 12(b)(1) plans involving such affiliates as well as

2    advisory fees are subject to review under Section 36(b).  Were

3    such review not available, investment advisers might not be

4    able to extract additional compensation for advisory services

5    by excessive distributions under a 12(b)(1) plan.

6         "The statement, however, does not stand for the

7    additional proposition that 12(b)(1) payments to adviser's

8    affiliates are to be aggregated with advisory fees to determine

9    the merits of a Section 36(b) claim.  The two kinds of payments

10   are for entirely different services, namely, advice on the one

11   hand, sales and distribution on the other."

12        Your Honor, as I read that, the Second Circuit is very

13   clearly saying that regardless of whether what we are alleging

14   is that the 12(b)(1) fees were, in effect, part of an excessive

15   advisory fee or whether we are simply saying the 12(b)(1) fees

16   themselves were improper, either way it is a part of a valid

17   36(b) claim.  We think the cases that have come along since

18   then are consistent with that view.

19        In the Krinsk case in the Second Circuit that we cite,

20   the claims for the excessive 12(b)(1) payments were allowed to

21   proceed under 36(b) even though those payments were made to the

22   distributor rather than the adviser.  We believe that the

23   language that the defendants have relied on from the case that

24   they call Vogel II to argue that 36(b) does not encompass

25   12(b)(1) type payments doesn't mean that, it wasn't addressing

# Exhibit G

*Morningstar*

## Brand Name Value among Mutual Funds

Does a brand name entice you to pick a fund? Mutual fund companies think so. As investors continue to dump record-breaking bucket-loads of money into mutual funds, some firms are opting for snappier brand names in the hopes of luring cash to their coffers.

Branding is one of the major topics within the mutual fund industry these days. Life is hard for the new kid on the block that must compete with such household names as Fidelity and Vanguard, but it's also getting tougher for established funds whose brands vanish after a merger with another company.

Financial Research Corp. of Boston devoted its entire February 1998 industry report to the subject. "Fund companies face the challenge of distinguishing themselves among many competitors that appear similar" to the investor, the report says. "Fund companies have to consider what drives the consumer, what makes him or her feel good, and what are the attributes of a fund that the consumer really values."

Funds are undoubtedly stepping up their efforts to get their brands in the forefront of an investor's mind. In the first quarter of 1998, mutual fund companies increased advertising spending by about 25% to $193 million, compared with the previous year's first quarter, according to New York-based Competitrack. Roth IRA advertising represents only a fraction of the increase.

Some mutual fund firms are giving themselves fresh starts with revamped names. New England Investment Co. decided after 67 years in the mutual fund business that its name sounded too regional, and might repel any prospective investors outside the New England area. So, it changed its company name to Nvest.

New England isn't the first to think a regional name might put off potential investors. Four years ago, the Southeastern fund family decided that it might convince more investors to place their money in its funds if it changed its name to Longleaf. Unlike Nvest's fund family, Southeastern's name change filtered through to its individual mutual funds.

It seems to have worked. For instance, the fund currently called Longleaf Partners had taken seven years to surpass $500 million in assets. After the name change, the fund's assets doubled within nine months to $1 billion, and three years later is still growing steady at $3.4 billion. Of course, the performance of the Longleaf funds and the competency of the managers has likely had more of an impact on the asset growth than the fund's name change--we hope.

In contrast, the family of CT&T Funds was recently renamed the Alleghany Funds. The fund family didn't have much choice about the matter; the original CT&T name stood for Chicago Trust & Title, which was spun off from the parent company, Alleghany, in March. Recognizing the same regionalization fears as New England, the nearly five-year-old mutual funds under Alleghany's umbrella--Chicago Trust and Montag & Caldwell-- have kept their own names, since they belong to money management firms that have existed for decades, and are more widely recognized by brokers and financial advisers who sell those funds.

Some regional locations are beneficial to a fund. And yet, at least in one instance, the group is more concerned about where it lands in the alphabetical newspaper listings of mutual funds.

Interactive Investments, which invests in high-tech stocks, has located its managers near the heart of California's Silicon Valley. The firm's original fund, Technology Value, has been a success, in terms of performance. The fund was not marketed with the firm's formal Interactive Investments name, however. When

Interactive Investments came out with two more funds--one of which invests in biotechnology, not technology-- the firm negated a possible branding switch to, say, the Silicon Valley Funds. Instead, it has opted for Firsthand Funds. It's less of a mouthful for prospective investors, and it denotes the managers' previous work experience in the fields in which they now invest. Best of all, as the firm's partner in charge of marketing says, the new name will position the three funds just after Fidelity in newspaper listings.

Other fund families are fresh off of acquisition sprees and battling with ultralong names. Take Morgan Stanley Dean Witter & Co. and its subsidiaries, Van Kampen American Capital and Miller Anderson Sherrerd's MAS funds. The latter has a relatively low-key brand name, while Van Kampen built its brand with currently unfashionable fixed-income investments.

But now that they're under one umbrella, and managers are starting to cross-manage funds, Morgan Stanley Dean Witter has decided to follow Gap's model for separate branding of its Gap and Old Navy blue jeans. All of the funds will soon split into two distinct fund family names. A portfolio will be managed by the same people, but the funds investing in that portfolio will have different labels on them for the different sales channels. Like the higher-end Gap jeans that are sold in The Gap's fancy mall stores, any mutual fund sold by Morgan Stanley Dean Witter's own sales representatives will be called Morgan Stanley Dean Witter funds. But, like Old Navy's warehouse feel, Morgan Stanley Dean Witter's funds sold directly to individuals, or through outside brokers or financial advisers, will have a different, yet-to-be-determined name, according to Van Kampen American Capital's president and chief executive officer, Philip Duff.

American Century is also grappling with ultralong mutual fund names. Soon after Twentieth Century's 1996 acquisition of Benham Group, the two firms decided to rename the overall fund company American Century Investments, and keep the funds' original brands tacked on the funds. Sure, that may have bumped American Century up to the top of the newspaper listings, but the move spawned fund names like American Century-20th Century New Opportunities, and American Century-Benham Short Term Government. They've become so long and tedious that the firm may dump all of the brands for a single new one.

We've all experienced brand name changes. Some work; some don't. Kentucky Fried Chicken, for example, decided fried food was so passé in the health-conscious 1990s that it successfully changed its brand to KFC. But you can still get fried food there, of course.

And after a horrendous plane crash, ValuJet bought AirTran Airways and assumed AirTran's name. Perhaps it learned a lesson from PanAm, which, after its own bankruptcy bout following the disastrous Flight 103 crash over Lockerbie, Scotland, decided to resurface using the same brand name. PanAm eventually failed again.

Of course, it's important for fried-chicken eaters and airplane travelers to look beyond a label. But it's even more important for mutual fund investors searching out a fund; they should instead concentrate on a particular investment style, the skills of a fund manager, and low fees.

Besides, no multimillion-dollar brand-awareness campaign will ever cover up pitiful performance by a horrible manager, or erase age-old brands, like Steadman, from our memory.

---

*Questions:*

1. *What are some of the factors that might determine the brand name value of a fund family (such as Fidelity or Vanguard)?*
2. *Can individual funds (such as the Magellan fund) have different brand name values than the fund family that they belong to (such as Fidelity)? If so, why?*

3.  *Why might a potential acquirer of a fund family pay a premium over the market price, assuming that the fund family is publicly traded?*