UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES GILLIAM, Individually and on
Behalf of All Others Similarly Situated,
        Plaintiff,

        v.                                CIVIL ACTION NO.
                                          04-11600-NG[1]

FIDELITY MANAGEMENT &
RESEARCH COMPANY, et al.,
        Defendants.

**REPORT AND RECOMMENDATION RE:**
**MOTION OF INDEPENDENT TRUSTEE DEFENDANTS TO DISMISS**
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT (DOCKET**
**ENTRY # 101); MOTION OF THE NOMINAL DEFENDANTS, FIDELITY**
**FUNDS, TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION**
**COMPLAINT (DOCKET ENTRY # 103); FIDELITY**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'**
**CONSOLIDATED AMENDED COMPLAINT**
**(DOCKET ENTRY # 107)**

**September 18, 2006**

**BOWLER, U.S.M.J.**

        Plaintiffs Ghassan J. Awali, Marina Berti, Valerie A.

Daspit, Arthur G. Denker, Randall C. Heyward, Stanley H. Krupa,

Nicole Lenzi, David M. Lucoff, Joseph F. Martingano, Michael S.

Mendolia, Patricia K. Munshaw, Brian D. Reese, Jay J. Rupp,

Gilbert P. Travis, Jewel R. Travis, David O. Fallert, William S.

---

        [1]  In addition to the above lead case, this action is a
consolidation of four other actions consisting of Bogatin Family
Trust v. Fidelity Management and Research Company et al., Civil
Action No. 04-11642-NG; Ghassan J. Awali v. Fidelity Management
and Research Company et al., Civil Action No. 04-11709-MLW;
William S. Groeschel v. Fidelity Management and Research Company
et al., Civil Action No. 04-11735-GAO; and David O. Fallert v.
Fidelity Management and Research Company et al., Civil Action No.
04-11812-MLW.

Groeschel and Bogatin Family Trust ("plaintiffs"), each of whom held one or more shares or units in 25 Fidelity funds during the class period from July 19, 1999 to November 17, 2003 ("the class period"),[2] bring this putative class action on behalf of a class of all persons or entities who held one or more shares of the 206 Fidelity mutual funds listed in exhibit A of the CACAC during the class period.

By stipulation, plaintiffs dismissed a derivative claim under sections 206 and 215 of the Investment Company Act of 1940 ("the ICA") as well as a number of other counts. At present, the

---

[2] Those funds consist of Fidelity Contrafund, Fidelity Magellan Fund, Fidelity OTC Portfolio, Fidelity Advisor Equity Growth Fund, Fidelity Advisor Dividend Growth Fund, Fidelity Advisor Technology Fund, Fidelity Advisor Mid Cap Fund, Fidelity Southeast Asia Fund, Fidelity Small Cap Stock Fund, Fidelity Low-Priced Stock Fund, Fidelity Small Cap Independence Fund, Fidelity Advisor Growth & Income Fund, Fidelity Advisor Diversified International Fund, Fidelity Advisor Aggressive Growth Fund, Spartan Pennsylvania Municipal Income Fund, Spartan U.S. Equity Index Fund, Fidelity Advisor Overseas Fund, Fidelity Adviser Growth Opportunities Fund, Fidelity Advisor Asset Allocation Fund, Fidelity Trend Fund, Fidelity Asset Manager, Fidelity Cash Reserves, Fidelity Growth Company Fund, Fidelity Blue Chip Growth Fund and Fidelity Large Cap Stock Fund. These funds do not include the funds held by certain individuals voluntarily dismissed by plaintiffs.
   The Fidelity Small Cap Selector Fund, held during the class period by plaintiff Stanley H. Krupa, is not noted in the list of the 206 Fidelity Funds ("the Fidelity Funds") in exhibit A attached to the Consolidated Amended Class Action Complaint ("CACAC"). Likewise, the Fidelity Select Biotechnology Portfolio, held during the class period by plaintiff William S. Groeschel, is not noted in the list of the 206 Fidelity Funds in exhibit A to the CACAC. Exhibit A is the list of Fidelity Funds held during the class period. Plaintiffs inadvertently omitted these funds from exhibit A and "seek leave at an appropriate time to add" these entities as nominal defendants. (Docket Entry # 112, n. 19).

CACAC includes direct claims alleging violations of: (1) section 34(b) of the ICA, 15 U.S.C. § 80a-33(b) ("section 34(b)"), a statute which prescribes material misrepresentations or omissions in documents filed under the ICA including registration statements, reports and prospectuses (Count One); (2) section 36(a) of the ICA, 15 U.S.C. § 80a-35(a) ("section 36(a)"), a statute which prescribes breaches of fiduciary duties involving personal misconduct on the part of officers, principal underwriters and directors of investment advisory boards (Count Two); (3) section 36(b) of the ICA, 15 U.S.C. § 80a-35(b) ("section 36(b)"), a statute which prescribes breaches of fiduciary duty on the part of investment advisors with respect to receipt of excessive compensation for services (Count Three); and (4) section 48(a) of the ICA, 15 U.S.C. § 80a-47(a) ("section 48(a)"), a statute governing control person liability (Count IV).

The CACAC names the following groups of persons or entities as defendants: (1) Fidelity Management and Research Company ("FMRCo") and FMR Co., Inc. ("FMRC"), registered investment advisors to the Fidelity Funds (Docket Entry # 122, Ex. 26 & 27); FMR Corporation ("FMR Corp."), parent of FMRCo and FMRC; Fidelity Distributors Corporation ("FDC"), a Massachusetts corporation that acts as the general distributor and underwriter of the Fidelity Funds; and Edward C. Johnson, III,[3] Abigail P. Johnson,

---

[3]  The CACAC references this individual as Ned Johnson.

Peter S. Lynch, Laura B. Cronin, Robert Reynolds and Robert
Pozen, all officers and/or directors of FMRC, FMRCo and/or FMR
Corp. during the class period and trustees of a number of
Fidelity Funds ("the interested trustees")[4] (collectively:  "the
Fidelity defendants"); (2) J. Michael Cook, Ralph F. Cox, Robert
M. Gates, George H. Heilmeier, Donald J. Kirk, Marie L. Knowles,
Ned C. Lautenbach, Marvin L. Mann, William O. McCoy, Gerald C.
McDonough and William S. Stavropoulos, all non-interested
trustees of various Fidelity Funds during the class period
(collectively:  "the independent trustees");[5] and (3) the
Fidelity Funds, named as nominal defendants.


## STRUCTURE OF MUTUAL FUNDS

In a mutual fund, investors contribute cash to create a pool
of assets with which to invest and purchase securities.  In
return for contributing cash, investors receive shares in the
fund.  Organized under state law, each mutual fund is a "separate

---

[4]  The CACAC identifies the foregoing individuals as
"interested trustees."  "Interested" is a term of art under the
ICA.  The statute defines an "interested person" as including
inter alia any "affiliated person" of an investment company.  15
U.S.C. § 80a-2(a)(19)(A)(1).  An "affiliated person" encompasses
officers or directors of an investment advisor.  15 U.S.C. §
80a-2(a)(3)(D); 15 U.S.C. § 80a-2(a)(19); see Forsythe v. Sun
Life Financial, Inc., 417 F.Supp.2d 100, 110 (D.Mass. 2006).

[5]  J. Gary Burkhead, Edward C. Johnson, IV and Elizabeth L.
Johnson are former defendants named in the CACAC that plaintiffs
voluntarily dismissed.  Plaintiffs also stipulated to the
dismissal of the section 36(a) claim in Count Three as against
the interested trustees and the independent trustees.

legal entity--typically either a corporation or a business trust." William K. Sjostrom, Jr., *TAPPING THE RESERVOIR: MUTUAL FUND LITIGATION UNDER SECTION 36(A) OF THE INVESTMENT COMPANY ACT OF 1940*, 54 U.Kan.L.Rev. 251, 255 (2005). Each fund has a board of directors or trustees "who are supposed to represent and protect the interests of its shareholders." In Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d 451, 455 (D.N.J. 2005).

Unlike a corporation, however, a mutual fund is not run by its employees but, instead, by a separate organization known as an investment advisor. Yameen v. Eaton Vance Distributors, Inc., 394 F.Supp.2d 350, 353 (D.Mass. 2005); In Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d at 455. The investment advisor manages the day to day operations of the fund and often selects the individuals to serve on the board of directors or board of trustees.[6] Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 536 (1984). The investment advisor also provides the fund "with investment advice, management services, and office space and staff." Tannenbaum v. Zeller, 552 F.2d 402, 405 (2nd Cir. 1977). In return for these services, the advisor receives an advisory fee "usually calculated as a percentage of the fund's net assets." Tannenbaum v. Zeller, 552 F.2d at 405. Given the

---

[6] This remains true in the case at bar inasmuch as FMRC and FMRCo "selected key Fund trustees from their own ranks." (Docket Entry # 98, ¶ 192).

economies of scale, the cost to the adviser "to run a $2-billion fund should be much smaller than the cost to run a $200-million fund." William K. Sjostrom, Jr., *TAPPING THE RESERVOIR: MUTUAL FUND LITIGATION UNDER SECTION 36(A) OF THE INVESTMENT COMPANY ACT OF 1940*, 54 U.Kan.L.Rev. 251, 256 (2005).

As shares are redeemed, a mutual fund must generate sales of new shares in order to remain viable. A principal underwriter or distributor customarily provides these marketing services by either selling the shares to a dealer or directly to members of the public. Indirectly selling the shares to the public involves the services of "financial intermediaries such as brokerage firms" who in turn are compensated usually in the form of commissions. William K. Sjostrom, Jr., *TAPPING THE RESERVOIR: MUTUAL FUND LITIGATION UNDER SECTION 36(A) OF THE INVESTMENT COMPANY ACT OF 1940*, 54 U.Kan.L.Rev. 251, 256-7 (2005). "Distribution fees are paid by an open-end investment company to a third party for marketing the fund's shares, with the aim of increasing or at least maintaining the size of the fund." In Re Morgan Stanley and Van Kampen Mutual Fund Securities Litigation, 2006 WL 1008138 at * 4 (S.D.N.Y. April 18, 2006). In 1980, the SEC adopted Rule 12b-1, 17 C.F.R. § 270:12b-1 ("Rule 12b-1"), which allows a fund to finance the distribution fees but provides certain safeguards such as the requirement of a written plan approved by the majority of shareholders and independent trustees

with respect to the distribution fees.  Id.

The relationship between investment advisors and mutual funds, which usually "are organized and underwritten by the same firm that serves as the company's 'investment adviser,'" Kamen v. Kemper Financial Services Inc., 500 U.S. 90, 93 (1991), is "'fraught with potential conflicts of interest.'"  Burks v. Lasker, 441 U.S. 471, 481 (1979).  For example, as an external business entity, the investment advisor's "primary interest is undeniably the maximization of its own profits" through increasing its fees.  Tannenbaum v. Zeller, 552 F.2d at 405.  The ICA provides "a scheme designed to address [these] potential conflicts of interest."  Krantz v. Fidelity Management & Research Co., 98 F.Supp.2d 150, 153 (D.Mass. 2000).


FACTUAL BACKGROUND[7]

The Fidelity Funds consist of open ended mutual funds

---

[7]  Facts are taken from the CACAC, attachments thereto and matters of public record in the file.  See In Re Morgan Stanley and Van Kampen Mutual Fund Securities Litigation, 2006 WL 1008138 at * 6 (S.D.N.Y. April 18, 2006) (allowing consideration of "matters of public record" in course of deciding motion to dismiss securities act and ICA claims); In Re Stone & Webster, Inc., 253 F.Supp.2d 102, 128 & n. 11 (D.Mass. 2003) (considering copies of SEC forms without converting motion to dismiss into motion for summary judgment); In Re Milestone Scientific Securities Litigation, 103 F.Supp.2d 425, 450-451 & n. 15 (D.N.J. 2000) (considering numerous SEC public filing documents without converting motion to dismiss into motion for summary judgment and noting that court may consider "matters of public record" and "documents referred to in the complaint").
Citations to the record are provided only for direct quotes.

organized under Massachusetts law as business trusts or under Delaware law as statutory trusts. Delaware defines its statutory trust in a similar if not identical manner to a Massachusetts trust. See Del. Code Ann. tit 12, § 3801(a). The funds, registered investment companies, have separate boards of trustees or directors.

FMRC and FMRCo, as the investment advisors to the Fidelity Funds, provide advisory services and receive compensation for such services. The fees, "calculated as a percentage of assets," increased as the funds increased in size. (Docket Entry # 98, ¶ 9). FDC, as general distributor of the Fidelity Funds, receives Rule 12b-1 fees. Although the dollar amount of the advisory and Rule 12b-1 fees increased during the class period, "the services provided did not change or improve." (Docket Entry # 98, ¶ 4). FMRC, FMRCo and FDC received excessive fees inasmuch as they did not pass on the "economies of scale" to investors. (Docket Entry # 98, ¶ 81). Given the increase in assets and the economies of scale, the advisory and Rule 12b-1 fees became "grossly disproportionate to the services" provided. (Docket Entry # 98, ¶ 83). Put another way, the excessive fees were not reasonably related to the services provided.

"A major reason for the dramatic increase in compensation" to FMRC, FMRCo and FDC was the growth in size of the Fidelity Funds "resulting from defendants' use of Fund assets to promote the sale of Fund shares." (Docket Entry # 98, ¶ 3). FMRC, FMRCo

and FDC thereby used fund assets to promote the sale of shares as opposed to paying for such promotions or expenses themselves.

For example, they paid brokers excessive commissions and cash payments from fund assets "in return for the brokers' agreement to push sales" of Fidelity Funds. (Docket Entry # 98, ¶ 3). More specifically, they used the guise of Rule 12b-1 marketing fees as a means to pay brokers to push Fidelity Funds to a greater degree than "other funds offered by the brokers." (Docket Entry # 98, ¶ 75). They also utilized a form of directed brokerage whereby they steered business to certain brokerage firms in return for their agreement to push or more aggressively promote the sale of Fidelity Funds. In addition, they paid excessive commissions in the form of soft dollars beyond that allowed for research and other safe harbor activities under 15 U.S.C. § 28(e). Fidelity's own extensive research department belies the need to earmark these soft dollar payments for research. FMRC, FMRCo and FDC further "secretly siphoned monies from the Funds" and made or approved these undisclosed excessive payments in whole or in part "to finance the [s]helf [s]pace agreements." (Docket Entry # 98, ¶¶ 78 & 81).

FMRC and FMRCo failed to disclose that their excessive fees "were actually being used for the payment of kickbacks to brokers solely to benefit" themselves as well as other defendants. (Docket Entry # 98, ¶ 72). FMRC, FMRCo and FDC used the excessive fees "to pay for these arrangements" and failed "to

9

share any economies of scale created by these arrangements" as well as disclose "the magnitude and nature of these arrangements."  (Docket Entry # 98, ¶ 112).

FMRC, FMRCo, FDC and the interested and independent trustees thereby charged investors excessive advisory and Rule 12b-1 fees and made undisclosed and improper soft dollar payments.  In making these payments, these defendants improperly drew upon the assets of the Fidelity Funds as opposed to bearing such expenses themselves.

The independent and interested trustees, all of whom received substantial compensation, provided little, if any, supervision over these inadequately disclosed kickbacks.  They did "not assure that compensation received" by FMRC, FMRCo or FDC was reasonable.  (Docket Entry # 98, ¶ 8).  In light of "[t]he significant increase in fees," the independent and interested trustees should have recognized the excessive nature of such fees as unrelated to any additional services provided and "should have been negotiating lower fees."  (Docket Entry # 98, ¶ 106).  Under the inadequate oversight of the independent and interested trustees, FMRC, FMRCo and FDC "used excessive commissions and directed brokerage business to compensate" those brokers who steered clients into Fidelity Funds regardless of the investment quality of such funds.  (Docket Entry # 98, ¶ 137).

Similarly, FMRC, FMRCo, FDC and the interested and the independent trustees failed to disclose:  the direct payments and

10

excessive commissions paid to brokers from Fidelity Funds and shareholder assets in exchange for shelf space; the compensation of FMRC, FMRCo and FDC from investor assets for payments made under revenue sharing agreements; the directed brokerage payments amounting to a form of undisclosed marketing in contravention of Rule 12b-1; the failure to pass on the "economies of scale achieved by marketing the Fidelity Funds to new investors;" the improper use of soft dollars paid from Fidelity Funds assets; and the abdication of duties on the part of the interested and independent trustees.  (Docket Entry # 98, ¶ 229).

Prospectuses and registration statements of the Fidelity Funds issued during the class period failed to disclose the revenue sharing arrangements and excessive fees paid to brokers for steering clients into Fidelity Funds, the directed brokerage payments, the noncompliant Rule 12b-1 fees, the failure to pass on the savings achieved from the economies of scale, the improper use of soft dollars paid from Fidelity Funds assets for overhead which should have been borne by FMRC, FMRCo and FDC, and the abdication of supervision duties on the part of the interested and independent trustees.  Annual reports and semi-annual reports filed with the Securities and Exchange Commission ("the SEC") contained similar material omissions.


<u>STANDARD OF REVIEW</u>

On a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P.,

this court accepts the factual allegations in the CACAC as true
and draws all reasonable inferences in favor of plaintiffs. <u>See</u>
<u>Alternative Energy v. St. Paul Fire & Marine</u>, 267 F.3d 30, 33
(1st Cir. 2001) (on a motion to dismiss, court accepts all
allegations in complaint as true and construes "all reasonable
inferences in favor of the plaintiffs").  "'A court may dismiss a
complaint only if it is clear that no relief could be granted
under any set of facts that could be proved consistent with the
allegations.'"  <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 514
(2002); <u>accord</u> <u>Blackstone Realty LLC v. FDIC</u>, 244 F.3d 193, 197
(1st Cir. 2001) (dismissal is proper "only if, under the facts
alleged," the plaintiff "cannot recover on any viable theory");
<u>State Street Bank and Trust Company v. Denman Tire Corporation</u>,
240 F.3d 83, 87 (1st Cir. 2001) (dismissal appropriate "only if
it 'appears to a certainty that the plaintiff would be unable to
recover under any set of facts'").


<u>DISCUSSION</u>

I.   <u>Implied Right of Action under Sections 34(b), 36(a) and 48(a)</u>

     The Fidelity defendants, the independent trustees and the
nominal defendants uniformly move to dismiss counts one, two and
four respectively alleging violations of sections 34(b), 36(a)
and 48(a) because of the absence of an implied private right of
action for investors.  Defendants are correct.

     The foregoing sections of the ICA fail to contain an express

12

private right of action.  The issue therefore devolves into whether a private right of action may be implied.

Ascertaining whether a statute provides an implied private right of action turns upon the intent of Congress.  In Re Evergreen Mutual Funds Fee Litigation, 423 F.Supp.2d 249, 256 (S.D.N.Y. 2006) ("'courts must look to the intent of Congress in determining whether a federal private right of action exists'") (quoting Olmsted v. Pruco Life Ins. Co. of New Jersey, 283 F.3d 429, 432 (2nd Cir. 2002)); In Re Lord Abbett Mutual Funds Fee Litigation, 407 F.Supp.2d 616, 629 (D.N.J. 2005) ("whether a private right of action may be implied . . . turns on the intent of Congress"); Mutchka v. Harris, 373 F.Supp.2d 1021, 1026 (C.D.Ca. 2005) ("'critical inquiry is whether Congress intended to create a private right of action'").  In 2001, the Supreme Court in the Sandoval opinion clarified the analytical framework for ascertaining that intent and implying a private right of action.  Alexander v. Sandoval, 532 U.S. 275 (2001); Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d 100, 105-108 (D.Mass. 2006) (recognizing that Supreme Court in Sandoval and in Gonzaga University v. Doe, 536 U.S. 273 (2002), "clarified the law regarding implied rights of action"); Stegall v. Ladner, 394 F.Supp.2d 358, 367 (D.Mass. 2005) ("Supreme Court took the opportunity in Sandoval to clarify the appropriate approach to implied causes of action").

As explained by the Supreme Court in Sandoval, Congress must

intend to create both a private right and a private remedy. Alexander v. Sandoval, 532 U.S. at 286 ("judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy"); accord Bonano v. East Caribbean Airline Corp., 365 F.3d 81, 84 (1st Cir. 2004) (existence of private right of action involves whether Congress intended to (1) "create a private right of action" and (2) "create a corresponding remedy"). Without the Congressional intent to create a private remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Alexander v. Sandoval, 532 U.S. at 286-287.

The search for Congressional intent begins with the text and structure of the statute. See Alexander v. Sandoval, 532 U.S. at 288 (beginning and ending "search for Congress's intent with the text and structure" of the statute); Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 106 ("congressional intention to imply a private right of action . . . depends in the first instance on the text and structure of the statute); Yameen v. Eaton Vance Distributors, 394 F.Supp.2d at 352 n. 1 (Sandoval "requires that any implied right of action must be found in the 'text and structure' of a statutory provision"); In Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d at 465 ("search for congressional intent begins with and remains on the text and

structure of the statute").

A private right of action may be implied where the text of the statute contains "'rights-creating' language." <u>Forsythe v. Sun Life Financial, Inc.</u>, 417 F.Supp.2d at 106. In other words, the "text must be 'phrased in terms of the persons benefitted.'" <u>Gonzaga University v. Doe</u>, 536 U.S. at 284; <u>accord</u> <u>Bonano v. East Caribbean Airline Corp.</u>, 365 F.3d at 84 (statute "ought not to be read to create a private right of action unless its text is 'phrased in terms of the person benefitted'"). Consequently, "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" <u>Alexander v. Sandoval</u>, 532 U.S. at 289; <u>In Re Franklin Mutual Funds Fee Litigation</u>, 388 F.Supp.2d at 465 (same).

The text of sections 34(b), 36(a) and 48(a) focus on the person regulated rather than the benefitted subclass. Turning first to section 34(b), the statute is bereft of a focus on the persons benefitted. Rather, it declares two things as "unlawful" that those persons "filing reports with the SEC are prohibited from doing."[8] <u>In Re Dreyfus Mutual Funds Fee Litigation</u>, 428

---

[8] Section 34(b) reads as follows:

It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter or the keeping of which is required pursuant to section 80a-30(a) of this title. It shall be unlawful for any person so

F.Supp.2d 342, 348 (W.D.Pa. 2005).  Such language prescribes conduct as opposed to conferring rights.  See In Re Evergreen Mutual Funds Fee Litigation, 423 F.Supp.2d at 256 (section 34(b) contains "language that prohibits conduct rather than confers rights").  A fair reading of the text of section 34(b), including the twice repeated "It shall be unlawful" phrase, demonstrates "a general regulation of activities and does not focus upon a benefitted class."  Bonano v. East Caribbean Airline Corp., 365 F.3d at 85 (interpreting different statute but explaining that a general ban "carries with it no implication of an intent to confer rights on a particular class of persons"); see In Re Dreyfus Mutual Funds Fee Litigation, 428 F.Supp.2d at 348 (quoting the "[i]t shall be unlawful" language in section 34(b) and commenting upon the absence of "persons benefitted" language).  Section 34(b)'s "materially misleading" language also fails to salvage plaintiffs' argument that the statute contains an implied private right of action for investors.

Plaintiffs' additional argument premised upon section

---

filing, transmitting, or keeping any such document to omit
to state therein any fact necessary in order to prevent the
statements made therein, in the light of the circumstances
under which they were made, from being materially
misleading.  For the purposes of this subsection, any part
of any such document which is signed or certified by an
accountant or auditor in his capacity as such shall be
deemed to be made, filed, transmitted, or kept by such
accountant or auditor, as well as by the person filing,
transmitting, or keeping the complete document.

15 U.S.C. § 80a-33(b).

34(b)'s reference to section 31(a), which includes the more favorable language "for the protection of investors," 15 U.S.C. § 80a-30(a), fails for the same reasons articulated by the court in Dreyfus.  See In Re Dreyfus Mutual Funds Fee Litigation, 428 F.Supp.2d at 348.  The phrase modifies the duty of the SEC to establish holding periods for records.  Id.  Moreover, the cross reference in section 34(b) to another section, i.e., 31(a), that contains the language "for the protection of investors" is too attenuated to conclude that Congress intended to create a private remedy for an investor.  Id.

Section 36(a) likewise fails to contain rights creating language.  Instead, it "focuses on the actions of fund managers, and makes no mention of investors."[9]  Stegall v. Ladner, 394

---

[9]  Section 36(a) provides:

The Commission is authorized to bring an action . . . alleging that a person serving or acting in one or more of the following capacities has engaged . . . in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts--
  (1) as officer, director, member of any advisory board, investment adviser, or depositor; or
  (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80(a)-1b of this title.

F.Supp.2d at 369.  Indeed, the statute centers upon the conduct

of the person regulated and lists those individuals in

subsections (1) and (2).  Although the statute mentions "the

protection of investors," the language appears only in the

context of the court's assessment of whether to enter an

injunction and only permissively instructs the court to have "due

regard" for the investor as opposed to mandating the court to

craft the remedy for the benefit of the investor.

Section 48(a), like section 34(b), speaks in terms of

unlawful activity and focuses on the conduct of the person

regulated as opposed to the person benefitted.  See Forsythe v.

Sun Life Financial, Inc., 417 F.Supp.2d at 107 (section 48(a), as

well as sections 34(b) and 36(a), "describe prohibited conduct,

focusing only on the persons regulated by the statute, rather

than a class of persons benefitted by the regulation"); In Re

Eaton Vance Mutual Funds Fee Litigation, 380 F.Supp.2d 222, 230-

233 (S.D.N.Y. 2005) (section 48(a), as well as sections 34(b) and

36(a), "describe prohibited actions").

The structure of the ICA, which places the overall

responsibility for the enforcement of the statute squarely in the

hands of the SEC, further belies the implication that Congress

intended to create a private remedy for a harmed investor.  See

Alexander v. Sandoval, 532 U.S. at 290 ("express provision of one

---

15 U.S.C.A. § 80a-35(a).

method of enforcing a substantive rule suggests that Congress intended to preclude others"); Bonano v. East Caribbean Airline Corp., 365 F.3d at 85 ("'where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it'"). Captioned "Enforcement of subchapter," section 42 of the ICA, 15 U.S.C. § 80a-41, gives the SEC the power to enforce the statute through civil suits for injunctions and monetary penalties. The exception of a derivative private right of action in section 36(b), although postdating the enactment of sections 36(a), 34(b) and 48(a), adds additional support to the conclusion that Congress did not intend to create a private right of action in any of these sections of the ICA. See Stegall v. Ladner, 394 F.Supp.2d at 370 n. 10 & 371 n. 13.

Finally, the weight of recent case law refusing to find implied causes of action under these sections provides overwhelming precedent. See, e.g., In Re Evergreen Mutual Funds Fee Litigation, 423 F.Supp.2d at 255-257 (no implied right of action under §§ 34(b) and 36(a)); Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 105-108 (no implied right of action under §§ 34(b), 36(a) and 48(a)); In Re Goldman Sachs Mutual Funds Fee Litigation, 2006 WL 126772 at * 5 (S.D.N.Y. Jan. 17, 2006) (no implied right of action under §§ 34(b) and 36(a)); In Re Lord Abbett Mutual Funds Fee Litigation, 407 F.Supp.2d at 629-632 (no implied right of action under §§ 34(b) and 36(a)); In Re Eaton Vance, 403 F.Supp.2d 310, 312-313 (S.D.N.Y. 2005) (rejecting

19

additional argument based on <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167 (2005), and reaffirming absence of implied right of action under §§ 34(b), 36(a) and 48(a)); <u>Hamilton v. Allen</u>, 396 F.Supp.2d 545, 555 (E.D.Pa. 2005) (no implied right of action under §§ 34(b) and 36(a)); <u>Stegall v. Ladner</u>, 394 F.Supp.2d at 367-368 (no implied right of action under § 36(a)); <u>Yameen v. Eaton Vance Distributors</u>, 394 F.Supp.2d at 352 n. 1 (no implied right of action under § 36(a)); <u>In Re Davis Selected Mutual Funds Litigation</u>, 2005 WL 2509732 at * 2 (S.D.N.Y. Oct. 11, 2005) (no implied right of action under §§ 34(b), 36(a) and 48(a)); <u>In Re Dreyfus Mutual Funds Fee Litigation</u>, 428 F.Supp.2d at 348-349 (no implied right of action under §§ 34(b) and 36(a)); <u>In Re Franklin Mutual Funds Fee Litigation</u>, 388 F.Supp.2d at 464-467 (no implied right of action under §§ 34(b) and 36(a)); <u>In Re Eaton Vance</u>, 380 F.Supp.2d at 230-233 (no implied right of action under §§ 34(b), 36(a) and 48(a)).

Given the foregoing discussion and weight of authority, plaintiffs' remaining arguments to the contrary do not merit extended discussion. Plaintiffs' reliance on <u>Strougo v. Bassini</u>, 282 F.3d 162 (2nd Cir. 2002), is misplaced for the reasons set forth by the courts in <u>Hamilton</u>, 396 F.Supp.2d at 555 n. 19, <u>Stegall v. Ladner</u>, 394 F.Supp.2d at 368 n. 8 & 12, and <u>In Re Eaton Vance</u>, 380 F.Supp.2d at 232.

Plaintiffs' recitation of case law predating <u>Sandoval</u> is unconvincing because, as noted by the First Circuit in <u>Bonano</u>,

"<u>Sandoval</u> changed the legal landscape."  <u>Bonano v. East Caribbean</u>
<u>Airline Corp.</u>, 365 F.3d at 86 n. 4 (further eschewing
"pre-<u>Sandoval</u> decision[s] as lacking continued vitality").  The
court in <u>Forsythe</u> cogently explained the reasoning for the
inapplicability of pre-<u>Sandoval</u> decisions, a reasoning this court
adopts.  See <u>Forsythe v. Sun Life Financial, Inc.</u>, 417 F.Supp.2d
at 107-108.

     Plaintiffs' argument based upon legislative history is
likewise unavailing.  "[C]ases that have given undue weight to
subsequent legislative history were decided under the old [pre-
<u>Sandoval</u>] regime."  <u>In Re Lord Abbett Mutual Funds Fee</u>
<u>Litigation</u>, 407 F.Supp.2d at 629; <u>see</u> <u>Stegall v. Ladner</u>, 394
F.Supp.2d at 370 (rejecting the plaintiffs' legislative history
argument inasmuch as language and text of section 36(a) "invites
no clarification"); <u>see also</u> <u>Alexander v. Sandoval</u>, 532 U.S. at
288 ("legal context matters only to the extent it clarifies
text").

     Finally, contrary to plaintiffs' assertion, the recent
Supreme Court decision in <u>Jackson v. Birmingham Board of</u>
<u>Education</u>, 544 U.S. 167 (2005), does not militate a different
result.  All of the courts that address the <u>Jackson</u> decision in
the context of arguments that sections 34(b), 36(a) or 48(a)
contain implied private rights of action reject the notion that
<u>Jackson</u> compels such a conclusion.  See, <u>e.g.</u>, <u>Forsythe v. Sun</u>
<u>Life Financial, Inc.</u>, 417 F.Supp.2d at 107 n. 10 ("[t]he

21

plaintiffs' argument that <u>Jackson</u> somehow nullifies the broad change that <u>Sandoval</u> wrought in the approach to finding implied private rights of action is wrong"); <u>In Re Goldman Sachs Mutual Funds Fee Litigation</u>, 2006 WL 126772 at * 5 n. 10 (S.D.N.Y. Jan. 17, 2006) (<u>Jackson</u> "does not compel a different conclusion" inasmuch as "Court explicitly stated that its decision was '[i]n step with <u>Sandoval</u>'"); <u>In Re American Mutual Funds Fee Litigation</u>, 2005 WL 3989803 at * 3 (C.D.Ca. Dec. 16, 2005) ("[n]o federal court since <u>Sandoval</u>, including cases after [<u>Jackson</u>], has found an implied private right of action under the ICA"); <u>In Re Eaton Vance</u>, 403 F.Supp.2d 310 at 312-313 ("<u>Jackson</u> does not alter this Court's analysis under <u>Olmsted</u> and <u>Sandoval</u>"); <u>In Re Mutual Funds Investment Litigation</u>, 384 F.Supp.2d 845, 868 n. 24 (D.Md. 2005) ("<u>Jackson</u> does not alter the Court's emphasis on statutory text").  Moreover, in contrast to the text and the structure of sections 34(b), 36(a) and 48(a), the text of the Title IX statute in <u>Jackson</u> "itself contain[ed] the necessary prohibition."  <u>Jackson v. Birmingham Board of Education</u>, 544 U.S. at 178 (reaching the "result based on the statute's text").

Accordingly, it is the recommendation of this court that the section 34(b), 36(a) and 48(a) claims be dismissed.  Furthermore, because sections 34(b), 36(a) and 48(a) do not permit private causes of action for reasons already discussed, the recommended dismissal with respect to these claims will be with prejudice. <u>See</u> <u>generally</u> <u>Stegall v. Ladner</u>, 394 F.Supp.2d at 378 ("[b]ecause

22

the failure arises out of the substance of plaintiff's sole allegation of misconduct, a failure for which I can foresee no cure, leave to amend the complaint to re-plead this count will not be granted").

II.  Section 36(b)

A.  Section 36(b) as Derivative or Direct

FMRC, FMRCo, FMR Corp., FDC and the nominal defendants move to dismiss the section 36(b) claim on the basis that plaintiffs improperly pled the claim directly rather than derivatively on behalf of the Fidelity Funds.[10]  In the event this court concludes that the section 36(b) claim is derivative, plaintiffs request leave to amend the CACAC in order to replead the claim derivatively.  (Docket Entry # 112, n. 31).  After carefully examining section 36(b)'s language and legislative history and all of the relevant case law, including contrary case law in this district, this court concludes that plaintiffs must bring the section 36(b) claim derivatively on behalf of the Fidelity Funds.

Beginning with the language of section 36(b), Goodwin v. C.N.J., Inc., 436 F.3d 44, 49 (1st Cir. 2006) ("beginning point" of statutory construction "must be the language of the statute"), section 36(b) expressly states that, "An action may be brought under this subsection by the Commission, or *by a security holder*

---

[10]  By stipulation, the parties agreed to dismiss Count III against the independent and interested trustees.  (Docket Entry # 126).

23

of such registered investment company *on behalf of* such company,

against such investment adviser . . ..."[11]  15 U.S.C. § 80a-35(b)

(emphasis added).  Such express language, while not containing

the word "derivative," nonetheless evidences an intent on the

part of Congress to prescribe the shareholder's 36(b) cause of

action as one asserting a derivative claim on behalf of the

corporation as opposed to a direct action by the shareholder

asserting a private injury on his own behalf.  See Burks v.

Lasker, 441 U.S. at 477 (defining derivative suit as one "brought

by shareholders to enforce a claim *on behalf of* the corporation")

(emphasis added); Forsythe v. Sun Life Financial, Inc., 417

F.Supp.2d at 118 (section 36(b) "is a 'derivative' cause of

action because it is brought 'on behalf of' an investment company

to vindicate the rights of the investment company and any

recovery flows to the investment company, not the shareholder

plaintiff"); Mutchka v. Harris, 373 F.Supp.2d at 1025 (dismissing

shareholder's section 36(b) claim based on section 36(b)'s "plain

---

[11]  The statute, in pertinent part, states that:

. . . the investment adviser of a registered investment
company shall be deemed to have a fiduciary duty with
respect to the receipt of compensation for services . . . .
An action may be brought under this subsection by the
Commission, or by a security holder of such registered
investment company on behalf of such company, against such
investment adviser . . . for breach of fiduciary duty in
respect of such compensation or payments paid by such
registered investment company . . . .

15 U.S.C. § 80a-35(b).

language" because it was not brought derivatively); see also
Simcox v. San Juan Shipyard, Inc., 754 F.2d 430, 438 (1st Cir.
1985) (distinguishing, albeit in the context of a state law cause
of action, a derivative claim from a direct claim inasmuch as in
the latter the plaintiffs asserted "a private injury for which
they seek personal redress and [were] not claiming damages on
behalf of the corporation"); Parnes v. Bally Entertainment Corp.,
722 A.2d 1243, 1245 (Del. 1999) ("derivative claim is one that is
brought by a stockholder, on behalf of the corporation, to
recover for harms done to the corporation") (emphasis added); 5
James Wm. Moore Moore's Federal Practice § 23.1.02[1] (2005) (in
"derivative action, one or more shareholders of a corporation,
perceiving that the corporation has received an injury that the
management of the corporation has failed to redress, sues on
behalf of the corporation") (emphasis added).

        This language falls comfortably within the framework of the
statutory scheme of the ICA and the purposes Congress sought to
serve.  See General Motors Corporation v. Darling's, 444 F.3d 98,
108 (1st Cir. 2006) (examining "plain meaning of the statutory
language and consider[ing] the language in the context of the
whole statutory scheme"); Arnold v. United Parcel Service, Inc.,
136 F.3d 854, 858 (1st Cir. 1998) (interpreting statute's words
"'in light of the purposes Congress sought to serve'").  The ICA
attempts to "arrest the potential conflicts of interest inherent

in" the organization of a mutual fund, <u>Kamen v. Kemper Financial Services, Inc.</u>, 500 U.S. at 93, and "functions primarily to 'impose controls and restrictions on the internal management of investment companies.'"  <u>Burks v. Lasker</u>, 441 U.S. at 471-472. Conversely, the concern was not to arrest private wrongs inflicted upon individual shareholders.

Furthermore, the primary mechanism to enforce the act was not private causes of action.  <u>See</u>, <u>e.g.</u>, <u>Goodwin v. C.N.J., Inc.</u>, 436 F.3d at 49 (examining the enforcement scheme of statute in interpreting language).  Rather, the SEC had the power to enforce the ICA via an action for injunction together with the threat of a monetary penalty.  15 U.S.C. § 80a-41(d) & (e).  The independent directors additionally performed a watchdog role by holding the "primary responsibility for looking after the interests of the funds' shareholders."  <u>Burks v. Lasker</u>, 441 U.S. at 485.  Where the independent advisors could not be relied upon to exercise their watchdog role, such as in the area of excessive fees, <u>Daily Income Fund, Inc. v. Fox</u>, 464 U.S. at 545 (investment advisors "could not be relied upon to control excessive advisory fees") (Stevens, J., concurring),[12] the SEC, 15 U.S.C. § 80a-41,

---

[12]  In addition to the numerous citations compiled by Justice Stevens in <u>Daily Income</u>, the hundreds of pages of testimony in 1969 before the Senate Committee on Banking and Currency that immediately preceded the passage of the Senate bill that passed the Conference Committee in lieu of the House bill evidence the committee's concern that "independent" directors "'[were] not fully informed'" and relied "'on the [investment] advisor and affiliated directors for [their] information and

together with a derivative shareholder action specific to
excessive fees, 15 U.S.C. § 80a-35(b), provided the means to
address and alleviate such fees.  The enforcement scheme in
section 36(b) thereby gave the shareholder a derivative cause of
action to act in the place of the investment company which lacked
the motivation and neutrality to control the excessive fees
itself.  Confining that cause of action to a shareholder acting
on behalf of the mutual fund as opposed to the more broad based,
direct cause of action to enforce a private wrong fits within the
structure of the statute which overall places enforcement in the
hands of the SEC as opposed to the hands of an individual
shareholder.  Finally, the ICA's policy of guarding against the
pitfalls inherent in the organization and management of
investment companies is focused upon protecting "the interest of
all classes of [an investment company's] shareholders" as opposed
to the interest of a single shareholder seeking to redress a
personal wrong or a subclass of shareholders.  15 U.S.C. § 80a-
1(b)(2).

---

advice.'"  Hearings on S. 34 Before the Senate Committee on
Banking and Currency, 91st Cong., 1st Sess., pp. 111-112 (Senator
William Proxmire questioning the President of the Investment
Company Institute and placing foregoing excerpts from prior
testimony and a 1966 report by the Securities and Exchange
Commission into the record).  Indeed, "'There [was] no real doubt
that unaffiliated directors are selected by their affiliated
colleagues and are persons who are unlikely to be active in
procuring lower fees on behalf of fund shareholders.'"  Id. at p.
110 (prior testimony placed in record as source of Senator
Proxmire's information during questioning of President of
Investment Company Institute).

In sum, the plain language of section 36(b) placed in the context of the entire statutory scheme demonstrates that Congress intended to create in section 36(b) a derivative cause of action as opposed to a direct cause of action.

Even assuming for purposes of argument that the language of section 36(b) "admits of more than one reasonable interpretation," General Motors Corporation v. Darling's, 444 F.3d at 108 (court looks beyond plain language where statute is ambiguous, i.e., "it admits of more than one reasonable interpretation"), the legislative history confirms the nature of the cause of action as equitable and derivative as opposed to personal and direct.

First, as exemplified in the legislative history, "any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff[s]." Daily Income Fund, Inc. v. Fox, 464 U.S. at 535 n. 11; Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 118; accord S.Rep. No. 91-184 (1969) ("the Senate Report"), 1970 U.S.C.C.A.N. 4897, 4912 ("any recovery of damages [under section 36(b)] would revert to the fund"). Again, such a characteristic typifies a derivative as opposed to a direct claim,[13] see generally Tooley v. Donaldson, Lufkin, & Jenrette,

---

[13] In contrast, a "direct claim is one in which an individual stockholder or a class of stockholders seeks 'relief for direct injuries that are independent of any injury to the corporation.'" Parnes v. Bally Entertainment Corp., 722 A.2d at 1245.

Inc., 845 A.2d 1031, 1033 (Del. 2004) (because "derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation"), thereby evidencing a Congressional intent to create a derivative as opposed to a direct cause of action.  See, e.g., In Re Blackrock Mutual Funds Fee Litigation, 2006 U.S.Dist. Lexis 13846 at * 34 (W.D.Pa. March 29, 2006) (section 36(b) "is a 'derivative' cause of action because . . . any recovery flows to the investment company").

Second, the Senate Report which preceded the 1970 enactment describes the shareholder's section 36(b) cause of action as "equitable" in nature.[16]  See S.Rep. No. 91-184 (1969), 1970 U.S.C.C.A.N. 4897, 4910 (section 36(b) authorizes "a shareholder acting on behalf of the fund to institute an equitable action involving a claim of breach of fiduciary duty").  The reference to the "equitable" nature of the section 36(b) cause of action in the Senate Report further suggests that Congress intended to create a derivative cause of action in section 36(b).  See generally Kamen v. Kemper Financial Services, Inc., 500 U.S. at 95 (originating in equity, the derivative suit placed in the hands of the shareholder the means to protect the interests of the corporation from the misconduct "of 'faithless directors and

_____

[16]  The fiduciary duty imposed under section 36(b) "is owed to the company itself as well as the shareholders," Daily Income Fund, Inc. v. Fox, 464 U.S. at 535 n. 11, a finding this court has fully considered in drawing the conclusion that the action is derivative as opposed to direct.  See generally Tooley v. Donaldson, Lufkin, & Jeanrette, Inc., 845 A.2d at 1039.

managers'").

Plaintiffs correctly point out, however, that the Senate
bill included a reference to the derivative or representative
nature of the shareholder's section 36(b) suit but the final
version of the statute eliminated this reference.  In citing this
legislative history, plaintiffs rely exclusively upon the Supreme
Court's recitation of that history in Daily Income.  (Docket
Entry # 112, pp. 40-41).  The history of section 36(b), which
spans a three year period, merits a more extensive examination.

The 1970 amendments to the ICA that led to section 36(b)
culminated more than a decade long effort which began in 1958
with the SEC's authorization of a study by the research unit of
the Wharton School of Finance and Commerce of the University of
Pennsylvania ("the Wharton Report").  S.Rep. No. 91-184 (1969),
1970 U.S.C.C.A.N. 4897, 4900.  Although the Wharton Report
pointed out a number of problems with the mutual fund industry,
it did not make any "legislative recommendations."  Id.  Rather,
it was not until 1966 when the SEC formulated a "detailed program
for amending the act" that Congress began the process of
examining the various options of amending section 15(d) of the
ICA, the precursor to section 36(b) and then codified at 15
U.S.C. § 80a-15(d).  Id.

As initially proposed to the Senate and the House of
Representatives by the SEC in 1967, section 15(d) imposed a
reasonableness standard to gage the propriety of investment

advisor fees and, more importantly, "empowered the SEC to bring actions to enforce the reasonableness standard and to intervene in any similar action brought by or on behalf of the company." Daily Income, 464 U.S. at 538.  The industry was against giving the SEC the ability to enforce the reasonableness of investment advisor fees for fear that the power amounted to rate making authority.  Id.  In 1968, the Senate passed a bill that rejected the industry's proposal to allow "only" a suit by the investment company or a security holder "on its behalf."  Daily Income, 464 U.S. at 538.  Instead, the bill passed by the Senate in the 90th Congress allowed the "security holder of a registered investment company acting in a derivative or representative capacity" to bring suit "if the Commission refuse[ed] or fail[ed] within six months to bring such action upon the written request of such security holder."  S. 3724, 90th Cong., 2d Sess., § 8(d)(6)(1968).[17]

The latter language in section 8(d)(6) was added as an amendment during Senate floor debate "to meet some of the objections of the industry" which feared an increase in shareholder strike suits.  Hearings on S. 34 Before Committee on Banking and Currency, 91st Cong., 1st Sess., p. 7.  In a separate

---

[17]  Section 8(d) amended section 15 of the ICA, then codified at 15 U.S.C. § 80a-15(d).  The Senate bill passed in the 90th Congress, S. 3724, is "identical to" the bill introduced at the outset of the 91st Congress, S. 34.  S.Rep. No. 91-184 (1969), 1970 U.S.C.C.A.N. 4897, 4900.

subsection, the Senate bill allowed the SEC to intervene in any

section 15(d) action "brought by or on behalf of [the] registered

investment company." S. 3724, 90th Cong., 2d Sess., § 22

(1968).[18]

Congress adjourned the 90th Session without the House of

Representatives taking any action on the foregoing Senate bill.

The bill that passed the Senate was reintroduced in the 91st

Congress. Hearings were held before the Senate Banking and

Currency Committee ("the Committee") that included presentations

by the Commission and investment company representatives. S.Rep.

No. 91-184 (1969), 1970 U.S.C.C.A.N. 4897, 4900.

The Senate bill that emerged from these hearings before the

Senate Banking and Currency Committee ("the Committee") passed in

lieu of the House bill and resulted in the enactment of the

Investment Company Amendments Act of 1970. S.Rep. No. 91-184

(1969), 1970 U.S.C.A.C.A.N. 4897. One significant change[19]

resulting from these hearings was the substitution of a fiduciary

duty standard in lieu of a reasonableness standard with respect

to advisor fees. S.Rep. No. 91-184 (1969), 1970 U.S.C.C.A.N.

4897, 4900. Indeed, the Senate Report that accompanies the

legislation devotes much of its discussion of section 36(b) to

_____

[18]   Section 22 amended section 44 of the ICA, then codified
and still codified at 15 U.S.C. § 80a-43.

[19]   "As a result of these hearings[,] many changes were made
in the proposed legislation." S.Rep. No. 91-184 (1969), 1970
U.S.C.C.A.N. 4897, 4900.

the fiduciary duty standard and to management fees in general.
Id. at 4901-4903, 4909-4912 & 4931.  The Senate Report, however,
is inconclusive with respect to the reason for eliminating the
sentence concerning the shareholder's power to bring suit "in a
derivative or representative capacity, if the [SEC] refuses or
fails within six months to bring such action."  S. 3724, 90th
Cong., 2d Sess., § 8(d)(6) (1968).

   The Senate Report accompanying the statute specifically
addresses the shareholder's section 36(b) cause of action in two
separate sentences.  The first sentence, "Under this proposed
legislation either the SEC or a shareholder may sue in court on a
complaint that a mutual fund's management fees involve a breach
of fiduciary duty," S.Rep. No. 91-184 (1969), 1970 U.S.C.C.A.N.
4897, 4903, fails to qualify the shareholder's action as direct
or derivative.  The second sentence, however, which reads that,
"Section 36(b) authorizes the Commission and also a shareholder
acting *on behalf of* the Fund to institute an *equitable* action
involving a claim of breach of fiduciary duty," Id. at 4910
(emphasis added), indicates, as previously noted, a Congressional
intent to create a derivative action.  Both the "on behalf of"
language as well as the reference to the "equitable" nature of
the action support this finding.

   During the April 1969 hearings before the Committee, the
Commissioner of the SEC reiterated the importance of giving the

agency the ability to "bring lawsuits where it felt there were overcharges in the management fee area."  Hearings on S. 34 Before Committee on Banking and Currency, 91st Cong., 1st Sess., pp. 12-13.  The industry again objected and, as a further means of discouraging shareholder strike suits, proposed restricting such suits to shareholders holding $250,000 in shares or representing 1% of the total number of shareholders.[20]  Id.  Two Committee members expressed concern about limiting or restricting shareholder suits particularly given the restricted and unsuccessful nature of existing shareholder actions under the corporate waste doctrine.  Id. at pp. 14-17 & 19-20.  The SEC formally responded to these concerns in a letter explaining that the SEC similarly rejected imposing "procedural hurdles" upon the shareholder's "derivative action."  Id. at p. 30.

Neither the 1% nor the $250,000 restriction or the six month waiting period with the adjacent "derivative or representative capacity" language survived the 1969 hearings.  The Committee thus acceded to the SEC's view that the agency be given authority to bring suit[21] and declined the industry's proposal to allow

---

[20]  The industry proposed this restriction during negotiations with the SEC about the SEC's ability to bring suit. The SEC proved unable to reach an agreement with the industry and, during the April 1969 hearings, the Chairman of the Committee voiced his disappointment about the inability to reach a consensus.

[21]  Section 36(b) provides, in no uncertain terms, that "[a]n action [under section 36(b)] may be maintained by the Commission."  15 U.S.C. § 80a-35(b).

suit by the investment company.[22]  The proposed shareholder
action remained intact minus the "derivative or representative
capacity" language but with the "by or on behalf" of the
investment company language that originally appeared in section
22.  The final version moved the "on behalf of" language from the
jurisdictional section of the ICA, codified at 15 U.S.C. § 80a-
43, to the section that specifically created the cause of action,
i.e., section 36(b).[23]

     Given the continued inclusion of the "on behalf of" language
and the movement of the language to the statutory section that
creates the cause of action, Congress could easily have viewed it
unnecessary to further describe the action as "derivative or in a
representative capacity."  The fact that the statute retains the
"on behalf of" language makes it difficult to place too much
emphasis on the omission of the duplicative or redundant
derivative or representative capacity language that appeared in
the earlier version of the legislation.  On balance, therefore,
the legislative history, which <u>inter alia</u> reiterates the "on
behalf of language" and describes the shareholder's cause of

---

     [22]  More specifically, the statute retained the earlier
language, S. 3724, 90th Cong., 2d Sess. § 22 (1968), that the
shareholder was acting "on behalf of" the investment company and
omitted the language in the same section and sentence regarding
the action "by" the investment company.

     [23]  The SEC's ability to intervene in the shareholder's
section 36(b) cause of action remained in the jurisdictional
section.  <u>See</u> 15 U.S.C. § 80a-43.

action as "equitable," confirms the finding that Congress
intended to create a shareholder derivative cause of action under
section 36(b).

    That said, however, the section 36(b) cause of action lacks
the characteristic of a typical derivative action because the
investment company itself cannot bring an action under the
statute.  Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at
118.  The section 36(b) cause of action is thereby "unique"
because, even though the express language gives the right to sue
to the shareholder who acts "on behalf of" the investment
company, the investment company cannot bring a direct action to
redress the fiduciary breach.  Daily Income Fund, Inc. v. Fox,
464 U.S. at 535 n. 11; Forsythe v. Sun Life Financial, Inc., 417
F.Supp.2d at 118.  Because the corporation lacks the ability or
right to bring a section 36(b) cause of action, the shareholder's
section 36(b) action lies out the scope of Rule 23.1, Fed. R.
Civ. P. ("Rule 23.1"), which, by its terms, applies only to a
derivative suit brought by shareholders "to enforce a right that
'may properly be asserted' by the corporation itself."  Daily
Income Fund, Inc. v. Fox, 464 U.S. at 542 (quoting Rule 23.1).
Consequently, the procedural requirement in Rule 23.1 that the
complaint include a demand[24] does not apply to a section 36(b)

_____

    [24] Rule 23.1 requires inter alia that:

    The complaint shall also allege with particularity the
    efforts, if any, made by the plaintiff to obtain the action

cause of action. Id. The *substantive* requirement of a demand,
see Kamen v. Kemper Financial Services, Inc., 500 U.S. at 96
(citing and relying upon the concurring opinion of Justice
Stevens in Daily Fund, 464 U.S. at 543-544 & n. 2 (Stevens, J.,
concurring), which characterized demand as a substantive
requirement), a matter of federal law, also does not apply to the
section 36(b) cause of action because, as eloquently reasoned by
Justice Stevens, the text and legislative history of section
36(b) is "inconsistent with a demand requirement." Daily Income
Fund, Inc. v. Fox, 464 U.S. at 545 (Stevens, J., concurring).[25]

Understanding the distinction between derivative suits which

---

he desires from the directors or comparable authority and,
if necessary, from the shareholders or members, and the
reasons for his failure to obtain the action or for not
making the effort.

Rule 23.1, Fed. R. Civ. P.

[25] Although Justice Stevens' concurrence was not the
reasoning adopted by the majority in Daily Income, it is fully
consistent with the later, unanimous opinion in Kamen. The Court
in Kamen concluded that the demand requirement under a different
section of the ICA was governed by federal law which, in turn,
incorporates state law unless, as is the case here with respect
to section 36(b), application of state law "would be inconsistent
with the federal policy underlying the cause of action." Kamen
v. Kemper Financial Services, Inc., 500 U.S. at 99. In other
words, the demand requirement invariably effects the governing
powers within a corporation thereby giving rise to a presumption
that the federal common law incorporates the substantive
requirement under state law of a demand. Kamen v. Kemper
Financial Services, Inc., 500 U.S. at 98-101. This presumption
of incorporation of state law, however, impedes the policies of
section 36(b), a cause of action which Congress created precisely
because the independent and affiliated directors and/or the
investment advisors could not be relied upon to control excessive
fees.

can be maintained without a precomplaint demand, such as the
shareholder's section 36(b) cause of action, and those which can
be maintained only after a precomplaint demand under Rule 23.1,
is helpful to understand the Supreme Court's discussions of
section 36(b).  Supreme Court case law characterizes the
shareholder's section 36(b) cause of action as derivative in the
broad sense of the word but not a "derivative action" for
purposes of the procedural rule embodied in Rule 23.1, Fed. R.
Civ. P. ("Rule 23.1").  Daily Income Fund, Inc. v. Fox, 464 U.S.
at 533-534 n. 8 & 10 & 535 n. 11; see Kamen v. Kemper Financial
Services, Inc., 500 U.S. at 96 (acknowledging Rule 23.1 as a
"procedural rule").[26]  Regarding the latter, a "derivative
action" for purposes of applying Rule 23.1 is an action brought
by a shareholder to enforce a right of the corporation which the
corporation "'has failed to enforce'" and which "'may properly be
asserted by [the corporation].'"  Daily Income Fund, Inc. v. Fox,
464 U.S. at 527-534.  Because the corporation cannot assert or
judicially enforce the right conferred by section 36(b), "Rule
23.1 does not apply to an action brought by a shareholder under §

---

[26]  Unfortunately, as discussed infra, dicta in Kamen uses
the term "direct" to refer to the former claim and derivative to
refer to the latter claim.  See Kamen v. Kemper Financial
Services, Inc., 500 U.S. at 108; In Re Dreyfus Mutual Funds Fee
Litigation, 428 F.Supp.2d 357, 359 (W.D.Pa. 2006) (Supreme Court
"uses the term 'direct' to refer to a subclass of derivative
suits," i.,e., those that "do not fall in the subclass of Rule
23.1 derivative suits, but are, nevertheless, derivative").

36(b)" and the shareholder "need not first make a demand upon the fund's directors before bringing suit." Id. at 542.

As succinctly explained by a Western District of Pennsylvania court:

> The Supreme Court has examined the nature of section 36(b) claims several times and has held that *while section 36(b) claims are not derivative for purposes of Rule 23.1* of the Federal Rules of Civil Procedure, which requires pre-suit demand on the board of directors, *they are derivative, in the general sense of the word, because they are asserted on behalf of all shareholders and result in no direct benefit to the individual plaintiff shareholders.*

In Re Dreyfus Mutual Funds Fee Litigation, 428 F.Supp. at 359 (emphasis added). Similarly, at least one court in this district recognizes the Supreme Court's interpretation in Daily Income of a shareholder's section 36(b) cause of action as a derivative cause of action in the broadest sense of the word albeit not a derivative cause of action in the traditional sense because the corporation does not have the power to bring a section 36(b) claim. Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 118. Noting the "unique" or "'unusual'" nature of the shareholder's section 36(b) cause of action, the Forsythe court stated that:

> In the broadest sense, it is a "derivative" cause of action because it is brought "on behalf of" an investment company to vindicate the rights of the investment company and any recovery flows to the investment company, not the shareholder plaintiff. [citing Daily Income, 464 U.S. at 535 n. 11]. Nevertheless § 36(b) is not like the traditional derivative cause of action because the fund itself does not have the power to bring an action under the statute. See Id. at 535-42, 104 S.Ct. 831. Instead,

> Congress explicitly gave the right to enforce violations of
> the statute to shareholders and to the SEC but not to the
> investment company itself.  See Id.  The Supreme Court made
> clear in Daily Income Fund that the shareholder suing under
> § 36(b) sues on behalf of a fund, though not in substitution
> for the fund.  Any recovery belongs to the fund, not the
> shareholder.

Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 117

(discussing section 36(b) in the context of standing requirement

that shareholder must hold an interest in each fund).[27]

The history of the Supreme Court's interpretation of section

36(b) evidences this distinction beginning with the 1979 decision

in Burks v. Lasker, 411 U.S. 471 (1979).  Therein, the Court

stated in dicta that Congress intended not to allow action on the

part of a board of directors to cut off the "derivative" suit

under section 36(a).  Id. at 484 ("when Congress did intend to

prevent board action from cutting off derivative suits, it said

so expressly," citing section 36(b) and noting that the section

"performs precisely this function for derivative suits charging

breach of fiduciary duty with respect to adviser's fees").  Thus,

when the Supreme Court initially examined the shareholder's

---

[27]  A review of the memoranda in support of the defendants'
motion to dismiss in Forsythe on the court's publically available
electronic document filing system confirms what the opinion
implies, the court in Forsythe was not presented with an argument
that the plaintiffs improperly pled the derivative section 36(b)
claim as a direct claim.  See In Re Blackrock Mutual Funds Fee
Litigation, 2006 U.S.Dist.LEXIS 13846 at * 34 n. 6 (W.D.Pa. March
29, 2006) (recognizing that Forsythe did not dismiss the section
36(b) claim, brought directly, in its entirety and explaining
that the court "did not address whether the claim should have
been pled as a derivative claim").

section 36(b) cause of action, the Court unequivocally characterized the action as derivative as opposed to direct.

Having characterized the investor's cause of action under section 36(b) as "derivative" in Burks, the Supreme Court in Daily Income held that Rule 23.1 did not apply to a shareholder's section 36(b) cause of action and, accordingly, the shareholder plaintiff "need not first make a demand upon the fund's directors before bringing suit." Daily Income, 464 U.S. at 542.  The Court expressly addressed the "on behalf of" language in the statute by noting that the shareholder's section 36(b) cause of action was "undeniably 'derivative' in the broad sense of the word" but not derivative for purposes of applying Rule 23.1:

> The "on behalf" language in § 36(b) indicates only that the right asserted by a shareholder suing under the statute is a "right of the corporation"--a proposition confirmed by other aspects of the action:  The fiduciary duty imposed on advisers by § 36(b) is owed to the company itself as well as its shareholders and any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff. See S.Rep. No. 91- 184, p. 6 (1970); § 36(b)(3).  In this respect, a § 36(b) action is undeniably "derivative" in the broad sense of that word.

Id. at 535 n. 11; accord In Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d at 468 (same).

In 1991, the Supreme Court in Kamen imprecisely stated that the Daily Income decision concluded "that a shareholder action 'on behalf of' the company under § 36(b) is direct rather than derivative and can therefore be maintained without any precomplaint demand on the directors."  Kamen v. Kemper Financial

41

Services, Inc., 500 U.S. at 108. The next sentence of the Kamen opinion, however, states that, "Under these circumstances, it can hardly be maintained that a shareholder's exercise of his state-created prerogative to initiate a *derivative suit* without the consent of the directors frustrates the broader policy objectives of the ICA." Id. (emphasis added). As previously intimated, the foregoing dicta in Kamen simply equates the term "direct" to mean a "derivative suit" and reconfirms that a derivative suit remains derivative even though maintained without the consent of the directors. See In Re Dreyfus Mutual Funds Fee Litigation, 428 F.Supp.2d at 359.

Following the lead of a number of courts, this court therefore distinguishes Kamen as stating, consistent with the Daily Income opinion, that the shareholder may bring a section 36(b) claim "directly, meaning without making a precomplaint demand pursuant to Rule 23.1" but that otherwise the "suit remains a derivative action brought on behalf of the company." In Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d at 468 n. 12. The foregoing passage in Kamen, read in context, reveals "nothing more than the incontestable proposition that a shareholder may bring a derivative claim under Section 36(b) without making a pre-complaint demand. However, that suit remains a 'derivative' action brought on behalf of the company." In Re Lord Abbett Mutual Funds Fee Litigation, 407 F.Supp.2d at

42

632 n. 6; accord In Re Dreyfus Mutual Funds Fee Litigation, 428 F.Supp.2d at 359-360 (same); In Re Blackrock Mutual Funds Fee Litigation, 2006 U.S.Dist.LEXIS 13846 at * 32-33 (W.D.Pa. March 29, 2006) (same); In Re American Mutual Funds Litigation, 2005 WL 3989803 at * 3 (C.D.Ca. Dec. 16, 2005) (same); see also Olmsted v. Pruco Life Insurance Co. of New Jersey, 282 F.3d 429, 433 (2nd Cir. 2002) ("Congress explicitly provided in § 36(b) of the ICA for a private right of *derivative* action for investors in regulated investment companies") (emphasis added); In Re Eaton Vance, 403 F.Supp.2d at 312-313 (noting the existence of "strong support" for the principle that shareholder section 36(b) claim "must be asserted as a derivative cause of action").

Finally, although case law in this district characterizes the shareholder's section 36(b) cause of action as direct, In Re Columbia Entities Litigation, 2005 U.S.Dist.LEXIS 33439 at * 27-28 (D.Mass. Nov. 30, 2005), appeal docketed, No. 06-1227 (1st Cir. Dec. 12, 2005); Krantz v. Fidelity Management & Research Co., 98 F.Supp.2d at 157, this court declines to follow the decision in Columbia because it is based upon a different reading of the Daily Income and Kamen decisions. See In Re Columbia Entities Litigation, 2005 U.S.Dist.LEXIS 33439 at * 19-20. With all due respect, the Columbia court's statement that the Court in Daily Income "held that, due to the purposes of the statute, Section 36(b) of the ICA provided for a direct action to be

brought by a shareholder, rather than for a derivative action to be brought on behalf of the corporation," In Re Columbia Entities Litigation, 2005 U.S.Dist.LEXIS 33439 at * 19, is imprecise. Rather, the Court in Daily Income held that Rule 23.1 does not apply to a shareholder's section 36(b) cause of action. Daily Income Fund, Inc. v. Fox, 464 U.S. at 542. The court in Krantz simply cited the statute, 15 U.S.C. § 80a-35(b), as the basis for its brevis finding that, "A shareholder has a direct private cause of action under § 36(b) against the investment adviser 'for breach of fiduciary duty in respect of . . . compensation' paid by a fund." Krantz v. Fidelity Management & Research Co., 98 F.Supp.2d at 137-138 (quoting 15 U.S.C. § 80a-35(b)). The court in Stegall, another decision in this district, assumed *without deciding* that the plaintiff could bring a direct claim under section 36(b) and further stated that, "In the final analysis, because plaintiff fails to state a cause of action under § 36(b), it is *immaterial* whether he may bring the claim directly." Stegall v. Ladner, 394 F.Supp.2d at 373 & n. 16 (emphasis added).

Having found that Congress intended to create a derivative cause of action for the shareholder, this court turns to state substantive law to ascertain whether the present allegations are derivative or direct in nature. Massachusetts and Delaware law uniformly construe the section 36(b) allegations raised by plaintiffs as derivative as opposed to direct.

44

Addressing Massachusetts law, plaintiffs did not suffer an injury distinct from the injury suffered by the investment companies.  See In Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d at 463 ("under Massachusetts law, the issue turns on whether the shareholders suffered an injury distinct from the injury suffered by the corporation"); In Re Eaton Vance, 380 F.Supp.2d at 233 (under Massachusetts law, court determines "whether the plaintiff has alleged 'an injury distinct from that suffered by shareholders generally'").  In general, allegations of "mismanagement or wrongdoing on the part of corporate officers or directors normally state[] a claim of wrong to the corporation" and "the action, therefore, is properly derivative." Jackson v. Stuhlfire, 547 N.E.2d 1146, 1148 (Mass.App.Ct. 1990). More specifically, under Massachusetts law, if the alleged wrong "results in harm to a plaintiff shareholder only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative."  Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 112 (collecting numerous cases applying Massachusetts law). For example, allegations by a shareholder of "'mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets'" are derivative.  In Re Columbia Entities Litigation, 2005 U.S.Dist.LEXIS 33439 at * 15-16.

45

Delaware law does not "materially differ" from Massachusetts law "when distinguishing between direct and derivative claims." In Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d at 462 n. 8. Delaware law classifies a shareholder's claim as direct under a twofold standard which turns upon: "'(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'" In Re Lord Abbett Mutual Funds Fee Litigation, 407 F.Supp.2d at 625-626 (quoting Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d at 1035). "The stockholder's claimed direct injury must be independent of any alleged injury to the corporation" and "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d at 1039. Plaintiffs' injuries are not independent of the injuries to the Fidelity Funds caused by the alleged wrongdoing on the part of the investment advisors, distributor, directors  and affiliates. Furthermore, any recovery will go the funds. See generally In Re Goldman Sachs Mutual Funds Fee Litigation, 2006 WL 126772 at * 6 (S.D.N.Y. Jan. 17, 2006) (applying Delaware law); In Re Lord Abbett Mutual Funds Fee Litigation, 407 F.Supp.2d at 625-626 (applying Delaware law and recognizing that "'stockholder's claimed direct injury must be independent of any alleged injury

46

to the corporation'").

Similar to the allegations of injuries at issue in Eaton
Vance, 380 F.Supp.2d at 228 & 234,[28] and Franklin, 388 F.Supp.2d
at 463,[29] plaintiffs' injuries suffered indirectly by virtue of
the diminution in the value of their shares are indirect.
Applying either Massachusetts or Delaware law, their cause of
action is therefore properly classified as derivative.
Plaintiffs' arguments to the contrary based upon the structure of
mutual funds and principles of trust law are unavailing for the
reasons set forth by the Fidelity defendants (Docket Entry # 121,
¶¶ II(B)(3) & III(A)) and the Fidelity Funds (Docket Entry # 117,
¶ I(B)).

    B.  Standing

---

[28] The alleged injuries in Eaton Vance included the "misuse
of Eaton Vance Funds' assets to provide excessive compensation to
brokers, improper 12b-1 plans," improper compensation of
investment advisor and distributor from investor assets, "soft
dollar compensation to brokers," compensating brokers from fund
assets "to steer more investors towards the Funds" and failing to
pass "any economies of scale achieved by marketing the Eaton
Vance Funds to new investors." Eaton Vance, 380 F.Supp.2d at 228
& 234. The court concluded that the injuries to the shareholders
were indirect and therefore required the plaintiffs to bring
derivative claims. Id. at 234-236.

[29] The injuries at issue in Franklin consisted of: "(1)
excessive advisory fees; (2) excessive 12b-1 marketing fees; (3)
excessive director compensation; and (4) payments to brokerage
firms (directed brokerage, excessive commissions, soft dollars,
revenue sharing)." Franklin, 388 F.Supp.2d at 463. Looking
beyond the plaintiffs' characterizations of the claims and
examining their nature, the court concluded that "all of the
plaintiffs' alleged injuries [were] derivative." Id. at 463 &
464.

Defendants additionally seek to dismiss plaintiffs' section 36(b) claim with respect to the funds that they do not own.  In opposition, plaintiffs submit they can pursue closely related claims in the class action context.  In particular, they maintain that once a plaintiff has individual standing, they may then assert or plead claims on behalf of all of the other shareholders in the Fidelity Funds complex as long as such claims are closely related.  Once this threshold showing is made, plaintiffs urge this court to defer a ruling until the class certification stage.

Standing, however, is a "threshold inquiry" which courts traditionally resolve "before reaching issues of class certification."  Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 118-119 & n. 18; accord Stegall v. Ladner, 394 F.Supp.2d at 361 ("[s]tanding is a threshold question"); In Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d at 460 ("[s]tanding is a threshold inquiry, not a mere hurdle that can be cleared with the assistance of Rule 23"); see also In Re Columbia Entities Litigation, 2005 U.S.Dist.LEXIS 33439 at * 28-29 (noting that other circuits have deferred ruling on the issue at the motion to dismiss stage but finding such deferral unnecessary).  Although plaintiffs reason that the close relationship of the claims in the same fund complex confers standing, such reasoning is more properly addressed, if at all in this instance, in the context of Rule 23, Fed. R. Civ. P., as opposed to in the context of Article III standing.  See In Re

48

Dreyfus Aggressive Growth Mutual Fund Litigation, 2000 WL 1357509 at * 3 (S.D.N.Y. Sept. 20, 2000) ("courts repeatedly hold that . . . class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security" but "have not addressed this concern vis a vis the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement").  "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"  Lewis v. Casey, 518 U.S. 343, 357 (1996).  Accordingly, plaintiffs' attempt to recharacterize standing as a class certification issue or defer a ruing on the matter until class certification is unavailing.

The "constitutional core" of Article III standing requires the plaintiff to "make a tripartite showing" that:  (1) "he has suffered an injury in fact;" (2) his "injury is fairly traceable to the disputed conduct;" and (3) "the relief sought promises to redress the injury sustained." Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005); accord Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-181 (2000).  "[A]n array of prudential monitions" embellish these core constitutional requirements.  Osediacz v. City of

<u>Cranston</u>, 414 F.3d at 139.  These prudential concerns "include 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'"  <u>Id.</u> (quoting <u>Allen v. Wright</u>, 468 U.S. 737, 750 (1984)).

In the context of mutual funds litigation, the plaintiff must personally suffer the injury and that injury must be traceable to the particular defendant.  <u>In Re Franklin Mutual Funds Fee Litigation</u>, 388 F.Supp.2d at 460-461.  Plaintiffs' injuries stem from their ownership of shares in the various Fidelity Funds and the alleged misconduct by the investment advisors, FMRC and FMRCo, and the distributor, FDC, as well as FMR Corp.  Plaintiffs' injuries, which result from being shareholders in certain Fidelity Funds, are fairly traceable to the misconduct of the investment advisors or distributor as to those funds in which they own shares.  Plaintiffs, however, cannot trace their injuries to a defendant's misconduct involving a fund in which plaintiffs do not own shares.[30]  See <u>generally</u> <u>In</u>

---

[30]  Plaintiffs' attempt to distinguish <u>Stegall</u> (Docket Entry # 112, pp. 50-51) on the basis that the opinion involved claims against funds as opposed to investment advisors, underwriters or parent corporations is unconvincing.  The court in <u>Forsythe</u> dismissed a section 36(b) claim as to funds in which the plaintiffs did not own shares as against the defendant investment advisor, the trustees and the principal underwriter.  <u>Forsythe v. Sun Life Financial, Inc.</u>, 417 F.Supp.2d at 117-120.  A number of

Re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d at 461.
In other words, because plaintiffs have not purchased shares in
those funds, they cannot establish injuries caused by the
investment advisors or distributor of those funds.  In Re
Alliance Bernstein Mutual Fund Excessive Fee Litigation, 2005 WL
2677753 at * 10 (S.D.N.Y. Oct. 19, 2005) ("because the named
Plaintiffs have not purchased shares in the forty-eight Funds at
issue, they cannot establish injuries caused by the advisers of
those Funds" and therefore lack standing to pursue section 36(b)
claims).

     Furthermore, contrary to plaintiffs' position, it is
entirely appropriate to treat each mutual fund "as a separate and
distinct entity in the § 36(b) context and a plaintiff may not
use the corporate structure of the broader investment company to
confer standing."  Forsythe v. Sun Life Financial, Inc., 417
F.Supp.2d at 118.  As echoed by the court in Stegall, 394
F.Supp.2d at 362, "one clearly may not use the corporate
structure of the broader investment company to confer standing

---

other courts likewise reject or discourage section 36(b) claims
against investment advisors based upon funds in which the
plaintiffs do not own shares.  See, e.g., In Re Blackrock Mutual
Funds Fee Litigation, 2006 U.S.Dist.LEXIS 13846 at * 35 n. 7
(should the plaintiffs replead the section 36(b) claim against
the investment advisor defendants, "relevant caselaw supports the
conclusion that [the] plaintiffs may not bring claims
derivatively on behalf of funds in which they do not have an
ownership interest"); In Re Lord Abbett Mutual Funds Fee
Litigation, 407 F.Supp.2d at 633; In Re Alliance Bernstein Mutual
Fund Excessive Fee Litigation, 2005 WL 2677753 at * 10 (S.D.N.Y.
Oct. 19, 2005).

across all funds within that company."

Applying the foregoing principles, courts in this district uniformly hold that "plaintiffs have no standing to sue on behalf of mutual funds they did not own despite the fact that they owned shares in other funds in the fund complex." Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 118-119; see Stegall v. Ladner, 394 F.Supp.2d at 362 (the plaintiff's "beneficial interest extends only to the investment decisions of the Small Cap Fund and does not permit him to bootstrap claims arising out of investment decisions made in relation to other funds in which he was not a participant"); In Re Columbia Entities Litigation, 2005 U.S.Dist.LEXIS 33439 at 29 ("[c]ourts in this circuit have held that ownership of shares in a limited number of defendant mutual funds is *not* sufficient to confer standing against all funds, regardless of the similarity of the wrongful conduct"); In Re Eaton Vance Corporation Securities Litigation, 219 F.R.D. 38, 40-41 (D.Mass. 2003).

In dismissing the claims made by the plaintiffs on behalf of mutual funds they did not own due to lack of standing, the court in Forsythe further reasoned that the language of section 36(b) allows "security holders" to bring a claim "on behalf of" the company. Forsythe v. Sun Life Financial, Inc., 417 F.Supp.2d at 117. Inasmuch as "'[s]ecurity holders' means current security holders," then "former security holders may not bring a claim on

52

behalf of an investment company that they formerly held shares in, but no longer do." <u>Id.</u> at 117-118 (dismissing for lack of standing "[a]ll other claims the complaint purports to state on behalf of the various MFS Funds, either never owned by any plaintiff or only formerly owned by a plaintiff").

Plaintiffs' juridical link argument is misguided. Originally conceived in the context of adequacy and typicality concerns, the doctrine "has no bearing on standing; rather its place lies in a Rule 23 analysis." <u>In Re Franklin Mutual Funds Fee Litigation</u>, 388 F.Supp.2d at 462 n. 7; <u>accord</u> <u>Forsythe v. Sun Life Financial, Inc.</u>, 417 F.Supp.2d at 119 n. 19 (same); <u>In Re Eaton Vance Corporation</u>, 220 F.R.D. 162, 169-171 (D.Mass. 2004). For the reason expressed by the Fidelity defendants (Docket Entry # 121, ¶ V(B)) as well as other reasons, plaintiffs' argument that Rule 23.2, Fed. R. Civ. P., confers Article III standing (Docket Entry # 112, ¶ III (B)), also lacks merit.[31]

   C.  <u>Amend or Dismiss</u>

In light of the foregoing discussion, plaintiffs will need to replead the section 36(b) claim as a derivative claim brought on behalf of the Fidelity Funds in which they have an ownership

---

[31] Because this court will recommend the dismissal, albeit without prejudice, of the section 36(b) claim, it is not necessary to address at this time any remaining arguments including the Fidelity defendants' argument regarding the insufficiency of the section 36(b) allegations (Docket Entry # 121, ¶ II(A)(3)). Plaintiffs have notice of such argument[s], however, for purposes of evaluating any future request for leave to replead.

interest.  Whereas plaintiffs seek leave to amend the CACAC
(Docket Entry # 112, n. 31 & 82), the Fidelity defendants ask for
a dismissal with prejudice.  They maintain that plaintiffs had
notice of the deficiencies in the CACAC but failed to cure them
thereby warranting a dismissal with prejudice.  This court
disagrees.

Denying leave to amend is appropriate where the plaintiff
repeatedly fails "to cure deficiencies by amendments previously
allowed." Foman v. Davis, 371 U.S. 178, 182 (1962).  For
example, after a first dismissal without prejudice, it is not an
abuse of discretion to dismiss a second amended complaint with
prejudice.  See Benzon v. Morgan Stanley Distributors, Inc., 420
F.3d 598, 613-614 (6th Cir. 2005) (inasmuch as the "[p]laintiffs
had already been permitted twice to amend the complaint," court
did not abuse its discretion in denying leave to amend the second
amended complaint).  The two cases cited by the Fidelity
defendants to support a dismissal with prejudice, Krantz v.
Prudential Investments Funds Management, 305 F.3d 140, 144-145
(3rd Cir. 2002), and Benak v. Alliance Capital Management, L.P.,
2004 WL 1459249 at * 10 (D.N.J. Feb. 9, 2004), involved
procedural histories different from the procedural history in the
case at bar.  The plaintiff in Krantz filed an amended complaint
after he had notice of its deficiencies because the defendants
had already filed a motion to dismiss the original complaint.
Krantz v. Prudential Investments Funds Management, 305 F.3d at

144 & n. 1.  Similarly, the court in <u>Benak</u> dismissed the complaint with prejudice because "the case's procedural history" included a motion to dismiss filed in one of the individual actions prior to consolidation "on grounds similar to those raised" in the current motion to dismiss.  <u>Benak v. Alliance Capital Management, L.P.</u>, 2004 WL 1459249 at * 10 & n. 4.

In the case at bar, plaintiffs undoubtedly knew about the weakness of their arguments due to cases dismissing similar complaints.  Nonetheless, *this* court had not previously ruled on those or similar arguments in this case.  Plaintiffs lacked notice of the deficiencies through a previously filed motion to dismiss in this case.  Prior motion practice in the four individual actions before consolidation as well as in the two individual actions that were not consolidated concerned appointment of lead counsel, consolidation and severance.  Finally, case law in this district, particularly in the area of section 36(b), is not uniform.  Accordingly, dismissal of the section 36(b) claim will be without prejudice.  In the event plaintiffs wish to replead, they should file a motion for leave to amend the CACAC and submit the proposed amended complaint within 30 days.

## CONCLUSION

In accordance with the foregoing discussion, this court

**RECOMMENDS**[32] that the motions to dismiss (Docket Entry ## 101, 103 & 107) be **ALLOWED** except to the extent of dismissing the section 36(b) claim without prejudice in order to allow plaintiffs the opportunity to file a motion for leave to amend the CACAC within 30 days.

　　　　　　　　　　　　　　　　/s/ Marianne B. Bowler
　　　　　　　　　　　　　　　**MARIANNE B. BOWLER**
　　　　　　　　　　　　　　　United States Magistrate Judge

---

[32] Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. United States v. Escoboza Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).